# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

## CONCISE SUMMARY OF THE CASE

Pursuant to 3rd Cir. LAR 33.3, counsel are required to file a concise summary of the case within **14** days of the date of docketing of the Notice of Appeal. Total statement is limited to no more than 2 pages, single-spaced. Counsel may utilize this form or attach a 2 page statement encompassing the information required by this form.

SHORT
CAPTION:_____

USCA NO.: _____

LOWER COURT or AGENCY and DOCKET NUMBER:

_____

NAME OF
JUDGE:_____

Specify who is suing whom, for what, and the subject of this action. Identify (1) the nature of the action; (2) the parties to this appeal; (3) the amount in controversy or other relief involved; and (4) the judgment or other action in the lower court or agency from which this action is taken:

<u>LIST and</u> **ATTACH** a copy of each order, judgment, decision or opinion which is involved in this appeal. If the order(s) or opinion(s) being appealed adopt, affirm, or otherwise refer to the report and recommendation of a magistrate judge or the decision of a bankruptcy judge, the report and recommendation or decision shall also be attached.

Provide a short statement of the factual and procedural background, which you consider important to this appeal:

Identify the issues to be raised on appeal:

This is to certify that this Concise Summary of the Case was electronically filed with the Clerk of the U.S. Court of Appeals for the Third Circuit and a copy hereof served to each party or their counsel of record

this _____ day of _____,20_____.

_____
Signature of Counsel

Rev. 07/2015

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | No. 4:21-CV-01091 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a PREP SPORTSWEAR; CHAD HARTVIGSON; ERIK HARTVIGSON; and MICHELLE YOUNG, | |
| Defendants. | |

## <u>ORDER</u>

**FEBRUARY 6, 2024**

In accordance with the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that:

1. Vintage Brand's *Daubert* motion (Doc. 93) is **GRANTED** and David Franklyn is prohibited from testifying at trial regarding Survey 1;

2. Penn State's *Daubert* motion (Doc. 95) is **DENIED**;

3. Vintage Brand's motion to strike (Doc. 135) is **GRANTED** as to Paragraphs 1, 5, and 114 of the SUMF, and Paragraph 15 and the first sentence of Paragraph 6 of Petulla's Declaration, but is **DEFERRED** in all other respects;

4. Penn State's motion to strike (Doc. 141) is **GRANTED** as to Paragraphs 16 and 25 of Chad Hartvigson's Declaration, but **DENIED** in all other respects;

5.     Vintage Brand's second motion to strike (Doc. 159) is **GRANTED** to the extent that the sentence "[t]he image on the left was most likely sourced from a decal created by a third party around the early 1950s" is stricken from Paragraph 5 of Hartvigson's Supplemental Declaration, but is **DENIED** in all other respects;

6.     Vintage Brand's motion for summary judgment (Doc. 110) is **GRANTED** in part and **DENIED** in part:

   a.     The motion is granted as to Counts 2, 3, 4, 5, and 6 of the second amended complaint, and judgment is entered in Vintage Brand's favor as to those counts; and

   b.     The motion is denied as to Counts 1 and 7 of the second amended complaint, and as to Counterclaim One.

7.     Penn State's motion for summary judgment (Doc. 113) is **GRANTED** in part and **DENIED** in part;

   a.     The motion is granted as to Vintage Brand's Affirmative Defenses Seven and Eight, but only as to incontestable registrations; and

   b.     The motion is denied in all other respects.

8.     The Court will schedule a telephonic status conference by separate Order.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | No. 4:21-CV-01091 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a PREP SPORTSWEAR; CHAD HARTVIGSON; ERIK HARTVIGSON; and MICHELLE YOUNG, | |
| Defendants. | |

### MEMORANDUM OPINION

**FEBRUARY 6, 2024**

Vintage Brand, LLC ("Vintage Brand") produces goods featuring historical sports images that feature various universities, including The Pennsylvania State University ("Penn State"). Penn State challenges Vintage Brand's use of the historical images on the goods that it produces, as many of those images incorporate in some form one or more of Penn State's trademarks. Although the historical images indisputably incorporate Penn State trademarks, the images are visually distinct from those trademarks, and Vintage Brand provides numerous disclaimers on its website that disavow affiliation with any university. These facts mean that many of Penn State's claims fail. However, the existence of dueling facts regarding likelihood of

confusion mean that Vintage Brand's trademark infringement claim must proceed to trial.

## I.      BACKGROUND

### A.      Underlying Facts[1]

Penn State is a public research university located in State College, Centre County, Pennsylvania.[2] Like many colleges and universities, it sells merchandise and licenses others to sell merchandise in stores and online.[3] It promotes its goods and services through a variety of images and text that it claims as trademarks.[4] Such examples are the text: "THE PENNSYLVANIA STATE UNIVERSITY," "TPSU," and "PENN STATE"[5] and images like the following:

---

[1]    Unless otherwise noted, the following facts are undisputed.
[2]    Doc. 138 ¶ 1.
[3]    *Id.* ¶ 68.
[4]    *Id.* ¶ 6.
[5]    *Id.* ¶ 7.



"S Lion Logo"[6]          "Penn State Seal"[7]          "Pozniak Lion Logo"[8]

          

"Nittany Lion Rock Design"[9]          "Nittany Lion Frankfurter Design"[10]

Collectively, the Court terms the images and text the "Penn State Marks." Penn State owns trademark registrations in the Penn State Marks and uses them on a variety of merchandise, but Vintage Brand disputes the contexts in which those marks are valid.[11] Penn State licenses the Penn State Marks to other entities to use on merchandise.[12] It has a formal licensing program that it began in 1983.[13] To this

---

[6]   *Id.* ¶¶ 38-41.
[7]   *Id.* ¶¶ 43-49.
[8]   *Id.* ¶¶ 30-37.
[9]   *Id.* ¶¶ 20-29.
[10]  *Id.*
[11]  *See id.* ¶¶ 8-41. Vintage Brand admits that the "PENN STATE," "TPSU," "Lion Shrine Logo," and "Penn State Seal" marks are incontestable. *Id.* ¶¶ 10, 16, 26, 44. There are two "Penn State Seal" marks that Penn State owns and purports to use. *See id.* ¶ 47.
[12]  *Id.* ¶ 55.
[13]  *Id.* ¶ 56.

day, it continues to create and execute procedures for the purpose of limiting the use of its claimed marks.[14] Vintage Brand disputes that Penn State adheres to its own procedures, however.[15]

Penn State has an exclusive licensing agent, the Collegiate Licensing Company ("CLC") to operate its licensing program.[16] "CLC facilitates agreements between [Penn State] and potential licensees, helps review and evaluate prospective licensees' merchandise to determine quality, and helps enforce Penn State's rights against counterfeiters."[17] Penn State also puts out standards for use of the Penn State Marks.[18]

Vintage Brand is a Washington-based corporation whose three members are co-Defendants Chad Hartvigson, Erik Hartvigson, and Michelle Young.[19] Sportswear, Inc. is also a Washington-based corporation owned in part by Chad Hartvigson.[20] Vintage Brand owns a large collection of sports memorabilia.[21] It scans images from these items and reproduces them on products (shirts, hats, mugs

---

[14] *Id.* ¶ 59. Penn State asserts that it has used all of the marks since 1986. *See id.* ¶ 60. Vintage Brand does not dispute that Penn State used PENN STATE, TPSU, and the Penn State Seal "for decades" but disputes that Penn State used the Pozniak Lion, the S Lion Logo, and the Lion Shrine Logo since the 1980s, as it claims. *Id.* At some point, the S Lion Logo image offered on Vintage Brand's website had a trademark symbol ("TM") on it. *See id.* ¶ 120. Vintage Brand contends that the presence of the symbol was a mistake. *See id.*

[15] *Id.* ¶ 59.

[16] *Id.* ¶ 63.

[17] *Id.* ¶ 64.

[18] *Id.* ¶ 66.

[19] Doc. 153 ¶ 1.

[20] *Id.* ¶ 2.

[21] *Id.* ¶ 5.

etc.) chosen by its customers on its website.[22] Sportswear manufactures Vintage Brand's apparel and ships it to consumers.[23] Vintage Brand's website contains a Home Page, a landing page for specific teams and institutions (a "Team Page"), and individual product pages that offer specific goods (a "Product Page").[24]

Vintage Brand's trademark (a stylized "V" followed by the words Vintage Brand) appears on each of its website's pages.[25] The team page for Penn State is titled: "PENN STATE NITTANY LIONS VINTAGE DESIGNS."[26] Underneath that title is a disclaimer that reads: "Vintage designs not affiliated with, licensed, or sponsored by any college, team or league."[27] Although the parties dispute its exact location on the page, each of Vintage Brand's pages also has a disclaimer reading:

> Our products are not affiliated with, licensed, sponsored, or endorsed by any college, team, league, event or licensing entity . . . All products are designed by Vintage Brand® and manufactured for Vintage Brand.[28]

One Vintage Brand customer, Meghan Maffey, testified at her deposition that she did not see "any language that [she] might consider legalese or a disclaimer on the website" when she visited it in July 2022.[29]

---

[22] *Id.* ¶¶ 5-6.
[23] *Id.* ¶ 3.
[24] *Id.* ¶ 11.
[25] *Id.* ¶¶ 9, 12.
[26] *Id.* ¶ 14.
[27] *Id.*
[28] *Id.* ¶ 13.
[29] Doc. 123-40 at 10; *see* Doc. 153 ¶¶ 13, 103-10. Maffey is an alumna of Penn State who researches and reaches out to companies selling apparel featuring Penn State to raffle off to raise funds for charitable purposes. *See* Doc. 153 ¶ 103-04.

Once a customer chooses an item from a Team Page, they are taken to a Product Page.[30] On that page, the customer will see an image of the product associated with that Product Page.[31] Under the title on each Product Page (example of such a title: "1929 PENN STATE NITTANY LIONS MEN'S PREMIUM BLEND RING-SPUN T-SHIRT"), there is another disclaimer that reads: By Vintage Brand™ not affiliated with or sponsored by Penn State Nittany Lions" in font smaller than that of the title.[32] Once the customer orders a product, the selected image is printed onto a tangible product and shipped to consumer in packaging bearing Vintage Brand's trademark.[33] Many, but not all, of Vintage Brand's products are also labeled with its trademark.[34]

In 2018, Vintage Brand sold merchandise on its website depicting Penn State Marks.[35] Vintage Brand contends that it has disabled the Team Page for Penn State.[36] Penn State disagrees and asserts that the page remained accessible beyond that

---

[30] *Id.* ¶ 15.

[31] *See id.* Vintage Brand asserts that the images on Product Pages are "digital mockups." *See id.* Penn State asserts that the image depicts a physical product that has already been created. *See id.* ¶¶ 15, 18.

[32] *Id.* ¶ 16.

[33] *Id.* ¶ 19.

[34] *Id.*

[35] *Id.* ¶ 20. In 2021, Vintage Brand sold merchandise depicting the Pozniak Lion but later removed those products from its store. *Id.* Vintage Brand contends that it did not make any Penn State Marks available alone on its products save the S Lion Logo. *See id.* ¶ 96.

[36] *Id.*

date.[37] The gross revenue from items bearing Penn State Marks and other related designs was less than $25,000.[38]

Penn State claims some images offered on Vintage Brand's website as images it has trademarked.[39] It never granted Defendants permission to use the Penn State Marks.[40] Penn State asserts its alleged trademark rights in the Penn State Marks through several registrations.[41]Its targets for merchandise sales include "students,

---

[37]  *Id.*

[38]  *Id.* ¶ 21.

[39]  *See id.* ¶¶ 7, 22.

[40]  *Id.* ¶ 141.

[41]  PENN STATE is the subject of Registration Nos. 1,308,610 (the "610 Registration") and 5,766,698 (the "698 Registration") (collectively the "PENN STATE Marks"). Doc. 153 ¶ 35. "The 610 Registration was issued in 1984 and covers various goods as well as educational and research services." *Id.* ¶ 36. The 698 Registration was issued in 2019 and covers a variety of goods, including "decorative magnets, drinking glasses, cutting boards, fabric flags, hooded sweatshirts, sweatpants, caps being headwear, coasters, and jigsaw puzzles." *Id.* ¶ 37. To obtain the 698 Registration, Penn State claimed that the mark PENN STATE had "acquired distinctiveness." *Id.* The TPSU text is subject of Registration Nos. 1,315,693 (the "693 Registration"), 5,399,989 (the "989 Registration"), and 5,742,516 (the "516 Registration"). *Id.* ¶ 43. "The 693 Registration was issued in 1985 and covers a variety of goods and services." *Id.* ¶ 44. It "does not claim the exclusive right to use the words 'State University' and includes" an acquired distinctiveness claim. *Id.* "[T]he 989 Registration was issued in 2018 and covers hats, shirts, sweatshirts, and t-shirts but does not claim the exclusive right to use the word 'PENNSYLVANIA.'" *Id.* ¶ 46. The 516 Registration was issued in 2019 and includes an acquired distinctiveness claim as to the word "PENNSYLVANIA." *Id.* ¶ 47. The Lion Shrine Logo is the subject of Registration No. 1,350,286 (the "286 Registration"). *Id.* ¶ 50. The 286 Registration "covers a variety of different goods, including license plates and decorative needlepoint clips" but not services. *Id.* ¶ 51. Penn State also asserts its rights in the text NITTANY LION and the Lion Design subject to Registration No. 1,397,810 (the "810 Registration"). *Id.* ¶ 54. "The 810 Registration was issued in 1986 and covers only "frankfurters." *Id.* ¶ 55. The Pozniak Lion Logo is the subject of Registration No. 5,305,910 (the "910 Registration"). *Id.* ¶ 56. The 910 Registration was issued in 2017 and covers license plates, clothing and various entertainment services. *Id.* The Penn State Seal is the subject of Registration Nos. 1,276,712 (the "712 Registration") and 5,877,080 (the "80 Registration"). *Id.* ¶ 69. The 712 Registration was renewed in 2014 and covers an older version of the Penn State Seal. *Id.* A newer version of the Penn State Seal is the subject of the 80 Registration and covers a variety of goods. *Id.* ¶ 73. The S Lion Logo is not registered as a trademark. *Id.* ¶ 76.

alumni, and fans of Penn State throughout Pennsylvania and the entire United States."[42]

### B.   The Experts

#### 1.   David Franklyn

Penn State offers the expert testimony of David Franklyn, an intellectual property law professor at the Sandra Day O'Connor College of Law at Arizona State University.[43]  Professor Franklyn prepared a report (the "Franklyn Report") summarizing his findings.[44] He performed two surveys: (1) a commercial impression survey and (2) a likelihood of confusion survey.[45]

##### a.   Franklyn's Commercial Impression Survey ("Survey 1")

The commercial impression survey presented a sample of individuals with three images in cells: (1) an image of a Product Page from Vintage Brand's website depicting a t-shirt with some Penn State Marks on it, (2) a Vintage Brand Product Page depicting a t-shirt with the text "PENN STATE BASKETBALL" and the Pozniak Lion Logo, and (3) an image of a t-shirt with the text "GAME DAY" on it along with a football.[46] Cell 3 served as a control cell.[47]

---

[42] Doc. 151 ¶ 124.
[43] Doc. 94-2 at 5.
[44] *Id.*
[45] *See id.* at 4, 7-8.
[46] *Id.* at 7, 9-12.
[47] *Id.*



| Cell 1 | Cell 2 | Cell 3 |

After viewing the three images, the respondents were shown this definition of trademark, which Professor Franklyn adapted from the Lanham Act's statutory definition:

> The term "trademark" includes any word, name, symbol, device (e.g., a drawing or design), or any combination thereof, used by an entity to identify and distinguish its merchandise from merchandise manufactured or sold by others and to indicate the source of the merchandise.[48]

After viewing the definition, respondents were shown one of the images and asked if it contained any trademarks.[49] Respondents who indicated that they believed the image contained a trademark were asked to identify which parts of the image, if any, they believed were a trademark.[50] The survey results indicated that 81% of

---

[48] *Id.* at 13.

[49] *Id.* Respondents were also permitted to express that they did not understand what a trademark was or that they had had no opinion. *Id.* at 13-14.

[50] *Id.* For Cell 1, the options were "the image of the lion on the rock," "the image of the seal with the words The Pennsylvania State University," "the phrase The Pennsylvania State University," "the word Nittany," and "the color of the shirt." *Id.* at 14. For Cell 2, the options were "the face of the lion," "the phrase Penn State," "the word basketball," and "the color of the shirt." *Id.* For Cell 3, the options were "the phrase Game Day," "the image of the football," "the color of the shirt," and a fill-in "other" option. *Id.* at 15. Each question also allowed a

respondents believed that Cell 1 contained a trademark, 80% for Cell 2, and 24% for Cell 3.[51]

At the *Daubert* hearing conducted by this Court, Franklyn explained that he has done the survey before and referred to a similar survey in a case in the United States District Court for the Southern District of California, *Bauer Brothers LLC v. Nike, Inc.* (the "Rea Survey") and a survey he performed in a pending action before the United States Patent and Trademark Office, *Nike v. Van's*.[52] Franklyn also explained his process for testing the survey. He had members of his team take it to ensure that respondents would not face any obstacles in taking the survey.[53]

### 2.    Tülin Erdem

Dr. Tülin Erdem is a professor of marketing and business administration at the Stern School of Business at New York University.[54] She serves as the editor-in-chief of the Journal of Marketing Research, the academic journal of the American Marketing Association.[55] She has "served as an expert witness in several cases, on

---

[51]    respondent to express that they did not know or had no opinion on whether the Cell contained a trademark. *See id.* at 14-15.

[51]    *Id.* at 23. For Cell 1, 45% of respondents identified the image of a lion on a rock as a trademark, 70% identified the image of the seal with the words "The Pennsylvania State University" as a trademark, 45% identified the words "The Pennsylvania State University," 44% identified the word "Nittany," and 7% identified the color of the shirt. *Id.* at 24. For Cell 2, 65% of respondents identified the Pozniak Lion Logo as a trademark, 65% identified the text "Penn State," 11% identified the word "basketball," and 6% identified the color of the shirt. *Id.* For Cell 3, 20% identified the phrase "Game Day" as a trademark, 14% identified the image of a football, and 3% identified the color of the shirt. *Id.*

[52]    Doc. 185 at 21-24, 131-33.

[53]    *Id.* at 34-35.

[54]    Doc. 94-7 at 4.

[55]    *Id.*

matters relating to marketing, consumer behavior, brand positioning, and brand equity" and worked with consumer surveys.[56] For this matter, she conducted an "Eveready" consumer survey to assess whether consumers "are confused regarding (i) the source of Vintage Brand's products as they relate to Penn State or (ii) whether a business relationship exists between Vintage Brand and Penn State," and "whether consumers believe that Penn State is responsible for the quality of Vintage Brand's products that bear Penn State-related images."[57]

For her survey, Erdem defined the target population as "current or prospective purchasers of 'collegiate apparel or merchandise' who reside in the United States and are at least [eighteen] years old."[58] She then "presented respondents with a series of four stimuli images of Vintage Brand's website," which included "(i) the main Vintage Brand homepage ("home page"), (ii) the landing page for Penn State merchandise ("landing page"), (iii) a product page for a Vintage Brand sweatshirt product decorated with Penn State imagery, and (iv) a checkout cart page.[59] Her rationale for the above approach was twofold: "to evaluate the potential for confusion under existing marketplace conditions by re-creating a real-world

---

[56]   *Id.* at 5.

[57]   *Id.* at 7. Erdem was also asked to evaluate Franklyn's surveys. The Court discusses her evaluation below in the context of Vintage Brand's motion to exclude Franklyn's Survey 1.

[58]   *Id.* at 10. Erdem designed the screening process such that the resultant sample included "(i) anyone who had purchased collegiate apparel or merchandise in the past six months; or (ii) anyone who was planning on purchasing collegiate apparel or merchandise in the next six months." *Id.*

[59]   *Id.* at 12-13.

shopping experience" for Vintage Brand products bearing Penn State Marks and "to test for potential confusion under different scenarios by manipulating two key parts of the webpage images: the disclaimer and product logo images."[60]

Qualified respondents were placed into one of three experimental groups "to view one of three logos on a gray hooded sweatshirt, within the Vintage Brand purchasing environment."[61] The three logos were: the "1929 Penn State Nittany Lions" logo, the "1950 Penn State Nittany Lions" logo, and a "State of Pennsylvania Seal" logo, the last of which she "designed . . . to be as close as possible to the Vintage Brand products decorated with Penn State imagery and to control for the potential influence of elements other than the at-issue imagery on confusion."[62]

**Figure 3**
**Likelihood of Confusion Survey Test and Control Groups**



| **Test Group 1** *1929 Penn State Nittany Lions Logo* | **Test Group 2** *1950 Penn State Nittany Lions Logo* | **Control Group** *State of Pennsylvania Seal Logo* |

---

In addition to the above stimuli, Erdem "also created additional stimuli conditions that allow [her] to estimate the impact of disclaimers on respondents' perception of the source of Vintage Brand products, Vintage Brand's business relationships, and quality of Vintage Brand's products as they relate to products decorated with Penn State imagery."[63] She designed "four website condition groups with variations on Vintage Brand's existing disclaimer."[64]

**Figure 4**
**Website Condition Groups – Description of Disclaimer Types**

| Website Condition Group | Description of Stimuli Images |
|---|---|
| **Condition A (Current Vintage Brand Website)** | • Current Vintage Brand website<br>• Current disclaimer |
| **Condition B (No Disclaimer)** | • Current Vintage Brand website<br>• All disclaimers removed. |
| **Condition C (Official Licensing Statement)** | • Current Vintage Brand website<br>• Official licensing statements replace all disclaimers |
| **Condition D (Acknowledgment Disclaimer)** | • Current Vintage Brand website<br>• Additional stimuli at the beginning with a pop-up with current disclaimer. |

Erdem's survey then asked respondents a series of questions regarding whether they were confused about the source of the products on the pages they saw on Vintage Brand's webpages or the business relationship between Vintage Brand and Penn State.[65] The source questions included an open-ended question asking the

---

[63] *Id.* at 14.
[64] *Id.*
[65] *See id.* at 23-25.

respondent to identify who produced the sweatshirt they saw and an open-ended question asking the respondent why they felt that way.[66] The business-relationship questions included a close-ended question asking whether the respondent thought the entity putting out the sweatshirt had a business relationship with another entity, followed by an open-ended question asking the respondent to identify that entity.[67] Respondents who indicated the presence of a business relationship were then asked why they believed one existed.[68] Erdem then queried respondents on their level of certainty in their answers after each substantive question.[69]

Erdem also asked whether respondents believed that the "law requires Penn State's permission to sell apparel or merchandise with the design on the sweatshirt shown below."[70] She also assessed respondents' belief that their answer to the legal permission question was correct.[71]

Next, Erdem asked respondents whether they had an opinion on the quality of the pictured sweatshirt and what entity they felt was responsible for the quality of the sweatshirt.[72] Respondents were also asked whether Penn State, Vintage Brand,

---

[66] *Id.* at 24.

[67] *Id.*

[68] *Id.* at 24-25.

[69] *See id.* at 25. Respondents were asked whether they were "just guessing," or if they felt that their answer was "somewhat likely correct," "very likely correct," or "definitely correct." *Id.* at 26.

[70] *Id.*

[71] *Id.* at 27-28.

[72] *Id.* at 28-29.

neither, or both were responsible for the quality of the sweatshirt.[73] Erdem pretested her survey to ensure that putative respondents thought the questions were unambiguous.[74]

Based on the results of her survey, Erdem concluded that respondents were not confused as to the source of Vintage Brand's products or the existence of a business relationship between Vintage Brand and Penn State.[75]

## C.    Procedural History

By way of its Second Amended Complaint, Penn State sues Vintage Brand for (1) willfully infringing on Penn State's trademarks in violation of 15 U.S.C. § 1114 (Count One);[76] (2) selling and marketing counterfeit products in violation of Sections 1114, 1116(d) and 1117 (Count Two);[77] (3) unfair competition and falsely designating Penn State as the source of Vintage Brand's products in violation of Section 1125(a) (Count Three);[78] (4) falsely advertising and endorsing its products' affiliation with Penn State in violation of Section 1125(a) (Count Four);[79] diluting Penn State's trademarks in violation of Section 1125(c) and 54 Pa. C.S. § 1124

---

[73]  *Id.* at 30.

[74]  *Id.* at 31.

[75]  *Id.* at 31-45 (detailing and analyzing survey results).

[76]  Doc. 67 ¶¶ 99-105. Specifically, Penn State alleges that Vintage Brand infringed on its PENN STATE, TPSU, Nittany Lion Logo, Pozniak Lion Logo, and Penn State Seal marks. *Id.*

[77]  *Id.* ¶¶ 106-12.

[78]  *Id.* ¶¶ 113-16.

[79]  *Id.* ¶¶ 117-25.

(Counts Five and Six, respectively);[80] and (7) infringing on Penn State's common-law trademarks.[81]

Vintage Brand denies all of Penn State's allegations.[82] Relevant to the motions before the Court, Vintage Brand raises the following affirmative defenses: the Seventh Affirmative Defense, asserting that Penn State's claims are barred because it uses its own marks only for ornamental purposes, and the Eighth Affirmative Defense, asserting that Penn State's claims are barred because Vintage Brand uses the images only in an ornamental fashion.[83]

Lastly, Vintage Brand counterclaims to cancel the registration of Penn State's Seal Marks on the ground that the marks incorporate the Commonwealth of Pennsylvania's Coat of Arms.[84] Vintage Brand further counterclaims to cancel the PENN STATE Marks on the ground that such marks are merely ornamental.[85]

## II.   LAW

### A.   Federal Rule of Evidence 702

Under Federal Rule of Evidence 702 "a trial judge acts as a gatekeeper to ensure that any and all expert testimony or evidence is not only relevant, but also

---

[80]   *Id.* ¶¶ 126-34 (Count Five), 135-40.
[81]   *Id.* ¶¶ 141-45.
[82]   Doc. 72.
[83]   *Id.* at 40.
[84]   *Id.* at 44-47.
[85]   *Id.* at 47-50.

reliable."[86] As gatekeeper, trial judges have three duties: (1) "confirm the witness is a qualified expert"; (2) "check [that] the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge"; and (3) "ensure the expert's testimony is 'sufficiently tied to the facts of the case,' so that it 'fits' the dispute and will assist the trier of fact."[87] "The text of Rule 702 contains no exception to these requirements, so if they are not satisfied, an expert cannot testify before the 'trier of fact.'"[88]

Reliable expert testimony must be "based on the methods and procedures of science, not on subjective belief and unsupported speculation" or "mere haphazard, intuitive inquiry."[89] But it need not have the "best foundation" or be "supported by the best methodology or unassailable research."[90] It need only be based on "good grounds."[91] To test the basis for the opinion, courts should consider the following list of factors, none of which are dispositive:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness

---

[86]  *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) (internal quotation marks omitted).

[87]  *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993)).

[88]  *Id.* (citing Fed. R. Evid. 702).

[89]  *Id.* at 833-34 (internal quotation marks omitted).

[90]  *Id.* (internal quotation marks omitted).

[91]  *Id.* (internal quotation marks omitted).

testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.[92]

Whether the opinion "fits" depends on "whether it 'will help the trier of fact to understand the evidence or to determine a fact in issue.'"[93] "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."[94] "Thus, even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge for purposes of the case."[95]

## B.   Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[96] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[97] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[98] Conversely, to survive summary judgment, a plaintiff must "point to

---

[92]   *Id.* (internal quotation marks omitted).
[93]   *Id.* (quoting Fed. R. Evid. 702).
[94]   *Id.* (quoting *Daubert*, 509 U.S. at 591).
[95]   *Id.* (internal quotation marks omitted).
[96]   Fed. R. Civ. P. 56(a).
[97]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).
[98]   *Clark v. Mod. Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993).

admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[99]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[100] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[101] The nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[102] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[103]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[104] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[105] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the

---

[99]  *Id.*

[100]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[101]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[102]  *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

[103]  *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (internal quotation marks omitted).

[104]  *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

[105]  *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

motion."[106] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[107]

## III.   ANALYSIS

Both parties' respective motions for summary judgment and their oppositions rely on the expert reports discussed above. Accordingly, the Court addresses the *Daubert* motions first.

### A.   Vintage Brand's *Daubert* Motion to Exclude Franklyn's Survey 1

Vintage Brand argues that Franklyn's Survey 1 is not reliable and does not fit the case. As for fit, Vintage Brand asserts that Franklyn's Survey 1 does not test a relevant question.[108] With regard to reliability, Vintage Brand contends that Franklyn's methodology is largely novel, and therefore fails under the *Daubert* factors.[109] Vintage Brand also challenges Franklyn's qualifications.[110]

#### 1.   Fit

As discussed above, Franklyn's Survey 1 supplied respondents with a definition of trademark adapted from the Lanham Act's definition and then asked them whether they perceived trademarks on images of two Vintage Brand products.[111]

---

[106] Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).
[107] Fed. R. Civ. P. 56(c)(3).
[108] Doc. 94 at 11.
[109] *Id.* at 11-21.
[110] *Id.* at 15.
[111] That definition read:

Vintage Brand argues that Franklyn's Survey 1 failed to properly assess whether the respondents regarded the trademarks they identified to indicate Penn State "as the source, provider, licensor, or sponsor of the apparel itself."[112] Penn State responds that Franklyn's reference to merchandise in his definition of a trademark does just that.[113] The Court agrees with Vintage Brand as to fit. Vintage Brand's arguments focus on Survey 1's identification question, which asks respondents if they think the image they are shown contains one or more trademarks.[114]

Vintage Brand correctly notes that the question does not refer respondents to the proper inquiry—whether the images contain trademarks for the apparel. But the question appears directly underneath the definition of trademark, which includes the term "merchandise."[115] A reasonable respondent seeing the definition's reference to merchandise would understand that they are looking for trademarks indicating the

---

The term "trademark" includes any word, name, symbol, device (e.g., a drawing or design), or any combination thereof, used by an entity to identify and distinguish its merchandise from merchandise manufactured or sold by others and to indicate the source of the merchandise.

Doc. 94-2 at 13.
[112] Doc. 94 at 11.
[113] Doc. 98 at 13.
[114] Doc. 94-2 at 14.
[115] *See id.*

source of the merchandise.[116] And the only merchandise the respondents were shown were shirts. Accordingly, Franklyn's Survey 1 fits the case.

### 2. Reliability

Vintage Brand also challenges the reliability of Franklyn's survey on numerous grounds.

### a. Acceptance

Vintage Brand's first line of attack is that the novelty of Survey 1's methodology precludes its use in this case because it has not been assessed in scholarly literature, has not been generally accepted, and has no non-judicial use.[117] Vintage Brand's rebuttal expert, David Neal, does not believe that Franklyn's methodology has ever been used before in any context.[118]

Neal also asserts that Franklyn's survey does not identify the underlying "trademark construct" he purports to test such as "recognition" or "secondary meaning."[119] He explains that if the tested construct is secondary meaning, then the proper analysis is to subtract the percentage of respondents who identified a trademark on the Game Day shirt (20%) from the percentages that identified a trademark on either of the other two shirts.[120] That analysis substantially reduces the

---

[116] Vintage Brand points to Erdem's survey as a more appropriate test of the relevant question.
[117] Doc. 94 at 13.
[118] Doc. 94-5 at 11.
[119] *Id.* at 20.
[120] *See id.* at 23-25.

percentage of respondents who identified the Penn State Marks on Vintage Brand's products as trademarks.[121]

Penn State offers two counterarguments. First, it notes the United States District Court for the Southern District of California's acceptance of what it suggests is a similar survey in *Bauer Brothers, LLC v. Nike, Inc.*[122] Second, it offers academic literature that it argues shows prior use of surveys like Franklyn's.[123]

The *Bauer Brothers* survey sought to determine whether consumers perceived a certain mark as branding or a trademark.[124] But as Vintage Brand notes, the *Bauer Brothers* survey's methodology is markedly different from that of Survey 1.[125] Some of these differences overlap with Vintage Brand's other criticisms of Franklyn's methodology, which the Court discusses below. One notable difference is that the *Bauer Brothers* survey provided examples of a brand or trademark that were unrelated to the goods at issue in the case, whereas Survey 1 does not.[126] The *Bauer Brothers* survey does little to establish prior use and acceptance of Franklyn's methodology due to those differences.

---

[121] *See id.* at 26.

[122] Doc. 98 at 14-15 (citing *Bauer Bros., LLC v. Nike, Inc.*, 159 F. Supp. 3d 1202, 1211 (S.D. Cal. 2016)).

[123] *Id.* at 15-16 (citing TRADEMARK & DECEPTIVE ADVERTISING SURVEYS: LAW, SCIENCE, AND DESIGN, 115 (ABA 2d ed. 2022) (S. Diamond & J. Swann, eds.) ("DIAMOND & SWANN")).

[124] *See* 159 F. Supp. 3d at 1211.

[125] Doc. 99 at 10-12.

[126] *See Bauer Bros, LLC v. Nike, Inc.*, No. 3:09-CV-00500, ECF 134-11 at 3 (Oct. 12, 2011, S.D. Cal.) ("For example, 'Ford' is a brand/trademark for cars. The oval shaped emblem with 'Ford' written in the center is also a brand/trademark for cars").

Penn State next cites to Diamond & Swann's discussion of "Teflon surveys" as evidence of general acceptance of Franklyn's methodology as well as one case from the United States District Court for the Eastern District of New York that accepted a similar survey: *DuPont Cellophane Co. v. Waxed Products Co.*[127] As Diamond & Swann explains, a Teflon survey "define[s] a brand name and a common name in the introductory section and then ask[s] respondents to classify a list of names (including the challenged mark) as one or the other."[128] Diamond & Swann notes that the *DuPont Cellophane* survey provided a list of names and asked respondents to identify which were trademarks, defined as "a name or mark which indicates that the goods bearing this name or mark are manufactured or sponsored by one concern only."[129]

Vintage Brand responds that both Teflon surveys and the *DuPont Cellophane* survey go to the question of whether a disputed term is a trademark or a generic term, which it contends is not the relevant question.[130] The Court agrees. The differences between the Teflon and *DuPont Cellophane* surveys and Survey 1 are inherent in the survey's different structures. The first two provide a list of several names, both

---

[127] Doc. 98 at 15-16 (citing DIAMOND & SWANN at 115; *DuPont*, 6 F. Supp. 859 (E.D.N.Y. 1934)). The *DuPont Cellophane* court found the survey to be "fairly presented" but did not ultimately rely on it on hearsay grounds, a view to which modern courts no longer subscribe. 6 F. Supp. at 885.

[128] DIAMOND & SWANN at 115.

[129] *Id.* at 115-16 n. 32. The *DuPont Cellophane* survey may have served as the inspiration for the Teflon survey. *Id.*

[130] Doc. 99 at 13.

generic and trademarked, to assess whether consumers perceive the disputed term as generic. Here, no one argues that Penn State is or has become a generic term. The relevant question is whether consumers perceive the Penn State Marks to associate Penn State with goods that carry the Penn State Marks.

Given the novelty of Franklyn's approach, Vintage Brand also cites the lack of any error rate or standards to measure Franklyn's methods.[131] Penn State responds that Franklyn's work meets generally accepted standards for general consumer surveys.[132] The Court agrees that the lack of any error rate adds to the difficulty in assessing Franklyn's Survey 1, and indicates its further unreliability.

### b.    Demand Artifacts

Vintage Brand also maintains that Franklyn's methods are unreliable because his survey is structured in such a way to bias respondents to find trademarks.[133] Erdem refers to these biased aspects as demand artifacts, which are cues or other aspects of a survey that suggest to respondents what goal the survey seeks to accomplish.[134] She explains that that Franklyn's definition of a trademark "primed"

---

[131] Doc. 94 at 14-15.

[132] Doc. 98 at 17.

[133] Doc. 94 at 12-13.

[134] Doc. 94-7 at 51-52; *see* Alan G. Sawyer, *Demand Artifacts in Laboratory Experiments in Consumer Research*, JOURNAL OF CONSUMER RESEARCH (March 1975) ("Sawyer"); *see also Simon Prop. Group L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1048 (D. Ind. 2000) ("The question about whether the two [non-competing] items are put out by the same or a related source is likely to generate so-called 'demand effects' that bias the survey by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items"); *Gov't Employees Ins. Co. v. Google, Inc.*,

respondents to "hunt" for trademarks, biasing the results in favor of Penn State.[135] Lastly, she criticizes Franklyn's failure to portray the images of Vintage Brand's products in a marketplace context.[136]

Erdem claims that the combination of Franklyn's trademark definition and his questions asking the respondents to state whether the images contain trademarks gave respondents the impression that Franklyn wanted them to find trademarks and/or that the images contained at least one trademark.[137] She explains that "[i]t would have been important to review a respondent's initial thoughts about the definition of a trademark as a quality control measure to see if there was any confusion, and then ask whether anything in the image constitutes a trademark."[138] Similarly, Erdem criticizes as out of line with generally accepted survey practices Franklyn's failure to offer open-ended questions after the close-ended questions to better contextualize the responses.[139] She also faults Franklyn for not pretesting his questions and definition of trademark as she did to assess whether they confused respondents, suggesting that without pretesting, "Franklyn has no way of knowing

---

No. 1:04CV507, 2005 WL 1903128, at *6 (D. Va. Aug. 8, 2005) ("demand effect results when the interviewer's questions or other elements of the survey design influence participants' responses by suggesting what the 'correct' answers might be or by implying associations that might not otherwise occur to participants").

[135] Doc. 94-7 at 51.

[136] *Id.*

[137] *Id.* at 52.

[138] *Id.*

[139] *Id.* at 52-53 (citing Shari S. Diamond, *Reference Guide on Survey Research*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 392 (Nat'l Acad. Press 2011) ("*Reference Guide on Survey Research*").

if respondents understood his included definition of a trademark as applied to the at-issue Vintage Brand products."[140]

Neal also criticizes Franklyn's Survey 1 for priming respondents to think of Penn State by naming it in multiple screening questions, which he contends made Penn State "artificially salient in survey respondents' mind just prior to key questions."[141] He notes that Diamond & Swann recommends that the party names "should not be mentioned to respondents during the screener" because such identifications can "bias or influence the participants' responses to the questions that follow in the main questionnaire."[142] He also suggests that the screening questions at issue (which asked whether respondents had purchased apparel featuring any of a list of several universities, including Penn State), had no functional role in the survey.[143]

As to priming respondents to hunt for trademarks, Penn State responds that the structure of the survey allays any concerns over priming.[144] Penn State breaks Survey 1 into three steps:

---

[140] *Id.* (citing Sawyer at 20). As noted above, Franklyn provided an option for respondents to indicate that they did not know what a trademark is. But Erdem contends that this option fails to meaningfully assess respondents' knowledge because survey respondents are generally motivated to avoid such answers. *Id.* at 53-54 (citing Ran Kivetz & Itamar Simonson, *Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions*, in TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS 245 (2012)). Neal echoes this criticism. *See* Doc. 94-5 at 21.

[141] *Id.* at 10-11, 15-19.

[142] *Id.* at 18 (quoting DIAMOND & SWANN at 55-56).

[143] *Id.* at 17-18.

[144] Doc. 98 at 18.

(1) respondents were shown one of the test Images or the Control Image;

(2) respondents were shown the definition for "trademark" and asked whether they believed one or more trademarks was present on the image; and

(3) respondents who had indicated that at least one trademark was present were then given the option to select what specific components they believed to be trademarks.[145]

Penn State contends that step two is a filter question that "insulated against the sort of priming effects [Vintage Brand] claim[s] here."[146] But respondents were shown the images again in connection with the filter question. So, as Vintage Brand notes, the combination of the image and the definition may have "affected how they responded to the filter question itself—i.e., by making them more likely to report that they did believe a trademark was present."[147]

The Court is also troubled with Franklyn's trademark definition. There is no doubt that it accurately tracks the Lanham Act's language, but Neal's and Erdem's concerns regarding respondents' ability to apply the definition are well-taken. Neal explains that "Franklyn failed to test if people understood, and could accurately apply, his definition of a trademark, even though such a test is standard practice in trademark surveys with comparable goals."[148] Notably, Neal cites to Diamond &

---

[145] *Id.*
[146] *Id.* at 19.
[147] Doc. 99 at 14.
[148] Doc. 94-5 at 21.

Swann's discussion of Teflon surveys and how they "first teach[] respondents the distinction between a brand name and a common name and then test[] respondents' ability to apply this definition accurately to two terms," only allowing respondents who pass the test to proceed.[149]

### c.      Marketplace Conditions

Vintage Brand next contends that Survey 1 is unreliable because it fails to sufficiently replicate the marketplace conditions in which consumers would see Vintage Brand's products.[150] Erdem discusses Franklyn's alleged failure to use a marketplace context, pointing out that Franklyn cannot reliably test the commercial impression of Vintage Brand products without showing respondents the products on Vintage Brand's website, where a putative consumer would be able to purchase them.[151]

Penn State responds that showing the test images in a marketplace condition "would have been improper here because this would have injected information other than the Penn State Marks on the relevant goods which could affect respondents' perceptions," citing to two cases.[152] Penn State first cites to *Thomas & Betts Corp. v. Panduit Corp.*, where the United States Court of Appeals for the Seventh Circuit

---

[149]  *Id.* at 21 n.55 (citing DIAMOND & SWANN, at 107-161).

[150]  Doc. 94 at 19-20 (citing *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230-41 (S.D.N.Y. 2010)).

[151]  Doc. 94-7 at 54 (citing *Survey methodology—Approximating market conditions*, 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 32:163 (5th ed., June 2022) ("MCCARTHY").

[152]  Doc. 98 at 22 (citing *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662-63 (7th Cir. 1995); *Gucci America, Inc. v. Guess?*, Inc., 831 F. Supp. 2d 723, 745-46 (S.D.N.Y. 2011)).

took issue with a survey because it showed both the protectable trade-dress along with "clearly non-protectable elements."[153] Because most survey respondents explained that they identified the product at issue from a non-protectable element, the court found the survey worthless.[154] In *Gucci America, Inc. v. Guess?*, the Honorable Shira A. Scheindlin of the United States District Court for the Southern District of New York excluded a survey that presented products at the point-of-sale context because they were irrelevant to the plaintiff's theory of post-sale confusion.[155] Penn State further contends that "[s]howing the shirts in a store or marketplace setting would have also been entirely inconsistent with the law on whether a mark is merely ornamental, which requires an examination of the mark as used on the relevant good and does not consider point of sale context."[156]

However, the Court agrees with Vintage Brand that the cases on which Penn State relies are inapposite.[157] This is not a case involving consumers' perception of non-protectable elements of a product as was the case in *Thomas & Betts*. Nor does this case involve a theory of post-sale confusion, as was the case in *Gucci America*.[158]

---

[153] 65 F.3d at 662.

[154] *Id.* at 663.

[155] 831 F. Supp. 2d at 745-46.

[156] *Id.* (citing TMEP § 1202.03(a)-(g)).

[157] Doc. 99 at 17-18.

[158] Although the Third Circuit does not appear to have precisely answered the question, the great weight of authority holds that post-sale confusion is reserved for cases where the junior use of the mark makes substantially inferior products; most cases involve luxury brands. *See*

The Court finds the marketplace context of substantial importance in a case like this one, where the allegedly infringing defendant claims that its use of the plaintiff's marks is not a trademark use. The context in which a consumer sees the product naturally informs their perception of whether a product is associated with a particular source or endorsed/sponsored by a particular entity.

### d.    Improper Control

Vintage Brand next challenges Franklyn's control image (the "Game Day" shirt) as improper. Franklyn chose his control because it was "not specific to any team or other affiliated entity and expresses an informational message about football."[159] Erdem disagrees with his choice, maintaining that it "does not serve as a control at all."[160] She notes that a proper control is one that "shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."[161] She explains that Franklyn "not only changes the color scheme and the imagery in the control, he also removes the product from its marketplace context."[162] She therefore argues that "[a]s a result, it is impossible to determine if respondents selected Penn State as a trademark

---

McCarthy, § 23:7. Penn State does not appear to allege that Vintage Brand's products are inferior.

[159]   Doc. 94-2 at 12.

[160]   Doc. 94-7 at 55.

[161]   *Id.* (quoting Diamond & Swann Ch. 9 and citing McCarthy § 32:163).

[162]   *Id.*

because of the manipulated imagery, manipulated color scheme, or the removal of relevant marketplace context."[163]

Penn State responds that Vintage Brand and Erdem's argument miss the mark because Franklyn's survey sought to determine *whether* respondents were confused about Vintage Brand's products' association with Penn State rather than *why* respondents were confused.[164] But as Vintage Brand correctly notes, Franklyn does appear to inquire into what caused respondents' confusion.[165] Moreover, the Court believes that the failure to use marketplace conditions in the survey also undermines Franklyn's choice of a control image for the same reasons stated above.

### 3.   Qualifications

Vintage Brand additionally argues that Franklyn is unqualified to testify to his novel survey because he lacks training in "marketing, statistics, or psychology" despite having performed numerous consumer surveys in the past.[166] The Court disagrees to the extent that Franklyn's lack of qualifications independently warrants

---

[163] *Id.*

[164] Doc. 98 at 24 (citing Jacob Jacoby*, Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys*, TRADEMARK REPORTER, 92 TMR 890, 903 (2002)).

[165] *See* Doc. 94-2 at 24 ("Consumers who indicated that they believed that the image contained trademarks were shown a follow up question to further understand what caused this perception"); 25 ("Furthermore, this commercial impression is driven by the Penn State name and imagery, rather than other elements of the shirt design such as the color of the shirt or descriptions of the sport").

[166] Doc. 94 at 15-16.

his exclusion. But the Court is concerned about the combination of Franklyn's lack of training in relevant disciplines and the novel method he appears to have used.

### 4.   Conclusion

In sum, Vintage Brand has presented persuasive arguments as to Survey 1's unreliability that Penn State largely fails to rebut. The overarching issue is the Court's concern that, without pretesting or examples of trademarks to guide respondents (or any similar efforts to that end), there is no way to adequately assess whether respondents applied Franklyn's definition of trademark properly. From a broad level, it appears that Franklyn's Survey 1 asks respondents to perform the same sort of analysis that a USPTO examining attorney might undertake when presented with an application for registration. That seems to be a tall order for a layperson respondent. Asking survey respondents to perform such a complex analysis is not in itself an insurmountable problem. But doing so without ensuring that respondents can reliably apply a legal definition (or a simplified version of it) is a fatal flaw in this Court's view. Accordingly, based on a totality of the circumstances, the Court will grant Vintage Brand's motion to exclude Franklyn's testimony on Survey 1.

### B.   Penn State's Motion to Exclude Erdem

Penn State moves to exclude Erdem's testimony regarding the conclusions she reached from her survey research because her methodology is unreliable due to

several flaws. Penn State contends that (1) Erdem used an improper control[167] and (2) improperly assessed respondents' certainty in a way that departs from accepted survey research practices.[168] Penn State also argues that Erdem's work does not fit the relevant question in this case because her query on whether Penn State and Vintage Brand have a business relationship improperly measured respondents' confusion.[169]

### 1. Fit

Penn State challenges Erdem's business-relationship questions to measure confusion because they do not address the full scope of the question in this case: whether consumers are confused about Penn State's potential approval or sponsorship of Vintage Brand products.[170] Penn State notes that traditional Eveready surveys ask questions related to sponsorship, such as: "Who do you believe, if anyone, is sponsoring or promoting [the product]?"[171] Based on that accepted practice, Penn State argues that Erdem's business-relationship questions are overly general and confusing.[172] Vintage Brand responds that the wording of Erdem's questions has been accepted in academic literature.[173] Erdem's justification for using

---

[167] Doc. 96 at 17-27.

[168] *Id.* at 30-33.

[169] *Id.* at 27-30.

[170] *Id.* at 27-28.

[171] *Id.* at 28 (quoting Jerre Swann, *Eveready and Squirt—Cognitively Updated*, 106 TRADEMARK REPORTER 727, 729 (2016)).

[172] *Id.* at 29-30.

[173] Doc. 97 at 20 (citing Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt*, 98 TRADEMARK REPORTER 739, 740-42 (2008)).

alternative wording was her own experience that questions regarding "business relationships" resonate better with respondents.[174]

The Court concludes that Erdem's wording of the question "fits" the issues present in this case. As she suggests, a "business relationship" arguably brings to mind sponsorship and/or official approval and the like.

### 2.    Erdem's Allegedly Infringing Control

Erdem's control was a sweatshirt with the Seal of the Commonwealth of Pennsylvania.[175] She chose that logo "to be as close as possible to the Vintage Brand products decorated with Penn State imagery and to control for the potential influence of elements other than the at-issue imagery on confusion."[176] Penn State first argues that Erdem used an infringing control by placing the control image in the context of Vintage Brand's website, which itself contains Penn State Marks like "PENN STATE."[177] Second, Penn State asserts that Erdem's control image itself, the Seal of Pennsylvania, is substantially similar to the Penn State Seal such that it also infringes.[178]

---

[174]  Doc. 97-1 at 18-20.
[175]  Doc. 94-7 at 13-14.
[176]  *Id.* at 13.
[177]  *Id.* at 17-19.
[178]  *Id.* at 19-24.

| Example of one of Penn State's Registered Seal Marks | Control Product Image |
|---|---|
|  | |

Penn State also directs the Court's attention to Erdem's results. Approximately 17-30% of Erdem's controlled group was confused, a figure that Penn State argues is unacceptably high.[179]

Vintage Brand responds that the presence of the text "PENN STATE" on its pages is not improper because Erdem sought to test whether consumers were confused about the merchandise bearing Penn State Marks, not the website.[180] As for the similarities between the seals, Vintage Brand asserts that Penn State's argument "inappropriately dissects the seals for comparison, in violation of trademark law's anti-dissection rule."[181] Beyond its point regarding dissection, Vintage Brand contends that Penn State's argument is overbroad. Under its

---

[179] *Id.* at 25 (citing Jacob Jacoby, *Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys*, 92 TRADEMARK REPORTER 890, 931-32 (2002)).
[180] Doc. 97 at 11.
[181] *Id.* at 15-16 (citing *In re Nat'l Data Corp.*, 753 F.2d 1056, 1058 (Fed Cir. 1985)).

reasoning, any circular seal could potentially infringe on the Penn State Seal.[182]
Vintage Brand also admits that Erdem's results for confusion in the control group
are high but argues that they are not unacceptably high and are overshadowed by the
difference in confusion between the test and control groups, which is the more
appropriate measure.[183]

As Penn State argues, the Seal of Pennsylvania and the Penn State Seal do
have some similarities.[184] They both incorporate the words "Pennsylvania" and
"State" as well as some elements of the Pennsylvania Coat of Arms.[185] But in the
Court's view, these are similarities that nearly all seal-type logos will share. They
are usually all circles. They often contain symbolic images like the ones in the Penn
State Seal. These similarities alone do not render Erdem's control infringing or
invalid. Nor does the high confusion rate render the survey invalid, due to the
difference in confusion between the test and control groups.

### 3.    Erdem's Measurement of Certainty

Lastly, Penn State challenges Erdem's certainty questions as deviations from
accepted survey practice.[186] Erdem had respondents assess how certain they were of
their answers on a four-point scale from "definitely correct" to "just guessing" and

---

[182]  *Id.*
[183]  *Id.* at 17 (citing Jacoby, *supra* note 150 at 932 n.76).
[184]  *Id.* at 25-26.
[185]  *Id.*
[186]  Doc. 96 at 30-33.

excised any response marked as "somewhat likely correct" and "just guessing."[187] Penn State argues that Erdem's approach has no basis in academic research and therefore undermines the reliability of Erdem's survey.[188] In its view, "confused people are generally uncertain, and asking someone if they are 'certain of their answer' prompts them to assume they are not."[189]

Penn State further argues that even if it had a basis, Erdem's four-point certainty scale is problematic because she does not include more options, such as an option indicating 50% certainty.[190] Penn State argues that Erdem's certainty-adjusted results should be excluded even if the rest of results are not.[191]

Vintage Brand responds by noting that Erdem provided her unadjusted results, which still showed low levels of confusion.[192] Vintage Brand questions Penn State's argument about the effect of certainty questions in a likelihood-of-confusion survey, noting that under Penn State's reasoning, respondents who answer "don't know" should be marked as confused, a conclusion with which even Franklyn disagrees.[193] Lastly, Vintage Brand notes that at least one court has held that certainty-adjustment was not grounds for exclusion.[194]

---

[187] *See* Doc. 94-7 at 26.
[188] Doc. 96 at 30-31.
[189] *Id.* at 8.
[190] *Id.* at 32.
[191] *Id.* at 33.
[192] Doc. 97 at 22-23.
[193] *Id.* at 24.
[194] *Id.* at 25 (citing *BBK Tobacco & Foods LLP v. Cent. Coast Agric. Inc.*, 615 F. Supp. 3d 982, 1004-05 (D. Ariz. 2022)).

The Court concludes that the issues cited by Penn State do not warrant exclusion of Erdem's survey or the analysis related to controlling for certainty. The inclusion of a certainty analysis does not itself warrant exclusion of Erdem's survey.[195] Particularly so here, where the information gathered by this portion of Erdem's survey provides additional data for evaluating the responses, but did not result in the exclusion of any of the respondents, and Erdem provided her unadjusted results which still demonstrate confusion. Erdem's methodology is not therefore flawed; regardless of whether it is the best method, Erdem's results are sufficiently reliable, and sufficiently fit the case, for their admission at trial. Accordingly, Penn State's motion to exclude Erdem's survey will be denied.

## C.  Vintage Brand's Motion to Strike

Vintage Brand moves to strike several paragraphs and portions of paragraphs from Penn State's SUMF in support of its motion for summary judgment.[196] They are: paragraphs 1, 5, and 114 of Penn State's SUMF, the first sentence of paragraph 6, the entirety of paragraph 15 of the Declaration of Stephanie Petulla (Penn State's Director of Licensing and Visual Identity), the entirety of exhibit 12 to Penn State's SUMF, and portions of exhibits 3, 5, 8, 14, 15, 16, 48, and 57.[197] The Court turns to these items in turn.

---

[195] *See BBK Tobacco*, 615 F. Supp. 3d at 1004-05 (noting that the inclusion of such questions and analysis "does not so distort the survey's results as to render them wholly inadmissible").

[196] Doc. 135.

[197] *Id.*

### 1.    Paragraph 1 of Penn State's SUMF

Paragraph 1 of Penn State's SUMF states: "Penn State is the flagship public research university in the Commonwealth of Pennsylvania and is famous throughout the United States and the world for its educational programs, athletics programs, and many other goods and services."[198]

That paragraph has one source: paragraph 6 of the Petulla Declaration, which reads:

> Penn State is the flagship public research university in the Commonwealth of Pennsylvania and is famous throughout the United States and the world for its educational programs, athletics programs, and many other goods and services that Penn State offers and provides to students, alumni, and members of the general public. Penn State enrolls approximately 100,000 students from across the United States and abroad each year and employs over 31,000 faculty and staff. Penn State has one of the largest living alumni bases among all U.S.-based universities. Almost one percent of all college graduates in the United States are Penn State alumni.[199]

Vintage Brand argues that Petulla's observation violates Federal Rule of Evidence 701 because her lay opinion that Penn State is famous is not, and cannot be, based on Petulla's perception and/or is not based on her own personal knowledge.[200] Penn State responds that it does not intend to use Petulla's testimony to show Penn State's fame for the purposes of trademark dilution.[201] Rather, her

---

[198]  Doc. 122 ¶ 1.

[199]  Doc. 123-1 ¶ 6.

[200]  Doc. 136 at 9-10 (citing *Adidas-Salomon AG v. Target Corp.*, No. CV-01-1582-ST, 2002 WL 35633578, at *4 (D. Or. Jan. 17, 2002)).

[201]  Doc. 157 at 2-3.

testimony "is squarely about the recognition of the University around the country."[202]

In the Court's view, regardless of the purpose for which Penn State uses it, Petulla's observation that Penn State is famous cannot be based on her personal knowledge. The only support Penn State offers is a case admitting an executive's opinions about a business' particular practices.[203] Petulla's testimony goes much farther than that and is accordingly inadmissible. The Court will therefore strike Paragraph 1 of Penn State's SUMF, along with Paragraph 15 and the first sentence of Paragraph 6 of Petulla's Declaration.

### 2.   Paragraphs 5 and 114 of Penn State's SUMF

Paragraph 5 of Penn State's SUMF reads "[t]hese students, faculty, staff, and alumni, as well as the general public nationwide, have come to recognize and associate the University Marks, as defined below, with goods sourced from or licensed by Penn State," and cites Paragraph 15 of the Petulla Declaration, a document depicting the results of a Penn State engagement study, and the Franklyn Report.[204]

---

[202] *Id.* at 3.

[203] *See Webster v. Dollar Gen., Inc.*, 197 F. Supp. 3d 692, 701 (D.N.J. 2016) (cited in Doc. 157 at 3).

[204] Doc. 122 ¶ 5. Paragraph 114 of Penn State's SUMF reads: "Consumers perceive the merchandise sold by Vintage Brand bearing the University Marks as being trademarks," and cites the Franklyn Report. *Id.* ¶ 114.

The relevant portion of the Petulla Declaration explains consumers' general recognition of the Penn State Marks, their expectation that goods displaying Penn State Marks are of a certain standard of quality, and their desire to purchase such goods to support Penn State.[205]

Vintage Brand appears to argue that Petulla lacks the personal knowledge to support her statements in Paragraph 15 of her Declaration. Again, Vintage Brand is correct. Petulla has no personal basis evident in her Declaration to understand consumers' attitudes about the Penn State Marks or the quality of Penn State-sponsored goods.

Vintage Brand next argues that the engagement study is inadmissible because it was submitted after the discovery deadline and has no expert attached to it.[206] Penn State disclosed the ongoing study to Vintage Brand before the discovery deadline, and therefore its late submission is entirely excusable. Penn State contends that the study is an example of a business record, which is generally admissible under Rule 803(6) and it could authenticate it as such at trial.[207] Penn State notes that other courts have accepted similar documents in other cases, but in the one case most on point,

---

[205] *See* Doc. 123-1 ¶ 15.
[206] Doc. 136 at 6.
[207] Doc. 157 at 8-9.

the court accepted the survey as admissible but concluded it had no evidentiary value for the proponent's claims.[208]

As an initial matter, the Court cannot rely on other cases finding that such surveys constitute business records—those cases are based upon the evidence presented therein, and this Court must make its determination based upon the evidence presented—or not presented—by Penn State in support of its contention that the survey is a business record.

To qualify under the business records exception to the hearsay rule, the proponent of the evidence must demonstrate, through the testimony of the custodian or another qualified witness, that the purported business record was: (1) made at or near the time of the event the record describes; (2) was made by a person with knowledge of the record's contents; and (3) was kept in the regular course of business.[209] At oral argument this Court asked Penn State to forecast what evidence it would offer in support of its assertion that the survey was a business record, as Penn State provided no such evidence in its briefing; other than unsupported statements that the survey was "done in the ordinary course of business," Penn State

---

[208] *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 507 F. Supp. 3d 1289, 1369 (D. Kan. 2020), *aff'd sub nom. In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022) (cited in *id.*).

[209] Fed. R. Evid. 803(6). *See also United States v. Bansal*, 663 F.3d 634, 666 (3d Cir. 2011).

provided no genuine evidence or explanation to support its claim that the survey is a business record.[210]

In absence of any explanation or evidence relating how the survey was kept in the regular course of business, or even relating to when the report was recorded in relation to the survey itself, the Court cannot conclude that the survey constitutes a business record. Accordingly, Paragraphs 5 and 114 may not properly rely on that survey.

Finally, Vintage Brand argues that the statement cannot permissibly be based upon the Franklyn Survey 1, given the flaws inherent in that survey.[211] The Court has excluded the Franklyn Survey 1 and, as a result, agrees that Paragraphs 5 and 114 may not be based upon that evidence. Because there is no evidentiary support for Paragraphs 5 and 114, the Court will grant Vintage Brand's motion to strike those paragraphs.

### 3.    The Wayback Machine Screenshots

Finally, Vintage Brand argues that the Court should exclude from consideration Exhibits 3, 5, 8, 14-16, 48, and 57 because they are all screen captures using the "Wayback Machine," an internet application that allows users to see how webpages appeared in the past.[212] Vintage Brand argues that in the absence of a

---

[210]  Doc. 186 at 233-36.
[211]  Doc. 136 at 13.
[212]  *Id.* at 14-16; *see Bansal*, 663 F.3d at 667 (explaining the Wayback Machine).

witness authenticating the screenshots, they are inadmissible.[213] Penn State advises the Court that it will be able to produce an authenticating witness at trial,[214] and the Court therefore defers consideration of this aspect of Vintage Brand's motion to strike, pending authentication of the exhibits at trial.

### D.    Penn State's Motion to Strike Portions of Hartvigson's Declaration

Penn State moves to strike portions of Chad Hartvigson's declaration and their use in Vintage Brand's SUMF.[215] Penn State seeks to strike the following portions:[216]

1.    ". . . all works of authorship contained thereon are believed to be in the public domain."[217]

2.    ". . . to the best of my knowledge, all of the historic images were authored or created by third parties; none of the images were authored by [Penn State]."[218]

3.    "Customers can choose to have those images printed on a range of tangible goods. . . ."[219]

4.    ". . . The historic images . . . are what makes customers want to buy the merchandise in the first place. The attractive nature of these historic images satisfies customer preferences for a custom item with a retro look and a nostalgic feeling, while also allowing customers to express affinity for the team or school referred to in the historic images. Customers decide if they like a historic image enough to place it on a t-shirt or other item and order the product."[220]

---

[213] *Id.*

[214] Doc. 157 at 10-11.

[215] Doc. 141.

[216] Doc. 142 at 4-14.

[217] Doc. 116-2 ¶ 12.

[218] *Id.* ¶ 15.

[219] *Id.* ¶ 13.

[220] *Id.*

5.  ". . . a customer's selection of a particular digital mockup indicates that customer's interest in the historic image itself . . ."[221]

6.  "Vintage Brand does not use any historic images as a trademark."[222]

With respect to the first statement, Penn State argues that Hartvigson's statement on his personal beliefs are inadmissible because they are subjective and unsupported by personal knowledge.[223] Vintage Brand counters that Hartvigson's statement is based on his belief about the law and his belief is relevant because Penn State sues Vintage Brand for willful trademark infringement.[224] The Court agrees with Vintage Brand, and concludes that the statement is relevant to this case.[225]

With respect to the second statement, Penn State first offers the same argument it did in connection with the first: that Hartvigson's beliefs are insufficient. Again, the Court finds them relevant to his and, by extension, Vintage Brand's state of mind. Penn State also argues that Hartvigson's assertion is contradicted by his prior deposition, in which he testified that he did not search for the artists of memorabilia that did not have an artist listed.[226]

The relevant excerpt of the deposition transcript reads:

Q: And so you've never asked any artist their permission to use their work?

---

[221] *Id.* ¶ 25.
[222] *Id.* ¶ 16.
[223] Doc. 142 at 5-6.
[224] Doc. 154 at 5-6.
[225] Of course, the Court gives no weight to Hartvigson's beliefs with respect to whether Vintage Brand objectively infringed on Penn State's trademarks.
[226] Doc. 142 at 8.

A: Game tickets and programs, you know, a lot of these things—well, most of them there's no copyright notice, nor is there any authorization or author established on that item. Most of these items are throwaway, printed for one day only. A few people decided to start collecting these things, and that's how we've come across them. But these—these are works of art that, you know, never meant to be copyrighted.

Q: But how do you know that? I mean, have you asked the artist?

A: Most of the artists are dead.

Q: Artists from 1989 are dead?

A: Well, it is 33 years ago. But majority of the stuff that's on our website is from the '40s, '50s, and '60s.

Q: But, I mean, you don't know 'cause you never bothered to find the artist, correct?

A: I haven't searched for artists. I don't know how you go about doing that for items when there's no artist listed.[227]

Based on the above excerpt, Vintage Brand contends that Hartvigson's testimony does not show that he never researched any artists, just that he did not specifically locate artists who were unlisted.[228] The Court does not find the blatant contradiction between the two testimonies that Penn State suggests, and will not strike that portion of Hartvigson's declaration based on its *possible* inconsistency with his deposition testimony.

---

[227] Doc. 142-1 at 9-10.
[228] Doc. 154 at 8.

Moving onto the third statement, Penn State contends that Hartvigson's assertion that customers can choose what images to have printed contradicts his prior testimony that "a customer's never going to just click on an image; they're always going to click on a product that has an image on it."[229] Penn State argues that given Hartvigson's "testimony conceding that Vintage Brand customers select and click on *products* rather than images, Hartvigson's contrary statements in his declaration must be struck."[230] The Court discerns no contradiction. Based on its understanding of Vintage Brand's business model, customers can choose from a variety of products depicting a variety of graphics.

Penn State next seeks to strike portions of the Hartvigson declaration regarding customers' motivations for purchasing Vintage Brand products because he lacks foundation as to those customers' motivations.[231] On this point, the Court agrees with Penn State for the same reasons it agreed with Vintage Brand that portions of the Petulla Declaration must be stricken. Hartvigson has no basis to say that the "[historic images] make customers want to buy the merchandise in the first place" or "satisf[y] customer preferences" or indicate where a consumer's "interest" lies.[232] Consequently, Paragraphs 16 and 25 of Hartvigson's declaration will be stricken.

---

[229] Doc. 142 at 9 (quoting Doc. 142-1 at 3).
[230] *Id.*
[231] *Id.* at 10-11.
[232] Doc. 116-2 ¶¶ 16, 25.

Finally, Penn State moves to strike Hartvigson's statement that Vintage Brand does not use any historic images as a trademark because it is a legal conclusion.[233] However, the statement has value outside of the alleged legal proposition it contains because it demonstrates a lack of willfulness on Hartvigson's part, which is a contested issue in this matter. That statement is therefore admissible. Consequently, the Court will grant Penn State's motion to strike only as to Paragraphs 16 and 25, and will deny the remainder of the motion.

### E.     Penn State's Motion to Strike Portions of Hartvigson's Supplemental Declaration

Penn State also seeks to strike portions of Chad Hartvigson's supplemental declaration.[234] Specifically, Penn State seeks to strike portions of Paragraphs 5 and 7:[235]

1.     ". . . Vintage Brand would have scanned both images below from historic memorabilia:



---

[233] Doc. 142 at 12.
[234] Doc. 159.
[235] *Id.* at 2-3.

The image on the left was most likely sourced from a decal created by a third party around the early 1950s. . . . I believe the image on the right was sourced from a historic ticket for the 1929 Penn State v. University of Pennsylvania (ticket image below):"



2.      "Vintage Brand consumers typically browse or purchase merchandise from multiple teams."

As to the first statement, the Court concludes that Hartvigson's assertion regarding the first image is inappropriately speculative. With no explanation, Hartvigson declares that it is likely that the image was culled from a decal. But without any further explanation, it is impossible to determine that Hartvigson speaks from any sort of personal knowledge, and it is not likely that he would possess such knowledge. That is not the case, however, as to the second image, and Hartvigson's statement regarding that image appears, at this time, to be sufficiently based upon Hartvigson's personal knowledge. Hartvigson is intimately familiar with Vintage Brand and its procedures for obtaining historical items; that he only "believes" that the image was pulled from one historical item rather than another—and does not

know with absolute certainty—does not render his statement inadmissible. And he points to the very historical item from which he believes the image was pulled.[236] This is sufficient for the statement to be admissible at this time.

With respect to the second statement, Penn State argues that Hartvigson's assertion is not based on personal knowledge and is contradicted by other testimony.[237] The Court agrees with Vintage Brand that the testimony to which Penn State cites does not explicitly contradict Hartvigson's challenged statement.[238] Moreover, there is no evidence that the statement is not based on his personal knowledge and would appear to be within Hartvigson's purview at Vintage Brand, meaning the statement is admissible.[239] Accordingly, Vintage Brand's motion to exclude portions of Hartvigson's supplemental declaration will be granted in part and denied in part.

### F.     Vintage Brand's Motion for Summary Judgment

Vintage Brand moves for summary judgment on:

1.     All of Penn State's claims other than its dilution claims because there is no actionable confusion.

---

[236] The Court disagrees with Penn State's assertion that the historical item is markedly different from the image used by Penn State. Doc. 160 at 7. And Penn State's argument that the image would have required more work to edit than Vintage Brand performed on other images does not impact the admissibility of Hartvigson's statement..

[237] Doc. 160 at 8-11.

[238] See Doc. 162 at 8-11.

[239] Regardless of its admissibility, the statement has no impact on this Court's summary judgment opinion.

2.      All of Penn State's claims because the Penn State-related historic images are functional when used ornamentally on merchandise.

3.      Penn State's counterfeiting claim because the historic images are neither substantially indistinguishable from Penn State's purported marks nor spurious.

4.      Penn State's dilution claims because PENN STATE is not a famous mark.

5.      Penn State's false advertising claim because it does not allege an actionable false statement.

6.      Penn State's false endorsement claim because the purported "endorsement" comes only from Penn State's association with the historic images, and because Vintage Brand's website contains numerous disclaimers.

7.      Vintage Brand's counterclaim to cancel the registrations for the Seal Designs because those designs comprise the Coat of Arms of Pennsylvania.[240]

### 1.      Willful Trademark Infringement Claim

To successfully demonstrate trademark infringement, in accordance with 15 U.S.C. § 1114(1)(a), "a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion."[241] "If a mark is both

---

[240] Doc. 127 at 12-15.
[241] *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).

federally registered and 'incontestible,' the mark is presumed to meet the first two requirements."[242] "The plaintiff bears the burden of proof."[243]

Penn State's marks that are at issue here are all incontestable save for one, the Pozniak Lion Design, registration number 5,305,910.[244] Vintage Brand's motion for summary judgment therefore rises or falls on the issue of whether its use of Penn State's marks causes a likelihood of confusion.

"A likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark."[245] The Third Circuit has "developed a nonexhaustive list of factors to consider in determining whether there is a likelihood of confusion between marks."[246] Those factors, known at the "*Lapp* factors," are:

---

[242] *Express Servs., Inc. v. Careers Exp. Staffing Servs.*, 176 F.3d 183, 185 (3d Cir. 1999) (internal citation omitted). "A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there is no pending proceeding and there has been no adverse decision concerning the registrant's ownership or right to registration." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 n.7 (3d Cir. 1994).

[243] *A & H Sportswear*, 237 F.3d at 210-11.

[244] Vintage Brand argues in a footnote that Penn State does not own rights in the marks because it only uses those marks in a trademark maintenance program, which does not qualify as a bona fide use of the marks. Doc. 127 at 21 n.2. However, "[w]hether a particular use constitutes a 'trademark maintenance program' depends upon the specifics of the use," and here Vintage Brand's arguments are insufficiently developed for the Court to reach any reasoned decision on this particular issue. *Bd. of Trustees of Univ. of Ill. v. Vintage Brand, LLC*, No. 21-CV-6546, 2023 WL 6388302, at *6 (N.D. Ill. Sept. 29, 2023). Accordingly, the Court will not address Vintage Brand's argument at this time.

[245] *A & H Sportswear*, 237 F.3d at 211 (internal quotation marks omitted).

[246] *Id.*

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.[247]

Vintage Brand offers four broad reasons why Penn State's trademark infringement claims fail: (1) the marks are merely ornamental; (2) Vintage Brand's use of the marks creates no confusion as to the source of the tangible goods; (3) the images used by Vintage Brand are aesthetically functional; and (4) under the relevant *Lapp* factors, there is insufficient likelihood of confusion.[248]

---

[247] *Id.* (quoting *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983)).
[248] Doc. 127 at 20-39.

### a.      Ornamentality

Vintage Brand first argues that Penn State cannot prove likelihood of confusion because consumers perceive that Penn State uses its marks for purely ornamental/aesthetic, rather than trademark, purposes.[249] Vintage Brand asserts that there is no evidence that Penn State uses the images that appear on Vintage Brand products as trademarks and any claims to the contrary "rely on illegitimate dissection of the composite images" in violation of trademark law's anti-dissection rule.[250]

As an initial matter, as noted above, several of the marks that Penn State seeks to protect are incontestable. Incontestable registrations may only be challenged on limited grounds, and a defendant cannot defend against trademark infringement claims for incontestable registrations "on the ground that they are merely" ornamental.[251] Therefore, Vintage Brand is prohibited from presenting this defense as to most of Penn State's marks at issue in this case. And even if it were not, there remains a genuine issue of material fact as to whether Penn State's marks are merely ornamental.

Although "[a]ny picture, design or symbol may be capable of playing the role of a trademark, . . . a design [that] is solely or merely ornamental and does not also

---

[249]  *Id.* at 9-12.
[250]  *Id.* at 10.
[251]  *Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1264 (S.D. Cal. 2018) (citing *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985); 15 U.S.C. § 1115(b)).

identify and distinguish source" cannot be a trademark.[252] "To be a trademark, a design or ornamentation must do the job of a trademark: to identify and distinguish a source."[253] "If customers perceive a design solely and only as attractive ornamentation, then the design is not a trademark."[254] "If customers perceive a design as not only attractive, but also as an indicator of source, then it is a trademark."[255]

A registration fails on this ground when its overall commercial impression is "solely as attractive ornamentation" and not "also as a symbol that identifies and distinguishes a single source."[256] In assessing aesthetic ornamentation—the first half of this conjunctive requirement—courts have considered the symbol's "size, location[,] and dominance," and whether it is accompanied by a ™ or ®.[257] Sitting at the non-ornamental end of this continuum are the small symbols affixed to the tag of a shirt or stamped on the bottom of a mug. On the ornamental side stand the large, dominant, and centrally located symbols, such as shirts with text emblazoned across the chest or a coaster with a mascot featured across the top. As this Court has previously noted, Penn State's marks appear to fall into the latter category.[258]

---

[252] MCCARTHY § 7:24.
[253] *Id.*
[254] *Id.*
[255] *Id.*
[256] *Id.* § 7:81; *see Macy's Inc. v. Strategic Marks, LLC*, No. 11-CV-06198-EMC, 2016 WL 374147, at *3 (N.D. Cal. Feb. 1, 2016); *Bobosky v. Adidas AG*, 843 F. Supp. 2d 1134, 1145 (D. Or. 2011).
[257] *Bobosky*, 843 F. Supp. 2d at 1145.
[258] Doc. 43 at 5.

But that finding does not settle the matter. The ornamentality requirement is conjunctive; that "a design is pleasing to the eye and serves a decorative purpose does not mean that the design cannot also serve a trademark purpose."[259] The Court must also consider whether the marks "identify and distinguish" the goods. This requirement, which invokes the Lanham Act's definition of a trademark, broadens the analysis to the fundamental trademark question: does the mark serve a source identifying function?[260] And here, the parties' understanding of the law diverges.

Vintage Brand contends that a mark only serves a source identifying function if it indicates the source of the tangible goods themselves.[261] And since the Penn State Marks do not indicate the source of the tangible goods sold by Vintage Brand, they are merely ornamental.[262] Penn State in turn argues that marks serve a source identifying function if they indicate the secondary source of the marks[263]—i.e. "sources such as licensors who authorize licensees to use the licensor's trademark in a manner that indicates sponsorship or authorization of the product."[264] Because, Penn State asserts, it has proffered evidence demonstrating that its marks indicate it as a secondary source, the marks are not merely ornamental.[265]

---

[259] MCCARTHY § 7:24.
[260] *Id.* § 7:81 ("The 'merely ornamental' rule is simply a facet of the basic trademark factual question: is the disputed feature in fact perceived by customers as a trademark or not?").
[261] Doc. 127 at 23-25.
[262] *Id.*
[263] Doc. 143 at 28-29.
[264] *Ducks Unlimited, Inc. v. Boondux, LLC*, No. 214CV02885SHMTMP, 2017 WL 3579215, at *23 (W.D. Tenn. Aug. 18, 2017).
[265] Doc. 143 at 28-29.

As this Court stated in ruling on Penn State's motion to dismiss, it is not willing to adopt the per se approach utilized by the Trademark Trial and Appeal Board ("TTAB"), wherein the use of a university's marks will always identify that university as a sponsor of the physical goods.[266] However, neither is the Court willing to adopt the opposite position advocated for by Vintage Brand—that the use of a mark is ornamental unless it is perceived as indicative only of the source of the tangible product itself.[267]

Rather, the ground staked out by numerous other courts—and the ground that seems to be proposed by amicus counsel—is the better position.[268] Those courts have held that a plaintiff must demonstrate that the use of a "mark[] is likely to create consumer confusion as to origin, source, approval, affiliation, association, or sponsorship," not merely as to the source of the tangible good itself.[269] This test is consistent with the plain language of the statute, and adequately addresses the interests of the mark holder in protecting its reputation[270] while permitting the free

---

[266]  Doc. 43 at 9-10, 16-17.

[267]  Doc. 127 at 23-25.

[268]  *See* Doc. 167 at 18 ("This Court can properly refocus infringement analysis on confusion about source *or sponsorship* of the product, rather than of the trademark" (emphasis added)).

[269]  *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256, 1264 (11th Cir. 2017).

[270]  The mark holder may, for instance, be concerned with the prospect of being associated with a goods manufacturer whose practices are in opposition to the values mark holder—i.e., perhaps the manufacturer uses child labor, or engages in strong political activities when the mark holder prefers to express only neutrality on political topics.

market to operate in ways that do not deceive consumers or diminish the rights or interests of the mark holder.[271]

Applying that standard here, the Court cannot conclude that, as a matter of law, Penn State's marks are merely ornamental. Relevant to that inquiry is Professor Franklyn's second survey, which raises questions as to whether Penn State's marks identify it as a secondary source when used on Vintage Brand's goods.[272] In that survey, respondents were asked to examine the three images shown below—with Cell C being a control cell[273]—and identify who made the tangible goods.[274]

---

[271] *See* 15 U.S.C. § 1125(a)(1)(A) (a trademark claim may lie where use of a mark "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person").

[272] Although Vintage Brand sought to exclude Franklyn's Survey 1, it did not move to exclude the second survey, which this Court describes below.

[273] According to Franklyn, "[t]he role of the control cell is to account for noise in the dataset (i.e. could any shirt offered on the Vintage Brand website create a latent connection with a university or Penn State specifically)." Doc. 94-2 at 40.

[274] *Id.* at 27-29.



**Cell A**

**Cell B**



**Cell C**

The vast majority of respondents correctly identified Vintage Brand as the manufacturer, with 5% identifying Penn State as the manufacturer for Cell A, and 9% identifying Penn State as the manufacturer for Cell B.[275] When those same respondents were asked whether the product was sponsored or approved by another entity, 30% believed that the product in Cell A was sponsored or approved by another institution, while 43% believed it was not, and 35% believed that the product in Cell B was sponsored or approved by another institution, while 36% believed it was not.[276] However, 20% of respondents believed that the item in Cell C was sponsored or approved by another institution, with 36% believing it was not.[277] "This

---

[275] *Id.* at 39-40.
[276] *Id.* at 41.
[277] *Id.*

creates a net of 10 to 15% sponsorship or affiliation."[278] In Cell A, 16% of respondents identified Penn State as the sponsor or affiliate, while 20% did so in Cell B.[279]

Respondents were far less clear in answering whether they believed the company that made the products were affiliated with another company: 19% responded in the affirmative for Cell A, 21% for Cell B, and 22% for Cell C, while 48% responded in the negative for Cell A, 44% for Cell B, and 36% for Cell C.[280] In both Cell A and Cell B 11% of respondents identified the affiliate as Penn State, whereas in Cell C 0% identified the affiliate as Penn State.[281]

Finally, the survey also measured whether respondents believed that any of the products were licensed by a company or institution.[282] Many of the respondents believed they were: 43% for Cell A, 52% for Cell B, and 50% for Cell C.[283] In answer to whether the respondents believed the product was *not* licensed, 31% answered affirmatively for Cell A, 28% for Cell B, and 8% for Cell C.[284] In Cell A, 7% of respondents identified the licensor as Penn State, while 12% said so for Cell B, and 0% provided that answer for Cell C.[285]

---

[278] *Id.*
[279] *Id.*
[280] *Id.* at 42.
[281] *Id.* at 42-43.
[282] *Id.* at 43.
[283] *Id.*
[284] *Id.*
[285] *Id.* at 44.

From this data, Franklyn "created a composite metric, which aggregated responses" and "included consumers who were confused as to source, sponsorship, affiliation, or licensure and indicated Penn State or 'college, university, NCAA' within their open-ended responses."[286] He concluded that, for Cell A, "31% of consumers were confused as to source, sponsorship, affiliation, or licensure and mentioned 'Penn State' or 'college, university, NCAA', with 28% explicitly mentioning 'Penn State.'"[287] As to Cell B, "43% of consumers were confused as to source, sponsorship, affiliation, or licensure and mentioned 'Penn State' or 'college, university, NCAA', with 37% explicitly mentioning 'Penn State.'"[288] And, with Cell C, "4% of consumers were confused as to source, sponsorship, affiliation, or licensure and mentioned 'Penn State' or 'college, university, NCAA', with 0% explicitly mentioning 'Penn State.'"[289]

While that survey was primarily concerned with determining whether the use of Penn State's marks created a likelihood of confusion, it also reveals something about whether the marks are perceived as identifying a secondary source of those goods.[290] That survey reveals that many of the respondents believe the marks identify a secondary source—often Penn State. And while the Court has concerns about

---

[286] *Id.*
[287] *Id.*
[288] *Id.*
[289] *Id.* at 45.
[290] Vintage Brand raises issues that it claims render Franklyn's survey inherently unreliable. Doc. 127 at 31-34. Again, however, Vintage Brand has not moved to exclude Franklyn's survey.

whether this survey is influenced by a consumer belief that, as a legal matter, permission must be obtained to use a university's logos, images, or marks, that issue has not been offered as a ground to exclude the survey, and therefore must be left to a jury to evaluate.

This is not to say that Penn State's evidence is incontrovertible. To the contrary, in addition to the Erdem survey data presented by Vintage Brand, other evidence raises questions as to whether consumers view the marks as indicators of primary or secondary source. As Vintage Brand notes, under its licensing agreements, Penn State requires that licensees attach a label to all goods that states they are officially licensed by Penn State.[291] The very fact that Penn State requires such labels indicates that the marks themselves may not be source indicators, and something more is required to direct consumers to the primary or secondary source of the goods.

Nevertheless, Penn State's evidence is sufficient, at the summary judgment stage, to defeat any claim that the marks are merely ornamental. Accordingly, Vintage Brand is not entitled to summary judgment on this ground.

### b.   Aesthetic Functionality

The Court turns next to the question of whether Penn State's marks are aesthetically functional, and therefore not protectable. Vintage Brand argues that the

---

[291]  *Id.* at 18.

marks are aesthetically functional because consumers purchase goods featuring the marks "for reasons independent of any source-related meaning"—that is, they buy such goods for the sole purpose of expressing affiliation with Penn State.[292] Because the marks are central to any goods' uses, and because depriving Vintage Brand of use of the marks would place it at a significant, non-reputational disadvantage in sourcing Penn State-related goods, it argues that the marks are aesthetically functional and non-trademarkable.[293]

It is well established that, regardless of whether a mark is protected, and whether a competitor's use of that mark is likely to cause confusion, "the competitor can nevertheless prevail [on a trademark infringement claim] by showing that the mark is functional—a traditional defense to the enforcement of a trademark."[294] A mark is functional even if it is only aesthetically functional, rather than functional in a utilitarian sense.[295] The United States Supreme Court has

> explained that, in general terms, a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage.[296]

---

[292]  Doc. 127 at 38; *see id.* at 38-39.

[293]  *Id.* at 38-39.

[294]  *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 217 (2d Cir. 2012) (brackets, ellipsis, and internal quotation marks omitted).

[295]  *Id.*

[296]  *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 165 (1995) (brackets and internal quotation marks omitted). *See also Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 986 F.3d 250, 257-58 (3d Cir. 2021) (discussing doctrine).

Where a mark meets that definition, it is considered functional "even if there is 'no indication that the mark has any bearing on the use or purpose of the product or its cost or quality.'"[297] Consequently, while trademark protection is improper where it "would significantly hinder competition by limiting the range of adequate alternative designs," "distinctive and arbitrary arrangements of predominantly ornamental features that do *not* hinder potential competitors from entering the same market with differently dressed versions of the product are . . . eligible for trademark protection."[298] Stated differently, "aesthetic functionality, mean[s] a design that communicates the use, purpose, cost, or quality of the product in a way that competitors cannot avoid replicating without incurring costs."[299]

In making a determination regarding aesthetic functionality, "courts must carefully weigh the competitive benefits of protecting the source-identifying aspects of a mark against the competitive costs of precluding competitors from using the feature."[300] Furthermore, courts must "take care to ensure that the mark's very success in denoting (and promoting) its source does not itself defeat the markholder's right to protect that mark."[301] "Because aesthetic function and

---

[297] *Christian Louboutin*, 696 F.3d at 220 (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 33 (2001) (brackets omitted)).

[298] *Id.* at 222 (brackets and internal quotation marks omitted).

[299] *DayCab Co., Inc. v. Prairie Tech., LLC*, 67 F.4th 837, 847 (6th Cir. 2023) (internal quotation marks omitted).

[300] *Christian Louboutin*, 696 F.3d at 222 (internal quotation marks omitted).

[301] *Id.*

66

branding success can sometimes be difficult to distinguish, the aesthetic functionality analysis is highly fact-specific."[302]

As the United States Court of Appeals for the Sixth Circuit has noted, "there are few aesthetic designs that are so fundamental to an industry that competitors cannot fairly compete without free use of them."[303] "Accordingly, a party's initial burden to show that a design lacks aesthetic functionality is not substantial; the plaintiff need only show that the design is not a competitive necessity such that exclusive use would put competitors at a significant non-reputation related disadvantage."[304]

Using these standards as a benchmark, it is clear that the available evidence demonstrates that, at the summary judgment stage, Penn State has met its "not substantial" burden to demonstrate that prohibiting Vintage Brand from using the challenged marks would not place Vintage Brand at a significant non-reputational disadvantage.[305]

As an initial matter, neither party has attempted to define the "relevant market" that must be used to assess whether the Penn State Marks are aesthetically functional. In the Court's view, there are two likely markets that could apply to Penn State's Marks: the collegiate goods market in general, or the Penn State-branded

---

[302] *Id.*
[303] *DayCab Co., Inc.*, 67 F.4th at 848 (brackets and internal quotation marks omitted).
[304] *Id.* (ellipsis and internal quotation marks omitted).
[305] *Id.*

goods market specifically. The Court need not assess which market is at play here[306] because, even accepting the narrower definition, it cannot be said, as a matter of law, that Penn State's exclusive use and control of its marks would put Vintage Brand at a significant non-reputation related disadvantage.

It is not necessary for Vintage Brand to use the specific Penn State Marks to compete in the athletics apparel marketplace or even the Penn State apparel marketplace. For example, Vintage Brand could use non-trademarked Penn State historical images that omit the Penn State Marks.[307] Or Vintage Brand could use its own creative language to attempt to entice Penn State supporters to purchase its goods.[308] Vintage Brand could even seek to use non-protected color schemes to invoke Penn State in the minds of consumers without infringing upon any trademark. For instance, many alumni and supporters or Syracuse University or Bucknell University would undoubtedly associate a bright orange and navy blue necktie with their favored university—and likely purchase such goods—even if that tie lacked any marks that explicitly associated it with those universities.

---

[306] *See Vitamins Online, Inc. v. Heartwise, Inc.*, 71 F.4th 1222, 1240-41 (10th Cir. 2023) (outlining considerations for defining the scope of the relevant market). It seems likely, based on those considerations, that the narrow definition is appropriate here although, in the absence of any briefing on this issue, the Court declines to take any firm position on the matter.

[307] Vintage Brand's brief in support of its motion for summary judgment at ECF pages 17 and 27 contain several attractive images that appear to be usable if Vintage Brand were to omit trademarks from the image such as the words "PENN STATE."

[308] For example, companies are prohibited from using the term "Super Bowl" without authorization; many creative companies skirt this prohibition by using terms such as "the Big Game"—a reference that any fan of the National Football League instantly recognizes.

Although prohibiting Vintage Brand from using the Penn State Marks would undoubtedly place Vintage Brand at a disadvantage in trying to win over Penn State supporters, the evidence is simply insufficient at this stage to describe that disadvantage as significant. Consequently, there remains a genuine issue of material fact as to whether the marks are aesthetically functional, and summary judgment on that ground will be denied.

As a final note, the Court cannot ignore the practical impact of any ruling that finds a university's marks are aesthetically functional because consumers wear goods bearing those marks only to express support for the institution itself. This would essentially render those marks wholly unprotectable, even if use of the marks would lead to confusion regarding the source or sponsorship of the product. Such a conclusion would stray dangerously close to the polar opposite of the per se approach rejected by this Court, and would mean that no trademark for universities would ever be valid for tangible goods. That is a conclusion that the Court cannot adopt.

### c.   Likelihood of Confusion and Balancing of the *Lapp* Factors

Finally, Vintage Brand asserts that consideration of the relevant *Lapp* factors demonstrates an absence of confusion.[309] Specifically, Vintage Brand contends that there is no evidence of actual confusion, no evidence that Vintage Brand intended to confuse the public, or any evidence that the marks are strong trademarks for

---

[309]  Doc. 127 at 34-38.

merchandise or similar to the composite historical images used by Vintage Brand.[310] As Vintage Brand notes, "the burden of proving likelihood of confusion rests with the plaintiff," even where the mark is incontestable.[311]

A review of the available evidence, as applied to the relevant *Lapp* factors,[312] demonstrates that there are factual conflicts that may not be reconciled by this Court but, rather, must be left to a jury to resolve. First, there is some "degree of similarity between [Penn State's] mark and the alleged infringing" products sold by Vintage Brand, as those products and the images they bear incorporate Penn State Marks.[313] And although Vintage Brand uses composite images that, as a general matter, do not appear to identically copy the Penn State Marks, as Penn State correctly notes, the marks must be viewed with respect to the overall impression they make, such that certain changes and additions to the marks do not necessarily mean that the marks are not confusingly similar.[314] The direct copying of portions of the Penn State Marks into Vintage Brand's composite images means that a jury could reasonably find that

---

[310] *Id.*

[311] *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004).

[312] The parties do not dispute that four factors are not relevant here, those factors being: factor 4, the length of time the defendant has used the mark without evidence of actual confusion arising; factor 7, whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; factor 8, the extent to which the targets of the parties' sales efforts are the same; and factor 10, other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market. *Compare* Doc. 127 at 34-38 *with* Doc. 143 at 29-42.

[313] *A & H Sportswear*, 237 F.3d at 211.

[314] *See* Doc. 143 at 30 (citing *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 477 (3d Cir. 1994)).

the images used by Vintage Brand are similar to Penn State's Marks; a jury could likewise conclude that the marks are not similar.[315] This factor is therefore neutral.

Second, as to the strength of the owner's marks, they are somewhat strong. Penn State has used the marks exclusively for many years, and has licensed those marks for use on a variety of goods and apparel.[316] The strength of these marks lends in favor of finding confusion.

Third, "the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase," which is functionally equivalent to asking how sophisticated the consumers are, is fairly difficult to parse.[317] Penn State has provided no evidence whatsoever that consumers seeking to purchase Penn State products are not sophisticated. On the one hand, one could easily imagine that many alumni of Penn State are sophisticated and discerning when it comes to purchasing products that demonstrate their support of their alma mater. On the other hand, one could just as easily imagine consumers being unsophisticated in their purchases—perhaps a fair-weather fan looking for a sweatshirt to wear to the single Penn State football game that he will attend. But one imagines that the first scenario is more likely, and devotees of Penn State will be discerning in their purchase of Penn State-related merchandise, similar to how "consumers will be

---

[315] This is discussed in more detail below in addressing Penn State's motion for summary judgment.

[316] Doc. 122 ¶¶ 7, 9-11, 14-17, 24-27, 30-34, 42-45.

[317] *A & H Sportswear*, 237 F.3d at 225.

discriminating in their selection of swimwear."[318] Given the lack of evidence here, however, this factor is neutral or weighs only slightly in Vintage Brand's favor.[319]

As to the fifth factor, Vintage Brand's intent in allegedly infringing upon Penn State's Marks, Penn State argues that intent may be inferred by Vintage Brand's decision to conduct preclearance trademark searches.[320] But this tells only part of the story. As Vintage Brand notes, the website where consumers go to purchase its products is replete with disclaimers noting that Vintage Brand has no affiliation with any university.[321] Vintage Brand's mark appears on many of its goods, and none of the goods contain an official label that would mark the product as having been endorsed by Penn State.[322] This evidence is critical, since mere evidence of an intent to copy is insufficient to satisfy this factor; the defendant must have intended "to *confuse* consumers."[323]

Vintage Brand's use of disclaimers indicates a lack of intent to deceive, even if other evidence may hint at intent. As the law professor amicus brief notes, such "clear labeling can indicate that the goods are (or are not) authorized by the

---

[318] *Id.*
[319] Penn State asserts that Vintage Brand's products are sold at relatively low prices, indicating that customers would assume the goods were offered by the same source. Doc. 143 at 34. However, Penn State provides no legal support for this proposition. And even if there were support for its argument, the examples used in Franklyn's second survey tends to undercut any assertion that the goods are sold at low prices. *See* Doc. 94-2 at 27-29.
[320] Doc. 143 at 41-42.
[321] Doc. 128 ¶¶ 13-14, 16-17.
[322] *Id.* ¶ 19.
[323] *A & H Sportswear*, 237 F.3d at 225-26.

trademark holder."[324] Given the available evidence that Vintage Brand did not intend to confuse consumers—balanced somewhat by some evidence of possible intent—this factor weighs slightly in Vintage Brand's favor.

As to one of the most critical factors, actual confusion, Penn State has offered some evidence of confusion. First, Penn State points to some testimonial evidence of actual confusion, although as Vintage Brand points out the testimony itself is not definitive.[325] Moreover, the second Franklyn survey—discussed previously—demonstrates that consumers may actually be confused about the source of Vintage Brand's products despite the use of disclaimers.[326] This tends to indicate actual confusion.[327]

Of course, in contrast Vintage Brand has presented Erdem's survey, which indicates no likely confusion as to Vintage Brand's products and alleged use of Penn State's Marks.[328] While both Vintage Brand and Penn State attempt to undermine

---

[324] Doc. 167 at 19.

[325] Doc. 143 at 35-36. *But see* Doc. 127 at 35-36 (Vintage Brand explaining weaknesses in Penn State's testimonial evidence of actual confusion).

[326] Doc. 94-2 at 39-45.

[327] Professorial amicus argues that any potential for confusion is adequately addressed through the use of clear labeling and disclaimers. Doc. 167 at 19-21. The assertion that there may be circumstances where consumers believe, at a minimum, that university sponsored tangible goods by creating partnership with producer or authorizing production, and that labeling can dispel any such confusion, is cogent and well taken. But here there are issues of fact—described previously—that preclude any conclusion that the use of disclaimers here prevented confusion. Under the fact-intensive approach set forth by numerous other courts, and as adopted by the Court here, there remains a genuine issue of material fact as to whether consumers were confused by Vintage Brand's use of Penn State's marks, or whether its disclaimers were sufficient to avoid liability for trademark infringement.

[328] *See* Doc. 94-7 at 31-45.

each other's expert surveys, these arguments "go to the weight of the survey"[329] and it must be left to the jury to ultimately conclude which survey merits greater weight. This factor therefore, at most, weighs slightly in Penn State's favor, although clear issues of fact here would preclude summary judgment.

Finally, as to the ninth factor, "the relationship of the goods in the minds of consumers because of the similarity of function,"[330] this factor again compels the denial of summary judgment, as it leads to a genuine issue of material fact that requires resolution by a jury. As Penn State notes, its marks appear on a variety of officially sanctioned goods similar to those offered by Vintage Brand.[331] But while Vintage Brand's goods are similar in function and are alleged to feature Penn State's Marks, the images used are composites that are different in appearance than any used by Penn State or licensed by Penn State. And more importantly, Vintage Brand's use of disclaimers on its website arguably distances the relationship of the goods in the minds of consumers. Ultimately, the available evidence simply does not permit the Court to conclude, as a matter of law, that this factor weighs either in Penn State's favor or Vintage Brand's favor.

In sum, a balancing of all relevant factors demonstrates insufficient strength to merit summary judgment in Vintage Brand's favor. Rather, there remain

---

[329] *P & P Imports LLC v. Johnson Enterprises, LLC*, 46 F.4th 953, 963 (9th Cir. 2022) (internal quotation marks omitted).

[330] *A & H Sportswear*, 237 F.3d at 211.

[331] Doc. 143 at 34; *see* Doc. 122 ¶¶ 13, 19, 29, 37, 40, 41, 47.

significant factual issues as to the Penn State's claim of trademark infringement that preclude summary judgment. Accordingly, Vintage Brand's request for summary judgment on that claim will be denied.

## 2.    Counterfeiting Claim

The Court next turns to Vintage Brand's assertion that it is entitled to summary judgment as to Penn State's counterfeiting claim. Vintage Brand argues that Penn State's claim is not colorable because: (1) Penn State's claim is overbroad as many of the marks apply only to goods that Vintage Brand has never sold; (2) Vintage Brand's composite images are not substantially indistinguishable from Penn State's marks, particularly since Vintage Brand's own trademark is displayed on its ordering website and packaging; (3) there is no likelihood of confusion; and (4) Vintage Brand's designs do not indicate who made the underlying product, meaning no reasonable person could believe that Penn State produced the products.[332]

The Court agrees that Vintage Brand is entitled to summary judgment as to Penn State's counterfeiting claim. Under the Lanham Act, a counterfeit mark is defined as, *inter alia*, "a counterfeit of a mark that is registered on the principal register in the [USPTO] for such goods or services sold, offered for sale, or distributed and that is in use."[333] The Lanham Act further defines a counterfeit as a

---

[332] Doc. 127 at 40-45. With respect to Vintage Brand's last argument, as discussed above the Court rejects the assertion that confusion may relate only to the producer of the goods.
[333] 15 U.S.C. § 1116(d)(1)(B)(i).

"spurious mark which is identical with, or substantially indistinguishable from, a registered mark."[334]

"Although 'spurious' is not a statutorily defined term under the Lanham Act, courts . . . have defined it as 'deceptively suggesting an erroneous origin; fake.'"[335] Therefore, courts have explained that "counterfeiting occurs only where the substantially identical mark is used 'to pass off the infringer's product as the original, rather than merely presented in a manner likely to confuse some consumers as to the origin or sponsorship of the infringer's product.'"[336]

Here, the evidence simply does not demonstrate that Vintage Brand's alleged use of the Penn State Marks is likely to cause confusion as to the origin of the goods sold by Vintage Brand. First, it is nearly impossible to believe that any rational consumer would expect that an institution of higher education produces its own merchandise and, therefore, equally difficult to believe that any consumer would be confused as to the origin of Vintage Brand's goods that carry the Penn State Marks. Second, it is undisputed that Vintage Brand's mark appears at the top of its webpage, is placed prominently on all packaging containing Vintage Brand's goods, and many

---

[334] *Id.* § 1127.

[335] *Antetokounmpo v. Paleo Prods. LLC*, No. 20-CV-6224 (JGK), 2021 WL 4864537, at *2 (S.D.N.Y. Oct. 18, 2021). *See also Lontex Corp. v. Nike, Inc.*, 384 F. Supp. 3d 546, 555 (E.D. Pa. 2019) (adopting same definition of spurious).

[336] *Ill. Tool Works Inc. v. J-B Weld Co., LLC*, 469 F. Supp. 3d 4, 10 (D. Conn. 2020) (quoting *Fujifilm N. Am. Corp. v. PLR IP Holdings, LLC*, No. 17 CIV. 8796 (NRB), 2019 WL 274967, at *3 (S.D.N.Y. Jan. 7, 2019)).

of Vintage Brand's products are labeled with that mark.[337] Given that Vintage Brand

placed its own mark "prominently on the packaging," "it is implausible that a

consumer would be deceived."[338]

Penn State nevertheless argues that there need not be confusion solely as to

the producer of the goods, and confusion as to sponsorship or affiliation is

sufficient.[339] But nothing in the Lanham Act compels such a reading. While the

Lanham Act directly states that trademark infringement may occur where there is

likely confusion as to, *inter alia*, sponsorship or approval of the goods,[340] it provides

no such definition for counterfeiting claims.[341] Rather, as explained above, the

Lanham Act defines counterfeit as the spurious use of a mark,[342] and spurious is best

understood to mean something that is fake or deceptively suggesting an erroneous

*origin*.[343]

This definition precludes Penn State's desired interpretation of the statute. An

improper use of a mark that only suggests an erroneous affiliation or sponsorship

cannot be said to suggest an erroneous origin; those are distinct concepts.

Counterfeiting is an attempt to make consumers believe that certain goods are the

genuine article, not that the goods are made by a different company that has been

---

[337] Doc. 153 ¶¶ 12, 19.
[338] *Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1081 (9th Cir. 2020).
[339] Doc. 143 at 47-48.
[340] 15 U.S.C. § 1125(a)(1)(A).
[341] *Id.* § 1116(d)(1)(B)(i).
[342] *Id.* § 1127.
[343] *Lontex Corp.*, 384 F. Supp. 3d at 555.

endorsed by the mark holder. Therefore, this Court agrees with other courts that have concluded counterfeiting does not occur when a product is "merely presented in a manner likely to confuse some consumers as to the origin or sponsorship of the infringer's product."[344]

There is simply no evidence from which a jury could conclude that Vintage Brand used Penn State's Marks in a manner deceptively suggesting an erroneous origin or that the goods were fake Penn State goods. Consequently, Vintage Brand is entitled to judgment in its favor as to Penn State's counterfeiting claim.

### 3.    Dilution Claim

Turning to Penn State's dilution claim, Vintage Brand first argues that the PENN STATE text mark is not famous, as: the term is geographically descriptive and therefore not distinctive; evidence of sales and advertising is insufficient to permit and inference of fame; and there is insufficient evidence of actual recognition of the PENN STATE text mark.[345] Second, Vintage Brand contends that the historic designs its uses are not sufficiently similar to the PENN STATE text mark to support a dilution claim.[346] Third, Vintage Brand asserts that it is not using the historic images as trademarks, and therefore its use does not fall within the anti-dilution statutes.[347] Fourth, Vintage Brand submits that Penn State cannot establish any likely

---

[344] *Ill. Tool Works Inc.*, 469 F. Supp. 3d at 10.
[345] Doc. 127 at 45-51.
[346] *Id.* at 51.
[347] *Id.* at 51-52.

or actual dilution, as there is no evidence of actual dilution and no likely dilution since "Penn" refers to both a state and another university, there was uncontrolled use of the words "PENN STATE" prior to 1982, and dilution by tarnishment cannot apply to Vintage Brand's use of the mark, as it celebrates the positive history of Penn State's athletic programs.[348]

"The federal cause of action for trademark dilution grants extra protection to strong, well-recognized marks even in the absence of a likelihood of consumer confusion—the classical test for trademark infringement—if the defendant's use diminishes or dilutes the strong identification value associated with the plaintiff's famous mark."[349] "The dilution doctrine is founded upon the premise that a gradual attenuation of the value of a famous trademark, resulting from another's unauthorized use, constitutes an invasion of the senior user's property rights in its mark and gives rise to an independent commercial tort for trademark dilution."[350] To establish a federal claim of dilution, a plaintiff must demonstrate:

> 1. The plaintiff is the owner of a mark that qualifies as a "famous" mark in light of the totality of the eight factors listed in § 1125(c)(1),
>
> 2. The defendant is making commercial use in interstate commerce of a mark or trade name,
>
> 3. Defendant's use began after the plaintiff's mark became famous, and

---

[348] *Id.* at 52-53.
[349] *Times Mirror Mags., Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 163 (3d Cir. 2000).
[350] *Id.*

4. Defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services.[351]

The standard for a dilution claim under Pennsylvania law is substantially similar, but is limited to acts within Pennsylvania, and requires actual dilution, rather than likely dilution as is required under federal law.[352]

Regardless of whether the PENN STATE Mark qualifies as famous under the statute,[353] Penn State's dilution claims fail for two reasons: the mark as used by Vintage Brand is not substantially similar to Penn State's Mark, and there is no evidence that Vintage Brand's use of the mark lessens the capacity of Penn State's Mark to identify and distinguish goods or services.

First, as other courts have noted, "a dilution plaintiff must be threatened by a very similar, if not identical, mark."[354] "Courts have repeatedly rejected dilution claims unless the marks are essentially the same" and "differences such as the use

---

[351] *Id.*

[352] *Dille Fam. Tr. v. Nowlan Fam. Tr.*, 207 F. Supp. 3d 535, 548 (E.D. Pa. 2016); *Pa. State Univ. v. Parshall*, No. 4:19-CV-01299, 2022 WL 2712051, at *15 (M.D. Pa. Feb. 17, 2022), *report and recommendation adopted*, No. 4:19-CV-01299, 2022 WL 2714998 (M.D. Pa. Mar. 31, 2022).

[353] *See Times Mirror Mags*, 212 F.3d at 163 (listing eight non-exclusive factors for courts to consider in determining whether a mark is famous). This Court has stricken as least some of Penn State's evidence in favor of its asserted fame.

[354] *Pharmacia Corp. v. Alcon Lab'ys, Inc.*, 201 F. Supp. 2d 335, 379 (D.N.J. 2002) (collecting cases).

of house marks 'alone' can defeat dilution claims."[355] Even the use of "a different font renders the marks at issue different" and weakens any claim of dilution.[356]

Here, the images used by Vintage Brand are different than the PENN STATE Mark, even if only subtly. A number of Vintage Brand's products that use the mark contain additional elements, such as, for example, a lion holding a football, a circular image containing an alligator and words stating "GATOR BOWL" and "JACKSONVILLE FLORIDA," a circular image of a man running through cotton accompanied by the words "Cotton Bowl" and "DALLAS TEXAS," a highly stylized lion cub with a snarling face, a circular image of a masted ship, and a frontal image of a lion's face accompanied by the words "I LIKE PENN STATE."[357] The aforementioned images are depicted below:



[355] *Id.* (quoting *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.,* 718 F.2d 1201, 1209-10 (1st Cir. 1983)).

[356] *Healthbox Glob. Partners, LLC v. Under Armour, Inc.,* No. CV 16-146-SLR, 2016 WL 3919452, at *9 (D. Del. July 19, 2016).

[357] Doc. 128 ¶¶ 15, 18, 19, 22.



Additionally, many of Vintage Brand's finished products include its own house mark on the product,[358] as depicted below:



These additional words and/or images, along with Vintage Brand's inclusion of its own trademarks on the finished products and multiple disclaimers of any affiliation with any university undercut the assertion that Vintage Brand's use of the PENN STATE Mark is sufficiently similar to the mark itself so as to amount to actionable dilution.

For example, in *Healthbox Glob. Partners, LLC v. Under Armour, Inc.*, the court found that the marks at issue were sufficiently distinguishable so as to defeat

---

[358] *Id.* ¶ 19.

a claim of dilution where the defendant had used a different font and included its own trademark, despite using the identical term "Healthbox."[359] And in *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, the United States Court of Appeals for the First Circuit found no actionable dilution despite defendant's use of the identical "ASTRA" mark because the defendant also printed its own name in full view on the products it produced, and made clear during sales negotiations that it, and not the plaintiff, produced the product.[360]

Similarly, here Vintage Brand uses additional symbols and words in its products to accompany the PENN STATE Mark, which distinguishes Vintage Brand's products.[361] Vintage Brand also uses its own trademark on many of its products, and its website not only prominently features its name, but disclaims any affiliation with any university. These acts distinguish Vintage Brand's use of the relevant mark and, because its mark and the PENN STATE Mark are not "essentially the same,"[362] the available evidence compels the conclusion that no dilution has occurred here.

Second, Penn State's dilution claims fail because there is no evidence that Vintage Brand's use of the PENN STATE Mark "causes dilution by lessening the

---

[359] 2016 WL 3919452 at *9.
[360] 718 F.2d 1201, 1209 (1st Cir. 1983).
[361] *See also Pharmacia Corp.*, 201 F. Supp. 2d at 379 (collecting cases).
[362] *Id.*

capacity of the plaintiff's mark to identify and distinguish goods or services."[363] As Penn State notes, "the central issue" is "whether Vintage Brand's use of the PENN STATE Mark lessens the degree to which consumers associate that mark with Penn State."[364]

Penn State points to no evidence that this has occurred. To the contrary, the parties seem to agree in their briefs that consumers are likely buying Vintage Brand's Penn State-related goods because they wish to express some form of affiliation with Penn State—they only disagree on whether they are purchasing goods from Vintage Brand because of confusion of whether Vintage Brand is officially linked to Penn State.[365] This would not seem to lead to any dilution of the PENN STATE mark; rather, it would appear that Penn State implicitly agrees that Vintage Brand's use of the PENN STATE Mark *strengthens* the degree to which consumers associate that mark with Penn State by continuously linking the PENN STATE Mark with Penn State.[366]

These two factors compel the conclusion that no genuine issues of material fact remain as to Penn State's state and federal dilution claims. Penn State has failed

---

[363] *Times Mirror Mags., Inc.*, 212 F.3d at 163.
[364] Doc. 143 at 51.
[365] *Compare* Doc. 127, *with* Doc. 143.
[366] Although perhaps not legally relevant, it is interesting to note that Penn State's infringement claim is premised on the exact opposite notion—that consumers are confusing the goods and believe Penn State is involved in some way with Vintage Brand. If that is the case, it is difficult to conclude that any dilution would likewise be occurring.

to produce sufficient evidence in support of those claims, and Vintage Brand is entitled to summary judgment in its favor.

### 4.    False Advertising and False Endorsement Claims[367]

As to Penn State's false advertising claim, Vintage Brand asserts that the Court should grant summary judgment in its favor because, as a matter of law, any alleged false association between two businesses is insufficient to support such a claim.[368] With respect to Penn State's false endorsement claim, Vintage Brand argues that summary judgment is appropriate because any confusion relates only to the images that Vintage Brand uses, not the physical goods themselves.[369]

As an initial matter, Penn State offers no response to Vintage Brand's assertion that Penn State's false advertisement claim is deficient as a matter of law, and appears to have abandoned this claim.[370] Even assuming that it has not, Vintage Brand is correct that Penn State's false advertisement claim cannot survive summary judgement.

---

[367] Penn State also raises a claim for unfair competition and false designation of origin, alleging that Vintage Brand's use of the Penn State Marks is "likely to cause confusion, mistake, or deception as to the source of origin of the goods and services provided by Defendants." Doc. 67 ¶ 114. However, the Third Circuit has unambiguously held that confusion as to origin, as referenced in 15 U.S.C. § 1125(a), "refers solely to the place of origin and not to the creator, manufacturer, or any broader conception of the term 'origin.'" *Parks LLC v. Tyson Foods, Inc*, 863 F.3d 220, 229 (3d Cir. 2017). Penn State's claim is premised solely on the contention that Vintage Brand's use will cause confusion as to affiliations or associations with Penn State— not that consumers will be confused as to the geographic origin of the goods. Doc. 67 ¶ 114. Accordingly, Penn State's claim fails as a matter of law.

[368] Doc. 127 at 54.

[369] *Id.*

[370] *See* Doc. 143.

As the Third Circuit has observed, "the statement at issue in a false advertising claim must 'misrepresent the nature, characteristics, qualities, or geographic origin' of a product."[371] Consequently, "a misrepresentation is actionable under § 1125(a)(1)(B) only if it misrepresents the characteristics of the good itself—such as its properties or capabilities. The statute does not encompass misrepresentations about the source of the ideas embodied in the object (such as a false designation of authorship)."[372]

Based upon that law, the Third Circuit in *Parks LLC v. Tyson Foods, Inc.* rejected false advertisement claims that "depend[ed] upon the purported false association between" two similar marks.[373] That court explained: "PARK'S FINEST is only misleading in the way that Parks suggests if a consumer makes the connection between PARK'S FINEST and PARKS and has in mind a pre-existing association between PARKS and high quality products. This is a [trademark infringement] claim and nothing more."[374] Because the false advertisement claim was merely a repackaged trademark infringement claim, that claim was legally infirm.[375]

Here too, Penn State's claim rests on its allegation that Vintage Brand's use of the marks is likely to deceive consumers "regarding the affiliation, connection, or

---

[371] *Parks LLC*, 863 F.3d at 226 (quoting 15 U.S.C. § 1125(a)(1)(B) (brackets omitted)).

[372] *Id.* at 227 (quoting *Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 796 F.3d 576, 590 (6th Cir. 2015)).

[373] *Id.*

[374] *Id.*

[375] *Id.* at 226-28.

association of Defendants with Penn State, or as to the sponsorship or approval by Penn State of Defendants' Goods."[376] As there is no allegation that Vintage Brand has misrepresented the characteristics of the goods themselves, and this claim instead appears to be a repackaged trademark infringement claim, it fails as a matter of law, and summary judgment will be granted in Vintage Brand's favor.

The Court next turns to Vintage Brand's assertion that summary judgment in its favor is appropriate as to Penn State's claim for false endorsement. These claims arise under § 43(a)(1)(A) of the Lanham Act. Such claims "are rare," as claims under § 43(a)(1)(A) ordinarily proceed as general trademark claims.[377] Nevertheless:

> To prove a violation of § 43(a)(1)(A) in a false endorsement case, a plaintiff must show that: (1) its mark is legally protectable; (2) it owns the mark; and (3) the defendant's use of the mark to identify its goods or services is likely to create confusion concerning the plaintiff's sponsorship or approval of those goods or services.[378]

Here, the Court need not analyze whether Penn State has produced sufficient evidence in support of its false endorsement claim, because this claim is duplicative of its trademark infringement claim and cannot stand independently. The two claims are functionally identical: in its trademark infringement claim, Penn State alleges that Vintage Brand's use of the Penn State Marks is likely to cause confusion by deceiving consumers into believing "that those goods offered by Defendants in

---

[376] Doc. 67 ¶ 119.
[377] *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1018 (3d Cir. 2008).
[378] *Id.* at 1014.

connection with the Infringing Marks are provided by, sponsored by, approved by, licensed by, affiliated or associated with, or in some other way legitimately connected to Penn State, when there is no such relationship,"[379] while the false endorsement claim likewise alleges that "Defendants' use of the Infringing Marks is likely to deceive a substantial portion of the target consumer audience, or actually deceives the target consumers, regarding the affiliation, connection, or association of Defendants with Penn State, or as to the sponsorship or approval by Penn State of Defendants' Goods."[380]

Essentially, both claims assert that Vintage Brand's use of the Penn State Marks is likely to, and is, causing confusion as to Penn State's association, sponsorship, approval, or affiliation with Vintage Brand and its products. Although Penn State tries to avoid this conclusion by arguing that the "false endorsement claim hinges on Vintage Brand's use of misleading content (including non-trademarked content) on its website to falsely suggest an endorsement by Penn State," the paragraphs of the second amended complaint to which Penn State cites do not support that argument.[381] Rather, Penn State's claim appears to be based solely upon Vintage Brand's use of the Penn State Marks on Vintage Brand products.[382] Penn State's allegations contain only the most perfunctory references to advertising or

---

[379] Doc. 67 ¶ 102.
[380] *Id.* ¶ 119.
[381] Doc. 143 at 52 (citing Doc. 67 ¶¶ 23-27, 36-37).
[382] *See* Doc. 67 ¶¶ 117-25.

misleading representations—and no references to, or examples of, misleading content.[383]

Penn State has not provided any images or other evidence of representations or advertisements by Vintage Brand, leaving only the images of Vintage Brand's products themselves as potential advertisements—accompanied by disclaimers on Vintage Brand's website that state it has no affiliation with any university.[384] But these images merely circle back to the core of Penn State's complaint: that Vintage Brand used Penn State's Marks on its products.[385] The images of products are not

---

[383] *Id.* Substantially similar references to advertising in Count One emphasize the identical nature of these claims. *Compare id.* ¶ 101-02 (alleging in Count One that "Defendants are using the Infringing Marks in advertisements for goods and services that do not originate with, and are not sponsored by or affiliated with, Penn State," which is "likely to cause confusion, mistake, or deception as to . . . [whether] the Infringing Marks are provided by, sponsored by, approved by, licensed by, affiliated or associated with, or in some other way legitimately connected to Penn State"), *with id.* ¶ 118 (alleging in Count Two that "Defendants' use in commercial advertising and promotions of the Infringing Marks in connection with Defendants' Goods constitutes a false or misleading representation of fact regarding the affiliation, connection, or association of Defendants with Penn State, or as to the sponsorship or approval by Penn State of Defendants' Goods").

[384] In its motion for summary judgment, Penn State highlights the goods themselves, descriptions that consumers may use to search for Penn State designs, and language describing the historical images. Doc. 114 at 37-38. But it does not describe, let alone produce any evidence to demonstrate, how this language creates the false impression that that Penn State has endorsed Vintage Brand's products.

[385] Interestingly, this Court has been unable to locate a single case within this circuit where the plaintiff successfully brought both a trademark infringement claim and false endorsement claim—let alone a case where both claims were based upon the same conduct. *See Acosta v. Faraones Nightclub*, No. CV 18-17710 (MAH), 2023 WL 4946960 (D.N.J. Aug. 3, 2023); *Geiger v. SA & G Corp.*, No. 2:22-CV-01797, 2023 WL 5515975 (D.N.J. Aug. 25, 2023); *Pellegrino v. Epic Games, Inc.*, 451 F. Supp. 3d 373 (E.D. Pa. 2020); *Cozzens v. DaveJoe RE, LLC*, No. CV 17-11535 (NLH/JS), 2019 WL 522071 (D.N.J. Feb. 11, 2019); *Johnson v. Park Ave. Rest. Corp.*, No. CV 17-7452 (WHW-CLW), 2018 WL 1535267 (D.N.J. Mar. 28, 2018); *Dille Fam. Tr. v. Nowlan Fam. Tr.*, 207 F. Supp. 3d 535 (E.D. Pa. 2016); *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007 (3d Cir. 2008). Perhaps this is due to the fact that, when a defendant has infringed upon a trademark, there will rarely be separate conduct that would constitute false endorsement. *Cf. Emondson v. 2001Live, Inc.*, No. 8:16-CV-3243-T-17AEP, 2017 WL

advertisements or misleading, any more than the goods themselves could rightly be considered advertisements or misleading statements.

Because Penn State's claim of false endorsement is just another way of saying that Vintage Brand's trademark infringement creates confusion as to association, sponsorship, approval, affiliation, that claim is derivative of its trademark infringement claim and constitutes an improperly pled trademark claim. As such, the false endorsement claim cannot proceed, and Vintage Brand is entitled to summary judgment in its favor on that claim.[386]

Moreover, even if the claim were not duplicative, summary judgment would still be appropriate. As noted above, to prove a claim of false endorsement, the plaintiff must demonstrate, *inter alia*, that the defendant used the plaintiff's marks

---

10085028, at *3 (M.D. Fla. Mar. 30, 2017) (holding that the statement "that the Eleventh Circuit has never recognized a separate claim of false endorsement distinct from trademark infringement under § 43(a) appears to stand for the . . . proposition that a plaintiff cannot assert [both] claims for false endorsement and trademark infringement under 15 U.S.C. § 1125(a)(1)(A)"). Had Vintage Brand taken some separate action that constitutes false endorsement by, for example, mailing free goods to newly-admitted Penn State students congratulating them on their acceptance, Penn State could bring an actionable false endorsement claim. *Cf. Nations Fund I, LLC v. Westward Mgmt. Co., LLC*, No. 6:20-CV-00498-AA, 2021 WL 4491712, at *3 (D. Or. Sept. 30, 2021) (permitting similar claims of fraud and fraudulent inducement to proceed where they were "based on distinct theories of defendants' intent and plaintiff's reliance").

[386] *Cf. Telescope Media Grp. v. Lucero*, 936 F.3d 740, 760 (8th Cir. 2019) (holding that, although the plaintiffs brought an associational-freedom claim, the claim was "really a disguised free-speech claim" because they did not object to forced association, rather, their "real objection is to the message of the videos themselves, which is just another way of saying that the MHRA violates their free-speech rights" and allowing only the free speech claim to proceed); *Franzone v. Lask*, No. 14CIV3043GHWGWG, 2016 WL 4154276, at *11 (S.D.N.Y. Aug. 5, 2016) (dismissing fraud claim as duplicative where "the claim of fraud is premised on the same facts as [the] malpractice claim").

"to identify its goods or services."[387] There is no evidence of such use here. To the contrary, the evidence establishes that Vintage Brand uses its own trademark on its goods to identify itself as the producers of its goods.[388] This provides an additional basis to enter judgment in Vintage Brand's favor as to Penn State's false endorsement claim.

### 5.  Whether Seal Designs Must be Cancelled

Finally, the Court turns to Vintage Brand's assertion that summary judgment should be entered as to its counterclaim seeking cancellation of Penn State's seal design marks.[389] Vintage Brand argues that the Lanham Act precludes the registration of a design that consists of or includes the insignia of a state and, since Penn State's registration numbers 1,276,712 and 5,877,080 include the Commonwealth of Pennsylvania's Coat of Arms, they must be cancelled.[390] Penn State responds that marks are unregistrable only if consumers would perceive the mark as a governmental designation, and Vintage Brand points to no evidence regarding consumer perception of the challenged marks, and visual differences in challenged marks preclude summary judgment.[391]

---

[387] *Facenda*, 542 F.3d at 1014.
[388] Doc. 153 ¶ 19.
[389] Doc. 127 at 55-56.
[390] *Id.*
[391] Doc. 143 at 22-23.

The Lanham Act precludes the registration of any mark that "[c]onsists of or comprises the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof."[392] "Comprises" is interpreted to mean "includes" and, therefore, the Lanham Act "prohibits registration of a mark that *includes* a flag of a foreign nation or any simulation thereof."[393] However, the ultimate question is not simply whether a mark contains a government's insignia, but whether relevant consumers would "perceive matter in the mark as a" government insignia.[394] Registration should therefore not be refused if the insignia used within the mark "is sufficiently altered, stylized, or merged with other elements in the mark, so as to create a distinct commercial impression."[395]

It is true, as Vintage Brand notes, that the challenged marks contain the entirety of Pennsylvania's Coat of Arms,[396] as demonstrated below:

---

[392] 15 U.S.C. § 1052(b).
[393] *In Re Fam. Emergency Room LLC*, 121 U.S.P.Q.2d 1886, 1889 n.2 (T.T.A.B. 2017). *See also In re Fox*, 702 F.3d 633, 638 (Fed. Cir. 2012) (same), *abrogated on other grounds by In re Tam*, 808 F.3d 1321 (Fed. Cir. 2015).
[394] *In Re Fam. Emergency Room LLC*, 121 U.S.P.Q.2d at 1890.
[395] *Id.*
[396] *See* Doc. 127 at 56.

**Penn State Marks**          **Pennsylvania Coat of Arms**

  

However, Vintage Brand presents no evidence as to whether Penn State's Marks, which merge Pennsylvania's Coat of Arms into a circle featuring the words "The Pennsylvania State University 1855" with a scalloped design on the outside is insufficient to create a distinct commercial impression. Certainly, the wholesale incorporation of Pennsylvania's Coat of Arms implies some governmental affiliation, and may indicate to consumers that the mark is itself a government insignia or simulation thereof. But given the visual differences between the marks and Pennsylvania's Coat of Arms, the Court cannot conclude as a matter of law—based on the available evidence—that Penn State's Marks do not create a distinct commercial impression. Summary Judgment will therefore be denied as to Vintage Brand's second counterclaim.

### G.   Penn State's Motion for Summary Judgment

Penn State has also moved for partial summary judgment on its claims and Vintage Brand's counterclaims.[397] As to Penn State's claims, it seeks summary

---

[397]  Doc. 113.

judgment with regard to its trademark infringement, unfair competition, counterfeiting, and false endorsement claims.[398] With respect to Vintage Brand's counterclaims, Penn State seeks judgment in its favor as to any ornamentality affirmative defense and counterclaim, and as to Vintage Brand's efforts to cancel Penn State's Seal Marks.[399]

### 1.    Penn State's Claims

As an initial matter, as explained above, summary judgment is appropriate in Vintage Brand's favor with respect to Penn State's claims for counterfeiting, false advertising, and false endorsement. Accordingly, Penn State's motion for summary judgment as to those claims will be denied, and the Court will only consider whether judgment should be entered in favor of Penn State with regard to its trademark infringement claims.

Penn State argues that it is entitled to summary judgment in its favor on its trademark infringement claims for two reasons. First, Penn State contends that it has produced clear evidence of confusion, as it owns valid (and often incontestable) marks.[400] And, Penn State asserts, Vintage Brand is using nearly identical marks on directly competing goods, which it argues conclusively establishes its claims as a matter of law.[401] Second, Penn State insists that, even under the relevant *Lapp*

---

[398]  Doc. 114 at 19-42.
[399]  *Id.* at 42-53.
[400]  *Id.* at 21-23.
[401]  *Id.* at 23-28.

factors, its evidence establishes a likelihood of confusion such that it is entitled to summary judgment.[402]

Vintage Brand responds that Penn State cannot establish as a matter of law a likelihood of confusion.[403] First, Vintage Brand argues that, when viewed as a whole, Vintage Brand's images are easily distinguishable from Penn State's marks and, therefore, Penn State's claims are not established as a matter of law.[404] Vintage Brand further asserts that its goods only compete with Penn State goods to the extent that consumers want their products to contain Penn State images in order to express their affiliation with Penn State.[405] Lastly, Vintage Brand contends that there is no evidence of actual confusion, or that Vintage Brand intended to cause confusion.[406]

The Court's determination in denying Vintage Brand's motion for summary judgment on this claim largely guides the analysis—and outcome—of Penn State's competing motion. To succeed on its trademark infringement claim, Penn State "must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion."[407] As discussed previously with regard to Vintage Brand's motion for summary judgment, the only element of the claim genuinely at

---

[402] *Id.* at 28-33.
[403] Doc. 137 at 14-32.
[404] *Id.* at 17-23.
[405] *Id.* at 23-25.
[406] *Id.* at 25-32.
[407] *A & H Sportswear*, 237 F.3d at 210.

issue here is whether there is a likelihood of confusion. The evidence is insufficient to conclude that, as a matter of law, likelihood of confusion has been established; rather, such a determination must be left to a jury.

As to Penn State's more novel argument that a likelihood of confusion is established because Vintage Brand is using nearly identical marks on directly competing goods, that contention fails on summary judgment. It is true that the Third Circuit has often noted that where plaintiff and defendant are in direct competition, and "the identical mark is used concurrently by unrelated entities, the likelihood of confusion is inevitable."[408] Regardless of whether Penn State and Vintage Brand are in direct competition, there is a significant question as to whether the images used by Vintage Brand are sufficiently identical to Penn State's Marks so as to trigger a finding of confusion as a matter of law.

While there is no dispute that many of Vintage Brand's offered products contain Penn State Marks within the images, these images are often composite images based upon historical memorabilia or other images. In support of its argument, Penn State points to the near identical nature of its marks and many of the pieces of the composite images used by Vintage Brand in its goods.[409] For example, from the following two images, Penn State emphasizes the Penn State Seals:[410]

---

[408] *Pappan Enterprises, Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 804 (3d Cir. 1998).
[409] *See* Doc. 114 at 25.
[410] *Id.*



But Penn State's efforts violate the anti-dissection rule. It is well established that, when analyzing trademarks, the marks "must be examined as a whole" and, therefore, a "composite mark should not be fragmented into its various pieces."[411] Because marks "must be considered as a whole in determining likelihood of confusion,"[412] "dissecting marks often leads to error."[413] The anti-dissection rule stems from the commonsense proposition that, because court must analyze "whether the labels create the same overall impression when viewed separately,"[414] "the message of a whole phrase may well not be adequately captured by a dissection and recombination."[415]

When viewing Vintage Brand's images in their entirety, a reasonable jury could well conclude that those images and the Penn State Marks are not sufficiently similar. For example, Penn State cites to numerous goods that utilize different Penn

---

[411] *Berner Int'l Corp. v. Mars Sales Co.*, 987 F.2d 975, 981 (3d Cir. 1993) (quoting MCCARTHY § 11:10 at 458). *See also A & H Sportswear*, 237 F.3d at 216 (noting "the general rule that marks should be viewed in their entirety").

[412] *Koninklijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*, No. CV113684SRCCLW, 2017 WL 3719468, at *22 (D.N.J. Aug. 29, 2017) (quoting *Juice Generation, Inc. v. GS Enterprises LLC*, 794 F.3d 1334, 1340-41 (Fed. Cir. 2015)).

[413] *Berner Int'l Corp.*, 987 F.2d at 981 (brackets and internal quotation marks omitted).

[414] *A & H Sportswear*, 237 F.3d at 216 (internal quotation marks omitted).

[415] *Koninklijke Philips Elecs. N.V.*, 2017 WL 3719468 at *22 (quoting *Juice Generation, Inc.*, 794 F.3d at 1340-41).

State Marks but, as depicted below, those marks are often only a small portion of the historical images that include larger depictions that may well not be affiliated, in the mind of a consumer, with Penn State, and sometimes even list other universities—as the images were pulled from old game materials.[416] Examples of images cited by Penn State that contain Penn State Marks are displayed below:

   

   

---

[416] *See, e.g.*, Doc. 138 ¶ 162.
[417] *Id.* Alleged to have copied PENN STATE, THE PENNSYLVANIA STATE UNIVERSITY, and the Penn State Seal marks.
[418] *Id.* Alleged to have copied THE PENNSYLVANIA STATE UNIVERSITY, Penn State Seal, and Lion Shrine Logo marks.
[419] *Id.* Alleged to have copied PENN STATE Mark.
[420] *Id.* Alleged to have copied PENN STATE Mark.
[421] *Id.* Alleged to have copied PENN STATE and Lion Shrine Logo marks.
[422] *Id.* Alleged to have copied PENN STATE Mark.
[423] *Id.* Alleged to have copied PENN STATE Mark.
[424] *Id.* Alleged to have copied PENN STATE Mark.

425 426 427

Viewing these images as a whole, a jury could reasonably conclude that many—if not most or all—appear easily distinguishable from the Penn State Marks. Again, "[t]he test for . . . similarity is whether the labels create the same overall impression when viewed separately."[428] Only "if ordinary consumers would likely conclude that the two products share a common source, affiliation, connection or sponsorship" should a court determine that the marks are confusingly similar.[429] Many of these composite images do not necessarily evoke affiliation with, or sponsorship from, Penn State.

In just the examples provided above, many images are old admissions tickets from prior football games and, in several of those tickets, Penn State is not even the featured team but is, instead, relegated to a lesser position on the ticket. Not only could a jury reasonably conclude that these images connote no connection

---

[425] *Id.* Alleged to have copied PENN STATE Mark.

[426] *Id.* Alleged to have copied PENN STATE Mark.

[427] *Id.* Alleged to have copied PENN STATE Mark.

[428] *A & H Sportswear*, 237 F.3d at 216 (internal quotation marks omitted).

[429] *Id.* (internal quotation marks omitted).

whatsoever to a university but, if they did, the jury could reasonably conclude that they implied affiliation with a university other than Penn State. Given these differences in the images and Penn State's Marks, the Court cannot conclude as a matter of law that a likelihood of confusion has been established, and summary judgment is not appropriate on that ground.

That leaves a possibility of a likelihood of confusion based only upon the relevant *Lapp* factors. As discussed in addressing Vintage Brand's motion for summary judgment, the Third Circuit has created a nonexhaustive list of ten factors that may be considered in determining whether there is a likelihood of confusion.[430]

And, as discussed previously, consideration of these factors leads to the inevitable conclusion that genuine issues of material fact remain as to the balancing of these factors, and this is an issue that must be left for resolution by a jury. First, although there is some degree of similarity between the images used by Vintage Brand and the Penn State Marks, significant differences between the marks and Vintage Brand's composite images mean that a jury could easily reach differing conclusion regarding this factor. Although Penn State's Marks are somewhat strong, any analysis as to "the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase,"[431] is hampered by the fact that Penn State—similar to Vintage Brand in its motion for summary

---

[430] *A & H Sportswear*, 237 F.3d at 211.
[431] *Id.*

judgment—points to no evidence that consumers seeking to purchase Penn State products are not sophisticated.[432]

As noted previously, with respect to Vintage Brand's intent in allegedly infringing upon Penn State's marks, given Vintage Brand's use of disclaimers, this factor weighs slightly against a finding of a likelihood of confusion. As to evidence of actual confusion, competing surveys and ambiguity in the available evidence create genuine issues of material fact that must be resolved by a jury. Finally, as to the ninth factor, "the relationship of the goods in the minds of consumers because of the similarity of function,"[433] there again remains a genuine issue of material fact that requires resolution from a jury, given Vintage Brand's use of composite images and disclaimers on its website.

Consequently, similar to Vintage Brand's motion for summary judgment, a balancing of all relevant factors demonstrates insufficient strength to merit summary judgment in Penn State's favor. Rather, there remain significant genuine issues of material fact that preclude summary judgment. Accordingly, Penn State's request for summary judgment on its trademark infringement claim will also be denied.

---

[432] Penn State again asserts that Vintage Brand's products are sold at relatively low prices, meaning that consumers are not overly attentive when purchasing those goods. Doc. 114 at 30-31. However, Penn State provides no evidence to support its assertion that customers are inattentive when purchasing such goods. The Court cannot rely upon the cases cited by Penn State to conclude that t-shirts as a general matter are not purchased with a high degree of care—cases that were based upon the unique evidence presented therein.

[433] *A & H Sportswear*, 237 F.3d at 211.

### 2.      Vintage Brand's Counterclaims

Penn State further seeks judgment as to some of Vintage Brand's counterclaims and affirmative defenses.[434] First, Vintage Brand seeks judgment on Vintage Brand's Affirmative Defenses Seven and Eight—arguing that Penn State's marks are merely ornamental—and Counterclaim Two, which seeks cancellation of the PENN STATE Mark and Penn State Seal Mark as merely ornamental.[435] Second, Penn State seeks judgment as to Vintage Brand's attempt to cancel the Penn State Seal Marks, as differences between those marks and the Pennsylvania Coat of Arms mean they do not fall within the prohibition on marks containing governmental insignia.[436]

### a.      Ornamentality Counterclaim and Affirmative Defenses

Before addressing the substance of Penn State's motion, as discussed with regard to Vintage Brand's motion for summary judgment, the marks that Penn State seeks to enforce—save for the Pozniak Lion Design—are incontestable, and Vintage Brand cannot challenge Penn State's trademark infringement claims "on the ground that [the marks] are merely" ornamental.[437] Summary judgment is therefore appropriate as to Vintage Brand's Affirmative Defenses Seven and Eight, with the

---

[434]   Doc. 114 at 42-53.
[435]   *Id.* at 42-49.
[436]   *Id.* at 49-53.
[437]   *Marketquest Grp.*, 316 F. Supp. 3d at 1264 (citing *Park 'N Fly*, 469 U.S. at 194; 15 U.S.C. § 1115(b)).

exception of the defense as it relates to Penn State's Pozniak Lion Design and any contestable registrations.[438]

The Court must therefore determine whether there is sufficient evidence for the defense to proceed as to any contestable registrations, and whether there is sufficient evidence for Vintage Brand's Second Counterclaim to proceed to trial, which seek cancellation as merely ornamental of two contestable marks—the PENN STATE Mark and Penn State Seal Mark.

Penn State argues that the affirmative defenses and counterclaim must fail because: (1) Vintage Brand has presented no evidence that the marks are perceived only as ornamentation; (2) the use of trademarks on merchandise to indicate a secondary source is not mere ornamentation; and (3) this Court does not have jurisdiction to cancel trademark registration based on an as-applied ornamentality challenge.[439]

Addressing the third argument first—as it relates to the Court's authority to even consider the first two arguments—Penn State contends that considerations of whether mark specimens are acceptable is reserved solely to the examining attorney,

---

[438] The Court rejects the argument that contestable registrations may not be challenged on ornamentality grounds when the marks' most salient features are contained in incontestable marks, Doc. 114 at 43-44, as incontestability requires proof of use as a mark, and such proof will naturally vary from mark to mark.

[439] *Id.* at 44-49. As discussed previously, the Court agrees that the Penn State Marks cannot be considered merely ornamental simply because they indicate a secondary source—i.e., that they do not indicate the manufacturer of the goods but, rather, indicate Penn State's approval, affiliation, association, or sponsorship of the goods/manufacturer of the goods.

and is not reviewable by the USPTO or district courts.[440] Penn State's argument, although novel, is ultimately without merit.

Penn State does not, and cannot, cite to a single case that has reached the conclusion it suggests, and nothing in any statute appears to divest courts of the power to consider as-applied challenges. To the contrary, courts routinely consider as-applied challenges to trademarks.[441] More importantly, Vintage Brand does not appear to be challenging the adequacy of the specimens that Penn State provided in support of its trademark applications, but is challenging whether those marks were in fact used as marks in service, or were merely ornamental.[442]

This issue is broadly within the authority of the USPTO and district courts to consider, as even Penn State's own cited case demonstrates. In *Century 21 Real Estate Corporation v. Century Life of America*,[443] the TTAB determined that it should not consider a challenge to the "sufficiency of the specimens submitted with an application."[444] However, the TTAB emphasized that "the underlying question of service mark usage . . . would constitute a proper ground for opposition" and, in any

---

[440] Doc. 114 at 48-49.

[441] *See, e.g., Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 918-20 (9th Cir. 1980) (considering an as-applied functionality defense to a trademark-infringement claim); *Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286, 304-05 (S.D.N.Y. 2000) (considering whether word "PILATES" is generic with respect to equipment and services offered in connection with the Pilates exercise method); *Brandwynne v. Combe Int'l, Ltd.*, 74 F. Supp. 2d 364, 381 (S.D.N.Y. 1999) (examining genericness of challenged term "as applied to products involving the vaginal area").

[442] *See* Doc. 72.

[443] 10 U.S.P.Q.2d 2034, 1989 WL 281901 (T.T.A.B. 1989).

[444] *Id.* at *1.

event, the appellant there took aim at the wrong target, as "[o]bjections to the specimens made by the Examining Attorney during examination are not actually to the acceptability of the specimens themselves, but are that the specimens do not show trademark use of the matter for which registration is sought."[445]

Because the case law supports the notion this Court maintains jurisdiction to consider Vintage Brand's ornamentality counterclaim, the Court will not grant summary judgment in Penn State's favor on that ground. Consequently, this Court must consider Penn State's remaining arguments in favor of summary judgment.

As to Penn State's assertion that Vintage Brand has presented no evidence that the marks are perceived only as ornamentation, that argument likewise fails. Vintage Brand's evidence is sufficient, at the summary judgment stage, to permit this counterclaim and affirmative defenses to process to trial as to any contestable marks.

First, the survey produced by Dr. Erdem provides significant evidence that consumers are not confused with regard to the origins of Vintage Brand's merchandise, or as to whether Vintage Brand and Penn State maintain a business relationship.[446] And although that survey was primarily geared toward a confusion analysis, the survey is helpful in understanding whether Penn State's marks are perceived as ornamentation by consumers. The fact that consumers viewed products

---

[445] *Id.* at *1-2.
[446] *See* Doc. 94-7 at 9-45.

bearing the Penn State Marks and perceive no connection between the manufacturer (here, Vintage Brand) and Penn State is strong evidence that they view the marks only as ornamental, not as indicative of a primary or secondary source.

Second, Vintage Brand has produced some circumstantial evidence that consumers view the marks as only ornamental. For example, Penn State's designated representative testified at a deposition that consumers are able to "express affinity or affiliation with Penn State . . . by wearing clothing decorated with Penn State's logos."[447] Moreover, at least some retailers who sell officially licensed Penn State merchandise market those goods as a method to express their allegiance to, or affiliation with, Penn State.[448] Additionally, under its licensing agreements, Penn State requires that licensees attach a label to all goods that states they are officially licensed by Penn State.[449] The very fact that Penn State requires such labels indicates that the marks themselves may not be source indicators.

Although these pieces individually do not constitute overwhelming evidence of ornamentality, taken together this evidence is sufficient to satisfy Vintage Brand's burden. Accordingly, Penn State is not entitled to summary judgment on Vintage Brand's counterclaim of ornamentality, or affirmative defense, as they pertain to any contestable marks.

---

[447]  Doc. 153 ¶ 29.
[448]  *Id.* ¶ 101.
[449]  Doc. 153 ¶ 94.

### b.   Registration of Penn State Seal Mark

Finally, the Court addresses Penn State's assertion that it is entitled to judgment in its favor as to Vintage Brand's Counterclaim One, seeking cancellation of the Penn State Seal Marks (registration numbers 1,276,712 and 5,877,080).[450] Penn State argues that summary judgment is appropriate because numerous visual differences between Pennsylvania's Coat of Arms and the Penn State Seal Marks means that the marks do not fall within the prohibition against use of government insignia in trademarks.[451] Vintage Brand responds that the Penn State Seal Marks indisputably incorporate Pennsylvania's Coat of Arms and therefore must, as a matter of law, be cancelled.[452]

Neither party is correct. As discussed earlier, the Lanham Act precludes the registration of any mark that "[c]onsists of or comprises the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof."[453] In determining whether a mark comprises such insignia, the factfinder must assess whether relevant consumers would "perceive matter in the mark as a" government insignia.[454] Registration should therefore not be refused if the insignia used within the mark "is sufficiently altered, stylized, or

---

[450] Doc. 114 at 49-53.

[451] *Id.*

[452] Doc. 150 at 54-55.

[453] 15 U.S.C. § 1052(b).

[454] *In Re Fam. Emergency Room LLC*, 121 U.S.P.Q.2d at 1890.

merged with other elements in the mark, so as to create a distinct commercial impression."[455]

Again, the challenged marks contain the entirety of Pennsylvania's Coat of Arms.[456] Penn State has made alterations to the Coat of Arms in its marks, which strip the Coat of Arms of its colors and merge Pennsylvania's coat of arms into a circle featuring the words "The Pennsylvania State University 1855" with scalloped design on the outside. As noted previously, there is insufficient evidence to determine, as a matter of law, that these alterations are insufficient to create distinct commercial impression. But neither are these additional elements sufficient to conclude as a matter of law that the marks *do* create a distinct commercial impression. It would be reasonable, based upon the similarity of the Seal Marks and Pennsylvania's Coat of Arms, for a jury to conclude that the marks appear to be governmental insignia without distinct commercial impression. Penn State's motion for summary judgment must therefore be denied as to Vintage Brand's Counterclaim One.[457]

---

[455] *Id.*

[456] *See* Doc. 127 at 56.

[457] This case is unlike the case to which Penn State cites, *City of New York v. Blue Rage, Inc.*, 435 F. Supp. 3d 472 (E.D.N.Y. 2020). There, the court determined at summary judgment that the challenged marks were not governmental insignia. *Id.* at 488-89. But that decision rested upon the obvious visual evidence "that the NYPD Shield does not reproduce the City Seal in its entirety, but rather incorporates only a few of its elements in a peripheral manner." *Id.* at 488. That is not the case here, where Pennsylvania's Coat of Arms was copied in its entirety, with only minor alterations made to the Coat of Arms when incorporated into Penn State's Marks.

## IV.   CONCLUSION

For the foregoing reasons, Vintage Brand's motion to exclude is granted, its motion to strike is granted in part and deferred in part, and its motion for summary judgment is granted in part and denied in part. Penn State's motion to exclude is denied, its motion to strike is granted in part and denied in part, and its motion for summary judgment is granted in part and denied in part.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | No. 4:21-CV-01091 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a PREP SPORTSWEAR; CHAD HARTVIGSON; ERIK HARTVIGSON; and MICHELLE YOUNG, | |
| Defendants. | |

## MEMORANDUM OPINION

### APRIL 2, 2024

## I.    BACKGROUND

In 2022 the Pennsylvania State University ("Penn State") filed a second amended complaint against Vintage Brand, LLC ("Vintage Brand") and other Defendants[1] asserting trademark infringement and other related claims.[2] In February 2024, the Court granted in part Vintage Brand's motion for summary judgment and entered judgment in its favor as to many of Penn State's ancillary claims, but permitted claims related to trademark infringement to proceed.[3] This Court

---

[1]   For the sake of simplicity, Defendants are referred to collectively as Vintage Brand.
[2]   Doc. 67.
[3]   Docs. 194, 195.

simultaneously granted in part Penn State's motion for summary judgment and, as relevant here, granted judgment in Penn State's favor with respect to Vintage Brand's Affirmative Defenses Seven and Eight to the extent that they sought to invalidate Penn State's incontestable registrations on the ground that those registrations were merely ornamental—either as used by Penn State (Affirmative Defense Seven) or Vintage Brand (Affirmative Defense Eight).[4]

Those affirmative defenses read:

### SEVENTH AFFIRMATIVE DEFENSE

Penn State's claims are barred and/or limited where Penn State's application of the text and designs described in the Second Amended Complaint to merchandise is merely ornamental and does not engender the commercial impression of a source-identifying trademark.

### EIGHTH AFFIRMATIVE DEFENSE

Penn State's claims are barred and/or limited where Vintage Brand's application of the text and designs described in the Second Amended Complaint to merchandise is merely ornamental and does not engender the commercial impression of a source-identifying trademark.[5]

Specifically, this Court concluded that the validity of incontestable registrations may be challenged only on limited grounds and cannot be challenged on the ground that they are merely ornamental.[6] This finding mostly precluded

---

[4]   Doc. 194 at 55, 102-03; Doc. 195 at 2.
[5]   Doc. 72 at 40.
[6]   Doc. 194 at 55.

Affirmative Defenses Seven and Eight, since many of Penn State's registrations are incontestable.[7]

Vintage Brand has now filed a motion for partial reconsideration or, in the alternative, for clarification, of the Court's Order granting in part Penn State's motion for summary judgment as to Affirmative Defense Eight.[8] Vintage Brand argues that Penn State's motion for summary judgment sought only to preclude the ornamentality defense as applied to contesting the validity of the trademarks.[9] Vintage Brand asserts that, while Affirmative Defense Seven challenged the validity of the marks, Affirmative Defense Eight instead focuses on Vintage Brand's use of the marks and goes to the likelihood of confusion and aesthetic functionality defense—not validity—meaning that the issue of incontestable trademarks is irrelevant.[10]

Penn State responds that reconsideration should not be granted, nor should the Court issue the requested clarification.[11] As to reconsideration, Penn State first asserts that the Court correctly determined that the ornamentality defense is largely foreclosed by Penn State's incontestable registrations—and the only differences between Affirmative Defenses Seven and Eight is that Affirmative Defense Seven

---

7    *Id.* at 102-03.
8    Doc. 199.
9    Doc. 200 at 3-4.
10   *Id.* at 5-6.
11   Doc. 203.

addressed ornamental use by Penn State, while Affirmative Defense Eight addressed ornamental use by Vintage Brand.[12] But the mere ornamentality defense cannot be used to challenge the validity of an incontestable registration.[13] Second, Penn State contends that binding precedent demonstrates that Vintage Brand cannot challenge the validity of the marks regardless of whether they appear on Penn State merchandise or Vintage Brand merchandise.[14]

As to Vintage Brand's alternative request for clarification, Penn State argues that there is no need for clarification.[15] It asserts that any argument regarding likelihood of confusion is not an affirmative defense but instead attacks an element of Penn State's case.[16] The Court's Order, therefore, only addressed ornamentality as a defense to validity, and did not address whether evidence or arguments may be introduced at trial as to consumer perception or confusion.[17] Finally, Penn State contends that the aesthetic functionality defense is set out in Affirmative Defenses Five and Six, and is not relevant to Affirmative Defense Eight.[18]

In it's reply brief, Vintage Brand reiterates that reconsideration is necessary.[19] Vintage Brand maintains that Affirmative Defense Eight focuses on its use of the

---

[12] *Id.* at 2-4.
[13] *Id.*
[14] *Id.* at 4-8.
[15] *Id.* at 8-10.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] Doc. 206.

marks within historic composite images in its products, and the defense therefore applies to only to Vintage Brand's ornamental use and has no bearing on the validity of Penn State's marks.[20] At bottom, Vintage Brand argues that it should be permitted to maintain the defense that its use of Penn State's trademarks does not infringe on Penn State's rights.[21] Alternatively, Vintage Brand asserts that it is proper for the Court to clarify that its prior ruling only prohibits Vintage Brand from challenging the validity of Penn State's incontestable marks, and not from arguing that Penn State's claims fail because Vintage Brand's use of the marks was for only an ornamental purpose.[22]

This matter has been fully briefed and is therefore ripe for disposition. For the following reasons, Vintage Brand's motion for partial reconsideration will be denied, while its alternative request for clarification will be granted.[23]

## II.    DISCUSSION

To properly support a motion for reconsideration, a party must demonstrate "at least one of the following: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion; or (3) the need to correct a clear error of law or fact or to prevent manifest

---

[20]   *Id.* at 2-7.

[21]   *Id.*

[22]   *Id.* at 8-9.

[23]   Also pending before the Court is Penn State's uncontested motion for partial reconsideration. Doc. 201. As explained by this Court during the March 12, 2024 telephonic status conference, the Court agrees that reconsideration is warranted as to Count Three, and Penn State's motion will therefore be granted.

injustice."[24]  As to the third ground, in reviewing for clear error, reconsideration is warranted only if the "[C]ourt is left with the definite and firm conviction that a mistake has been committed."[25]  "Thus, [to warrant reconsideration, Vintage Brand] must show more than mere disagreement with the earlier ruling; [it] must show that the . . . Court committed a direct, obvious, or observable error, and one that is of at least some importance to the larger proceedings."[26]

Vintage Brand does not base its motion on either new evidence or an intervening change in controlling law and, accordingly, reconsideration is warranted only if Vintage Brand demonstrates clear error in this Court's prior ruling. Vintage Brand has not met this burden, as it presents no compelling evidence or argument that it should be permitted to proffer an affirmative defense seeking to invalidate, on the ground of mere ornamentality, Penn State's incontestable registrations.

Vintage Brand's primary argument is that the Court's ruling conflated Affirmative Defenses Seven and Eight, as Affirmative Defense Seven related to Penn State's use of the challenged marks, while Affirmative Defense Eight related to Vintage Brand's use of the challenged marks.[27] This difference, Vintage Brand argues, is important because Affirmative Defense Eight does not seek to challenge

---

[24]   *In re Vehicle Carrier Servs. Antitrust Litig.*, 846 F.3d 71, 87 (3d Cir. 2017) (ellipsis and internal quotation marks omitted).

[25]   *Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d 252, 258 (3d Cir. 2008) (internal quotation marks omitted).

[26]   *In re Energy Future Holdings Corp.*, 904 F.3d 298, 312 (3d Cir. 2018) (brackets, quotation marks, and citation omitted).

[27]   Doc. 200 at 9.

the validity of Penn State's marks but, instead, is relevant to question of likelihood of confusion and the aesthetic functionality defense.[28]

But, as Penn State correctly observes, any defense related to aesthetic functionality appears to be covered by Affirmative Defenses Five and Six.[29] To the extent that Affirmative Defense Eight seeks to assert the same defense it would be redundant.

With regard to Vintage Brand's assertion that its use of Penn State's marks in the context of historical images does not infringe on Penn State's rights and does not cause confusion among consumers, that is not an affirmative defense. As this Court recently explained in a different matter, the "difference between a general defense and an affirmative defense is that a general defense negates an element of plaintiff's *prima facie* case, while an affirmative defense excuses the defendant's conduct even if the plaintiff is able to establish a *prima facie* case."[30] This definition has been embraced by the United States Court of Appeals for the Third Circuit.[31]

This definition makes clear that any issue related to likelihood of confusion, which Vintage Brand explains is the crux of Affirmative Defense Eight,[32] does not constitute an affirmative defense. Rather, the defense seeks directly to negate an

---

[28]  *See* Doc. 206 at 4-7.
[29]  *See* Doc. 72 at 39.
[30]  *Beard v. Helman*, No. 4:21-CV-00680, 2024 WL 967837, at *10 (M.D. Pa. Mar. 6, 2024) (internal quotation marks omitted).
[31]  *Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 321 (3d Cir. 2006).
[32]  *See* Doc. 206 at 7 n.5 (noting that "Affirmative Defense Eight focuses on the" likelihood of confusion element of a trademark infringement case).

element of Penn State's *prima facie* case—that Vintage Brand's use of the trademarks causes a likelihood of confusion.[33] Therefore, even under Vintage Brand's clarification as to the nature of Affirmative Defense Eight, judgment in favor of Penn State was appropriate, because the defense that Vintage Brand seeks to assert is not a proper affirmative defense at all.

However, the Court will grant Vintage Brand's request for clarification. Vintage Brand states that it "seeks to maintain" "the substance of [its] argument" that its "ornamental use of its historic images does not infringe any rights [Penn State] owns, even if [Penn State] has such rights."[34]

It appears then that Vintage Brand reads too much from the Court's Memorandum Opinion and Order. The Court ruled only that Vintage Brand cannot maintain an affirmative defense that Penn State's incontestable registrations are invalid because those trademarks are used in a merely ornamental manner.[35] As just explained, to the extent that Vintage Brand argues it did not in fact infringe on Penn State's rights and its use of Penn State's trademarks did not create a likelihood of confusion, that is not a proper affirmative defense and may not be maintained as such. However, nothing in the Court's ruling should be construed as prohibiting any

---

[33] *Id.*
[34] *Id.* at 7.
[35] *See* Doc. 194 at 102-03.

arguments at trial related to a likelihood of confusion, or that Vintage Brand did not infringe upon Penn State's rights in its trademarks.[36]

## III.   CONCLUSION

In accordance with the above discussion, Vintage Brand's motion for reconsideration is denied, while its alternative motion for clarification is granted.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

---

[36]   Nor however, should either this Order or the February 6, 2024, Memorandum Opinion and Order be construed as permitting any specific arguments. Rather, the Court did not reach in the February 6, 2024 Opinion the issue of whether any specific arguments may be proffered in regard to likelihood of confusion, and it does not reach the issue at this time.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | No. 4:21-CV-01091 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a PREP SPORTSWEAR; CHAD HARTVIGSON; ERIK HARTVIGSON; and MICHELLE YOUNG, | |
| Defendants. | |

## ORDER

### APRIL 2, 2024

In accordance with the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that:

1. Vintage Brand's motion for partial reconsideration (Doc. 199) is **DENIED**;

2. Vintage Brand's alternative request for clarification is **GRANTED**, as detailed in the accompanying Memorandum Opinion; and

3. Penn State's uncontested motion for partial reconsideration (Doc. 201) is **GRANTED**, the Court's prior entry of judgment in favor of Vintage Brand as to Count Three of the second amended complaint (alleging

common law trademark infringement) is **VACATED**, and Vintage

Brand's motion for summary judgment is **DENIED** as to Count Three.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | No. 4:21-CV-01091 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a PREP SPORTSWEAR; and CHAD HARTVIGSON, | |
| Defendants. | |

**ORDER**

**NOVEMBER 4, 2024**

In accordance with the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that:

1. Vintage Brand's motions *in limine* (Doc. 221) are **GRANTED** in part and **DENIED** in part as follows:

   a. Granted as to evidence related to profits and revenues unrelated to any alleged infringement;

   b. Granted as to prior trademark lawsuits and disputes involving Vintage Brand;

   c. Granted as to any evidence or description of counterfeiting or counterfeit goods;

   d. Granted as to evidence of Wayback Machine captures;

   e. Granted as to evidence related to the use of licensing revenue to fund scholarships;

   f. Granted in part and denied in part as to evidence related to manufacturing processes;

   g. Granted as to lay testimony regarding mark consumer perception or recognition of Penn State marks;

h.  Deferred as to evidence of images of clothing bearing the Pozniak Lion design; and

i.  Granted as to evidence or argument that trademarks bearing the Pozniak Lion design have achieved incontestable status.

2.  Penn State's motions in limine are **GRANTED** in part and **DENIED** in part as follows:

a.  Granted as to advice of counsel defense (Doc. 223);

b.  Granted as to evidence related to Jerry Sandusky (Doc. 227);

c.  Granted as to evidence related to Franklyn's Survey One (Doc. 229);

d.  Granted as to any legal testimony (Doc. 231);

e.  Granted as to any evidence related to copyright law (Doc. 233);

f.  Denied as to evidence related to antitrust law (Doc. 235);

g.  Denied as to evidence related to aesthetic functionality (Doc. 237); and

h.  Granted as to evidence related to the First Amendment or dismissed claims or defenses (Doc. 239).

3.  Penn State's motion to strike (Doc. 225) is **DENIED**.


BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | No. 4:21-CV-01091 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a PREP SPORTSWEAR; and CHAD HARTVIGSON, | |
| Defendants. | |

**MEMORANDUM OPINION**

**NOVEMBER 4, 2024**

This trademark dispute has proceeded in due course and is now approaching trial. Pursuant to this Court's scheduling deadlines, the parties have filed a number of pretrial motions. These motions primarily relate to the relatively mundane requests for evidentiary rulings that form the basis of most motions *in limine*. But, in certain instances, these motions seek to effectively strike defenses in a manner perhaps more appropriately brought in a dispositive motion filed well in advance of trial and with a more robust factual record placed before the Court. As discussed below, while the evidence that may be presented at trial will be trimmed back, the core of this case and the defenses presented—primarily relating to the question of whether a trademark claim may lie, or whether consumers are confused, when

consumers allegedly purchase goods bearing a protected mark for reasons unrelated to source identification—may properly be presented to a jury.

## I.    BACKGROUND

In 2022, The Pennsylvania State University ("Penn State") filed a second amended complaint alleging that Vintage Brand, LLC, Sportwear, Inc., Chad Hartvigson, Erik Hartvigson, and Michelle Young (collectively "Vintage Brand") alleging that Vintage Brand had: (1) willfully infringed on Penn State's trademarks in violation of 15 U.S.C. § 1114 (Count One);[1] (2) sold and marketed counterfeit products in violation of Sections 1114, 1116(d), and 1117 (Count Two);[2] (3) unfairly competed and falsely designated Penn State as the source of Vintage Brand's products in violation of Section 1125(a) (Count Three);[3] (4) falsely advertised and endorsed its products' affiliation with Penn State in violation of Section 1125(a) (Count Four);[4] diluted Penn State's trademarks in violation of Section 1125(c) and 54 Pa. C.S. § 1124 (Counts Five and Six, respectively);[5] and (7) infringed on Penn State's common-law trademarks (Count Seven).[6]

Much of the relevant history and the facts related to the underlying dispute was outlined in some detail in this Court's prior summary judgment Memorandum

---

[1]    Doc. 67 ¶¶ 99-105. Specifically, Penn State alleges that Vintage Brand infringed on its PENN STATE, TPSU, Nittany Lion Logo, Pozniak Lion Logo, and Penn State Seal marks. *Id.*

[2]    *Id.* ¶¶ 106-12.

[3]    *Id.* ¶¶ 113-16.

[4]    *Id.* ¶¶ 117-25.

[5]    *Id.* ¶¶ 126-34 (Count Five), 135-40.

[6]    *Id.* ¶¶ 141-45.

Opinion addressing the competing motions for summary judgment and to exclude certain expert opinions.[7] Because most of this discussion is not directly relevant to the pending motions *in limine*, those facts will not be repeated here.

Based on the facts underlying this matter, in February 2024, this Court granted in part and denied in part the parties' competing motions for summary judgment; granted Vintage Brand's motion to exclude expert opinions while denying Penn State's motion to exclude expert opinions; and granted in part and denied in part Vintage Brand's motions to strike while granting in part and denying in part Penn State's motion to strike.[8]

As to the expert opinions, as relevant here, this Court excluded Penn State's expert David Franklyn's commercial impression survey ("Survey One").[9] The Court determined that Survey One was not sufficiently reliable, as it was entirely novel and therefore was not generally accepted, and lacked any known error rate or standards by which to judge it.[10] Moreover, the Court was concerned that Survey One contained demand artifacts that primed respondents to see a trademark in the survey questions, failed to adequately place the images used within a marketplace context, and failed to use a proper control image.[11] Vintage Brand did not seek to

---

[7]    *See* Doc. 194. Rulings relevant to the motions *in limine* will be discussed in the body of this Memorandum Opinion.
[8]    Docs. 194, 195.
[9]    Doc. 194 at 20-33.
[10]    *Id.* at 22-25.
[11]    *Id.* at 25-32.

exclude Franklyn's likelihood of confusion survey ("Survey Two") and the Court denied Penn State's motion to exclude a survey from Vintage Brand's expert, Tülin Erdem.[12]

As to the motions for summary judgment, the Court first assessed Vintage Brand's motion.[13] The Court found that genuine issues of material fact precluded judgment as to Penn State's statutory and common law trademark infringement claims[14] and Vintage Brand's counterclaim seeking to cancel certain of Penn State's trademark registrations, but granted judgment in Vintage Brand's favor with regard to Penn State's counterfeiting, dilution, false advertising, and false endorsement claims. This Court denied summary judgment as to Vintage Brand's counterclaim seeking to cancel Penn State's Seal Designs, since visual differences between Penn State's trademarks and the Pennsylvania Coat of Arms did not permit the conclusion, as a matter of law, that the trademarks created an indistinct commercial impression.[15]

More specifically, as to the claim of willful trademark infringement, this Court determined that Penn State's evidence created a genuine issue of material fact as to whether its trademarks were merely ornamental, since Franklyn's Survey Two hinted that Penn State's trademarks indicate that it is a secondary source of any

---

[12]  *Id.* at 33-39.
[13]  *Id.* at 51-93.
[14]  The Court originally entered summary judgment as to Count Three, but later reinstated that claim. *See id.* at 85 n. 367; Doc. 212.
[15]  Doc. 194 at 91-93.

tangible goods.[16] Nor did the evidence establish as a matter of law that Penn State's trademarks were merely aesthetically functional, since Penn State had met its low burden of demonstrating a genuine dispute as to whether prohibiting Vintage Brand from using Penn State trademarks would result in a significant non-reputational disadvantage.[17] Finally, a balancing of the relevant factors sufficiently demonstrated a likelihood of confusion, such that summary judgment on the issue of willful infringement was inappropriate.[18]

However, the Court granted summary judgment in Vintage Brand's favor with regard to Penn State's counterfeiting claim, since nothing in the record supported the conclusion that Vintage Brand's use of Penn State marks deceptively suggested that Vintage Brand's goods were in fact Penn State's goods.[19] This Court also granted summary judgment in Vintage Brand's favor with respect to Penn State's dilution claim, as the images used by Vintage Brand were not substantially similar to Penn State's marks, and there was no evidence that Vintage Brand's alleged use of Penn State's marks lessened the capacity of those marks to identify and distinguish goods or services.[20]

---

[16]  *Id.* at 53-64.
[17]  *Id.* at 64-69.
[18]  *Id.* at 69-75.
[19]  *Id.* at 75-78.
[20]  *Id.* at 78-85.

Lastly, the Court granted summary judgment in Vintage Brand's favor as to claims of false advertising and false endorsement.[21] Specifically, this Court determined that there was no evidence that Vintage Brand had misrepresented the characteristics of its goods as was needed to support a false advertising claim, and further determined that Penn State's false endorsement claim could not stand independently, as it was merely a repackaged trademark infringement claim and there was no evidence that Vintage Brand had used Penn State's trademarks to identify Vintage Brand's goods or services.[22]

The Court also granted in part and denied in part Penn State's motion for summary judgment.[23] This Court denied the motion as to Penn State's claims for counterfeiting, false advertising, and false endorsement, as it had entered judgment in Vintage Brand's favor on those claims, and denied the motion as to its trademark infringement claims because—as with Vintage Brand's competing motion—genuine issues of material fact with respect to whether there was a likelihood of confusion prevented judgment in Penn State's favor.[24] It further denied Penn State's motion for summary judgment as to Vintage Brand's counterclaims except as to Vintage

---

[21]  *Id.* at 85-91.
[22]  *Id.*
[23]  *Id.* at 93-108.
[24]  *Id.* at 94-101.

Brand's ornamentality counterclaim and affirmative defenses as applied to any of Penn State's trademarks that are incontestable.[25]

Following that decision, all that remains is a pending jury trial on Penn State's claims and Vintage Brand's counterclaims. This matter is set for trial in November 2024 and, in accordance with this Court's Scheduling Order, the parties have filed their motions *in limine*.[26]

In its motion *in limine*, Vintage Brand raises nine issues.[27] Vintage Brand asserts that Penn State should be precluded from: (1) introducing evidence or argument related to Vintage Brand's revenue and profits that are unrelated to Penn State's trademarks; (2) presenting evidence related to Vintage Brand's other disputes and lawsuits; (3) characterizing Vintage Brand's products as counterfeit or suggesting that it engages in counterfeiting; (4) introducing Wayback Machine captures into evidence; (5) implying that money from any damages award would be used to fund scholarships; (6) implying that Vintage Brand's manufacturing process utilizes unethical practices; (7) introducing lay opinion testimony about consumer perceptions or recognition of Penn State's trademarks; (8) arguing or implying that images of clothing bearing the Pozniak Lion Design establish trademark rights; and (9) asserting that the Pozniak Lion Design trademark is incontestable.[28]

---

[25] *Id.* at 102-08.
[26] Docs. 221, 223, 225, 227, 229, 231, 233, 235, 237, 239.
[27] Doc. 222.
[28] *Id.*

Penn State in turn also raises nine issues. It argues that Vintage Brand should be prohibited from: (1) presenting an advice of counsel defense;[29] (2) referencing Jerry Sandusky or his crimes;[30] (3) referencing Franklyn's now-excluded Survey One;[31] (4) presenting legal testimony through lay witnesses;[32] (5) arguing that any of Penn State's claims are barred by copyright law, specifically the concept of public domain;[33] (6) offering any evidence or argument related to antitrust issues;[34] (7) presenting testimony or evidence regarding an aesthetic functionality defense;[35] and (8) introducing evidence or argument related to dismissed claims or defenses, or that its actions are protected by the First Amendment to the United States Constitution.[36] Penn State also seeks to strike Vintage Brand's aesthetic functionality defense.[37]

As explained below, Vintage Brand's motions *in limine* will be granted in part and denied in part, while Penn State's motions *in limine* will likewise be granted in part and denied in part. Penn State's motion to strike will be denied.

---

[29] Docs. 223, 224.
[30] Docs. 227, 228.
[31] Docs. 229, 230.
[32] Docs. 231, 232.
[33] Docs. 233, 234.
[34] Docs. 235, 236.
[35] Docs. 237, 238.
[36] Doc. 239.
[37] Docs. 225, 226.

## II.    DISCUSSION

Courts exercise discretion to rule *in limine* on evidentiary issues "in appropriate cases."[38] While motions *in limine* may serve as a useful pretrial tool that enable more in-depth briefing than would be available at trial, a court may defer ruling on such motions "if the context of trial would provide clarity."[39] "[M]otions *in limine* often present issues for which final decision is best reserved for a specific trial situation."[40] Thus, certain motions, "especially ones that encompass broad classes of evidence, should generally be deferred until trial to allow for the resolution of questions of foundation, relevancy, and potential prejudice in proper context."[41] Specifically, "*pretrial* Rule 403 exclusions should rarely be granted . . . a court cannot fairly ascertain the potential relevance of evidence for Rule 403 purposes until it has a full record relevant to the putatively objectionable evidence."[42] Regardless, "*in limine* rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial."[43]

---

[38]    *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 260 (3d Cir. 1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

[39]    *Frintner v. TruePosition*, 892 F.Supp.2d 699, 707 (E.D. Pa. 2012).

[40]    *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 518 n.10 (3d Cir. 1997).

[41]    *Leonard v. Stemetech Health Scis., Inc.*, 981 F. Supp. 2d 273, 276 (D. Del. 2013).

[42]    *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 859 (3d Cir. 1990).

[43]    *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000).

## A.    Vintage Brand's Motion *in Limine*

### 1.    Evidence Related to Vintage Brand's Profits and Revenues Unrelated to Alleged Infringement

Vintage Brand first argues that Penn State should be precluded from introducing evidence related to Vintage Brand's profits or revenues that are unrelated to any alleged infringement upon Penn State's trademarks.[44] Vintage Brand contends that such evidence is irrelevant to any potential calculation of damages under the Lanham Act, as only revenue derived from infringing conduct is incorporated into such calculations.[45] Penn State concedes it may not affirmatively offer such evidence, but responds that any ruling should be deferred until trial, as it may introduce evidence related to Vintage Brand's other profits and revenues should Vintage Brand open the door to the admission of such evidence.[46]

The Court agrees that evidence of Vintage Brand's revenue and profits that are wholly unrelated to any alleged infringing conduct is irrelevant to this case and will grant the motion *in limine*. Penn State will be prohibited from introducing such evidence at trial. However, Penn State's concerns are well considered, and Penn State may move for reconsideration of this ruling at trial should it believe Vintage Brand has opened the door to the admission of such evidence.

---

[44]    Doc. 222 at 9-11.
[45]    *Id.*
[46]    Doc. 240 at 7.

### 2. Evidence Related to Vintage Brand's Other Lawsuits and Disputes

Vintage Brand next argues that Penn State should be precluded from introducing evidence related to other trademark lawsuits against Vintage Brand or other similar disputes, as any possible relevance is substantially outweighed by the danger of unfair prejudice, confusion of the issues, potential undue delay, and wasting of time.[47] Penn State asserts that the evidence is relevant to Vintage Brand's intent, which is important in determining likelihood of confusion, willfulness, and an intent to confuse or deceive with respect to any disgorgement analysis; in that vein Vintage Brand's "prior adverse litigation experience" is relevant to intent since it indicates both a lack of good faith and that Penn State knew its conduct infringed on trademarks but failed to act differently.[48]

The Federal Rules of Evidence provide that evidence is relevant and generally admissible if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action."[49] However, even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair

---

[47] Doc. 222 at 11-12.
[48] Doc. 240 at 8-13.
[49] Fed. R. Evid. 401.

11

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[50]

In the abstract, prior lawsuits or other disputes involving a defendant that allege trademark infringement—such as cease and desist letters—may be relevant to intent.[51] But every case is unique, and the circumstances surrounding every alleged trademark infringement are unique. Here, several factors reduce the potential relevance of prior matters involving Vintage Brand and lead this Court to conclude that any possible relevance is substantially outweighed by dangers such as unfair prejudice, confusing the issues, and causing undue delay and wasting time.

Notably, two of the cases to which Penn State cites—the only two that Penn State points to as having final judgments of any sort—come from the United States Courts of Appeals for the Fifth and Eleventh Circuits, both of which employ the per se approach to trademark infringement adopted in *Boston Professional Hockey Association v. Dallas Cap & Emblem Manufacturing*[52] whereby trademarks are protected if they create only a mental association between the trademark and the trademark holder, even if consumers do not believe the trademark holder had

---

[50]    Fed. R. Evid. 403.
[51]    *See* Doc. 240 at 10-11 (collecting cases).
[52]    510 F.2d 1004 (5th Cir. 1975).

manufactured or sponsored the product; that approach was specifically rejected by this Court.[53]

Significant differences in legal standards with regard to trademark infringement would obviously play a large role in any determination of liability—or in a party's willingness to settle—since, as this Court noted previously, under the per se approach Vintage Brand would likely have been successful in dismissing Penn State's counterclaims.[54] More importantly, however, such legal differences would have a significant impact on any party's understanding of whether their conduct is infringing to begin with. Under the per se standard employed by other courts, Vintage Brand's conduct may well infringe whereas, under the standard adopted by this Court, Vintage Brand could reasonably believe that its conduct is legally proper. Therefore, even direct proof that Vintage Brand understood its conduct to be infringing in other circuits does not necessarily bear on whether Vintage Brand knew that its conduct was infringing here.

Moreover, each alleged act of infringement is factually unique, which would further diminish the relevance of other lawsuits or disputes as related to Vintage

---

[53] *Compare id.* (formulating approach) and *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256, 1258-59 (11th Cir. 2017) (noting that *Boston Hockey* is "binding precedent that [the Eleventh Circuit is] bound to follow"—even if the actual application in that case appears to leave some daylight between the Eleventh Circuit and the *Boston Hockey* standard), *with* Doc. 43 at 8-17 (discussing and rejecting per se approach) and Doc. 194 at 58-59 (adopting fact-intensive approach that aims to identify whether use of a mark create confusion as to whether trademark holder approved or sponsored the tangible goods bear those marks).

[54] Doc. 43 at 10.

Brand's willfulness. Factual questions relevant to each alleged act of infringement include issues such as, for example, whether the infringement involved composite images or direct use of trademarks, whether the defendant conducted research into whether images were trademarked, or whether any trademarks had obtained indisputable status. This would necessitate an examination of the underlying cases, conduct, and trademarks to determine whether the conduct there was similar to Vintage Brand's conduct in this matter, which would not only have the potential to confuse the jury, but would undoubtedly waste significant amounts of time.[55]

Finally, introducing evidence of those other disputes "would prejudice the jury, as it would have the effect of painting [Defendants] as serial trademark infringers—even if the prior lawsuits were not resolved on their merits or with any finding of liability."[56] Because the relevance—if any—of other lawsuits or disputes involving Vintage Brand is significantly outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time, the Court will grant Vintage Brand's motion. However, this Court is amenable to reexamining this ruling at a later date should Penn State demonstrate a closer factual nexus between Vintage Brand's conduct here and its conduct in those other cases.

---

[55] Moreover, it would need to be determined when these cases arose and when Vintage Brand was placed on notice that its conduct was potentially infringing. Several of the cases cited by Penn State appear to have arisen after Vintage Brand asserts that it ceased selling Penn State themed goods. *See* Doc. 240-2 at 2-3.

[56] *Avco Corp. v. Turn & Bank Holdings, LLC*, No. 4:12-CV-01313, 2022 WL 3970830, at *7 (M.D. Pa. Aug. 31, 2022).

### 3.    Reference or Characterization of Vintage Brand's Product as Counterfeit or its Conduct as Counterfeiting

Vintage Brand next contends that Penn State should be prohibited from arguing or presenting evidence that suggests Vintage Brand's products are counterfeit, or that it is engaged in counterfeiting.[57] Penn State in turns asserts that the motion should be denied as moot, since it agrees that it will not characterize Vintage Brand's merchandise as counterfeit or its conduct as counterfeiting.[58]

The Court agrees that evidence or argument suggesting that Vintage Brand's products are counterfeit or that it is engaging in counterfeiting is inadmissible, and Penn State is prohibited from introducing such evidence or argument at trial. To the extent that Penn State believes it has relevant testimony or evidence that skirts this line, it may seek clarification of the scope of this Order at trial.

### 4.    Wayback Machine Captures

Vintage Brand further seeks to exclude Penn State's Wayback Machine captures because, Vintage Brand argues, those captures cannot be authenticated at trial.[59] Specifically, Vintage Brand asserts that the captures must be authenticated by an Internet Archive employee and, here, Penn State's attempt to authenticate the captures through a declaration is improper since: (1) the captures do not produce an accurate result as demonstrated by Internet Archive's disclaimer, errors in the pages

---

[57]  Doc. 222 at 13-14.
[58]  Doc. 240 at 13-14.
[59]  Doc. 222 at 15-20.

captured, and no postdates or estimated postdates; and (2) any authentication would go to the captures themselves, not the accuracy of the contents of the webpages depicted, which is why Penn State seeks to admit those captures.[60]

Penn State argues that it will authenticate the Wayback Machine captures by way of an affidavit from an Internet Archive employee.[61] It asserts that an affidavit is adequate if the employee providing the affidavit has sufficient personal knowledge and if, as here, there is no basis upon which to question the accuracy of the captures themselves.[62]

Federal Rule of Evidence 902 provides that certain evidence is self-authenticating including, as relevant here, any "record generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with [the relevant] certification requirements."[63] In keeping with those requirements, the parties agree that Wayback Machine captures are not admissible unless authenticated by an Internet Archive employee.[64]

To authenticate the Wayback Machine captures, Penn State has submitted an affidavit—submitted under penalty of perjury—from Nathaniel E. Frank-White, a records request processor at the Internet Archive.[65] Frank-White states that the

---

[60] *Id.*
[61] Doc. 240 at 14-15.
[62] *Id.* at 15-17.
[63] Fed. R. Evid. 902(13).
[64] Doc. 222 at 16; Doc. 240 at 14-15.
[65] Doc. 240-6.

Wayback Machine "makes it possible to browse more than 450 billion pages stored in the Internet Archive's web archive" all of which may be searched by URL.[66] The data that is accessible via the Wayback Machine "is obtained by use of web archiving software that automatically stores copies of files available via the Internet, each file preserved as it existed at a particular point in time."[67] In addition to explaining the Wayback Machine's naming convention, Frank-White attests that the captures Penn State seeks to enter into evidence "are true and accurate copies of screenshots of the Internet Archive's records of the archived files for the URLs and the dates specified in the attached coversheet of each printout."[68]

Based on the contents of Frank-White's statement provided by Penn State, the Court must agree with Vintage Brand that the affidavit is insufficient to meet the requirements of Rule 902 and, therefore, is no proper substitute for live testimony. Notably, other than stating that "each file [is] preserved as it existed at a particular point in time,"[69] Frank-White's affidavit provides scant information upon which this Court may conclude that the Wayback Machine "produces an accurate result."[70] The affidavit does not explain, for example, how the screenshots are captured, whether there are any known error rates in the process of capturing webpages, or whether the

---

[66]  *Id.* at 2.
[67]  *Id.*
[68]  *Id.*
[69]  *Id.*
[70]  Fed. R. Evid. 902(13).

Internet Archive does anything to ensure or check the accuracy of any captures.[71] In essence, Frank-White's affidavit sufficiently attests that the proposed exhibits are accurate depictions of what is contained on the Wayback Machine, but does not adequately attest that what is contained on the Wayback Machine is accurate.[72]

Because Frank-White's affidavit is insufficient to establish the accuracy of the Wayback Machine captures, the attached exhibits are not self-authenticating under Rule 902(13).[73] Consequently, based on the information available to the Court, Vintage Brand's motion to exclude the Wayback Machine captures is granted. However, this is without prejudice to Penn State's ability to introduce evidence of the Wayback Machine captures should it introduce live testimony to authenticate

---

[71] *See, e.g., Magee v. Noe*, No. 2:20CV183-HSO-MTP, 2023 WL 116349, at *6 (S.D. Miss. Jan. 5, 2023) (affiant must speak "to the accuracy of the . . . process or system, which is necessary in order for the records generated by such an electronic process or system to be self-authenticating").

[72] Vintage Brand further argues that Frank-White may only authenticate the exhibits as to the accuracy of the Wayback Machine captures, but cannot authenticate the substance of those captures—i.e., that Vintage Brand was selling Penn State branded merchandise. Doc. 222 at 19-20. Because the affidavit submitted is insufficient to authenticate the Wayback Machine captures for any purpose, the Court will not definitively address this argument here. But testimony from an Internet Archive employee that sufficient discusses the accuracy of the Wayback Machine captures themselves—assuming Internet Archive is able to provide such testimony—would more than likely adequately demonstrate the accuracy of the underlying content as well. In any event, given the purpose for which the captures are offered, it is—at the least—questionable whether those captures may be admitted pursuant to Rule 902(11). *See United States v. Browne*, 834 F.3d 403, 409-11 (3d Cir. 2016).

[73] Penn State makes passing reference to admissibility under Rules 803(6) and 902(11), Doc. 240 at 15, but it does not actually argue admissibility under that subsection. *See id.* at 14-17. And is it not clear from Frank-White's affidavit that the Wayback Machine captures were "made at or near the time [of the relevant event] by—or from information transmitted by—someone with knowledge." Fed. R. Evid. 803(6)(A); *see id.* at 902(11) (requiring that records submitted pursuant to Rule 902(11) also meet the requirements of Rule 803(6)). The Court therefore cannot conclude that the captures are admissible under § 902(11).

those captures at trial, or authenticate the captures through an affidavit that adequately complies with Rule 902(13).

### 5.    Evidence that Licensing Revenue Funds Scholarships

Vintage Brand next asserts that Penn State should be precluded from arguing or presenting evidence that some portion of its licensing revenue funds student scholarships, as this would imply that a monetary award would be used in the same way and thereby influence the jury to find in Penn State's favor not based on the evidence, but because of altruistic motives.[74] Penn State responds that such evidence is relevant to the strength of its marks and to the public interest served by making Vintage Brand's alleged misconduct unprofitable.[75]

As an initial matter, contrary to Vintage Brand's arguments, the Court is unable to discern any identifiable prejudice that would result from the introduction of this evidence. However, potential prejudice does not come into play because the Court is likewise unable to discern any relevance to this evidence.

First, the Court rejects Vintage Brand's argument that such information is relevant to the strength of its marks. As the Third Circuit has explained, the "strength of a mark is determined by (1) the distinctiveness or conceptual strength of the mark and (2) its commercial strength or marketplace recognition."[76] As this demonstrates,

---

[74]   Doc. 222 at 20.
[75]   Doc. 240 at 17-18.
[76]   *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 282 (3d Cir. 2001).

the strength of a mark depends entirely on the recognition of the mark itself (or its distinctiveness), not broadly on the fact that individuals know of Penn State's trademarks or that its trademark licensing revenue is used to fund scholarships.

Second, while such information may be relevant to the issue of whether to disgorge profits, it is well established that any determination related to disgorgement is reserved to courts, not juries.[77] Therefore, while this information may be relevant to a disgorgement determination, it need not be presented to the jury, since the jury will not make any decision regarding disgorgement.[78] Because the Court cannot discern any relevance of information regarding the use of trademark licensing revenue for scholarship funds, Vintage Brand's motion will be granted, and Penn State will be prohibited from making reference to, or presenting evidence in support of, this fact.

### 6. Evidence that Vintage Brand Engages in Unethical Practices

Next, Vintage Brand argues that the Court should bar Penn State from presenting evidence related to corporate responsibility standards imposed on Penn State's licensees with regard to the manufacturing process, as such evidence is irrelevant and would falsely imply that Vintage Brand engages in unethical

---

[77] *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 217 (3d Cir. 2021). *Cf. Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 78 n.1 (3d Cir. 2009) (noting that "equitable remedies [are] to be determined by the court").

[78] In any event, the parties have stipulated to the amount of disgorgement damages that should be awarded in the event of a jury verdict in favor of Penn State. *See* Doc. 269 at 30-31.

practices.[79] Penn State agrees that it will not argue that Vintage Brand's manufacturing process is unethical, but maintains that standards for its licensees is relevant to the validity of its trademarks and the strength of those marks.[80]

The Court cannot conclude at this time that evidence related to the standards imposed upon Penn State's licensees is entirely irrelevant. Specifically, both parties agree that a company's control over the manufacturing process of goods that bear the relevant trademark symbols may be relevant to the question of whether a trademark is valid.[81] Here, Penn State's manufacturing requirements arguably apply to the quality of the goods at issue and consumer views of those goods. Although the relevance is somewhat fuzzy, it is not clear at this time that there is not possible basis for the admission of that evidence.

Nor is any prejudice related to this evidence apparent to the Court. Although Vintage Brand argues that this testimony or evidence will only serve to imply that Vintage Brand somehow does not follow similar standards and engages in unethical practices, that connections is far from intuitive. To the extent that Vintage Brand feels that it is necessary, it may counter any such inference by presenting testimony regard its manufacturing practices.

---

[79]  Doc. 222 at 21-22.
[80]  Doc. 240 at 18-20.
[81]  *See* Doc. 240 at 19 (citing *BIEC Int'l, Inc. v. Glob. Steel Servs., Ltd.*, 791 F. Supp. 489, 533 (E.D. Pa. 1992)); Doc. 250 at 21 (citing *Angelo Bros. Co. v. A&H Co.*, 1996 WL 571720, at *5 (E.D. Pa. Oct. 7, 1996)).

Consequently, Vintage Brand's motion *in limine* will be granted in part and denied in part. It is granted to the extent that Penn State is prohibited from stating or directly inferring that Vintage Brand engages in unethical manufacturing processes. It is denied without prejudice to the extent that Vintage Brand seeks to prohibit Penn State from referencing its own manufacturing controls. The Court may revisit this issue at trial upon proper motion from Vintage Brand should the testimony or evidence presented support Vintage Brand's contention that the evidence is irrelevant.

### 7.    Lay Testimony Regarding Consumer Perception or Recognition of Penn State Trademarks

Vintage Brand next seeks to exclude any testimony from lay witnesses related to consumer beliefs and perceptions about Penn State's marks, the quality of the goods bearing those marks, or their recognition of the Penn State marks.[82] Any such testimony, Vintage Brand argues, goes beyond the personal knowledge of a lay witness.[83] Penn State asserts that it "has no intention of violating these rules" related to expert testimony, but that any ruling on the matter would be premature at this stage and could be vague to the point of incomprehensibility.[84]

---

[82]    Doc. 222 at 22-23.
[83]    *Id.*
[84]    Doc. 240 at 20-21.

In accordance with the Court's prior ruling on this type of testimony,[85] Penn State may not present lay witness testimony related to consumer beliefs and perceptions about Penn State's trademarks, the quality of the goods bearing those marks, or consumer recognition of Penn State's trademarks. Contrary to Vintage Brand's protestations, the Court does not believe there will be any significant confusion about what testimony reasonably falls outside of this prohibition. And, to the extent there are any close questions regarding whether testimony may fall afoul of this ruling, there will be ample opportunity to address that during trial.

### 8.    Clothing Bearing Pozniak Lion Design

Vintage Brand also contends that Penn State should be prohibited from arguing or implying that certain clothing articles bearing the Pozniak Lion design establish Penn State's trademark rights in that design, as those articles do not show use in commerce.[86] Specifically, Vintage Brand asserts that the Pozniak Lion design has only been used in connection with the Nittany Lion Wrestling Club, the Lion Ambassadors, and a license plate program, and none of the goods offered through those programs were sold in the marketplace, as is required to establish a valid trademark.[87]

---

[85]    Doc. 194 at 41-42.
[86]    Doc. 222 at 23-27.
[87]    *Id.*

Penn State argues that it can demonstrate at trial that goods bearing the Pozniak Lion design were transported and sold in commerce—even if they were not sold to the general public—and, in any event, goods may be used in commerce even if not sold.[88] Consequently, it asserts that Vintage Brand's motion should be denied.

While Vintage Brand is correct that, as a general matter, "bald attorney argument is insufficient to oppose a motion *in limine*,"[89] here attorney argument is not being offered to support an assertion of fact. Rather, Penn State is merely forecasting that certain evidence will be presented at trial that will demonstrate goods bearing the Pozniak Lion design have been sold in commerce.[90] Evidence of clothing bearing the Pozniak Lion design would plainly be relevant if those goods were sold in commerce. Mindful that a motion *in limine* should be granted "only when the evidence is clearly inadmissible on all potential grounds,"[91] and consistent with this Court's practice,[92] the Court will defer any ruling on this motion pending Penn State's ability to establish at trial that goods bearing the Pozniak Lion were sold in commerce.[93]

---

[88]  Doc. 240 at 21-23.

[89]  Doc. 250 at 24.

[90]  Doc. 240 at 22.

[91]  *United States v. Tartaglione*, 228 F. Supp. 3d 402, 406 (E.D. Pa. 2017).

[92]  *See* Doc. 194 at 44-45.

[93]  Although Vintage Brand argues that Penn State's Rule 30(b)(6) representative provided testimony that contradicts any assertion that such goods were sold in commerce, Doc. 250 at 24, the testimony does not foreclose such a possibility, as the representative testified only that he did not know if goods bearing the Pozniak Lion design were sold for money. Doc. 116-28 at 57-58.

### 9.    Incontestability of Pozniak Lion Design Registration

Lastly, Vintage Brand contends that Penn State should be precluded from asserting at trial that the Pozniak Lion design had achieved incontestable trademark status.[94] Vintage Brand argues that Penn State's application for incontestable status is null because, by the time it filed an application seeking such status, Vintage Brand had already pled affirmative defenses in this matter challenging the validity of those registrations, thereby preventing incontestable status; this is so because a finding in Vintage Brand's favor would collaterally estop Penn State from opposing cancellation in a subsequent proceeding.[95] Vintage Brand's seventh affirmative defense provides:

> Penn State's claims are barred and/or limited where Penn State's application of the text and designs described in the Second Amended Complaint to merchandise is merely ornamental and does not engender the commercial impression of a source identifying trademark.[96]

Penn State responds that its Pozniak Lion registration has achieved incontestable status, as there were no pending claims or counterclaims at the time it filed its application for incontestability and Vintage Brand's affirmative defenses do not qualify as a proceeding sufficient to prevent incontestability.[97] Even if the affirmative defenses could qualify as a relevant proceeding, Penn State asserts that

---

[94]    Doc. 222 at 27-30.
[95]    *Id.*
[96]    Doc. 72 at 40.
[97]    Doc. 240 at 23-24.

the affirmative defenses challenge only particular uses of the Pozniak Lion design and therefore does not challenge the validity of the registration itself.[98] Moreover, Penn State contends that Vintage Brand's own conduct in this and other proceedings demonstrates that it does not seek cancellation of the Pozniak Lion registration.[99]

The Lanham Act provides that a trademark may achieve incontestable status after a party submits an affidavit to the United States Patent and Trademark Office ("USPTO") attesting that, at the time the affidavit is submitted: (1) "there has been no final decision adverse to the owner's claim of ownership of such mark for such goods or services, or to the owner's right to register the same or to keep the same on the register"; (2) "there is no proceeding involving said rights pending in the United States Patent and Trademark Office or in a court and not finally disposed of"; and (3) the trademark "has been in continuous use for such five consecutive years and is still in use in commerce."[100]

Penn State filed an affidavit with the USPTO, at the earliest, on June 9, 2023 attempting to secure incontestable status for its trademarks bearing the Pozniak Lion design.[101] There is no dispute that the trademark (and the affidavit submitted by Penn State) meet the requirements for incontestability save for one: whether there was a pending proceeding involving said rights at the time that Penn State filed its

---

[98] *Id.* at 25.
[99] *Id.* at 25-26.
[100] 15 U.S.C. § 1065.
[101] Doc. 222-3. *But see* Doc. 222-4 (resubmitted affidavit dated January 3, 2024).

26

affidavit. Specifically, the parties contest whether Vintage Brand's seventh affirmative defense—which was filed in this case prior to Penn State having filed any affidavits with the USPTO[102] and not resolved prior thereto—qualifies as a "proceeding involving said rights" such that the affirmative defense precludes those trademarks from achieving incontestable status.

There are conflicting interpretations of the phrase "proceeding involving said rights." The USPTO has "does not consider a proceeding involving the mark in which the owner is the plaintiff, where there is no counterclaim involving the owner's rights in the mark, to be a 'proceeding involving these rights' that would preclude the filing or acknowledgment of" an affidavit in support of incontestability.[103] Relying on that language, one district court has held, without examining the underlying statutory language, that an affirmative defense does not qualify as a relevant proceeding sufficient to undermine an application for incontestable status.[104]

But that determination, not to mention the USPTO's interpretation, does not align with a plain reading of 15 U.S.C. § 1065(2), which references broadly a "proceeding involving said rights" pending in any court that has not been "finally disposed of." An affirmative defense challenging the validity of a trademark

---

[102] Doc. 72.

[103] TMEP § 1605.04 (8th ed. Oct. 2011, May 2024 revision).

[104] *Marrero Enterprises of Palm Beach, Inc. v. Estefan Enterprises, Inc.*, No. 06-81036-CIV, 2008 WL 11412087, at *6 (S.D. Fla. Dec. 16, 2008).

certainly involves a party's rights in that trademark, and a successful affirmative defense here could mean that Penn State's trademarks bearing the Pozniak Lion design are invalid, or at least that Vintage Brand's use of those marks is not infringing. As the USPTO has repeatedly stated, to "the extent that a civil action in a Federal district court involves issues in common with those in a proceeding before the [USPTO], the decision of the Federal district court is binding upon the [USPTO],"[105] meaning a finding in Vintage Brand's favor would have preclusive effect before the USPTO.

In *British Broadcasting Corporation v. Scott Stander & Associates, Inc.*, the United States District Court for the Central District of California assessed whether a mark was incontestable when there was, at the time the application for incontestable status was filed, a pending "affirmative defense that [asserted] plaintiffs are not the rightful owners of any trademarks or rights to trademarks."[106] That court determined that, regardless of the fact that the challenge was brought in an affirmative defense, the defendants had "challenged plaintiffs' ownership and rights to the word mark in a pending proceeding," meaning the relevant trademark had not achieved incontestable status.[107]

---

[105] *Danelli v. Beata Music LLC*, No. 91249965, 2024 WL 1404967, at *17 (TTAB Mar. 29, 2024) (citing *DaimlerChrysler Corp. v. Maydak,* 86 USPQ2d 1945 (TTAB 2008)).

[106] No. CV 14-8047 FMO (EX), 2017 WL 11682913, at *6 (C.D. Cal. Mar. 17, 2017) (internal quotation marks omitted).

[107] *Id.*

And in *Holley Performance Products, Inc. v. Quick Fuel Technology, Inc.*, the United States District Court for the Western District of Kentucky rejected a literal interpretation of the USPTO's language holding that a proceeding in court does not qualify under § 1065(2) unless there is a counterclaim involved.[108] Instead that court registered its doubt that the USPTO's "use of the term 'counterclaim' is meant to privilege form over substance" and noted that another court had construed an affirmative defense as a counterclaim under the USPTO's definition.[109]

These decisions follow a more natural reading of the plain language of § 1065(2) and are in accord with what would appear to be the basic reason for having that rule: to prevent conflicting decisions from courts and the USPTO, particularly since any court decision would be binding on the USPTO. Consequently, the Court concludes that an affirmative defense is sufficient to preclude incontestability while that affirmative defense remains unresolved in federal court, as was the case here.

Penn State nevertheless argues that Vintage Brand's seventh affirmative defense is insufficient to preclude incontestability status because it challenges only particular uses of the Pozniak Lion marks, not their validity.[110] But as Penn State itself has previously observed, Vintage Brand's affirmative defense, asserting that

---

[108]  624 F. Supp. 2d 610, 615-16 (W.D. Ky. 2008).
[109]  *Id.* at 616. In *Holley*, all that was pending at the time the affidavit in support of an application for incontestable status was an answer denying an allegation, which the court found insufficient under § 1065(2). *Id.*
[110]  Doc. 240 at 25.

the marks are merely ornamental, "an affirmative defense on the issue of invalidity."[111] Because Vintage Brand's affirmative defense is "adverse to the [Penn State's] claim of ownership of [the Pozniak Lion] mark for such goods or services"[112] it qualifies as a proceeding under § 1065.[113]

Consequently, the Court concludes that Vintage Brand's seventh affirmative defense is sufficiently adverse to Penn State's claim of ownership in the Pozniak Lion design such that it qualifies as a proceeding that precludes (at least temporarily) Penn State from obtaining incontestability status for the Pozniak Lion design. Vintage Brand's motion *in limine* will therefore be granted, and Penn State will be prohibited from arguing at trial that its registrations involving the Pozniak Lion design have achieved incontestable status.

### B.    Penn States's Motions *in Limine*

### 1.    Advice of Counsel

Penn State in its first motion *in limine* argues that any evidence related to advice provided to Vintage Brand by its attorneys should be excluded.[114] Specifically, Penn State argues that, since none of the advice provided by counsel

---

[111]  Doc. 203 at 3-4. There is no reason why a party may not challenge both the validity of a mark and whether its use of that mark is infringing.

[112]  15 U.S.C. § 1065(1).

[113]  Penn State further argues that Vintage Brand could have directly challenged the validity of the Pozniak Lion marks in different ways but opted not to do so. Doc. 240 at 25-26. That Vintage Brand could have challenged the validity of the marks in other ways, but did not, is not relevant to whether they challenge it by way of an affirmative defense.

[114]  Docs. 223, 224.

was disclosed during discovery, not only is Vintage Brand unable to meet the requirements to present an advice of counsel defense, but any such advice would be hearsay, irrelevant, and unduly prejudicial.[115]

Vintage Brand concedes that it will not present an advice of counsel defense, but asserts that Penn State's motion is too broad.[116] Vintage Brand notes that, while it "would not be permitted to detail or describe any legal advice" it receive or "claim reliance upon that advice," it should be permitted to generally rebut any inference that it never obtained legal advice, and should be allowed to offer testimony as to beliefs regarding the use of the images at issue.[117]

The Court agrees that evidence of advice provided by counsel is inadmissible and will therefore grant the motion *in limine*; Vintage Brand will be prohibited from introducing such evidence at trial. Vintage Brand may, of course, move for reconsideration of this ruling at trial should it believe Penn State has opened the door to the admission of such evidence, or may seek clarification at the time of trial should it believe that pertinent evidence may skirt the line of this prohibition.

### 2.    Evidence Related to Jerry Sandusky

Second, Penn State seeks an Order precluding Vintage Brand from referencing Jerry Sandusky or his sexual abuse crimes, as such evidence would be

---

[115]  Doc. 224 at 4-8.
[116]  Doc. 241.
[117]  *Id.* at 2.

irrelevant and unduly prejudicial.[118] Similar to the motion *in limine* addressing advice of counsel, Vintage Brand again agrees that this evidence is inadmissible, but asserts that it should be permitted to introduce such evidence should Penn State open the door by providing evidence related to its good reputation and character outside of the context of trademark recognition and strength.[119]

Penn State's motion *in limine* will be granted and Vintage Brand prohibited from introducing this evidence at trial. Should Vintage Brand believe that Penn State has in some way opened the door to the admission of this evidence at trial, it may seek to revisit this ruling at that time.

### 3.    Reference to Franklyn's Survey One

In the next motion *in limine*, Penn State contends the Vintage Brand should be prohibited from introducing evidence or testimony related to Franklyn's Survey One, as that survey has been excluded by this Court.[120] It argues that Vintage Brand's experts should not be permitted to provide their opinions of the survey, as their rebuttal opinions are no longer relevant in light of the exclusion of that survey, and any probative value is substantially outweighed by the risk of unfair prejudice, confusing the issues, and wasting time.[121] It further argues that Franklyn should not be impeached based on this excluded survey either, as Penn State has not had the

---

[118]  Docs. 227, 228.
[119]  Doc. 242.
[120]  Docs. 229, 230.
[121]  Doc. 230 at 3-5.

opportunity to appeal that decision, and introduction of that exclusion may cause the jury to believe that the Court finds Franklyn incredible, and therefore discredit Franklyn's Survey Two on that basis alone.[122]

Vintage Brand in response argues that, although Survey One is not relevant or admissible and should not be rebutted by its experts, Vintage Brand may need to rebut the survey at trial in what Vintage Brand acknowledges are the "[im]probable" scenarios where Penn State violates the exclusion order or there are inconsistencies between Franklyn's work on Survey One and Survey Two.[123] Vintage Brand also asserts that it should be permitted to reference the exclusion of Survey One as it bears on Franklyn's credibility as an expert.[124]

First, this Court agrees with the parties that any testimony or evidence seeking to rebut Franklyn's Survey One is irrelevant. While Vintage Brand argues that it may need to rebut Survey One in certain improbable scenarios, that alone is an insufficient basis upon which to deny the pending motion. Should any scenario arise that would make rebuttal testimony relevant, Vintage Brand may seek an alteration to this ruling at that time. But until then, Vintage Brand is prohibited from introducing any testimony or evidence that seeks to rebut Survey One.

---

[122] *Id.* at 5-6.
[123] Doc. 243 at 4; *see id.* at 3-4.
[124] *Id.* at 4-9.

Second, contrary to Vintage Brand's position, any relevance to Franklyn's credibility based on the exclusion of Survey One would be substantially outweighed by the danger of unfair prejudice and confusing the jury. As other courts have noted, there "is too much of a risk that the jury will give the Court's prior *Daubert* order undue weight given that it is an order by the same Court that will preside over the trial."[125] There is a significant danger that the jury will believe that, because one of Franklyn's surveys was excluded by the Judge in this matter, his other survey must also be discounted—without actually examining the content of the survey to conclude for themselves whether it is entitled to any weight.[126] Vintage Brand therefore may not reference Franklyn's Survey One for the purpose of impeaching his credibility.

Accordingly, the Court will grant Penn State's motion *in limine* in its entirety. Vintage Brand will be prohibited from referencing Franklyn's Survey One during trial.

### 4.    Legal Testimony from Lay Witnesses

Next, Penn State seeks the preclusion of any lay testimony related to the law.[127] Penn States raises concerns that Chad Hartvigson will improperly offer legal

---

[125] *Vaporstream, Inc. v. Snap Inc.*, No. 217CV00220MLHKSX, 2020 WL 978731, at *10 (C.D. Cal. Feb. 28, 2020).

[126] This is particularly so where the Court was not asked to determine whether Franklyn's Survey Two was excludable under *Daubert*, and Penn State cannot even point out that Survey Two was admitted by this Court under the *Daubert* standard.

[127] Docs. 231, 232.

opinions at trial and, even if such testimony were proper, its relevance would be significantly outweighed by undue prejudice, the risk of confusing the issues, and wasting time.[128] Notably, during his deposition Hartvigson provided testimony that touched on: whether certain images were in the public domain; whether images were ornamental, merely descriptive, or used in a non-trademarked manner; whether Vintage Brand was required to obtain permission to use certain images or text; and that the collegiate sports licensing industry may violate antitrust laws.[129]

Vintage Brand responds that this Court has already held that much of the disputed testimony from Hartvigson is relevant to the issue of willfulness, which is in dispute in this case, and Hartvigson must be permitted to testify to his understandings of these matters, even though he cannot offer a legal opinion.[130] Specifically, Vintage Brand argues that Hartvigson may properly testify as to (1) his personal understanding of whether images are in the public domain, (2) how images are selected by Vintage Brand, (3) whether Vintage Brand intended to use images as a trademark or ornamentally, (4) his beliefs about whether permission was required from Penn State to use those images, and (5) his personal knowledge about obtaining a license from universities the or Collegiate Licensing Company's level of control in the process.[131]

---

[128]  Doc. 232.
[129]  *Id.*
[130]  Doc. 244 at 3-5.
[131]  *Id.* at 7-8.

To start, the parties agree on a fundamental fact: Hartvigson (and any other witness) may not testify as to what the law is or what it requires.[132] Likewise, it appears that the parties agree Hartvigson may testify as to his personal belief that Vintage Brand was not violating the law through its actions.[133] The only real dispute seems to center on how far Hartvigson (and any other witness) may go in explaining those personal beliefs.

Hartvigson[134] may testify as to his personal belief regarding many of the topics addressed by the parties, including what he was legally required to do, because, as this Court has previously held, those beliefs are germane to his intent and potential willfulness, or lack thereof.[135] However, such testimony many not cross the line into topics such as what legal advice Hartvigson received or what the law may require.[136] Even Hartvigson's testimony regarding his personal beliefs must

---

[132] *See* Doc. 232 at 6-7; Doc. 244 at 4, 7-8.

[133] *See* Doc. 254 at 6 ("Hartvigson can testify that he believed that his conduct did not violate Penn State's rights, and the jury can assess his credibility in making that statement").

[134] The Court addresses this testimony as applied to Hartvigson because the parties focus on his testimony, but this holding applies to all witnesses who may be called by Vintage Brand.

[135] Doc. 194 at 46, 49.

[136] *Cf. United States v. Leo*, 941 F.2d 181, 196-97 (3d Cir. 1991) (noting that "[w]hile it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury, our Court has allowed expert testimony concerning business customs and practices" and holding the "testimony was relevant both to explain the practice of the industry in which this prosecution arose and to establish what someone with [the defendant's] extended background in the industry probably would know"); *Exoto Inc. v. Sunrich Co., LLC*, No. 221CV03754MEMFJEMX, 2022 WL 20650232, at *8 (C.D. Cal. Mar. 29, 2022) (permitting "testimony about industry practice based upon [the witness'] perception of the law"); *Lebanon Farms Disposal, Inc. v. Cnty. of Lebanon*, No. 1:CV-03-0682, 2006 WL 8449786, at *3 (M.D. Pa. July 5, 2006) (witness may testify to "his understanding regarding [a company's] obligations under" the law but may not testify "to the language and meaning of statutes at issue in this action").

be circumscribed since he cannot testify that his belief is based on the advice of counsel, as the Court has barred any testimony regarding the reliance on advice of counsel.

The Court recognizes that this creates a fine line and Vintage Brand will have to tread carefully at trial. There are certain lines of inquiry and answers that may be acceptable. For example, Hartvigson may properly testify "I didn't believe anything we used related to Penn State was a trademark or was used as a trademark," or "I believed every image we used was in the public domain and therefore fair game to use," or "based on my understanding of the law I thought these images were in the public domain and could be freely used."[137] Testimony would impermissibly stray into legal discussions and conclusions if he instead testified, for example, "I asked my lawyer whether these images were trademarked and was told no," or "I researched how to determine if images were in the public domain and discovered that these images were in the public domain and could be used without issue."

Given the fine line that must be walked, the Court expects some disagreement at the time of trial and will handle any issues as they arise. In light of the above discussion, Penn State's motion *in limine* will be granted to the extent that Hartvigson and any other witnesses will be prohibited from providing legal

---

[137] Of course, as discussed below, fertile ground for cross examination would then exist because the concept of the public domain does not protect Vintage Brand's conduct here.

testimony, but may testify at to their beliefs about the law and whether they intentionally infringed on any alleged trademarks.

### 5.    Evidence Related to Copyright Law

Penn State also argues that Vintage Brand should be prohibited from introducing any evidence related to copyright law—specifically, the concept of the public domain.[138] First, it contends that such evidence is irrelevant, since Penn State's claims turn only on whether they hold valid trademarks and whether Vintage Brand used those marks in a manner likely to confuse consumers, while facts related to the public domain—a different form of intellectual property—have no bearing on that analysis.[139]

Second, Penn State asserts that Vintage Brand has no admissible evidence in support of their claim that any images were within the public domain, since Hartvigson has no actual knowledge of whether any images were in the public domain and cannot testify as to the requirements of copyright law.[140] Moreover, testimony related to copyright law would be speculative and constitute hearsay.[141] Third, Penn State argues that permitting the introduction of such evidence would unduly prejudice it, confuse and mislead the jury, and waste time since it would

---

[138]  Docs. 233, 234.
[139]  Doc. 234 at 4-6.
[140]  *Id.* at 6-11.
[141]  *Id.* at 10-11.

muddle various areas of the law and would force Penn State to put forth evidence attempting to rebut any public domain argument.[142]

Vintage Brand in turn argues that the motion should be denied because, in part, Penn State is improperly using a motion *in limine* to dispose of Vintage Brand's seventeenth affirmative defense,[143] which it argues is instead properly raised in a motion for summary judgment, as it is dispositive of a portion of Vintage Brand's defense.[144] Moreover, evidence that certain images are in the public domain is relevant to the seventeenth affirmative defense, as the Supreme Court of the United States has held that trademark law should not be read to conflict with copyright law.[145] Further, that evidence is, according to Vintage Brand, relevant to whether any infringement was willful.[146]

Vintage Brand also asserts that it has competent evidence that certain images were in the public domain, including Hartvigson's testimony about the criteria that he uses when searching for historical memorabilia, and the fact that dates are included on many pieces of memorabilia.[147]

---

[142] *Id.* at 11-13.

[143] That affirmative defense asserts that "Penn State's claims are barred and/or limited because the historic images reproduced by Vintage Brand and applied to merchandise are works in the public domain." Doc. 72 at 42.

[144] Doc. 245 at 9-11.

[145] *Id.* at 11-15.

[146] *Id.* at 16-17.

[147] *Id.* at 17-22.

The circumstances of this case present a difficult, and so far largely unexplored, intersection between trademark law and copyright law. Both legal concepts seek to protect the work of an individual or company from copying by others. But there are two primary differences between these legal concepts. One is their duration: "copyright law bestow[s] limited periods of protection, but trademark rights can be forever."[148] That distinction is not accidental, as the "Copyright and Patent Clause of the Constitution, Art. I, § 8, cl. 8, provides as to copyrights [that they shall be] for limited Times."[149] "The right to copy, and to copy without attribution, once a copyright has expired . . . passes to the public."[150]

The other distinction is their intended purpose. As to copyright law:

> the limited grant [of protection] is a means by which an important public purpose may be achieved. It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired.[151]

"The rights of a patentee or copyright holder are part of a carefully crafted bargain under which, once the patent or copyright monopoly has expired, the public may use the invention or work at will and without attribution."[152]

---

[148] *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001).

[149] *Eldred v. Ashcroft*, 537 U.S. 186, 192-93 (2003).

[150] *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33 (2003).

[151] *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984).

[152] *Dastar*, 539 U.S. at 33-34 (internal citations and quotation marks omitted). This is generally referred to as the "public domain."

In contrast, "[t]he Lanham Act," [the Supreme Court has] said, does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity."[153] As the Supreme Court has explained:

> Federal trademark law has no necessary relation to invention or discovery, but rather, by preventing competitors from copying a source-identifying mark, reduces the customer's costs of shopping and making purchasing decisions, and helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product.[154]

These conflicting priorities and periods of protection can sometimes create problematic overlaps—an issue that the Supreme Court touched upon in its decision in *Dastar Corporation v. Twentieth Century Fox Film Corporation.*[155] There, a company named Doubleday had published a book about General Dwight D. Eisenhower's experience in World War II; Twentieth Century Fox later acquired the rights to that book and created a television series based upon it—a series for which Fox received copyright protections.[156] Doubleday renewed its copyright in the underlying book, but Fox did not renew its rights in the series, "leaving the television series in the public domain."[157]

---

[153] *Id.* at 34 (internal quotation marks omitted).
[154] *Id.* (brackets, internal citations, and quotation marks omitted).
[155] 539 U.S. 23 (2003).
[156] *Id.* at 25-26.
[157] *Id.* at 26.

Fox later reacquired the rights to the television series and granted exclusive rights to New Line Home Video, Inc. to distribute that series on videotape.[158] Dastar thereafter "purchased eight beta cam tapes of the *original* version of the Crusade television series, which is in the public domain, copied them, and then edited the series" before selling that as its own product.[159] Fox sued Dastar under both copyright law and trademark law.[160] The Supreme Court was called upon to answer the question of whether the word "origin" as used in the Lanham Act's prohibition against using "a false designation of origin, or any false description or representation" in connection with "any goods or services" refers "only to the manufacturer or producer of the physical 'goods' that are made available to the public" or instead "includes the creator of the underlying work" that was copied.[161]

That issue, of course, is not directly relevant to this case. However, in resolving that question and concluding that "origin" refers to the origin of physical goods rather than the underlying work itself, the Supreme Court used fairly broad language in describing the interaction between copyright (and patent) law and trademark law. That court explained that, upon the expiration of a copyright, the subject passes into the public domain and essentially belongs to the public, which

---

[158] *Id.*

[159] *Id. See id.* at 26-27.

[160] *Id.* at 27.

[161] *Id.* at 31.

has an unfettered right to copy that material without attribution.[162] Extending trademark law to cover "communicative products" that have fallen into the public domain "would create a species of mutant copyright law that limits the public's federal right to copy and to use expired copyrights."[163]

The failure to delineate between the two areas of the law would, in the Supreme Court's estimation, "be akin to finding that § 43(a) [of the Lanham Act] created a species of perpetual patent and copyright, which Congress may not do."[164] That broad language is somewhat undercut, however, by the Supreme Court's statement that Fox's trademark "claim would undoubtedly be sustained if Dastar had bought some of New Line's Crusade videotapes and merely repackaged them as its own,"[165] and its assertion that Fox could potentially bring a false advertising claim under the Lanham Act if Dastar had "substantially copied the Crusade series [and] were, in advertising or promotion, to give purchasers the impression that the video was quite different from that series."[166]

Courts and commentators have struggled in the decades since *Dastar* to determine the exact scope of that decision.[167] Since that opinion issued, only one

---

[162] *Id.* at 33-34.
[163] *Id.* (internal quotation marks omitted).
[164] *Id.* at 37.
[165] *Id.* at 31.
[166] *Id.* at 38.
[167] *See, e.g.*, Mark P. McKenna, *Dastar's Next Stand*, 19 J. Intell. Prop. L. 357, 362 (2012) (observing that "Dastar's reach remains unclear, largely because of the case's relatively unique factual context").

court has attempted to apply *Dastar* broadly to issues such as that which currently confronts this Court.[168] In *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, the United States Court of Appeals for the Ninth Circuit assessed the validity of a trademark claim that sought to limit the use of the Betty Boop cartoon character (of all things) on products—in that case on vintage posters that featured the Betty Boop character—despite the fact that the character had entered the public domain.[169]

The Ninth Circuit held, in part, that if it "ruled that A.V.E.L.A.'s depictions of Betty Boop infringed Fleischer's trademarks, the Betty Boop character would essentially never enter the public domain. Such a result would run directly contrary to *Dastar*."[170] But that opinion was quickly withdrawn by the panel[171] after, as one commentator described, an "uproar of the entertainment industry, trademark owners, and intellectual property lawyers . . . on the basis that the court had overly expanded *Dastar*."[172]

Given the context in which it arose, *Dastar* is not analogous to the matter before this Court, and does not directly answer the question of whether something

---

[168] The cases to which Penn State cites are inapposite, as those cases involved defendants seeking to invoke their own copyrights as a shield—a proposition that was rightly rejected by those courts because "a copyright is not a 'right' to use: it is a right to exclude *others* from using the copyrighted work." *E.g.*, *Univ. of Ala. Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1280 (11th Cir. 2012).

[169] 636 F.3d 1115, 1117-18 (9th Cir.), *opinion withdrawn and superseded on denial of reh'g*, 654 F.3d 958 (9th Cir. 2011).

[170] *Id.* at 1124.

[171] *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 960 (9th Cir. 2011).

[172] Irene Calboli, *Overlapping Trademark and Copyright Protection: A Call for Concern and Action*, 2014 U. Ill. L. Rev. Slip Opinions 25, 32 (2014).

that has fallen into the public domain cannot be protected under trademark law in any circumstance. Nor is the Ninth Circuit's decision in *Fleischer* helpful, as that opinion was withdrawn and, in any event, is not binding on this Court or thoroughly reasoned, with the entirety of the application of *Dastar* coming in one paragraph.

Despite the confusion surrounding the scope of *Dastar*, in attempting to define its scope and application this Court need not read beyond the opinion itself to reject the absolutist positions seemingly staked out by the parties in this case. After all, Penn State cannot be correct that "[l]iability (or defenses against liability) for one type of intellectual property does not prove or disprove liability (or defenses) for a different type of intellectual property"[173] when the Supreme Court explicitly concluded otherwise in *Dastar*, albeit in a different context.[174] Neither, however, can Vintage Brand be correct that a trademark claim cannot apply to an image that has entered the public domain,[175] or else the Supreme Court in *Dastar* would not have embraced at least certain species of trademark claims against the use of items in the public domain.[176]

---

[173] Doc. 234 at 5.

[174] *See Dastar*, 539 U.S. at 34 ("allowing a cause of action under § 43(a) for that representation would create a species of mutant copyright law that limits the public's federal right to copy and to use expired copyrights" (internal quotation marks omitted)).

[175] Doc. 245 at 11-15.

[176] *See Dastar*, 539 U.S. at 34 ("If . . . the producer of a video that substantially copied the Crusade series were, in advertising or promotion, to give purchasers the impression that the video was quite different from that series, then one or more of the respondents might have a cause of action—not for reverse passing off under the 'confusion . . . as to the origin' provision of § 43(a)(1)(A), but for misrepresentation under the 'misrepresents the nature, characteristics or qualities' provision of § 43(a)(1)(B)" (brackets omitted)). *See also* Kathryn M. Foley,

Rather, in reviewing the *Dastar* opinion, it is clear that a path between these extremes is necessary to ensure that the policy concerns of each of these oft-overlapping legal fields (trademark law and copyright law) do not undermine the primary concern of the other. Consequently, in defining the scope of that middle path based on *Dastar*'s application, the Court finds instructive the underlying purpose of each area of the law.

As the Supreme Court has explained, the Constitution itself provides for copyrights and "describes the basic Clause objective as one of promoting the Progress of Science, *i.e.,* knowledge and learning. The Clause exists not to provide a special private benefit, but to stimulate artistic creativity for the general public good."[177]

> It does so by motivating the creative activity of authors through the provision of a special reward. The reward is a means, not an end. And that is why the copyright term is limited. It is limited so that its beneficiaries—the public—will not be permanently deprived of the fruits of an artist's labors.[178]

---

*Protecting Fictional Characters: Defining the Elusive Trademark-Copyright Divide*, 41 Conn. L. Rev. 921, 959 (2009) ("*Dastar* did clarify that upon expiration of a copyright term, there exists an absolute right to copy the work without any identification of its creative source. This proposition will likely be cited by future defendants who copy public domain characters without authorization. Nonetheless, this over-simplified line of argument will fail as *Dastar* did not object to the mere possibility of copyright and trademark protection, but only to the granting of improper protection" (footnotes omitted)).

[177] *Eldred v. Ashcroft*, 537 U.S. 186, 245 (2003) (brackets, internal citations, and internal quotation marks omitted).

[178] *Id.* at 245-46 (brackets, internal citations, and internal quotation marks omitted).

Under copyright law then, any "reward to the owner [is] a secondary consideration."[179] Copyright law's primary objective is "to allow the public access to the products of [authors' and investors'] genius after the limited period of exclusive control has expired."[180]

In contrast, as summarized by the Supreme Court in *Dastar*, trademark law "reduces the customer's costs of shopping and making purchasing decisions, and helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product."[181] In line with that purpose, the Supreme Court "has recognized that '[n]ational protection of trademarks is desirable because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation.'"[182] In contrast with copyright law then, while trademark law provides benefits to consumers, historically the law "of trademark infringement 'was concerned primarily with wrongful conduct in commercial enterprises which resulted in business loss to another, ordinarily by the use of unfair means in drawing away customers from a competitor.'"[183]

---

[179] *Mazer v. Stein,* 347 U.S. 201, 219 (1954).

[180] *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984).

[181] *Dastar*, 539 U.S. at 34 (brackets, internal citations, and quotation marks omitted).

[182] *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 531 (1987) (quoting *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 198 (1985) (brackets and ellipsis omitted)).

[183] *Halicki v. Carroll Shelby Int'l, Inc.*, No. CV048813SJOPJWX, 2006 WL 8447777, at *6 (C.D. Cal. Apr. 28, 2006) (quoting *People ex rel. Mosk v. National Research Co.*, 201 Cal. App. 2d 765, 770 (1962)).

This is emphasized by what the Supreme Court has identified as the zone of interests protected by the Lanham Act. Specifically, the Lanham Act protects:

> [against] the deceptive and misleading use of marks in . . . commerce; . . . registered marks used in such commerce from interference by State, or territorial legislation; . . . persons engaged in such commerce against unfair competition; [against] fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks . . .[184]

That zone of interests generally protects against "injury to a commercial interest in reputation or sales."[185]

Attempting to navigate these concerns leaves courts balancing on a razor's edge. On one side, failing to read copyright law's concept of the public domain into cases involving trademark claims could potentially grant perpetual copyright protection to images solely by virtue of the fact that those images may contain a trademark.[186] On the other side, interpreting the public domain portion of copyright law as prohibiting a trademark claim would potentially permit companies to violate

---

[184] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131 (2014) (quoting 15 U.S.C. § 1127).

[185] *Id.* at 131-32.

[186] *See* Calboli, *supra*, at 30 ("the impact of overlapping copyright and trademark protection can easily degenerate into a mutant right capable of distorting the copyright equilibrium and severely impairing the public's ability to freely copy, adapt, distribute, and show works after their copyright has expired. This, in turn, should be prevented, as overlapping trademark rights can result in severely impacting society's creativity. In particular, freedom to copy is crucial to incremental advances in new creative works (as many copyright intensive industries know) and trademark protection in these works can severely impact this freedom. Moreover, access to knowledge can also be put at risk by overlapping protection, in that creative works would effectively not be available as part of the public domain after the expiration of the copyright term" (footnote and internal quotation marks omitted)).

the trademarks of another in a way that is calculated to confuse consumers without leaving a method of recourse for the trademark owner—for example, if Pepsi Cola prominently used on its packaging an old Coca Cola image that had fallen into the public domain to falsely imply that its products were Coca Cola products, or vice versa.

But by accounting for the primary purpose of each legal sphere, a test may be devised that largely avoids these twin harms, at least with respect to the societal benefits with which each area of the law is largely concerned. The key distinction in determining whether an image in the public domain may be subject to a trademark claim is, therefore, whether application of the public domain would implicate or undermine the primary concerns of each area of the law.

If a defendant's use of a trademark-containing-image that has fallen into the public domain is used for a creative purpose, then trademark law may not be applied, or else courts would undermine the "carefully crafted bargain" that permits the public to build upon the genius of the past and move our society forward in positive ways.[187] Failing to account for the purpose of copyright law and the public domain in such circumstances would "undermine the policy of encouraging competition in using material in the public domain and allowing new authors to build upon the

---

[187] *Dastar*, 539 U.S. at 33 (internal quotation marks omitted).

creativity of the past."[188] But if an image that bears a trademark is within the public domain, but is being used for purely commercial—as opposed to creative—purposes, then trademark law may be applied to its use; otherwise courts would undermine the purpose of trademark law in ensuring that companies reap the benefits associated with its products and reputation. Under this test, the creative expression meant to be fostered by copyright law remains largely, if not entirely, unimpeded by the application of trademark law, while the benefits that companies and individuals derive from their goodwill remain intact under trademark law.

This is in accord with other decisions related to the application of the Lanham Act to copyright cases. For example, in a pre-*Dastar* case, *Comedy III Productions, Inc. v. New Line Cinema*, the Ninth Circuit assessed whether the plaintiff could sustain a cause of action under the Lanham Act when the defendant had created a film and, as part of the film, included in the background a thirty second clip of The Three Stooges that was in the public domain.[189] The plaintiff sued, claiming a trademark in "the name, the characters, the likeness, and overall act of The Three Stooges."[190]

The Ninth Circuit concluded that the clip was not a trademark, reasoning that it was plainly covered by copyright law and if "material covered by copyright law

---

[188]  Leslie A. Kurtz, *The Independent Legal Lives of Fictional Characters*, 1986 Wis. L. Rev. 429, 517 (1986).
[189]  200 F.3d 593, 594 (9th Cir. 2000).
[190]  *Id.* at 595 (internal quotation marks omitted).

has passed into the public domain, it cannot then be protected by the Lanham Act without rendering the Copyright Act a nullity."[191] But in reaching that conclusion, the Ninth Circuit was careful to note that the clip in question was not used in a "purely commercial vehicle" and the defendant did not "in its use of the clip, create simulacra of The Three Stooges to sell a product" as had a company in a previous case in which the Ninth Circuit found trademark infringement.[192] The Ninth Circuit therefore rested its holding on the commercial nature, or lack thereof, of the alleged infringing use: had the defendant "used the likeness of The Three Stooges on t-shirts which it was selling, [the plaintiff] might have an arguable claim for trademark violation."[193]

Applying the creative/commercial test here, Vintage Brand cannot present evidence that the images it used were in the public domain. Its conduct here was wholly commercial in nature—it took images that were allegedly in the public domain and put them on products to sell, such as t-shirts, hats, mugs, and other physical merchandise. Applying copyright law would not further the goals of fostering creative expression but could potentially impair trademark law's goal of helping companies reap the financial and reputational-related awards associated with their product.

---

[191] *Id.*
[192] *Id.* at 596.
[193] *Id.*

The Court further rejects Vintage Brand's contention that Penn State's motion improperly seeks to dispose of an affirmative defense. [194] As Vintage Brand acknowledges, a motion *in limine* may appropriately dispose of an affirmative defense if that defense "is completely untenable as a matter of law."[195] Here, the commercial nature of Vintage Brand's use of the underlying images renders its defense related to the public domain untenable, and it is appropriate to address this issue through a motion *in limine*.[196] Consequently, the Court will grant Penn State's motion *in limine*, and Vintage Brand will be prohibited from presenting evidence that the images it used were in the public domain.[197]

### 6.    Evidence Related to Antitrust Issues

Next, Penn State contends that Vintage Brand cannot properly present evidence related to antitrust concerns.[198] Penn State notes that no court has ever refused to enforce a trademark because it was used in violation of antitrust law and argues that Vintage Brand has no admissible evidence that could establish an

---

[194]  Doc. 245 at 9-11.

[195]  *Id.* at 9 n.2 (citing *Cleveland Bros. Equip. Co., Inc. v. Vorobey*, 655 F. Supp. 3d 305, 326 (M.D. Pa. 2023)).

[196]  Vintage Brand also argues that its affirmative defense may proceed because Penn State is attempting to apply trademark law to the images in question, not the physical goods bearing those images, which is—according to Vintage Brand—barred by *Dastar*. Doc. 245 at 14-15. But *Dastar* reached its conclusion in the context of a claim for false endorsement under § 43(a). *Dastar*, 539 U.S. at 34. This Court has already disposed of Penn State's false endorsement claim, and *Dastar*'s direct holding is therefore not applicable here. Doc. 194 at 87-91.

[197]  Testimony as to Hartvigson's belief that the images were in the public domain and therefore could be used without violating trademark law is, however, relevant to the issue of willfulness, as this Court previously ruled. Doc. 194 at 46.

[198]  Docs. 235, 236.

antitrust claim, rendering irrelevant evidence related to antitrust law.[199] Even if relevant, Penn State asserts that any relevance is significantly outweighed by the danger of undue prejudice, confusing or misleading the jury, and wasting time.[200]

Vintage Brand argues, similar to its opposition to the motion addressing copyright law, that Penn State seeks to improperly dispose of a colorable affirmative defense in a motion *in limine* rather than through a motion to strike or for summary judgment, as is more appropriate.[201] In any event, Vintage Brand states that a trademark owner's violation of antitrust law is a valid defense to a trademark claim.[202] Moreover, Vintage Brand maintains that it can present competent evidence of the relevant market and issues related to the antitrust defense through Hartvigson's testimony, as he has "substantial personal experience and knowledge in the collegiate fan-apparel industry."[203]

As an initial matter, the parties agree that antitrust concerns do present a valid defense in the trademark context—they disagree, however, about whether it is a complete defense to a trademark claim, or a defense only to the incontestability of a trademark.[204] Their argument revolves specifically around the Lanham Act's provision that it is a defense if "the mark has been or is being used to violate the

---

[199]  Doc. 236 at 4-9.
[200]  *Id.* at 9-11.
[201]  Doc. 246 at 2-4.
[202]  *Id.* at 4-6.
[203]  *Id.* at 13; *see id.* at 6-15.
[204]  *Compare* Doc. 246 at 4-6, *with* Doc. 255 at 3-5.

antitrust laws of the United States."[205] The dispute over that defense's applicability arises because that language is contained in the section addressing incontestable trademarks, and therefore would appear to be a defense to incontestability only, rather than a complete defense to trademark infringement claims.[206]

Regardless of which position is correct, however, the dispute is irrelevant to this case because Vintage Brand's eighteenth affirmative defense is broad enough to encompass a request that the Court invoke its equitable power to refuse to enforce the trademarks based upon Penn State's alleged violations of antitrust law,[207] which is a well-established power of federal courts.[208] The Court therefore finds that Vintage Brand's affirmative defense is legally valid.[209]

This Court further rejects, as have many other courts, Penn State's contention that expert testimony is required to establish the foundation of an antitrust defense.[210]

---

[205] 15 U.S.C. § 1115(b)(7).

[206] *But see Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95-96 (2d Cir. 1985) ("An antitrust tie-in claim, if proven, will constitute a defense to trademark infringement").

[207] That affirmative defense states "Penn State's claims are barred and/or limited as an anticompetitive, illegal restraint of trade." Doc. 72 at 42.

[208] *Cf. Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1336 (7th Cir. 1977) (recognizing that "the defense of antitrust misuse is largely available to defeat the conclusive evidentiary force that would otherwise attach to a trademark certificate under the (Lanham) Act" but nevertheless recognizing "the equity power of a court to deny enforcement of a trademark on the part of one who has used that trademark in violation of the antitrust laws" (internal quotation marks omitted)).

[209] And, regardless of which party is correct, the resolution of this question has no bearing on the motion *in limine*. Whether antitrust concerns create a general defense or only a defense to incontestability, because a defense exists evidence related to that defense should go to a jury.

[210] *See, e.g., Lantec, Inc. v. Novell, Inc.*, 146 F. Supp. 2d 1140, 1148 (D. Utah 2001) ("the court will reject the absolute rule of the Eleventh Circuit in favor of the rule of other jurisdictions. The absence of expert testimony on the issue of relevant market and like issues is not, *per se,*

Such a rule would be particularly inappropriate within this Circuit, given the Third Circuit's repeated pronouncement that lay testimony may be "grounded either in experience or specialized knowledge . . . [and,] 'in order to be 'helpful,' an opinion must be reasonably reliable,' and Rule 701 therefore 'requires that a lay opinion witness have a reasonable basis grounded either in *experience or specialized knowledge* for arriving at the opinion that he or she expresses.'"[211] That is to say, "when a lay witness has particularized knowledge by virtue of her experience, she may testify—even if the subject matter is specialized or technical—because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702."[212]

Because a lay witness may be qualified to provide specialized knowledge as to the requirements to sustain an antitrust defense—such as the relevant geographic or product market—the Court will not adopt a per se rule barring such a defense in the absence of expert testimony. And here, Vintage Brand may conceivably be able to offer such testimony. Vintage Brand asserts that it will have Hartvigson—along

---

fatal to a plaintiff's antitrust claims. In other words, expert testimony is not required, but in its absence a plaintiff must show by other evidence sufficient facts from which a jury could infer market share, market power, relevant market, monopolization, dangerous probability of monopolization, and the like").

[211] *United States v. Savage*, 970 F.3d 217, 285-86 (3d Cir. 2020) (quoting *Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1201 (3d Cir. 1995)).

[212] *Id.* at 286 (brackets and internal quotation marks omitted).

with university personnel engaged in licensing—testify to the requirements of an antitrust claim based on their "personal experience in the market."[213]

This evidentiary assertion is sufficient basis to deny Penn State's motion *in limine*, as the evidence it seeks to exclude is not "clearly inadmissible on all potential grounds."[214] Of course, the Court must reach this decision based upon a minimal evidentiary record. This is a large part of the reason why motions *in limine* are ill-suited as vehicles for the disposition of a claim or defense; requests to exclude a defense are better brought in a motion for summary judgment and its accompanying factual record, but Penn State inexplicably failed to move to dispose of the defense in that fashion.

### 7.    Aesthetic Functionality Defense

Penn State next argues that Vintage Brand should not be allowed to support its aesthetic functionality defense[215] with evidence of consumers' motivation in purchasing items or assertions that Vintage Brand must be permitted to compete with authorized licensees.[216] First, it contends that Vintage Brand's defense is fatally

---

[213] Doc. 246 at 10.

[214] *Holmes v. Am. Home Patient/Lincare*, No. 4:21-CV-01683, 2024 WL 1118982, at *1 (M.D. Pa. Mar. 14, 2024) (internal quotation marks omitted).

[215] Vintage Brand's fifth affirmative defense reads "Penn State's claims are barred and/or limited where Penn State precluding Vintage Brand's application of the text and designs described in the Second Amended Complaint to merchandise would put Vintage Brand at a significant non-reputation-related disadvantage," while its sixth affirmative defense asserts that "Penn State's claims are barred and/or limited where the text and designs described in the Second Amended Complaint are essential to the use or purpose of Vintage Brand's merchandise and/or affect the cost or quality of Vintage Brand's merchandise." Doc. 72 at 39.

[216] Docs. 237, 238.

flawed, as evidence "that consumers purchase Vintage Brand's products because they desire to express an affiliation with Penn State . . . is not relevant to any recognized test for aesthetic functionality," which generally examine whether forbidding use of the feature would put others at a significant, non-reputational disadvantage, or whether the feature is essential to the purpose or use of an item or affects its cost or quality.[217] Vintage Brand's defense essentially relies on consumer recognition of the Penn State trademarks, which is not an aesthetic functionality defense.[218] Because Vintage Brand's affirmative defenses are not viable, Penn State argues, evidence related to that defense is irrelevant and must be excluded.[219]

Even if the defense were viable, Penn State contends that evidence related to the reasons why consumers purchase Vintage Brand products would be inadmissible as no proffered witness has personal knowledge as to why consumers buy Vintage Brand products.[220] Penn State further asserts that such evidence should be excluded because Vintage Brand failed to properly disclose that evidence during discovery.[221]

Vintage Brand argues that, again, Penn State improperly seeks a dispositive ruling on an affirmative defense in a motion *in limine* rather than a motion to strike or for summary judgment. [222] Regardless, Vintage Brand asserts, Penn State

---

[217] Doc. 238 at 11; *see id.* at 10-14.
[218] *Id.*
[219] *Id.* at 13-14.
[220] *Id.* at 14-17.
[221] *Id.* at 17-20.
[222] Doc. 247 at 7-9.

misunderstands the doctrine of aesthetic functionality, and the proposed evidence is relevant to such a defense.[223] Specifically, reputation and recognition in the context of aesthetic functionality means recognition or reputation as to the source of the relevant good, not the trademark, and a mark is functional if it is used for a purpose other than branding—such as to allow consumers to express their affiliation or support of Penn State.[224]

As to the evidence to be presented at trial, Vintage Brand points to testimony from Penn State's representative agreeing that individuals could express their affiliation with Penn State by wearing apparel bearing Penn State imagery, as well as testimony from alumna and advertising material showing that people wear Penn State gear to affiliate themselves with Penn State.[225] Vintage Brand will also provide expert testimony that Penn State has no reputation as a source of apparel and consumers do not believe it is responsible for the quality of products.[226] Finally, Vintage Brand contends that it properly and timely disclosed any expert opinions and evidence upon which is relies for this affirmative defense.[227]

As this Court has previously noted with regard to the doctrine of aesthetic functionality, the Supreme Court in *Qualitex Co. v. Jacobson Products Co., Inc.*

---

[223] *Id.* at 9-14.
[224] *Id.*
[225] *Id.* at 15-18.
[226] *Id.* at 17.
[227] *Id.* at 18-19.

explained that, in general terms, a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage.[228]

The Court further noted that "'aesthetic functionality[] mean[s] a design that communicates the use, purpose, cost, or quality of the product in a way that competitors cannot avoid replicating without incurring costs.'"[229]

The parties here dispute the precise meaning of the Supreme Court's holding in *Qualitex*. Vintage Brand argues that "reputation and recognition in the trademark context means reputation and recognition *as a source of the relevant good*—not recognition of the mark itself,"[230] while Penn State asserts that courts must account for the overall reputation of the trademark owner.[231]

The Ninth Circuit in *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.* traced the recent history of that doctrine before the Supreme Court and iterated that the Supreme Court has "offered a simple definition of functionality: 'a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'"[232] As explained by the Ninth Circuit, the Supreme Court in *Qualitex* later "considered whether a color . . . could be protected as a

---

[228] Doc. 194 at 65 (quoting *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 165 (1995)).

[229] *Id.* at 66 (quoting *DayCab Co., Inc. v. Prairie Tech., LLC*, 67 F.4th 837, 847 (6th Cir. 2023)).

[230] Doc. 247 at 10.

[231] Doc. 256 at 3-5.

[232] *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1070 (9th Cir. 2006) (quoting *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 850 n.10 (1982)).

trademark" and "underscored . . . that functionality protects against a competitive disadvantage 'unrelated to recognition or reputation'" and "because 'the [district] court found 'no competitive need in the press pad industry for the green-gold color, since other colors are equally usable,' functionality did not defeat protection."[233]

In the Ninth Circuit's view, a more recent Supreme Court case, *TrafFix Devices, Inc. v. Marketing Displays, Inc.,*[234] explained the relationship between those two holdings.[235] *Qualitex* did not displace the Supreme Court's earlier decision with respect to functionality but, instead, "'expand[ed] upon' the [earlier] definition, by observing that 'a functional feature is one the 'exclusive use of which would put competitors at a significant non-reputation-related disadvantage.'"[236] *TrafFix* explained that if "a feature is functional under [the earlier test], the inquiry ends and the feature cannot be protected under trademark law" whereas "in the context of aesthetic functionality, . . . considerations [of competitive necessity and significant non-reputation-related disadvantage] may come into play because a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation related disadvantage.'"[237] Consequently,

> After *Qualitex* and *TrafFix,* the test for functionality proceeds in two steps. In the first step, courts inquire whether the alleged "significant non-trademark function" satisfies the *Inwood Laboratories* definition of

---

[233] *Id.* (quoting *Qualitex*, 514 U.S. at 166, 169).
[234] 532 U.S. 23 (2001)
[235] *Au-Tomotive*, 457 F.3d at 1070-71.
[236] *Id.* at 1071 (quoting *TrafFix,* 532 U.S. at 32 (brackets omitted))
[237] *Id.* at 1071-72 (quoting *TrafFix,* 532 U.S. at 32).

functionality—"essential to the use or purpose of the article or affects its cost or quality." *TrafFix,* 532 U.S. at 32-33 (*citing Inwood Laboratories,* 456 U.S. at 850, n. 10). If this is the case, the inquiry is over—the feature is functional and not protected. *TrafFix,* 532 U.S. at 33. In the case of a claim of aesthetic functionality, an alternative test inquires whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage. *Id.; and see also Qualitex,* 514 U.S. at 165.[238]

Of course, this review does not directly address the question of whether a defendant may, in light of those Supreme Court decisions, maintain an aesthetic functionality defense when its sole argument is that the trademarks are "non-reputation-related because consumers want the images so they can express their own affiliation with the [plaintiff], not because they believe that the [plaintiff] is a reputable source for high-quality apparel."[239]

But the Ninth Circuit has persuasively answered that question in the affirmative both in *Au-Tomotive* and other cases. As the Ninth Circuit in *Au-Tomotive*—a case to which Penn State itself cites—is careful to note, the rule espoused in *Qualitex* and *TrafFix* is no bar to the aesthetic functionality defense. Rather, that doctrine must be applied "careful[ly] to prevent 'the use of a trademark to monopolize a design feature which, *in itself and apart from its identification of source,* improves the usefulness or appeal of the object it adorns.'"[240] Accordingly,

---

[238] *Id.* at 1072 (brackets and footnote omitted).
[239] Doc. 247 at 5.
[240] *Au-Tomotive*, 457 F.3d at 1073 (quoting *Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 774 (9th Cir. 1981)).

"aesthetic functionality [is generally] limited to product features that serve an aesthetic purpose wholly independent of any source-identifying function."[241]

That is precisely what Vintage Brand argues here: consumers do not purchase Vintage Brand goods bearing Penn State imagery because the marks identify the producer or sponsor of those goods but, instead, purchase those goods solely to express their affiliation with, or support of, Penn State. That is to say, the Penn State images used by Vintage Brand "serve an aesthetic purpose wholly independent of any source-identifying function."[242]

The distinction between an actionable and non-actionable aesthetic functionality defense is best exemplified by *International Order of Job's Daughters v. Lindeburg and Co.*[243] There, the Ninth Circuit examined whether the doctrine of aesthetic functionality protected the defendant's conduct in "selling jewelry and related items bearing the Job's Daughters[244] insignia" despite the fact that it was not authorized to do so, whereas other companies were so authorized.[245]

The Ninth Circuit noted that "[t]rademark law does not prevent a person from copying so-called 'functional' features of a product which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance

---

[241] *Id.* (citing *Qualitex,* 514 U.S. at 166).
[242] *Id.*
[243] 633 F.2d 912 (9th Cir. 1980).
[244] Job's Daughters is a young women's fraternal order.
[245] *Id.* at 914.

that a particular entity made, sponsored, or endorsed a product." [246] It further

explained:

> It is not uncommon for a name or emblem that serves in one context as
> a collective mark or trademark also to be merchandised for its own
> intrinsic utility to consumers. We commonly identify ourselves by
> displaying emblems expressing allegiances. Our jewelry, clothing, and
> cars are emblazoned with inscriptions showing the organizations we
> belong to, the schools we attend, the landmarks we have visited, the
> sports teams we support, the beverages we imbibe. Although these
> inscriptions frequently include names and emblems that are also used
> as collective marks or trademarks, it would be naive to conclude that
> the name or emblem is desired because consumers believe that the
> product somehow originated with or was sponsored by the organization
> the name or emblem signifies. [247]

That court went on to conclude

> that Lindeburg was not using the Job's Daughters name and emblem as
> trademarks. The insignia were a prominent feature of each item so as to
> be visible to others when worn, allowing the wearer to publicly express
> her allegiance to the organization. Lindeburg never designated the
> merchandise as "official" Job's Daughters' merchandise or otherwise
> affirmatively indicated sponsorship. Job's Daughters did not show a
> single instance in which a customer was misled about the origin,
> sponsorship, or endorsement of Lindeburg's jewelry, nor that it
> received any complaints about Lindeburg's wares. Finally, there was
> evidence that many other jewelers sold unlicensed Job's Daughters
> jewelry, implying that consumers did not ordinarily purchase their
> fraternal jewelry from only "official" sources. We conclude that Job's
> Daughters did not meet its burden of proving that a typical buyer of
> Lindeburg's merchandise would think that the jewelry was produced,
> sponsored, or endorsed by the organization. The name and emblem
> were functional aesthetic components of the product, not trademarks.
> There could be, therefore, no infringement. [248]

---

[246] *Id.* at 917.
[247] *Id.* at 918.
[248] *Id.* at 920.

Although this decision is somewhat aged and has since been narrowed in scope, "the case remains good law."[249]

Imagery, even if it is trademarked and is the reason why consumers purchase a product, is subject to the aesthetic functionality defense so long as there is sufficient evidence that the images serve an aesthetic purpose wholly independent of any source-identifying function. In such circumstances the producer or sponsor of the goods would be of no consequence to consumers and, as the Supreme Court observed in *Dastar*, "[t]he words of the Lanham Act should not be stretched to cover matters that are typically of no consequence to purchasers."[250]

The Court therefore concludes that Vintage Brand has proffered a legally sound affirmative defense in the form of aesthetic functionality. This is not to say that Vintage Brand will have an easy task of establishing this defense at trial. As the Ninth Circuit emphasized in *Au-Tomotive*:

> It is difficult to extrapolate from cases involving a true aesthetically functional feature, like a box shape or certain uses of color, to cases involving well-known registered logos and company names, which generally have no function apart from their association with the trademark holder. The present case illustrates the point well, as the use of Volkswagen and Audi's marks is neither aesthetic nor independent of source identification. That is to say, there is no evidence that consumers buy Auto Gold's products solely because of their "intrinsic" aesthetic appeal. Instead, the alleged aesthetic function is

---

[249] *LTTB LLC v. Redbubble, Inc.*, 840 F. App'x 148, 150 (9th Cir. 2021) (quoting *Au-Tomotive*, 457 F.3d at 1069).

[250] *Dastar*, 539 U.S. at 32-33.

indistinguishable from and tied to the mark's source-identifying nature.[251]

But because "aesthetic function and branding success can sometimes be difficult to distinguish, the aesthetic functionality analysis is highly fact-specific,"[252] and this issue should be submitted to the jury if Vintage Brand has evidence to support its defense.

Contrary to Penn State's assertion, the Court finds that Vintage Brand has produced sufficient evidence to support an aesthetic functionality defense—although just barely. The testimony of Penn State's Rule 30(b)(6) representative and, critically, statements from a Penn State alumna that she wears Penn State gear to football games to show "school spirit" and show that she is "part of the same crowd that's rooting for this team,"[253] combined with expert testimony that consumers do not necessarily associate Penn State with the quality of products bearing its trademarks,[254] creates a sufficient basis upon which to send this issue to the jury.

As to Penn State's argument that any evidence related to the aesthetic functionality defense should be excluded pursuant to Federal Rule of Civil Procedure 37(c)(1) for failure to provide required discovery, the Court sees no basis

---

[251] *Au-Tomotive*, 457 F.3d at 1073-74.

[252] *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 222 (2d Cir. 2012).

[253] Doc. 247-2 at 6.

[254] *See* Doc. 247 at 15-18.

upon which to exclude said evidence at this late stage[255] in the proceedings.[256] Penn State was certainly made aware of the proposed expert testimony and knew, or should have known, the general testimony that its own witnesses would provide.[257]

Accordingly, the Court finds no reason to exclude Vintage Brand from presenting evidence related to its aesthetic functionality affirmative defense. Penn State's motion *in limine* will therefore be denied.

### 8.    First Amendment and Dismissed Claims

In its final motion *in limine*, Penn State seeks to exclude evidence that its claims are limited in any way by the First Amendment to the United States Constitution, as well as any reference to claims or defenses that have been dismissed or removed from the case by amended pleadings or answers.[258] Vintage Brand does not contest this motion,[259] and it therefore will be granted.

### C.    Penn State's Motion to Strike

Finally, Penn State seeks to strike Vintage Brand's aesthetic functionality affirmative defense. [260] First, Penn State argues that Penn State's use of the trademarks in a functional manner is not a proper aesthetic functionality defense,

---

[255] It is difficult to understand why, as with many of the present motions *in limine*, this was not raised at an earlier opportunity.
[256] Doc. 238 at 17-20.
[257] Of course, Vintage Brand's experts may not stray beyond the bounds of what was disclosed in their expert reports.
[258] Doc. 239.
[259] *Id.*
[260] Docs. 225, 226.

which instead focuses on whether the trademark itself is functional.[261] Second, Penn State contends that any functionality must be unrelated to the recognition or reputation of the mark holder.[262] Finally, Penn State asserts that use of a trademark to attract fans is not protected by the doctrine of aesthetic functionality.[263]

Vintage Brand claims that Penn State improperly seeks to file a dispositive motion more than one year after the deadline without leave of the Court or good cause.[264] It further argues that, in any event, the motion fails on the merits.[265] First, trademarks are properly subject to the aesthetic functionality defense when consumers purchase the challenged features for reasons independent of source identification.[266] Second, Vintage Brand asserts that a feature is functional if it is useful for anything beyond branding, which it avers is the case here.[267] Finally, it maintains that reputation for trademark purposes refers only to reputation as to the source of the relevant goods, and here Penn State has no reputation as a source for goods.[268]

Despite the incredibly late nature of Penn State's motion, the Court need not determine whether Penn State's motion is an improper dispositive motion because,

---

[261] Doc. 226 at 11-14.
[262] *Id.* at 14-19.
[263] *Id.* at 19-21.
[264] Doc. 248 at 6-12.
[265] *Id.* at 12-25.
[266] *Id.* at 12-16.
[267] *Id.* at 16-21.
[268] *Id.* at 21-25.

for the reasons explicated above as to Penn State's motion *in limine* to prohibit evidence of aesthetic functionality, Vintage Brand has adequately stated an affirmative defense under that doctrine. As discussed previously, the aesthetic functionality defense applies "to product features that serve an aesthetic purpose wholly independent of any source-identifying function."[269]

Although that quote comes from a Ninth Circuit decision, that definition is not unique to the Ninth Circuit.[270] To the contrary, the Third Circuit has stated plainly that a "design is functional if it is useful for anything beyond branding" and the functionality analysis must focus on whether the trademark or dress "only advanced the brand."[271] So too has the Supreme Court observed that the aesthetic functionality defense applies if the disputed feature serves a "significant nontrademark function" such as identifying the type of medicine involved or simply satisfying "the noble instinct for giving the right touch of beauty to common and necessary things."[272] Much as the Third Circuit has concluded that a watermelon-colored wedge shape is functional because it serves to identify the flavor of a

---

[269] *Au-Tomotive*, 457 F.3d at 1073.

[270] Penn State's assertion that the Third Circuit has rejected the reasoning behind cases such as *Au-Tomotive* reads too much into *Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822 (3d Cir. 1981). The Third Circuit there rejected the Ninth Circuit's decisions to the extent that they "define[] aesthetic functionality in terms of consumer acceptance." *Id.* at 825. But the question of consumer acceptance was not at issue in *Job's Daughters* or *Au-Tomotive*.

[271] *PIM Brands Inc. v. Haribo of Am. Inc.*, 81 F.4th 317, 321, 322 (3d Cir. 2023).

[272] *Qualitex*, 514 U.S. at 170 (internal quotation marks omitted).

candy,[273] so too could a jury decide here that the images in question serve a functional purpose outside of "the mark's source-identifying nature."[274]

As to Penn State's assertion that functionality must be assessed solely as defined by the trademark owner,[275] there is no case in the Third Circuit that has explicitly so held. And, in any event, whether functionality is defined by the plaintiff or by the defendant's actual use is a distinction without a difference, since either method leads to the same question: whether the trademarks as used on physical goods are functional or, instead, source identifying. When viewed in that light, whether the disputed images are source identifying as defined by Penn State or as used on Vintage Brand's goods is immaterial. In either case, they either identify Penn State as the source or sponsor of the goods or they do not.

In sum, the Court concludes that Vintage Brand has presented a legally viable defense in the form of aesthetic functionality. Penn State's motion to strike will therefore be denied.

---

[273] *Id.* at 322-23.
[274] *Au-Tomotive*, 457 F.3d at 1074.
[275] Doc. 226 at 13-14; Doc. 258 at 9-12.

**III.    CONCLUSION**

In accordance with the above discussion, the motions *in limine* will be granted

in part and denied in part, and the motion to strike will be denied.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | No. 4:21-CV-01091 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a PREP SPORTSWEAR; and CHAD HARTVIGSON, | |
| Defendants. | |

## <u>ORDER</u>

**NOVEMBER 19, 2024**

In accordance with the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that The Pennsylvania State University's Motion for Reconsideration (Doc. 312) is **GRANTED**.

BY THE COURT:

<u>s/ Matthew W. Brann</u>
Matthew W. Brann
Chief United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | No. 4:21-CV-01091 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a PREP SPORTSWEAR; and CHAD HARTVIGSON, | |
| Defendants. | |

## MEMORANDUM OPINION

### NOVEMBER 19, 2024

## I.    BACKGROUND

Vintage Brand, LLC ("Vintage Brand") designs apparel featuring various designs, including the trademarked symbols at issue in this case, and sells that apparel on its website. As part of its contract with Vintage Brand, Sportswear Inc. ("Sportswear") manufactures this apparel—including affixing the allegedly infringing marks—and ships it to customers on demand when they place orders on Vintage Brand's website.[1]

For the past several years, plaintiff, The Pennsylvania State University ("Penn State") and defendants, Vintage Brand and Sportswear, have been embroiled in

---

[1] *See* Exhibit A – C. Hartvigson 2022.08.13 Dep. Tr. at 17:5-7, Doc. 318.

trademark litigation over the use of Penn State's marks on Vintage Brands apparel. Today marks the sixth day of Penn State's trademark infringement jury trial. On November 14, 2024, after the conclusion of Penn State's case, defendant Sportswear Inc. moved for judgment as a matter of law on the direct trademark infringement claim against it.[2] This Court granted that motion on November 15 on the understanding that, as a manufacturer of the products, Sportswear had no role in designing, marketing, or selling them—it may have been liable under a contributory infringement theory,[3] but not for direct trademark infringement. On November 16, Penn State filed a motion for reconsideration of this Court's ruling.[4] On November 18, Sportswear filed its brief in opposition,[5] and Penn State filed its reply brief.[6] The motion is now ripe for disposition. For the reasons stated below, it is granted.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 50(a) allows a district court to "remove from the jury's consideration cases or issues when the facts are sufficiently clear that the law requires a particular result."[7] When deciding a Rule 50(a) motion, the district court is not permitted to weigh the parties' evidence or the reasonable inferences that

---

[2]    Motion for Judgment as a Matter of Law, Doc. 310.
[3]    *Inwood v. Ives Labs.*, 456 U.S. 844 (1982).
[4]    Motion for Reconsideration, Doc. 312.
[5]    Brief in Opposition, Doc. 319.
[6]    Reply Brief, Doc. 320.
[7]    Wright & Miller, FEDERAL PRACTICE AND PROCEDURE, *Rule 50, § 2521 History and Purpose of the Rule* (citing *e.g., Weisgram v. Marley Co.*, 528 U.S. 440 (2000)).

may be drawn by the jury.[8] The United States Court of Appeals for the Third Circuit has held that "[a] motion for judgment as a matter of law under Rule 50(a) will be granted only if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under governing law."[9]

Federal Rule of Civil Procedure 59(e) permits litigants to file a motion to alter or amend judgment within 28 days after the entry of judgment. To support a motion for reconsideration, a party must show "at least one of the following: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion; or," as relevant here, "(3) the need to correct a clear error of law or fact or to prevent manifest injustice."[10]

## III.    ANALYSIS

Penn State makes two arguments in support of its motion. First, it argues that Sportswear's distribution of goods featuring the allegedly infringing Penn State marks (the "goods") constitutes trademark infringement. Alternatively, it disputes this Court's original assumption that where a defendant manufactures goods featuring protected marks for sellers, that defendant can only be liable for contributory infringement, not direct trademark infringement. Based on its current

---

[8]    *See e.g.*, *Harris v. Homecomings Fin. Servs.*, 377 F. App'x 240, 242 (3d Cir. 2010).
[9]    *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 237 (3d Cir. 2013).
[10]    *In re Vehicle Carrier Servs. Antitrust Litig.*, 846 F.3d 71, 87 (3d Cir. 2017) (cleaned up).

understanding of this thorny area, the Court opts for a third approach, which is the most narrow one. Regardless of whether a defendant's manufacture or shipment of goods featuring a protected mark could support direct trademark infringement in isolation, a reasonable juror could find that they can do so together.

In *Inwood Laboratories v. Ives Laboratories*, the Supreme Court of the United States established the contributory liability theory of trademark infringement under the Lanham Act, which applies to defendants who cannot be held directly liable for infringement.[11] Though it was "undisputed that those pharmacists who mislabeled generic drugs with Ives' registered trademark violated § 32" of the Lanham Act, the manufacturers, who had not mislabeled the drugs, could only be liable under a contributory liability theory.[12] This case is different both because Sportswear applied the mark itself during manufacturing, and shipped the goods to consumers.

As articulated by the Third Circuit, to prove trademark infringement, "a plaintiff must demonstrate that (1) it has a valid and legally protectible mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion."[13] The third element is the crux of this dispute, and the Lanham Act provides context demonstrating its constituent parts.

---

[11]   456 U.S. 844, 853-54 (1982) (explaining that liability would require showing that defendant "intentionally induced the pharmacists to mislabel generic drugs or, in fact, continued to supply [the drug] to pharmacists whom the petitioners knew were mislabeling generic drugs").

[12]   *Id.*

[13]   *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).

The Lanham Act provides:

> Any person who shall, without the consent of the registrant . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable.[14]

This statutory text fleshes out the third element of trademark infringement in more detail. (1) The defendant must use the mark "in commerce," (2) that use in commerce must be "in connection with" various commercial activities, including the sale or distribution of goods, and (3) that use must cause a likelihood of confusion, mistake, or deception on or in connection with the specified commercial activity.

The meaning of "use in commerce" in the Lanham Act's infringement provision has long been contentious in trademark law, and several definitions have sprung up around it.[15] The registration definition approach looks to the definition of "use in commerce" in the Act's registration provision.[16] Although persuasive authorities have criticized the registration definition,[17] Sportswear relies upon it in

---

[14] 15 U.S.C. § 1114(1).

[15] *See, e.g.*, *Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 139 (2d Cir. 2009) (arguing in dictum that meaning of use in commerce is determined by jurisdiction provision); *Karl Storz Endoscapy-Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 855 (9th Cir. 2002) ("'use in commerce' appears to contemplate a trading upon the goodwill of or association with the trademark holder"); *See North Am. Med. Corp. v. Axiomo Worldwide, Inc.*, 522 F.3d 1211, 1219 (11th Cir. 2008) (looking to the "plain meaning of the language of the statutory language").

[16] 15 U.S.C. § 1127.

[17] *See New Balance Athletics, Inc. v. USA New Bunren Int'l Co. Ltd. LLC*, 424 F.Supp. 3d 334, 344-45 (D. Del. 2019); *Rescuecom Corp. v. Google, Inc.*, 562 F.2d 123, 130-40 (2d Cir. 2009); *BTG Patent Holdings, LLC v. Bag2Go*, 193 F.Supp. 3d 1310, 1322-23 (S.D. Fla. 2016);

its brief in opposition,[18] and the Supreme Court of the United States very recently endorsed it in *Abitron Austria GmbH v. Hetronic International, Inc.* "Under the Act, the 'term "use in commerce" means the bona fide use of a mark in the ordinary course of trade,' where the mark serves to 'identify and distinguish [the mark user's] goods . . . and to indicate the source of the goods.'"[19] Both because it is the definition proffered by Sportswear, and because of this language from *Abitron*, the Court will apply the  test enunciated in Section 1127.

Sportswear argues from this proposition that a liable defendant must use the marks at issue "to identify the source *of its own goods*" to be liable under this definition.[20] But there is no textual source for such a requirement in Section 1127; even where the infringing goods do not belong to the defendant, the mark still "identif[ies] and distinguish[es] . . . the source of the goods" and "indicate[s] the[ir] source."[21] In this Court's research, it found one decision advancing Sportswear's interpretation, and that decision acknowledges that it is distinguishable from cases in which defendants transport goods to facilitate a sale.[22] Yet other courts applying this same definition of use in commerce have found it to be very broad, covering

---

*VersaTop Support Sys., LLC v. Georgia Expo, Inc.*, 921 F.3d 1364, 1370 (Fed. Cir. 2019); 3 McCarthy on Trademarks and Unfair Competition § 23:11.50 (5th ed.) ("[T]he Lanham Act § 45 definition of 'use in commerce' defines the kind of use needed to register a mark, not to infringe it.").

[18]   *See* Brief in Opposition, Doc. 319 at 5.

[19]   600 U.S. 412, 428 (2023).

[20]   Brief in Opposition, Doc. 319 at 6.

[21]   15 U.S.C. § 1127.

[22]   *See Nike, Inc. v. B&H Customs Servs.*, 565 F.Supp. 3d 498, 509-11 (S.D.N.Y. 2021).

even unwitting transporters of goods with protected marks.[23]  "While sales are the typical and clearest evidence, they are not the *sine qua non* of use in commerce."[24]

Sportswear analogizes to "white label" sellers such as Amazon and eBay, as well as the plethora of cases holding that they are not directly liable.[25] It bemoans that "[u]nder the University's proposal, Amazon, eBay, and similar intermediaries— who are necessary commercial conduits of many potentially infringing goods— could be held strictly liable for trademark infringement."[26]

But the slope is not as slippery as it would seem for several reasons, all of which mark areas this Court does not reach today. Remember that the Lanham Act requires that the "use in commerce" both be "in connection with" a specified commercial activity, and that "on or in connection with" that activity, the use in commerce must be "likely to cause confusion, or to cause mistake, or to deceive."[27]

---

[23] *See, e.g.*, *Phillip Morris USA, Inc. v. Lee*, 481 F.Supp. 2d 742, 747 (W.D. Tex. 2006); *Phillip Morris USA Inc. v. Liu*, 489 F.Supp.2d 1119, 1121-22 (C.D. Cal. 2007) (defendant directly liable for trademark infringement because he "unloaded and transported some cargo which unfortunately turned out to be counterfeit cigarettes"); *Abbott Labs. v. Adelphia Supply USAA*, Nos. 15-CV-5826 & 17-CV-6002, 2019 U.S. Dist. LEXIS 194268, at *46 (E.D.N.Y. Sep. 27, 2019); *Nike, Inc. v. E. Ports Custom Brokers, Inc.*, No. 2:11-cv-4390-CCC-MF, 2018 U.S. Dist. LEXIS 120351, at *12-21 (D.N.J. 2018); *Nike, Inc. v. KAL Am., Inc.*, No. CV 15-5269-GW(PJWx), 2016 U.S. Dist. LEXIS 141266, at *7-9 (C.D. Cal. 2016). The Court expressly refrains from opining on whether the Lanham Act goes this far. The Court need not, and does not, decide whether shipping, in isolation, is a use in commerce.

[24] *ITT Indus. v. Wastecorp, Inc.*, 87 F.App'x 287, 296 n.12 (3d Cir. 2004).

[25] Brief in Opposition, Doc. 319 at 7-8; *see also Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 103 (2d Cir. 2010).

[26] Brief in Opposition, Doc. 319 at 8.

[27] 15 USC § 1114(1)(a). *See, e.g.*, *Ak Futures LLC v. LCF Labs. Inc.*, 8:21-cv-02121-JVS (ADSx), 2022 U.S. Dist. LEXIS 231481, at *21 (Sep. 28, 2022) (providing transportation services for shipment of products did not create confusion in minds of consumers).

As such, the aforementioned broad definitions of "use in commerce" are hemmed in by the fact that this use must also be the likely cause of confusion. Intermediaries or "auction houses" that merely facilitate the brokering of sales are not "true" sellers, and so their "passive" participation is not "use in commerce."[28] And while shipment is definitionally use in commerce under the registration definition, it is not clear whether this "use" could fairly be said to cause consumer confusion because the defendant did not "design or create" the infringing material, or place the mark on the goods.[29] In contrast, under similar circumstances, Courts have found that contributing to design or manufacturing and affixing a label displaying the mark,[30] or manufacturing and affixing the label along with shipping the goods,[31] suffices to show a use in commerce that misleads consumers.

---

[28]  *Compare GMA Accessories, Inc. v. BOP, LLC*, 765 F.Supp. 2d 457, 463-64 (S.D.N.Y. 2011) with *Johnson & Johnson v. S. Pointe Wholesale, Inc.*, No. 06-CV-1269 (SLT)(SMG), 2014 US Dist LEXIS 190383, at *71-76 (E.D.N.Y. Mar 28, 2014).

[29]  *Basketball Mktg. Co. v. FX Digital Media, Inc.*, 257 F.App'x 492, 494 (3d Cir. 2007) ("Plaintiff must still prove a likelihood of confusion arising from Gitten's actions to establish a claim of direct infringement."); *InvenTel Prods., LLC v. Li*, 406 F.Supp. 3d 396, 405 (D.N.J. 2019) ("When defendants did not 'design or create' the offending material, they cannot be directly liable for any 'likelihood of confusion' the materials may cause."); *Car-Freshener Corp. v. Meta Platforms, Inc.*, No. 5:22-CV-1305 (MAD/ML), 2023 US Dist LEXIS 199408, at *57-60 (N.D.N.Y. Nov. 7, 2023); *Lopez v. Bonanza.com, Inc.*, No. 17 Civ. 8493 (LAP), 2019 US Dist LEXIS 170715, at *16-21 (S.D.N.Y. Sep. 30, 2019); Ethan Horwitz, 3 Intellectual Property Counseling & Litigation § 30.05 ("Furthermore, the 'use' has to cause confusion or deception . . . and one might question whether merely arranging for shipment causes any confusion.").

[30]  *Red Rock Sourcing LLC v. JGX LLC*, No. 21 CIV. 1054 (JPC), 2024 U.S. Dist. LEXIS 52748, at *24 (S.D.N.Y. Mar. 22, 2024) (defendant who helped design and affix labels for infringing product was directly liable).

[31]  *Haw. Foodervice All., LLC v. Meadow Gold Dairies Haw., LLC*, CIV No. 21-00460-LEK-WRP, 2023 US Dist LEXIS 4801, at *10-13 (D. Haw. Jan. 11, 2023) (farms who made goods and placed misleading labels on them were directly liable for analogous claim).

Indeed, several cases have also distinguished between intermediaries like Amazon and eBay on such a basis.

In *Ohio State University v. Redbubble, Inc.*, the United States Court of Appeals for the Sixth Circuit held that the defendant company Redbubble could be held directly liable for infringement.[32] The defendant company, Redbubble, allowed artists to create clothing designs hosted on its website; upon sale, Redbubble printed the clothing with the designs, shipped it to customers, and affixed a Redbubble tag.[33] Along the way, the Court noted that it was undisputed that "an entity that is . . . the creator or manufacturer of the offending goods . . . is liable."[34] Explaining that "the degree of control and involvement exercised by Redbubble over the manufacturing, quality control, and delivery of goods to consumers is relevant to an assessment for the purpose of liability," the court held that Redbubble was "more than just a passive facilitator" of sales because "products ordered on Redbubble's website do not yet exist, coming into being only when ordered through Redbubble, and are delivered in Redbubble packaging and Redbubble tags."[35]

Likewise, in *H-D U.S.A., LLC v. SunFrog, LLC*, a case involving similar facts, the court's inquiry was broader.[36] The defendant company in *Sunfrog* automatically

---

[32]  989 F.3d 435 (6th Cir. 2021).
[33]  *Id.* at 440-441.
[34]  *Id.* at 447.
[35]  *Id.* at 448.
[36]  311 F.Supp. 3d 1000 (E.D. Wis. 2018).

printed products designed by a seller and shipped them to customers who ordered them on its website.[37] The court concluded that the marks "were not maintained in the All Art database without SunFrog's effort, did not get onto SunFrog's goods without the use of SunFrog's own printers, nor did they make it to purchasers without being shipped by SunFrog. Thus, SunFrog is actively involved in the infringing conduct."[38] Distinguishing SunFrog from passive facilitators like eBay, the court explained that "SunFrog operates the very printers that print infringing goods."[39] The Southern District of New York reached the same ruling in a case involving a similar defendant, reasoning that "'[t]he goods are sold and transported in commerce'" whenever the imprinted merchandise is sold and shipped to CafePress' online customers . . . The sort of 'use discussed in the search provider context is simply irrelevant in cases, like this one, where the alleged infringer physically places the mark on goods that it sells to customers."[40]

There are of course distinctions. *Redbubble* held that a defendant who manufactures and ships goods designed by a third party could still be liable, but it also drew attention to Redbubble's packaging, tags, and maintenance of an online marketplace. *SunFrog*'s language was broader, but it also noted how SunFrog

---

[37] *Id.* at 1030.

[38] *Id.*

[39] *Id.* at 1037.

[40] *Born to Rock Design, Inc. v. CafePress.com, Inc.*, 10 Civ. 8588 (CM), 2012 U.S. Dist. LEXIS 129230, at *13 (S.D.N.Y. Sept. 7, 2012).

involved itself in advertising products. And *CafePress*, though it seems to capture this case within its dictum, remains distinguishable on the facts. But together, these cases stand for the proposition that one uses a mark in commerce by manufacturing goods displaying the mark in connection with their sale, which causes consumer confusion. In this case, Sportswear manufactures goods displaying the mark in connection with their distribution, which causes consumer confusion. Both scenarios entail a far more active role from the defendants.

Another question the Court does not reach is whether Sportswear's status as a manufacturer would be enough, even a manufacturer who affixes the infringing mark. Some Courts have held that all defendants within the supply chain are directly liable for trademark infringement once the mark is affixed; the argument is that the ultimate sale of the good to the consumer is "in connection with" the manufacturer's upstream sale of the manufactured goods to the designer.[41] But one may argue, in contrast, that the "use in commerce" of manufacturing has not yet caused any confusion, because by fulfilling its contract, the manufacturer only provides the

---

[41] *See Ak Futures LLC v. LCF Labs. Inc.*, 8:21-cv-02121-JVS (ADSx), 2022 U.S. Dist. LEXIS 231481, at *16-20 (Sep. 28, 2022); *Juul Labs, Inc. v. Chou*, 557 F.Supp. 3d 1041, 1052 (C.D. Cal. 2021) (defendants, who stored, coordinated, shipped, and managed the handling of infringing goods at the New Jersey warehouse were "part of the distribution chain and therefore used the goods in commerce"); *See also Red Rock Sourcing LLC v. JGX LLC*, No. 21 Civ. 1054 (JPC), 2024 U.S. Dist. LEXIS 52748, at *80-81 (SDNY Mar. 22, 2024) ("Indeed, any member of the distribution chain may be held liable for infringement.") (collecting cases).

goods to the designer, the true infringer, and this does not convey the goods to the consumer and so does not result in consumer confusion.[42]

In sum, is not clear whether or when mere manufacturers or shippers can be liable for direct infringement, and the Court does not opine on those facts. The context is unique here because in response to orders on Vintage Brand's website, Sportswear manufactures the goods on demand, affixes the marks, and ships them directly to the customers. Sportswear's commercial use of the mark (manufacturing) is in connection with its distribution of the goods through shipping them to customers, and upon that shipping, Sportswear's use of the mark in manufacturing may be likely to cause consumer confusion such that it can be liable for direct infringement.

## IV.    CONCLUSION

Accordingly, Penn State's motion for reconsideration will be granted.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[42]   *See* Stacey L. Dogan & Mark A. Lemley, *Grounding Trademark Law Through Trademark Use*, 92 Iowa L. Rev. 1669, 1680 (2007) (discussing *Andrew Jergens Co. v. Bonded Prods. Corp.*, 21 F.2d 419, 422 (2d Cir. 1927)).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THE PENNSYLVANIA STATE
UNIVERSITY,

       Plaintiff,

   v.

VINTAGE BRAND, LLC;
SPORTSWEAR, INC.,
d/b/a PREP SPORTSWEAR; and
CHAD HARTVIGSON,

       Defendants.

No. 4:21-CV-01091

(Chief Judge Brann)

## <u>ORDER</u>

### NOVEMBER 19, 2024

In accordance with the Court's oral rulings during trial, **IT IS HEREBY ORDERED** that:

1.  Defendants' motion for judgment as a matter of law (Doc. 310) is **DENIED** as explained in the Court's oral ruling of November 14, 2024, and modified by the Memorandum Opinion and Order dated November 19, 2024;

2.  Plaintiff's motion for judgment as a matter of law (Doc. 321) is **DENIED** for the reasons set forth in the Court's oral ruling on November 18, 2024; and

3.   Defendant's second motion for judgment as a matter of law (Doc. 323) is **DENIED** on the grounds provided in this Court's oral ruling on November 18, 2024.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | No. 4:21-CV-1091 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a PREP SPORTSWEAR; and CHAD HARTVIGSON, | |
| Defendants. | |

## <u>JURY CHARGE</u>

NOVEMBER 19, 2024

Members of the jury: You have seen and heard all the evidence to be presented and the arguments of the parties. I will now instruct you on the law that you must apply. These instructions, and those that I gave to you before and during the trial, must guide you in reaching a decision in this case.

## I.    DUTIES OF THE JURY

When you retire to the jury room to deliberate, you may take with you these instructions and your notes. The exhibits that the Court has admitted into evidence are already preloaded into the electronic jury system in the jury room. You should select one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open court.

You have two main duties as jurors. The first one is to decide what the facts are from the evidence that you saw and heard here in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide if, under the appropriate burden of proof, the parties have established their claims. It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

As jurors, you have a duty to consult with each other and to deliberate with the intention of reaching a verdict. Each of you must decide the case for yourself, but only after a full and impartial consideration of all of the evidence with your fellow jurors. Listen to each other carefully. In the course of your deliberations, you should feel free to re-examine your own views and to change your opinion based upon the evidence. But you should not give up your honest convictions about the

evidence just because of the opinions of your fellow jurors. Nor should you change your mind just for the purpose of obtaining enough votes for a verdict.

When you start deliberating, do not talk to the jury officer, to me or to anyone but each other about the case. During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a cell phone, smart phone like Galaxies or iPhones, or computer of any kind; the internet, any internet service, or any text or instant messaging service like Twitter; or any internet chat room, blog, website, or social networking service such as Facebook, LinkedIn, TikTok, or YouTube, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

You may not use these electronic means to investigate or communicate about the case because it is important that you decide this case based solely on the evidence presented in this courtroom. Information on the internet or available through social media might be wrong, incomplete, or inaccurate. Information that you might see on the internet or on social media has not been admitted into evidence and the parties have not had a chance to discuss it with you. You should not seek or obtain such information and it must not influence your decision in this case.

If you have any questions or messages for me, you must write them down on a piece of paper, have the foreperson sign them, and give them to the jury officer.

The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you.

One more thing about messages. Never write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that a certain number is voting one way or another. Your votes should stay secret until you are finished.

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, each juror must agree to the verdict. Your verdict must be unanimous.

A form of verdict has been prepared for you. It has a series of questions for you to answer. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will fill it in, and have your foreperson date and sign the form. You will then return to the courtroom and your foreperson will give your verdict. Unless I direct you otherwise, do not reveal your answers until you are discharged. After you have reached a verdict, you are not required to talk with anyone about the case unless I order you to do so.

Once again, I want to remind you that nothing about my instructions and nothing about the form of verdict is intended to suggest or convey in any way or

manner what I think your verdict should be. It is your sole and exclusive duty and responsibility to determine the verdict.

## II.    EVIDENCE

### A. What Is and Is Not Evidence

You must make your decision in this case based only on the evidence that you saw and heard in the courtroom. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence from which you are to find the facts consists of both the testimony of the witnesses and the documents and other things received as exhibits.

The following are not evidence:

- Statements and arguments of the attorneys for the parties in this case;

- Questions by the attorneys;

- Objections by attorneys, including objections in which the attorneys stated facts; and

- Anything you may have seen or heard about this case outside the courtroom.

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events and give it whatever weight you believe it deserves. If your experience and common sense tells you that certain evidence reasonably leads to a conclusion, you may reach that conclusion.

### B. Objections and Evidentiary Rulings

As I told you in my preliminary instructions, the rules of evidence control

what can be received into evidence. During the trial the parties objected when they thought that evidence was offered that was not permitted by the rules of evidence. These objections simply meant that the parties were asking me to decide whether the evidence should be allowed under the rules. You should not be influenced by the fact that an objection was made.

You should also not be influenced by my rulings on objections or any sidebar conferences you may have overheard. When I sustained an objection, the question was not answered or the exhibit was not received as evidence. You must disregard the question or the exhibit entirely. Do not think about or guess what the witness might have said in answer to the question; do not think about or guess what the exhibit might have shown. Sometimes a witness may have already answered before a lawyer objected or before I ruled on the objection. If that happened and if I sustained the objection, you must disregard the answer that was given.

Also, if I ordered that some testimony or other evidence be stricken or removed from the record, you must disregard that evidence. When you are deciding this case, you must not consider or be influenced in any way by the testimony or other evidence that I told you to disregard.

Although the parties may have called your attention to certain facts or factual conclusions that they thought were important, what the lawyers have said is not evidence and is not binding on you. It is your own recollection and interpretation of

the evidence that controls your decision in this case. Also, do not assume from anything I may have done or said during the trial that I have any opinion about any of the issues in this case or about what your verdict should be.

### C. Direct and Circumstantial Evidence

Let me speak now about direct and circumstantial evidence.

Two general types of evidence have been used in this trial, "direct evidence" and "circumstantial (or indirect) evidence." You may use both types of evidence in reaching your verdict.

"Direct evidence" is simply evidence which, if believed, directly proves a fact. An example of "direct evidence" occurs when a witness testifies about something the witness knows from his or her own senses — something the witness has seen, touched, heard, or smelled. For example, a witness may testify that he or she saw it raining outside.

"Circumstantial evidence" is evidence which, if believed, indirectly proves a fact. It is evidence that proves one or more facts from which you can infer some other fact through reason, experience, and common sense. For example, if someone walked into the courtroom wearing a wet raincoat and carrying a wet umbrella -- that would be circumstantial or indirect evidence from which you could reasonably infer that it was raining. You would not have to find that it was raining, but you could.

Sometimes different inferences may be drawn from the same set of facts. The Plaintiff may ask you to draw one inference, and the Defendant may ask you to draw another. You, and you alone, must decide what reasonable inferences to draw based on all the evidence and your reason, experience, and common sense.

You should consider all the evidence that was presented in this trial, both direct and circumstantial. The law makes no distinction between the weight that you should give to either type. It is for you to decide how much weight to give any evidence.

### D. The Role of Counsel

As I have explained, the statements and arguments of the attorneys are not evidence unless made as an admission or stipulation.

The purpose of an argument to the jury is to suggest inferences and deductions which the particular attorney believes can be drawn from the evidence. While you may follow the inferences and deductions that are suggested to you by a particular attorney, if they seem reasonable and logical to you, you are not bound to do so.

During their argument, the attorneys are permitted to make reference to evidence that they believe supports their position; they are permitted to refer to evidence from which they believe an inference can be drawn that supports their position; and in the course of their reference to the evidence, they are permitted to

characterize the evidence in a certain way. In all cases it is your recollection of the evidence which controls, not the attorney's recollection of what the evidence shows.

### E. Bench Conferences and Sidebars

You observed during the course of the trial that the court from time to time called the attorneys to the bench for a conference. You are admonished not to draw any unfavorable inference or inferences whatsoever from these conferences for or against any of the parties to the case. If the court felt that the jury should hear anything that was discussed out of its hearing at the bench, the court permitted that to be presented to you in open court.

### F. Credibility and Weight

In deciding what the facts are, you must decide what testimony you believe and what testimony you do not believe. You are the sole judges of the credibility of the witnesses, which simply means you decide whether a witness is worthy of belief. Was the witness truthful? Was his testimony accurate? You may believe everything a witness says, part of it, or none of it.

The sworn testimony of witnesses who testified by videotape at trial is entitled to the same consideration as if the witnesses had testified in court. The testimony was taken by deposition, and it was under oath, in the presence of the attorneys and was transcribed by a court reporter. You should evaluate the videotaped witnesses the same way as the other witnesses who testified in person in court.

You may decide whether to believe a witness based on his or her behavior and manner of testifying, the explanations the witness gave, and all the other evidence in the case. Decide whether to believe a witness just as you would in any important matter where you are trying to decide if a person is truthful, straightforward, and accurate in his or her recollection. Remember to use your common sense, your good judgment, and your experience.

In deciding what to believe, you may consider a number of factors, including:

- The opportunity and ability of the witness to see or hear or know the things about which the witness testified;

- The quality of the witness' knowledge, understanding, and memory;

- The witness' appearance, behavior, and manner while testifying;

- Whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice;

- Any relation the witness may have with a party in the case and any effect the verdict may have on the witness;

- Whether the witness said or wrote anything before trial that was different from the witness' testimony in court;

- Whether the witness' testimony was consistent or inconsistent with other evidence that you believe; and

- Any other factors that bear on whether the witness should be believed.

Inconsistencies or discrepancies in a witness' testimony or between the testimony of different witnesses may or may not cause you to disbelieve a witness' testimony. Two or more persons witnessing an event may simply see or hear it differently. Mistaken recollection, like failure to recall, is a common human experience. In weighing the effect of an inconsistency, you should also consider whether it was about a matter of importance or an insignificant detail. You should also consider whether the inconsistency was innocent or intentional.

You are not required to accept testimony even if the testimony was not contradicted and the witness was not impeached. You may decide that the witness is not worthy of belief because of the witness' bearing and demeanor, or because of the inherent improbability of the testimony, or for other reasons that are sufficient to you.

After you make your own judgment about the believability of a witness, you can then attach to that witness' testimony the importance or weight that you think it deserves. The weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testified or the quantity of evidence that was presented. What is more important than numbers or quantity is how believable the witnesses were, and how much weight you think his testimony deserves.

### G. Opinion Testimony

You have heard testimony containing opinions from a number of witnesses. In weighing this opinion testimony, you may consider the witnesses' qualifications, the reasons for that witness's opinions, and the reliability of the information supporting those opinions, as well as the factors I have previously mentioned for weighing the testimony of any other witness. The opinion of the witness should receive whatever weight and credit, if any, you think appropriate, given all the other evidence in the case.

### H. Opinion Evidence (Expert Witnesses)

The rules of evidence ordinarily do not permit witnesses to state their own opinions about important questions in a trial, but there are exceptions to these rules.

In this case, you heard testimony from David Franklyn, David Neal, and Tülin Erdem. Because of their knowledge, skill, experience, training, or education in the fields of consumer behavior and consumer surveys, these individuals were permitted to offer opinions in that field and the reasons for those opinions.

The opinions these witnesses state should receive whatever weight you think appropriate, given all the other evidence in the case. In weighing this opinion testimony you may consider the witness' qualifications, the reasons for the witness' opinions, and the reliability of the information supporting the witness' opinions, as well as the other factors discussed in these instructions for weighing the testimony of witnesses. You may disregard the opinions entirely if you decide that Professor

Franklyn, Dr. Neal, or Dr. Erdem's opinions are not based on sufficient knowledge, skill, experience, training, or education. You may also disregard the opinions if you conclude that the reasons given in support of the opinions are not sound, or if you conclude that the opinions are not supported by the facts shown by the evidence, or if you think that the opinions are outweighed by other evidence.

### I.  False in One, False in All

If you believe a witness knowingly testified falsely concerning any important matter, you may distrust the witnesses' testimony concerning other matters. You may reject all of the witness's testimony or you may accept the parts of the witness's testimony that you believe are true.

### J.  Stipulations of Fact

The parties have stipulated that certain facts are true, and those stipulations have been read to you during this trial. You must therefore treat these facts as having been proved for the purposes of this case.

### K.  Stricken Evidence

I have ordered that Chad Hartvigson's testimony referencing the public domain be struck from the record and I am instructing you that you must disregard that testimony. That means that when you are deciding the case, you must not consider that testimony in any way.

### L.  Limited Purpose

You have heard evidence that was received for a particular limited purpose. Specifically, you saw an email received by Caroline Gummo. This evidence can be considered by you as evidence of the date that The Family Clothesline learned of Vintage Brand. It may not be used for any other purpose. You further heard testimony from Chad Hartvigson about memorabilia that contained copyright symbols. You may consider that testimony only for the fact that Vintage Brand made efforts not to utilize memorabilia that contained copyright symbols. You may consider it for no other purpose.

### M. Judicial Notice

I have taken judicial notice of certain facts. Specifically, the accuracy and the fact of the Coat of Arms of the Commonwealth of Pennsylvania, which I will provide to you. I believe this fact can be so accurately and readily determined that it cannot reasonably be disputed. I have decided to accept as proved that fact, and you must accept this fact as true for purposes of this case.

### N. All Equal Before the Law

In deciding this case, you must follow and apply all of the law as I explain it to you, whether you agree with that law or not; and you must not let your decision be influenced in any way by sympathy, or by prejudice, for or against anyone.

The fact that a legal entity like a corporation or educational institution is involved as a party must not affect your decision in any way. A legal entity and all

other persons stand equal before the law and must be dealt with as equals in a court of justice. When a legal entity is involved, of course, it may act only through people as its employees; and, in general, a legal entity is responsible under the law for any of the acts and statements of its employees that are made within the scope of their duties as employees of the company.

### III.    BURDEN OF PROOF

The burden is on the Plaintiff, the Pennsylvania State University, in a civil action.

In most civil cases, the Plaintiff has the burden of proving its claims by a legal standard called "preponderance of the evidence." Preponderance of the evidence means a fact is more likely true than not.

To put it differently: if you were to put the evidence favorable to the Pennsylvania State University on one side of a scale, and the evidence favorable to the Defendants on the opposite side of the scale, the Pennsylvania State University would have to make the scale tip somewhat on its side. If the Pennsylvania State University fails to meet this burden, your verdict must be for the Defendants, Vintage Brand, LLC, Sportswear, Inc., and Chad Hartvigson.

The opposite is true as to the Defendants' affirmative defenses and counterclaims. The Defendants have the burden to prove by a preponderance of the evidence any affirmative defenses and counterclaims that they assert. Once again, preponderance of the evidence means a fact is more likely true than not.

To put it differently: if you were to put the evidence favorable to the Defendants on one side of a scale, and the evidence favorable to Penn State on the opposite side of the scale, the Defendants would have to make the scale tip somewhat

on their side. If the Defendants fail to meet this burden, your verdict must be for Penn State as to those affirmative defenses or counterclaims.

Again, as I mentioned in your preliminary instructions, while you may have heard of the phrase "proof beyond a reasonable doubt," that is a stricter standard of proof and it applies only to criminal cases. It does not apply in civil cases such as this. So you should put it out of your mind and only apply the preponderance of the evidence standard that I have just described to you.

## IV.    THE CLAIMS

I will now instruct you on the law as it applies to this case. The Plaintiff has brought three separate claims. It alleges trademark infringement, pursuant to 15 U.S.C. § 1114, unfair competition and false designation of origin, in accordance with 15 U.S.C. § 1125(a), and common law trademark infringement and unfair competition. However, all three claims require that the Plaintiff prove the same things, and I will therefore discuss all three claims together. The Defendants have also brought a counterclaim seeking the cancellation of certain of Penn State's trademarks, and I will discuss that counterclaim later.

Before I get to that, though, I want to discuss the burdens of proof that you must apply in this case. Earlier I explained the preponderance of the evidence standard. In this case, the Plaintiff, Penn State, contends that the Defendants have engaged in trademark infringement and unfair competition. That means that the

Plaintiff has the burden of proving by the preponderance of the evidence each element of its claims.

The Defendants have presented certain affirmative defenses. That is, they argue that there are some reasons why their conduct should be excused even if you conclude that they infringed on Penn State's trademarks. The Defendants bear the burden of proving each element of those affirmative defenses by a preponderance of the evidence. Moreover, the Defendants have filed a counterclaim in this case seeking cancellation of some Penn State trademarks. For this counterclaim, Vintage Brand has the burden of proving by a preponderance of the evidence each element of this claim that certain of Penn State's trademarks should be cancelled.

## A. PENN STATE'S CLAIMS

The Plaintiff claims that the Defendants here have used Penn State's trademarks on Vintage Brand goods and, by doing so, have engaged in unfair competition and falsely designated the origin of its goods under 15 U.S.C. § 1125(a) and under the common law, and have engaged in federal trademark infringement of Penn State's registered marks under 15 U.S.C. § 1114. The Defendants deny this.

First let me take a moment to explain a little bit about trademarks to you and describe in more detail the trademarks that are involved in this case. A trademark is a word, name, symbol, or device, or any combination of these items that indicates the source or sponsor of goods on or in connection with which they are used. The

owner of a trademark has the right to exclude others from using that trademark or a similar mark in a way that is likely to cause confusion in the marketplace.

This dispute involves eight different trademarks which, for the sake of simplicity, I will collectively call the "asserted marks." Of these eight asserted marks, two are combinations of words, those being "PENN STATE" and "THE PENNSYLVANIA STATE UNIVERSITY." The remaining six are images—more specifically, designs or logos. For your reference during deliberations, I will provide a copy of the asserted marks to you.

A person acquires the right to exclude others from using the same mark or a similar mark in a way that is likely to cause confusion in the marketplace by being the first to use it in the marketplace as a trademark, or by using it before the alleged infringer. Rights in a trademark are obtained only through use of the mark in commerce.

### 1. Requirements for Penn State's Claims

As to Penn State's claim for unfair competition and false designation of origin under 15 U.S.C. § 1125(a) and under the common law, as well federal trademark infringement of its registered marks under 15 U.S.C. § 1114, Penn State has the burden of proving each of the following elements by a preponderance of the evidence:

> First, that Penn State's asserted trademarks are valid, protectable trademarks;

Second, Penn State owns rights in those asserted trademarks;

Third, the Defendants used the asserted trademarks in interstate commerce, meaning the Defendants' goods are transferred, sold, or advertised across state lines; and

Fourth, the Defendants used the asserted trademarks—or words or symbols similar to the asserted trademarks—without the consent of Penn State in a manner that is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of the goods sold by Vintage Brand.

If you find that the Plaintiff did not prove each of these things by a preponderance of the evidence, then you must find for the Defendants. If, on the other hand, you find that the Plaintiff has proved each of these things by a preponderance of the evidence, you must then consider the Defendants' affirmative defenses. If you find that the Plaintiff has proved each of the elements of its claims by a preponderance of the evidence, and the Defendants have not proved one or more of their affirmative defenses by a preponderance of the evidence, then you must find for the Plaintiff.

I will now explain those requirements to you in a little more detail.

## 2. Validity and Ownership of Trademark

Penn State has the burden of proving by the preponderance of the evidence that it owns valid rights in the asserted marks.

The owner of a trademark may register that mark in the United States Patent and Trademark Office. Registration creates a presumption that the registered mark

is valid and that the registrant owns and has the exclusive right to use the registered mark to use the registered mark in commerce. Trademark registrations can become "incontestable" under certain conditions; for registrations that have become incontestable, the presumptions of validity and ownership may not be rebutted except on certain specified grounds.

Penn State has submitted certificates of registration for all of the asserted marks except the S-Lion Logo; the S-Lion Logo therefore is not registered. Penn State has submitted evidence that its registrations have achieved incontestable status, with the exception of the Pozniak Lion Logo.

### i. Validity and Ownership

For any trademark that is not registered—here, the S-Lion Logo—Penn State will need to prove that it was the first to use the S-Lion Logo in commerce.

In addition to showing that the trademark is valid, Penn State will need to prove ownership of that trademark. To do so, Penn State must demonstrate that it used the S-Lion Logo in a manner that allowed consumers to identify the S-Lion Logo with Penn State or its merchandise before the Defendants began to use the S-Lion Logo on the Defendants' merchandise. Among the factors you may consider are the volume of sales of the Plaintiff's product, the nature of the Plaintiff's sales and purchasers, and the amount of the Plaintiff's advertising, promotion, and

publicity relating to the product. As I will discuss later, you may find ownership if a licensee of Penn State has satisfied this requirement, rather than Penn State itself.

If you conclude that the S-Lion Logo is either not owned by Penn State or is not valid, your inquiry as to that particular mark is over, and you must find for the Defendants as to that mark or marks. If you find that one or more marks are both valid and owned by Penn State, you must consider likelihood of confusion, which I will now discuss.

### 3. Likelihood of Confusion

As I have told you, Penn State must also prove a likelihood of confusion to establish its claims. Again, you should only consider a likelihood of confusion if you first find that Penn State has established both that the trademarks are valid, and that it owns the trademarks. Undertake a likelihood of confusion analysis only as to each individual mark that you find is valid and owned by Penn State. As to those marks, Penn State must prove a likelihood of confusion among an appreciable number of purchasers or perspective purchasers of Vintage Brand's products. In deciding this, you may consider the following:

- the degree of similarity between Penn State's marks and the alleged infringing marks;

- the strength of Penn State's marks;

- the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

- any evidence of actual confusion and, relatedly, the length of time the Defendants have used the marks without evidence of actual confusion arising;

- the intent of the Defendants in adopting the marks;

- whether the goods are marketed through the same channels of trade and advertised through the same media;

- the extent to which the targets of the parties' sales efforts are the same;

- the similarity of the goods in the minds of consumers; and

- any other factors that you believe are relevant.

The weight to be given to each of these factors is up to you to determine. No particular factor or number of factors is required to prove likelihood of confusion, and you may give more weight to one factor than to others, if you believe that is appropriate. You may also conclude that some of these factors are not relevant to your decision. At bottom, those factors are merely guides to help you determine whether you believe that an appreciable number of consumers viewing Vintage Brand's products, goods, or website would probably assume that Vintage Brand's products are manufactured, sponsored, or approved by Penn State.

Some of those factors that I discussed are not self-explanatory, so I will give you a little more guidance on what you should examine for each particular factor.

**The degree of similarity between Penn State's marks and the alleged infringing marks**. This factor is straightforward: how similar are the asserted marks

to the images used by Vintage Brand? In evaluating the similarity of those images, you should consider whether the images create the same overall impression when viewed separately. Side-by-side comparison of the two images is not the proper method for analysis when the products are not usually sold in such a fashion. Instead, an effort must be made to move into the mind of the roving consumer. Furthermore, you must consider each image as a whole; you should not compare only a part or parts of an image to a part or parts of the other image. You must view them as a whole and decide whether the whole of one image is similar to the whole of a competing image.

**The strength of Penn State's marks**. This factor calls on you to consider the strength of Penn State's marks in a commercial sense. That is to say, you should consider the distinctiveness or conceptual strength of the mark and the commercial strength or marketplace recognition of the mark. In making this determination, consider the following definitions of arbitrary, fanciful, suggestive, descriptive, or generic marks.

Trademark law provides protection to distinctive or strong trademarks. Conversely, trademarks that are not as distinctive or strong are called "weak" trademarks and receive less protection from infringing uses. Trademarks that are not distinctive are not entitled to any trademark protection. Trademarks are grouped into four categories according to their relative strength or distinctiveness. These four

categories are, in order of strength or distinctiveness: arbitrary or fanciful (which is inherently distinctive), suggestive (also inherently distinctive), descriptive (which is protected only if it acquires in consumers' minds a "secondary meaning" which is not at issue here, and generic names (which are entitled to no protection).

- **Arbitrary or Fanciful Trademarks.** The first category is arbitrary or fanciful trademarks. Arbitrary marks are considered strong marks and are automatically protectable. They involve the arbitrary use of a word to designate the source of a product. Such a trademark is a word that in no way describes or has any relevance to the particular product it is meant to identify. It may be a common word used in an unfamiliar way.

  For instance, the common word "apple" became a strong and inherently distinctive trademark when used by a company to identify the personal computers that company sold. The company's use of the word "apple" was arbitrary because "apple" did not describe and was not related to what the computer was, its components, ingredients, quality, or characteristics. "Apple" was being used in an arbitrary way to designate for consumers that the computer comes from a particular manufacturer or source.

  Fanciful trademarks are closely related but involve the use of a fanciful or fictitious word to designate the source of a product. Such a trademark is a word that in no way describes or has any relevance to the particular product it is meant to identify. It is a newly created word, which is used solely as a trademark. For instance, the fanciful trademark "Google" is a strong and inherently distinctive trademark, identifying a prominent technology company. "Google" is a fanciful word that had no meaning or application prior to its use as the name of this company.

- **Suggestive Trademarks.** The second category is suggestive trademarks. These trademarks are inherently distinctive but are considered weaker than arbitrary and fanciful trademarks. Unlike arbitrary trademarks, which are in no way related to what the product is or its components, quality, or characteristics, suggestive trademarks imply some characteristic or quality of the product to which they are attached. If the consumer must use imagination or any type of multi-stage reasoning to understand the

trademark's significance, then the trademark does not describe the product's features, but merely suggests them.

A suggestive use of a word involves consumers associating the qualities the word suggests to the product to which the word is attached. For example, when "apple" is used not to indicate a certain company's computers, but rather "Apple–A–Day" Vitamins, it is being used as a suggestive trademark. "Apple" does not describe what the vitamins are. However, consumers may come to associate the healthfulness of "an apple a day keeping the doctor away" with the supposed benefits of taking "Apple–A–Day" Vitamins.

- **Descriptive Trademarks.** The third category is descriptive trademarks. These trademarks directly identify or describe some aspect, characteristic, or quality of the product to which they are affixed in a straightforward way that requires no exercise of imagination to be understood.

  For instance, the word "apple" is descriptive when used in the trademark "CranApple" to designate a cranberry-apple juice. It directly describes ingredients of the juice. Other common types of descriptive trademarks identify where a product comes from, or the name of the person who makes or sells the product. Thus, the words "Apple Valley Juice" affixed to cider from the California town of Apple Valley is a descriptive trademark because it geographically describes where the cider comes from. Similarly, a descriptive trademark can be the personal name of the person who makes or sells the product. So, if a farmer in Apple Valley, Judy Brown, sold her cider under the label "Judy's Juice" (rather than "Apple Valley Juice") she is making a descriptive use of her personal name to indicate and describe who produced the apple cider and she is using her first name as a descriptive trademark.

- **Generic Names**. The fourth and final category is entitled to no protection at all. They are called generic names and they refer to a general name of the product, as opposed to the plaintiff's brand for that product. Generic names are part of our common language that we need to identify all such similar products. A generic name is a name for the product on which it appears.

If the primary significance of the alleged mark is to name the type of product rather than the manufacturer, the term is a generic name and cannot be a valid trademark. If the majority of consumers would understand the term to name the type of product rather than the manufacturer, the primary significance of the term is generic and not entitled to protection as a trademark.

The word "apple" can be used as a generic name and not be entitled to any trademark protection. This occurs when the word is used to identify the fruit from an apple tree.

The computer maker who uses the word "apple" as a trademark to identify its personal computer, or the vitamin maker who uses that word as a trademark on vitamins, has no claim for trademark infringement against the grocer who used that same word to indicate the fruit sold in a store. As used by the grocer, the word is generic and does not indicate any particular source of the product. As applied to the fruit, "apple" is simply a commonly used name for what is being sold.

**The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase**. Here you should consider whether the consumer of a certain good is likely to be sophisticated and therefore more easily able to discern the company behind the goods, and whether the price of the goods indicates that a consumer would pay close attention to the company that manufactures or sponsors a good.

**Any evidence of actual confusion and, relatedly, the length of time the Defendants have used the marks without evidence of actual confusion arising**. This factor is fairly self-explanatory. You may find that evidence that consumers have actually been confused as to the manufacturer or sponsor of a good makes it more likely that there is a likelihood of confusion. Confusion in this sense does not

mean a simple mistake in making a purchase—it means that the consumer was actually confused as to the manufacturer, source, or sponsor of a good. You may also believe that evidence that the allegedly infringing use of a trademark has occurred for a long time without any actual confusion indicates a lower likelihood of confusion. Or conversely you may determine that evidence that the allegedly infringing trademark was used for only a short time before evidence of actual confusion arose indicates a higher likelihood of confusion.

**The intent of the Defendants in adopting the marks**. Here, you are not to consider whether the Defendants intended merely to copy the asserted marks. Rather, you should consider only whether you believe the Defendants intended to confuse consumers by using the images that Penn State alleges infringe on its trademarks. If you conclude that the Defendants intended to confuse consumers, then you may find it is more probable that there is a likelihood of confusion. In contrast, if you do not believe that the Defendants intended to confuse consumers, you may determine that there is a lesser likelihood of confusion.

**Whether the goods are marketed through the same channels of trade and advertised through the same media and the extent to which the targets of the parties' sales efforts are the same**. Here, you may consider whether Vintage Brand's products are sold in the same manner or in the same stores as those of Penn State or its licensees, or whether Vintage Brand and Penn State's licensees advertise

over the same platforms, such as in-store promotions, television commercials, endorsements from sports or apparel influencers, or other social media advertising. If Vintage Brand and Penn State's licensees generally advertise in the same way and through the same channels, you may conclude that there is a higher likelihood of confusion. For example, if both companies often advertise on television during Penn State football games, there may be a higher likelihood of confusion than if, say, Penn State's licensees advertised in such a manner, but Vintage Brand advertised through only social media companies. Likewise, there may be a higher likelihood of confusion if both Vintage Brand and Penn State's licensees sell goods in the same stores, such as Dick's Sporting Goods or Wal Mart, where the goods would naturally be viewed side by side.

**The similarity of the goods in the minds of consumers**. With this factor, you may ask yourself whether buyers and users of each parties' goods are likely to encounter the goods of the other, which may create an assumption of common source affiliation or sponsorship. That is to say, you should consider whether the goods are similar enough that a customer may assume they were offered by the same source. Bear in mind that goods may fall under the same general product category but operate in distinct niches, and when two products are part of distinct sectors of a broad product category, they can be sufficiently unrelated that consumers are not likely to assume the products originate from the same mark.

**Any other factors that you believe are relevant**. As this implies, the list of factors that I have provided to you is not exhaustive, meaning you should use your own judgment and common sense to determine if any other facts indicate to you that Vintage Brand's goods or website create a likelihood of confusion.

These factors may be helpful guides for you but, at bottom, it is up to you to decide whether you believe that Vintage Brand's use of the images in question creates a likelihood that consumers will be confused as to whether Penn State manufactured, sponsored, or approved Vintage Brand's goods. If you agree with Penn State that consumers are likely to be confused, then you should find that Penn State has succeeded in demonstrating a likelihood of confusion. If, however, you agree with Vintage Brand that consumers do not care who manufactures or sponsors these goods and are not confused by Vintage Brand's use of the images, then you should find that Penn State has not carried its burden of proving that there is a likelihood of confusion.

### 4. Individual Liability

If you conclude that Penn State has proven the elements of its infringement claims, you must consider whether Chad Hartvigson may be held personally responsible for that infringement. An officer of a corporation may be held individually liable for any acts of trademark infringement that he personally commits or authorizes and approves. To find Chad Hartvigson personally liable then, you

must find by a preponderance of the evidence that he personally committed trademark infringement or authorized and approved of Vintage Brand's trademark infringement.

### 5. Willfulness

As I explained previously, if you find that one or more Defendants infringed on one or more of the asserted marks and you find that no affirmative defenses protect the conduct of those Defendants, you must enter a verdict in Penn State's favor as against that or those Defendants. However, you must also consider whether the infringing Defendant(s) acted willfully.

An individual or organization willfully violates a trademark when it knowingly and purposefully capitalizes on and appropriates the goodwill of another. That is to say, willful infringement consists of more than the accidental or careless encroachment of another's rights. It involves an intent to infringe or a deliberate disregard of a mark holder's rights, in a way that was calculated to appropriate or otherwise benefit from the good will that the mark holder had nurtured.

Willful infringement may occur where an organization exhibits an aura of indifference to a mark holder's rights or where an organization undertakes a deliberate and unnecessary duplicating of a trademark in a way that was calculated to appropriate or otherwise benefit from the good will that the mark holder had nurtured. An act that is done willfully is done voluntarily and intentionally as

opposed to by mistake or accident—for example, an act may be mistaken or accidental if the infringer did not know that something was trademarked.

### 6. Licenses

The owner of a trademark may enter into an agreement that permits another person to use the trademark. This type of agreement is called a license, and the person permitted to use the trademark is called a licensee. Sometimes the only use of a trademark is through a licensee. The use of the trademark by a licensee generally creates the same legal rights as use of the trademark by the owner of the trademark, and such use does not affect the validity of that trademark or the validity of its registration.

However, for the use of a trademark by a licensee to create the same legal rights as would use by the licensor, the licensor has a duty to oversee the quality of a licensee's products. If a licensor fails to exercise reasonable control over the use of the mark by a licensee, then the trademark is no longer being used to identify goods and services that are under the control of the owner of the mark, and therefore the use of that trademark by a licensee does not inure to the benefit of the licensor. Stated differently, where a licensor does not exercise sufficient quality control over its licensees, the licensee is no longer using that mark as a trademark, and its use of the trademark does not create trademark rights for the licensor.

## B. AFFIRMATIVE DEFENSES

You heard me state earlier that the Defendants assert some affirmative defenses. If you find that the Defendants have established an affirmative defense by a preponderance of the evidence, you should find in favor of the Defendants even if you believed that one or more of the Defendants infringed on Penn State's trademarks.

### 1. Nominative Fair Use

Penn State contends that the Defendants infringed, in part, by using "PENN STATE" or "THE PENNSYLVANIA STATE UNIVERSITY" on the Vintage Brand website. If you find that Vintage Brand's use of the images in question on its products is not infringing, then you should consider whether Vintage Brand's use of Penn State on the Vintage Brand website constitutes what is called "nominative fair use." If you find that Vintage Brand's use of the words Penn State on Vintage Brand's website are likely to cause confusion, you must then proceed to the test that I will now describe to you. If you do not find that Penn State has proven by a preponderance of the evidence that Vintage Brand's uses of PENN STATE or THE PENNSYLVANIA STATE UNIVERSITY on Vintage Brand's website is likely to cause confusion, then you must find for Vintage Brand.

The owner of a trademark cannot exclude others from making a nominative fair use of that trademark. A defendant makes nominative fair use of a mark when

the defendant uses it as other than a trademark, to accurately describe or identify the plaintiff's product, even if the defendant's ultimate goal was to describe its own product.

The Defendants contend that they did not infringe the trademark because the alleged infringement was a nominative fair use of the trademark to describe or identify the Plaintiff's product. The Defendants must prove three things by a preponderance of the evidence:

- First, the product in question was not easily identifiable without use of the trademark;

- Second, the Defendants used only so much of the trademark as was reasonably necessary to identify the product in question; and

- Third, the Defendants did not do anything in connection with the trademark that would suggest sponsorship or endorsement by the plaintiff.

A product is not readily identified without use of its trademark when there would be no other effective way to compare, criticize, refer to, or identify it without using the trademark.

A reasonably necessary use of a trademark occurs when no more of the mark's appearance is used than is necessary to identify the product and make the reference intelligible to the consumer. For example, if a particular word is the plaintiff's trademark, the defendant reasonably uses it when the defendant does not use any

distinctive color, logo, abbreviation, or graphic that the plaintiff uses to display the trademark.

A use of the plaintiff's trademark does not suggest sponsorship or endorsement of the defendant's product when the defendant does not attempt to deceive, mislead, or capitalize on consumer confusion, or when the defendant does not appropriate the cachet of the plaintiff's product for the defendant's product.

The fact that the defendant's use of the trademark may bring the defendant a profit or help in competing with the mark owner does not mean the use was not a fair use.

## 2. Aesthetic Functionality

Vintage Brand further asserts the affirmative defense of aesthetic functionality. To succeed on such a defense, Vintage Brand must prove either of two things:

- First, it may demonstrate that the images in dispute here that it used are essential to the use or purpose of Vintage Brand's goods or affect the cost or quality of those goods.

- Second, it may instead demonstrate that protection of the features as trademarks would impose a significant non-reputation-related competitive disadvantage upon Vintage Brand.

It is important to note that aesthetic functionality protects the use of a design feature that, in itself and apart from its identification of source, improves the usefulness or appeal of the object it adorns. That is to say, the defense applies if the feature communicates the use, purpose, cost, or quality of the product rather than the source or sponsor of the product. Therefore, the defense is generally limited to product features that serve an aesthetic purpose independent of any source-identifying function.

If you find that the Defendants have proved this affirmative defense, then you must find for the Defendants on all of Penn State's claims, even if you conclude that one or more Defendants committed trademark infringement.

## V.    DAMAGES

I will now instruct you on the law regarding damages. The fact that I am instructing you on damages does not imply any opinion on my part as to whether damages should be awarded to the Plaintiff in this case.

Should you determine that one or more of the Defendants is liable in this matter, you must then determine what compensatory damages, if any, Penn State is entitled to. Compensatory damage means the amount of money that will reasonably and fairly compensate Penn State for any injury you find that the Defendants' infringement of the asserted marks contributed materially to.

Compensatory damages must be based solely on the injury caused to Penn State by Defendants' infringement of the asserted marks. In determining compensatory damages, the difficulty or uncertainty in ascertaining the precise amount of damages does not preclude recovery. Instead, you should use your best judgment in determining the amount of such damages. You may not, however, determine damages by speculation or conjecture. The Plaintiff must prove the amount of each category of compensatory damages by a preponderance of the evidence.

Here are several categories of damages that Penn State is seeking:

- The Plaintiff's lost profits on lost sales, licensing and sponsorship fees. This consists of the revenue Penn State would have earned but for the Defendants' infringement, less the expenses the Plaintiff would have sustained in earning these revenues. In assessing the amount of lost profits, the amount should be a reasonable approximation from the evidence put before you.

- Loss of royalties. A royalty is a payment for the right to use a trademark. In determining lost royalties, you should determine the royalty the Penn State and Vintage Brand would have agreed upon if they had negotiated the terms of a royalty before the Defendants used the asserted marks.

- Harm due to damage to Penn State's goodwill and reputation due to Vintage Brand's trademark infringement.

## VI.    COUNTERCLAIMS

Lastly, the Defendants have countersued Penn State seeking to cancel two of its trademarks on the ground that those marks inappropriately included a state seal. Penn State denies that the trademarks should be cancelled. You must reach a verdict regarding the Defendants' counterclaims, and you must do this regardless of how you resolve the Plaintiff's claims. The Defendants have filed counterclaims asserting that certain of Penn State's trademarks, specifically those that contain the Coat of Arms of the Commonwealth of Pennsylvania, must be cancelled.

A trademark may not be registered if it consists of or comprises the flag or coat of arms or other insignia of any State. Therefore, a trademark must be cancelled if it includes the coat of arms of a state in such a manner that consumers would perceive that trademark as a government insignia. In determining whether consumers would perceive a trademark as being a government insignia, you should consider whether the mark is sufficiently altered, stylized, or merged with other elements in the mark so as to create a distinct commercial impression. While you must visually compare the Penn State trademarks at issue with the Pennsylvania Coat of Arms, your focus should be on the relevant purchasers' general recollection of the

Coat of Arms, not on a careful side-by-side comparison of the trademarks and the coat of arms.

As you may have gathered from what I just told you, the disputed trademark need not consist only of the government insignia, and may comprise a government insignia even if there are other elements to the trademark. However, the incorporation of other elements may be relevant to your determination of whether the trademarks create a distinct commercial impression. Therefore, you must determine whether the Defendants have demonstrated by a preponderance of the evidence that the Penn State Seal Logos do not create a distinct commercial impression.

For your convenience, below are the trademarks that Vintage Brand seek to cancel:

 

And below is the Pennsylvania Coat of Arms:



## VII.    DELIBERATIONS

Now let me explain some things about your deliberations in the jury room and your possible verdicts.

First: The first thing that you should do in the jury room is choose someone to be your foreperson. This person will speak for the jury here in court. He or she will also preside over your discussions. However, the views and vote of the foreperson are entitled to no greater weight than those of any other juror.

Second: I remind you again that your verdict as to each specific claim must be unanimous. To find in favor of the Plaintiff on a particular claim, every one of you must agree that the Plaintiff has proven the elements of that claim by a preponderance of the evidence. The same goes for the Defendants' counterclaim; to find in their favor on a particular counterclaim, all of you must agree that the Defendants' proved their counterclaim by a preponderance of the evidence.

Third: As I have said before, your verdict must be based only on the evidence received in this case and the law I have given to you. You should not take anything I may have said or done during trial as indicating what I think of the evidence or what I think your verdict should be. What the verdict should be is the exclusive responsibility of the jury.

Fourth: Now that all the evidence is in and the arguments are completed, and once I have finished these instructions, you are free to talk about the case in the jury

room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong. But do not ever change your mind just because other jurors see things differently or just to get the case over with.

In the end, your vote must be exactly that—your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience. Listen carefully to what the other jurors have to say, and then decide for yourself whether the Plaintiff has proved its claims by a preponderance of the evidence or if the Defendants have proved their affirmative defenses or counterclaims by a preponderance of the evidence. No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. You should all feel free to speak your minds.

Fifth: You have been permitted to take notes to assist you in answering the special verdict questions. Your notes are not evidence; they are merely to aid you in your recollection. Your answers to the special verdict questions must be based on the evidence, not your notes. You should not give your notes precedence over the independent recollection of the evidence. If you did not take notes, you should rely

on your own independent recollection of the proceedings and you should not be influenced by the notes of other jurors. I emphasize that notes are not entitled to any greater weight than the recollection or impression of each juror about what the testimony may have been.

Sixth: Once you start deliberating, do not talk about the case to court officials, to me, or to anyone else except each other. A few days ago, I instructed you that you are not to communicate about this case either in person or by social media or other electronic media device. During your deliberations, you may not use any electronic device or media, such as a telephone, cell phone, smart phone, iPhone, Samsung Galaxy or computer; the internet, any internet service, or any text or instant messaging service; or any internet chat room, blog, or website such as Facebook, Twitter, LinkedIn, SnapChat, TikTok, YouTube or Instagram to communicate any information about this case or to conduct any research about this case.

Seventh: If you have any questions or messages, your foreperson should write them down on a piece of paper, sign the paper, and then give it to a court official who will give it to me. I will first talk to the attorneys about what you have asked, and I will respond as soon as I can. In the meantime, if possible, continue with your deliberations on some other subject. One more thing about messages. Do not ever write down or tell anyone how you or anyone else voted. That should stay secret until you have finished your deliberations. If you have occasion to communicate

with the court while you are deliberating, do not disclose the number of jurors who have voted in favor of or against either party.

The Clerk and all other persons are forbidden from communicating in any way or any manner with any member of the jury on any subject touching the merits of the case.

## VIII.    VERDICT FORM

As I alluded to earlier, a verdict form has been prepared for your convenience.

For the purpose of your findings, we will be using verdict questions. As a result, our instructions to you on the law have been tailored to reflect the use of these questions. Answer questions in the same sequence as they are given to you, starting with Question 1. Note that, depending on your answer, you may be instructed to skip a question or questions.

In answering the questions, it is your duty as jurors to consult with each other and to deliberate in an effort to reach an agreement. Each of you must decide the case for himself or herself, but you should do so only after a consideration of the case with your fellow jurors and you should not hesitate to change an opinion when convinced that it is erroneous. Discuss and weigh your respective opinions dispassionately, without regard to sympathy, public opinion, or prejudice or favor for either party, and adopt the conclusion that in your good conscience is in accordance with the truth.

You will take the verdict form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill it in, date and sign it, and then return to the courtroom.

## IX.    CLOSING

Keep in mind that the dispute between the parties is, for them, a most serious matter. They and the court rely upon you to give full and conscientious deliberation and consideration to the issues and evidence before you.

Consider all the circumstances, the probabilities or improbabilities of the testimony, and what the attorneys and the Court have said. You should try to reach what is a just, true, and correct resolution of the controversy submitted to you. In reaching your conclusion, you should be guided solely by the evidence that has been presented to you, the inferences drawn from the evidence, and the instructions of the court on the law. You should not be influenced by fear, favor, prejudice, or sympathy. All the parties stand equally before the court, and each is entitled to the same fair and impartial treatment at your hands.

Counsel, has there been a failure to charge on any substantial matter of law?

## X.    BAILIFF'S OATH

I will now ask the bailiff to take the jurors to the jury room so that you may start your deliberations.

Oath to Courtroom Deputy and CSO: Do you swear that you will keep this jury in some private and convenient place and that you will suffer no one to speak to them, nor will you speak to them yourself, without leave of court, unless it be to ask them if they have agreed upon a verdict, so help you God?

# APPENDIX A

| DESIGN OR WORD MARK | INFORMAL NAME |
|---|---|
| PENN STATE | PENN STATE |
| THE PENNSYLVANIA STATE UNIVERSITY | THE PENNSYLVANIA STATE UNIVERSITY |
|  | "Lion Shrine Logo One" |
|  | "Lion Shrine Logo Two" |
|  | "Pozniak Lion Logo" |
|  | "Penn State Seal Logos" |
|  | "S-Lion Logo" |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY,<br><br>       Plaintiff,<br><br>  v.<br><br>VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a PREP SPORTSWEAR; and CHAD HARTVIGSON,<br><br>       Defendants. | No. 4:21-CV-1091<br><br>(Chief Judge Brann) |

## **VERDICT FORM**

November 19, 2024

**Members of the Jury:**

    **Answer the questions on this form as instructed by the Court.  When you have completed the verdict form, each juror must sign and date the last page of the form.  The foreperson should then seal the verdict form in an envelope and indicate to the bailiff that you have reached a unanimous verdict.**

**Question One**

Did the Plaintiff prove by a preponderance of the evidence that any of the following Defendants infringed Plaintiff's alleged "PENN STATE" trademark?

Vintage Brand LLC _____✓_____ YES _____ NO

Sportswear, Inc. _____✓_____ YES _____ NO

Chad Hartvigson _____✓_____ YES _____ NO

*Proceed to Question Two*

**Question Two**

Did the Plaintiff prove by a preponderance of the evidence that any of the following Defendants infringed Plaintiff's alleged "THE PENNSYLVANIA STATE UNIVERSITY" trademark?

Vintage Brand LLC _____✓_____ YES _____ NO

Sportswear, Inc. _____ YES _____✓_____ NO

Chad Hartvigson _____✓_____ YES _____ NO

*Proceed to Question Three*

## Question Three

Did the Plaintiff prove by a preponderance of the evidence that any of the following Defendants infringed Plaintiff's alleged Lion Shrine Logo One trademark?

Vintage Brand LLC _____✓_____ YES _____ NO

Sportswear, Inc. _____✓_____ YES _____ NO

Chad Hartvigson _____✓_____ YES _____ NO

*Proceed to Question Four*

## Question Four

Did the Plaintiff prove by a preponderance of the evidence that any of the following Defendants infringed Plaintiff's alleged Lion Shrine Logo Two trademark?

Vintage Brand LLC _____✓_____ YES _____ NO

Sportswear, Inc. _____✓_____ YES _____ NO

Chad Hartvigson _____✓_____ YES _____ NO

*Proceed to Question Five*

**Question Five**

Did the Plaintiff prove by a preponderance of the evidence that any of the following Defendants infringed Plaintiff's alleged Pozniak Lion Logo trademark?

Vintage Brand LLC _____✓_____ YES _____ NO

Sportswear, Inc. _____✓_____ YES _____ NO

Chad Hartvigson _____✓_____ YES _____ NO

*Proceed to Question Six*

**Question Six**

Did the Plaintiff prove by a preponderance of the evidence that any of the following Defendants infringed Plaintiff's alleged Penn State Seal Logos trademark?

Vintage Brand LLC _____✓_____ YES _____ NO

Sportswear, Inc. _____✓_____ YES _____ NO

Chad Hartvigson _____✓_____ YES _____ NO

*Proceed to Question Seven*

**Question Seven**

Did the Plaintiff prove by a preponderance of the evidence that any of the following Defendants infringed Plaintiff's alleged S-Lion Logo trademark?

Vintage Brand LLC _____✓_____ YES _____ NO

Sportswear, Inc. _____✓_____ YES _____ NO

Chad Hartvigson _____✓_____ YES _____ NO

*Proceed to Question Eight*

**<u>Question Eight</u>**

Have Defendants proven by a preponderance of the evidence that the Penn State Seal Logos should be canceled?

_____ YES ____✓____ NO

*If you answered no to Questions One through Seven, you are finished with this verdict form. Please proceed to page eight of this form to sign and complete the form. If you have answered yes to one or more of Questions One through Seven, please proceed to Question Nine.*

**<u>Question Nine</u>**

If you answered yes to any of questions One through Seven, have Defendants proven by a preponderance of the evidence that Vintage Brand's use of any of the trademarks on its website constitutes nominative fair use?

_____ YES ____✓____ NO

*Proceed to Question Ten*

## Question Ten

If you answered yes to any of questions One through Seven, have Defendants proven by a preponderance of the evidence that the trademarks are aesthetically functional?

_____ YES _____✓_____ NO

*If you have answered yes to Question Ten, you are finished with this verdict form. Please proceed to page eight of this form to sign and complete the form. If you have answered no to Question Ten, please proceed to Question Eleven.*

## Question Eleven

Do you find that the Defendant(s)' conduct in infringing on any of the Plaintiff's trademarks was willful? Please answer "N/A" if you concluded that the specific Defendant is not liable for trademark infringement.

Vintage Brand LLC _____✓_____ YES _____ NO _____ N/A

If yes, indicate which trademarks Penn State, The Pennsylvania State University Lion shrine Logo One, Lion Shrine Logo Two, Pozniak Lion, Penn State Seal, S-Lion

Sportswear, Inc. _____✓_____ YES _____ NO _____ N/A

If yes, indicate which trademarks Penn State, Lion Shrine Logo one, Lion shrine logo two, Pozniak Lion, Penn State Seal S-Lion.

Chad Hartvigson _____✓_____ YES _____ NO _____ N/A

If yes, indicate which trademarks Penn State, The Pennsylvania State University Lion Shrine Logo one, Lion Shrine logo two, Pozniak Lion, Penn State Seal, S-Lion

*Proceed to Question Twelve*

## Question Twelve

Do you find that the Plaintiff is entitled to compensatory damages?

_____✓_____ YES _____ NO

If you answer yes, what amount is the Plaintiff entitled to recover?

$ 28,000.00

*You have completed the verdict form. Each juror must sign and date the next*

*page. The foreperson should then seal the verdict form in an envelope and press the*

*buzzer to inform the bailiff that you have reached a verdict.*

## SIGNATURES

| | JUROR NAME | DATE |
|---|---|---|
| 1 | | 11/19/24 |
| 2 | | 11/19/24 |
| 3 | | 11/19/24 |
| 4 | | 11/19/24 |
| 5 | | 11/19/24 |
| 6 | | 11/19/24 |
| 7 | | 11/19/24 |
| 8 | | 11/19/24 |

AO 450 (Rev. 11/11)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Middle District of Pennsylvania

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY | ) |
| *Plaintiff* | ) |
| v. | ) |
| VINTAGE BRAND, LLC, et al | ) |
| *Defendant* | ) |

Civil Action No.  4:21-CV-01091

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐  the plaintiff *(name)* _____ recover from the
defendant *(name)* _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐  the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____
_____ recover costs from the plaintiff *(name)* _____
_____ .

☑  other:  Final Judgment is entered in favor of Plaintiff and against Defendants, in the amount of Twenty-eight
Thousand ($28,000.00) dollars.

This action was *(check one)*:

☑  tried by a jury with Judge    Matthew W. Brann _____ presiding, and the jury has
rendered a verdict.

☐  tried by Judge _____ without a jury and the above decision
was reached.

☐  decided by Judge _____ on a motions for

Date:    November 19, 2024

CLERK OF COURT

*s/ Janel R. Rhinehart*
_____
Signature of Clerk or Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | No. 4:21-CV-01091 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a PREP SPORTSWEAR; and CHAD HARTVIGSON, | |
| Defendants. | |

**ORDER**

**JUNE 25, 2025**

In accordance with the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that:

1. Penn State's motion to amend or correct the Judgment (Doc. 342) is **GRANTED** and a permanent injunction shall issue;

2. Penn State's motion for attorneys' fees (Doc. 344) is **DENIED**; and

3. Defendants' motion to vacate costs taxed (Doc. 360) is **DENIED**.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | No. 4:21-CV-01091 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a PREP SPORTSWEAR; and CHAD HARTVIGSON, | |
| Defendants. | |

## MEMORANDUM OPINION

### June 25, 2025

This trademark dispute originated over Vintage Brand, LLC ("Vintage Brand"), Sportswear, Inc. ("Sportswear"), and Chad Hartvigson's (collectively "Defendants") use of certain of The Pennsylvania State University's ("Penn State") trademarks. After a motion to dismiss, dueling motions for summary judgment, and numerous motions *in limine*, this matter proceeded to trial, where a jury concluded that Defendants had willfully violated Penn State's trademarks.

Penn State now moves for the imposition of a permanent injunction and for an award of attorneys' fees, while Defendants move to vacate the Clerk of Court's taxation of costs against Defendants. Given the presumption of irreparable harm that applies after a finding of trademark infringement, and because the balance of equities

and other considerations tip in favor of a permanent injunction, the Court will enter such an injunction here. However, this Court concludes that an award of attorneys' fees is not warranted. This case, although exceptional in many ways as it included complex, colorable, and somewhat novel legal defenses, was not litigated by Defendants in an exceptional manner that would support such an award. Finally, because Penn State is the prevailing party, taxation of costs is appropriate.

## I.    BACKGROUND

In 2022, Penn State filed a second amended complaint alleging that Defendants had: (1) willfully infringed on Penn State's trademarks in violation of 15 U.S.C. § 1114 (Count One);[1] (2) sold and marketed counterfeit products in violation of Sections 1114, 1116(d), and 1117 (Count Two);[2] (3) unfairly competed and falsely designated Penn State as the source of Vintage Brand's products in violation of Section 1125(a) (Count Three);[3] (4) falsely advertised and endorsed its products' affiliation with Penn State in violation of Section 1125(a) (Count Four);[4] diluted Penn State's trademarks in violation of Section 1125(c) and 54 Pa. C.S. § 1124 (Counts Five and Six, respectively);[5] and (7) infringed on Penn State's common-law trademarks (Count Seven).[6]

---

[1]    Doc. 67 ¶¶ 99-105. Specifically, Penn State alleges that Vintage Brand infringed on its PENN STATE, TPSU, Nittany Lion Logo, Pozniak Lion Logo, and Penn State Seal marks. *Id.*

[2]    *Id.* ¶¶ 106-12.

[3]    *Id.* ¶¶ 113-16.

[4]    *Id.* ¶¶ 117-25.

[5]    *Id.* ¶¶ 126-34 (Count Five), 135-40.

[6]    *Id.* ¶¶ 141-45.

Much of the relevant history and the facts related to the underlying dispute was outlined in some detail in this Court's summary judgment Memorandum Opinion addressing the competing motions for summary judgment and to exclude certain expert opinions.[7] Because most of those facts are not directly relevant to the pending motions, they will not be repeated here.

Based on the facts underlying this matter, in February 2024, this Court granted in part and denied in part the parties' competing motions for summary judgment; granted Defendants' motion to exclude expert opinions while denying Penn State's motion to exclude expert opinions; and granted in part and denied in part Defendants' motions to strike while granting in part and denying in part Penn State's motion to strike—leaving Penn State with claims for Trademark Infringement and Unfair Competition (Counts One, Three, and Seven).[8] After unsuccessful negotiations, this matter proceeded to trial and, in preparation for that, the parties filed numerous motions *in limine*, some of which were granted, and some of which were denied.[9]

Following a six-day jury trial, the jury determined that Defendants had willfully violated Penn State's trademark[10] and awarded Penn State $28,000 in

---

[7]  *See* Doc. 194.
[8]  Docs. 194, 195.
[9]  *See* Docs. 295, 296.
[10]  Excluding Sportswear as to THE PENNSYLVANIA STATE UNIVERSITY trademark. Doc. 335 at 2.

compensatory damages.[11] The Clerk of Court entered judgment accordingly, followed by an Order taxing certain costs against Defendants.[12]

Penn State thereafter filed a motion to amend the judgment.[13] Penn State argues that it is entitled to a permanent injunction enjoining Defendants from using any Penn State trademarks at issue in this case, as it has suffered irreparable injury, other remedies are inadequate, the balance of hardships favors and injunction, and the public interest would be served by a permanent injunction.[14] It also filed a motion for attorneys' fees related to this case, asserting that, for several reasons, this case is an exceptional one that warrants the imposition of such fees.[15] Defendants filed their own motion to vacate the costs taxed, contending that Penn State does not qualify as a prevailing party, the Court should exercise its discretionary power to deny such an award, or the award should be reduced as some costs are not taxable.[16]

As explained below, the Court concludes that the relevant factors weigh in favor of the imposition of permanent injunction, and Penn State's motion will therefore be granted, with some modifications to the proposed injunction. However, Vintage Brand's conduct in litigating this matter was, on the whole, reasonable, and

---

[11] *See* Doc. 335.
[12] Docs. 337, 359.
[13] Doc. 342.
[14] Doc. 343.
[15] Docs. 344, 345.
[16] Docs. 360, 361.

attorneys' fees therefore will not be awarded. Finally, the Clerk of Court's Order taxing costs will stand.

## II.    DISCUSSION

### A.    Motion for a Permanent Injunction

Penn State first argues that it is entitled to a permanent injunction enjoining Defendants from using any Penn State trademarks at issue in this case, as Penn State has suffered irreparable injury, other remedies are inadequate, the balance of hardships favors and injunction, and the public interest would be served by a permanent injunction.[17]

As to irreparable harm, Penn State points out there is a presumption of irreparable harm following a finding of trademark infringement.[18] It contends that Defendants cannot overcome this presumption because there was testimony at trial that Defendants' activities resulted in harm to Penn State's reputation and goodwill, and harm from direct competition between Defendants and Penn State's authorized licensees.[19] Penn State further argues that other remedies are inadequate to compensate Penn State, as Defendants could continue infringing at a moment's notice.[20]

---

[17]    Doc. 343.
[18]    *Id.* at 12-13.
[19]    *Id.* at 13-15.
[20]    *Id.* at 15-16.

5

With respect to the balance of hardships, Penn State asserts that Defendants would face little harm as they have no legal right to use the trademarks and have no excess inventory, while Penn State would be harmed through loss of reputation, lost goodwill, and lost licensing fees.[21] Finally, Penn State urges that an injunction is in the public interest, since it would prevent confusion, and there is no public interest in permitting Defendants to continue selling infringing goods.[22]

Defendants respond that an injunction is not warranted because monetary damages are sufficient to compensate Penn State, and therefore there is no irreparable injury.[23] Alternatively, they assert that, even if an injunction is warranted, the injunction requested is overbroad for two reasons.[24] First, although Penn State expressly disclaimed that its complaint encompassed various images used by Defendants, it now seeks an injunction that would prohibit the use of any Penn State trademark in any manner.[25] Second, the proposed injunction is overbroad as it would cover images not contested in this case and images that may lawfully be used, and would impact Defendants' entire business model.[26] Moreover, barring the use of "substantially similar" marks would leave Defendants without any way of determining what may or may not be infringing conduct.[27] Consequently,

---

[21]  *Id.* at 16-19.
[22]  *Id.* at 19-20.
[23]  Doc. 354 at 5-9.
[24]  *Id.* at 9-20.
[25]  *Id.* at 9-18.
[26]  *Id.* at 18-20.
[27]  *Id.* at 20-23.

Defendants argue, any injunction should be tied to the images contained within the Second Amended Complaint, or images that consist of more than one Penn State trademark or the S-Lion Logo. [28] Finally, Defendants assert that enhanced disclaimers in lieu of an injunction may be sufficient.[29]

The issuance of a permanent injunction is "entrusted to a court's equitable discretion, [and therefore] an injunction 'does not follow from success on the merits as a matter of course.'"[30] To obtain a permanent injunction, a party "must make a sufficient showing that (1) it will suffer irreparable injury, (2) no remedy available at law could adequately remedy that injury, (3) the balance of hardships tips in its favor, and (4) an injunction would not disserve the public interest."[31] While courts must "consider these factors holistically, the inability to show irreparable harm—or, relatedly, that a legal remedy would be inadequate—defeats a request for injunctive relief."[32]

"The first two elements typically constitute two sides of the same inquiry, for the availability of adequate monetary damages belies a claim of irreparable injury."[33]

---

[28] *Id.* at 23-26.

[29] *Id.* at 26-28.

[30] *TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008)).

[31] *Id.* (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

[32] *Id.*

[33] *Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 442 (3d Cir. 2019).

Importantly, however, when a plaintiff in a Lanham Act case has proven trademark infringement, it "shall be entitled to a rebuttable presumption of irreparable harm."[34]

An analysis of those factors supports the imposition of a permanent injunction. First, Penn State has established the existence of irreparable injury. As just noted, because the jury found that Defendants infringed upon Penn State's marks,[35] there is a rebuttable presumption of irreparable injury.[36] Moreover, there was some testimony at trial that Penn State enjoys a positive reputation and goodwill related to its licensed merchandise, and that Vintage Brand's products do not meet Penn State's expectations related to quality.[37]

Second, as the United States Court of Appeals for the Third Circuit has observed, "[a] finding of infringement or the likelihood of confusion with the concurrent use of the infringed trademark implicitly signifies a loss of expectation and goodwill."[38] The Third Circuit went on to explain that "[t]he infringement amounts to borrowing the senior user's reputation and goodwill, which is an injury in and of itself, even without evidence of actual loss of goodwill."[39] And it is well

---

[34]  15 U.S.C. § 1116(a).
[35]  Doc. 335.
[36]  15 U.S.C. § 1116(a).
[37]  Doc. 347 at 133-35.
[38]  *Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 131 (3d Cir. 2004).
[39]  *Id.*

established that grounds "for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill."[40]

Defendants' infringement presumptively resulted in the coopting of Penn State's reputation and goodwill, which sufficiently demonstrates irreparable injury when coupled with the evidence received at trial. Relatedly, because a loss of control of Penn State's reputation and the loss of goodwill constitute irreparable injury, monetary remedies are insufficient, and no remedy other than an injunction is likely to remedy those injuries. Penn State has therefore demonstrated both irreparable injury and that no other remedy available at law could adequately remedy those injuries.

Turning to the third factor, the balance of hardships also favors the imposition of a permanent injunction. The purpose of this balancing test is "to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the mark's owner."[41] As courts within this circuit have noted, "'[t]he balance of hardships weighs strongly in favor of an injunction where all that is requested is that Defendant comply with the law and abstain from infringing."[42]

---

[40] *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 204 (3d Cir. 2014) (quoting *S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 378 (3d Cir.1992)).

[41] *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 727 (3d Cir. 2004).

[42] *Richardson v. Cascade Skating Rink*, No. CV 19-8935-NLH-MJS, 2022 WL 833319, at *5 (D.N.J. Mar. 21, 2022) (quoting *Warner Bros. Records Inc. v. Walker*, 704 F.Supp.2d 460, 469 (W.D. Pa. 2010)) (brackets omitted).

Here, Defendants' conduct has been found by a jury to be infringing, and a permanent injunction would require only that they stop violating the Lanham Act, which weighs in Penn State's favor.[43] Failing to issue an injunction would harm Penn State financially through lost licensing revenue, and would result in potential deterioration of its goodwill and harm to its reputation if, as one witness testified at trial, Vintage Brand produces goods that some would consider inferior to those produced by Penn State licensees.

Of course, Vintage Brand would be harmed by the imposition of a permanent injunction, although any harm is lessened by the fact that it operates a print-on-demand model of production. Vintage Brand will undoubtedly lose sales as a result of any injunction. But because of Vintage Brand's print-on-demand model, it can "can continue the unhindered sale of its product" so long as those products do not contain infringing Penn State trademarks.[44] Even though Defendants will suffer some financial losses from a permanent injunction, they "openly, intentionally, and illegally appropriated [Penn State's] marks, despite being warned not to. By virtue of this recalcitrant behavior, [Vintage Brand] can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon

---

[43] *Cf. Silvertop Assocs., Inc. v. Kangaroo Mfg., Inc.*, 319 F. Supp. 3d 754, 769-70 (D.N.J. 2018) ("The Court finds a balance of the hardships weighs in favor of granting a preliminary injunction when the only harm is precluding, at least temporarily, a defendant from the sale of an infringing article"), *aff'd*, 931 F.3d 215 (3d Cir. 2019).

[44] *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990).

itself."[45] Consequently, the third factor also weighs in favor of the imposition of a permanent injunction.

Finally, an injunction would not disserve the public interest. The Third Circuit has stated that "the most basic public interest at stake in all Lanham Act cases . . . [is] the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy."[46] Where there is a likelihood of confusion, "it follows that if such use continues, the public interest would be damaged. Conversely, a prohibition upon defendant's use of its mark would eliminate that confusion."[47] Based on the evidence presented at trial and the jury's verdict, Defendants have created a likelihood of confusion through their use of Penn State's trademarks, and this factor weighs in favor of an injunction.[48]

All four factors therefore militate in favor of the imposition of a permanent injunction. This leaves only the question of how broad the injunction should be. Defendants insist that the injunction should be narrow because: (1) Penn State limited its claims during trial by only presenting certain infringing images; (2) the requested injunction would create a per se rule against use of trademarks, which this Court has already rejected; (3) Penn State can be monetarily compensated if any

---

[45]  *Id. See* Doc. 335 at 6 (jury verdict finding that infringement was willful).
[46]  *Kos Pharms.*, 369 F.3d at 730.
[47]  *Id.* (brackets and internal quotation marks omitted).
[48]  Notably, Vintage Brand does not appear to contest this factor.

future infringement occurs in grey areas; and (4) a broad injunction would impact Vintage Brand's entire business model.[49]

Many of these arguments fail on their merits. First, as to Defendants' contention that Penn State explicitly limited its complaint to certain images, that is inaccurate. Defendants acknowledge that the second amended complaint specifically states that the images used are representative only.[50] And, as Penn State explains, its opposition to Defendants' attempt to present to the jury numerous images used by Vintage Brand was not based on a concession that some of the images were non-infringing: it opposed Defendants' efforts "to recast Penn State's claims as focusing on entire 'images' rather than the Penn State Marks" that formed the core of its complaint.[51]

Second, Defendants' "per se" argument is incorrect. The per se approach rejected by the Court was the legal conclusion that any use of a trademark always identified the trademark holder as the source or sponsor of the relevant good.[52] But here, after conducting a fact-intensive inquiry, the jury concluded that Defendants' use of Penn State's trademarks confused consumers as to the source or sponsor of the relevant goods. Prohibiting such use is therefore consistent with the jury verdict, not with a per se approach.

---

[49]  Doc. 354 at 18-28.
[50]  *Id.* at 13. *See also* Doc. 67 ¶¶ 79, 86 (noting that images are "representative samples").
[51]  Doc. 357 at 16-17.
[52]  *See* Doc. 43 at 9-10.

Third, Defendants' argument that monetary payments may compensate for any future infringement in legal grey areas may be summarily rejected based on the fact that Penn State's loss of goodwill or control over its reputation constitutes irreparable harm that cannot be compensated by a monetary award. With respect to the impact on Vintage Brand's business model, such an argument relates more to the balance of hardships analysis. A jury has found that Vintage Brand's business model infringed upon Penn State's trademark; the impact that a properly imposed injunction may have on Vintage Brand's business model is not relevant at this stage of the inquiry.

In addition to those four arguments, Defendants present their most cogent argument: that the proposed injunction's prohibition on the use of anything that is "substantially similar" to Penn State's trademarks is overbroad and confusing.[53] Penn State requests an injunction that would prevent Defendants from using "the Penn State Word and Logo Trademarks, or words, phrases, designs or parts of designs that are substantially similar thereto."[54]

It is firmly established that any injunction must be narrowly tailored and "cannot be broader than necessary to restrain the unlawful conduct."[55] Relatedly, "'[s]ince an injunctive order prohibits conduct under threat of judicial punishment,

---

[53] Doc. 354 at 20-26.
[54] Doc. 342-1 at 2.
[55] *Educ. Testing Servs. v. Katzman*, 793 F.2d 533, 545 (3d Cir. 1986) (citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 924 & n. 67 (1982)).

basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.'"[56] Stated differently, "an injunction ought not leave too much guesswork for the Defendants to determine if they are engaging in activities that violate the injunction; it cannot be little more than a recitation of the law."[57]

Defendants assert that the inclusion of the term "substantially similar" is problematic, as it leaves too much guesswork as to what may be substantially similar to a Penn State trademark.[58] Penn State does not attempt to explain what is meant by "substantially similar" or delineate the outer bounds of that phrase.[59] Instead, it argues that Defendants must understand the meaning of that phrase because they responded in discovery to a request for any designs that were "confusingly similar to" the Penn State marks.[60] Penn State further asserts that such phrasing is permissible because, without it, Defendants "could sidestep the bounds of any injunction by making small design tweaks" and because infringers must take extra care to avoid future infringement.[61]

While Penn State's point regarding side-stepping any court order is well taken, it ignores the fundamental requirement that those subject to injunctions must be made plainly aware of what conduct is prohibited. As the Third Circuit has

---

[56] *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 388 (3d Cir. 2021) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)).

[57] *Id.* (brackets and internal quotation marks omitted).

[58] Doc. 354 at 20-23.

[59] Doc. 357 at 20-22.

[60] *Id.* at 21.

[61] *Id.* at 21-22.

14

explained, Federal Rule of Civil Procedure 65(b) requires specificity in injunctions due to "concern with the dangers inherent in the threat of a contempt citation for violation of an order so vague that an enjoined party may unwittingly and unintentionally transcend its bounds." [62] Courts "must protect that which is protectable, but, in doing so, we must limit the use of injunctive relief to situations where it is necessary to prevent immediate and irreparable injury."[63]

The Court is concerned that the phrase "substantially similar" may be sufficiently ambiguous such that it does not give precise notice of what specific conduct is prohibited. This is especially true given that two of Penn State's trademarks—Lion Shrine Logo Two and Pozniak Lion Logo—consist only of representations of a mountain lion. It may be difficult to parse how similar or dissimilar an image of a mountain lion must be to cross the threshold into being "substantially similar" to those trademarks.

Penn State asserts that Defendants must understand the definition of "substantially similar" because they responded to discovery requests for designs used by Vintage Brand that were "confusingly similar" to Penn State marks, but there is a gulf of difference between those two phrases. And even if there were no practical difference between those phrases, there is a difference between a defendant being overly cautious and submitting anything that may qualify as confusingly

---

[62] *Mallet*, 16 F.4th at 389.
[63] *Id.*

similar during discovery, and an injunction that limits an entity's First Amendment rights by implementing potentially vague language regarding substantial similarity.

Moreover, it does not appear that such language is actually necessary to protect Penn State's rights in its trademarks. In a lawsuit filed by Baylor University, Vintage Brand and Baylor University agreed to the entry of a permanent injunction.[64] Nowhere in that injunction is the term "substantially similar" used; rather, the parties agreed to prohibit Vintage Brand from using "any design that resembles Baylor's Sailor Bear mark, notwithstanding any differences in color orientation, or other minor visual elements."[65] This is a more precise definition, and would appear to both put Defendants on better notice of what is prohibited, while also protecting Penn State from Defendants simply making minor alterations to Penn State's trademarks and using those new designs to circumvent any injunction. The Court will therefore adopt such language in the injunction that will issue.

Finally, Defendants urge that, in lieu of an injunction preventing use of the Penn State trademarks, the Court should consider requiring enhanced disclaimers.[66] As Penn State correctly notes, Defendants include no proposed disclaimer language, nor do they cite to any evidence that such a disclaimer would actually prevent

---

[64] *See Baylor University v. Vintage Brand*, LLC, No. 6:21-CV-00409, ECF No. 158 (W.D. Tx. Oct. 20, 2023).

[65] *Id.* at 9.

[66] Doc. 354 at 26-28.

confusion.[67] To the contrary, Defendants acknowledge that (1) Dr. Tülin Erdem found certain disclaimers were ineffective at dispelling confusion, and (2) the academic paper upon which they rely only indicates that "confusion is effectively reduced," not eliminated.[68]

The position advocated by Defendants also runs contrary to an aged, but still good, Third Circuit case. In *United State Jaycees v. Philadelphia Jaycees*, our Court of Appeals examined whether a district court abused its discretion in implementing an injunction that required the defendant cease using the trademark Jaycees unless such use was accompanied by a prominent disclaimer.[69] The Third Circuit held that the district court had abused its discretion for several reasons, notably holding "that a strong and fanciful mark is entitled to broad protection and . . . it is error to deny a broad injunction barring all use" of the trademark.[70] Although factual differences mean that *Jaycees* is not entirely controlling, the holding there—when considered in combination with the evidence from Dr. Erdem and lack of countervailing evidence indicating that any warnings would be effective—demonstrate that Defendants' requested compromise would be an abuse of discretion if implemented here. Consequently, this proposed compromise must be rejected.

---

[67]  Doc. 357 at 23-26.
[68]  Doc. 354 at 28.
[69]  639 F.2d 134, 141 (3d Cir. 1981).
[70]  *Id.* at 143.

### B.    Motion for Attorneys' Fees

Penn State also moves for an award of attorneys' fees related to this case.[71] It argues that this case is an exceptional one that warrants the imposition of attorneys' fees for three reasons.[72] First, Penn State contends that Defendants acted in bad faith because (1) after suit was brought against Defendants, Vintage Brand removed the trademark symbol from the S Lion Logo that it used on its merchandise,[73] and (2) Defendants willfully infringed on Penn State's trademarks despite a pre-suit cease and desist letter.[74]

Second, Penn State asserts that Defendants' litigation conduct justifies an award of attorneys' fees, since: (1) Chad Hartvigson purportedly disregarded his own criteria for selecting images for use on Vintage Brand products;[75] (2) they made misrepresentations and engaged in stonewalling during discovery by claiming they had deleted all images of the Pozniak Lion Logo when products featuring that logo were available through Vintage Brand's website after the case was filed, and misrepresented the number of sales of items using that logo;[76] (3) Hartvigson, at the direction of counsel, refused to answer certain questions during his deposition;[77] and (4) Defendants made a late decision not to pursue certain defenses and counterclaims

---

[71]  Doc. 344.
[72]  Doc. 345.
[73]  *Id.* at 7-9.
[74]  *Id.* at 9-10.
[75]  *Id.* at 10-13.
[76]  *Id.* at 13-16.
[77]  *Id.* at 16.

at trial—including an antitrust defense and counterclaim to cancel the University Seal, after these issues were litigated through summary judgment and motions *in limine*.[78]

Third, Penn State argues that this case is exceptional because Defendants need to be deterred from future willful infringement.[79] Specifically, Penn State believes that infringing merchandise was available for purchase from Defendants as of December 20, 2024.[80] This persistent infringement, Penn State argues, requires attorneys' fees as a deterrent measure.[81]

Defendants respond that attorneys' fees are not warranted because this is not an exceptional case, since Defendants litigated this case in a reasonable manner and engaged in good faith efforts to settle the dispute.[82] Defendants further dispute Penn State's allegations of unreasonable litigation conduct, asserting that, first, it accidentally removed the trademark symbol from the S Lion Logo during litigation but, by that point, it had already provided Penn State with samples that did have the trademark symbol.[83] Second, they contend that Hartvigson's alleged failure to adhere to certain criteria in selecting historical images for use on Vintage Brand products is not relevant to whether this is an exceptional case.[84]

---

[78] *Id.* at 17-18.
[79] *Id.* at 19-20.
[80] *Id.* at 19; Doc. 356 at 5-8.
[81] Doc. 345 at 20.
[82] Doc. 353 at 5-9.
[83] *Id.* at 10-12.
[84] *Id.* at 12-18.

Third, Defendants assert that there was no litigation misconduct in deleting its Pozniak Lion design file, as they were attempting to comply with Penn State's request that they stop selling items bearing that logo, and Penn State has produced no evidence that items bearing that logo were actually available for sale by Defendants after this case was initiated. [85] Fourth, Defendants contest that Hartvigson's refusal to answer certain questions during his deposition makes this case exceptional, since during the deposition Penn State requested information beyond the control of Sportswear, which was not yet a party to this lawsuit.[86]

Fifth, Defendants argue that their late abandonment of certain defenses and counterclaims was not done in bad faith, as they merely made a tactical decision to drop some defenses to focus on others before the jury.[87] Finally, Defendants assert that there is no need to deter them from future infringement because items listed for sale on their websites was the result of Defendants reactivating design files to create sample products for trial, and that issue has been corrected.[88]

Turning to the merits of the motion, the "Lanham Act . . . permits the recovery of reasonable attorneys' fees only 'in exceptional cases.'"[89] The Third Circuit has explained that, pursuant to United States Supreme Court precedent, "a district court

---

[85] *Id.* at 18-20.
[86] *Id.* at 20-22.
[87] *Id.* at 22-24.
[88] *Id.* at 25.
[89] *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 313 (3d Cir. 2014) (quoting 15 U.S.C. § 1117(a)).

may find a case 'exceptional,' and therefore award fees to the prevailing party, when (a) there is an unusual discrepancy in the merits of the positions taken by the parties or (b) the losing party has litigated the case in an 'unreasonable manner.'"[90]

"Thus, it is within a court's discretion to find a case 'exceptional' based upon 'the governing law and the facts of the case,' irrespective of whether the losing party is culpable. For example, 'a case presenting exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award.'"[91] "Whether litigation positions or litigation tactics are 'exceptional' enough to merit attorneys' fees must be determined by district courts 'in the case-by-case exercise of their discretion, considering the totality of the circumstances.'"[92] "The losing party's blameworthiness may well play a role in a district court's analysis of the 'exceptionality' of a case," but culpability is not a requirement to award attorneys' fees."[93]

As an initial matter, Penn State does not argue that there was an unusual discrepancy in the merits of the positions taken by the parties.[94] In any event, there was no unusual discrepancy, as demonstrated by the fact that this matter survived summary judgment—indeed Defendants' motion for summary judgment was

---

[90]  *Id.* at 315 (quoting (*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).

[91]  *Id.* at 314 (quoting *Octane Fitness*, 572 U.S. at 555 (ellipsis omitted)).

[92]  *Id.* at 315 (quoting *Octane Fitness*, 572 U.S. at 555).

[93]  *Id.*

[94]  *See* Docs. 345, 356.

granted in part—and proceeded to trial.[95] Although Defendants were unsuccessful in defending this case, they presented a valid defense with which the jury ultimately did not agree.

The Court must turn then to the analysis of whether Defendants litigated this case in an unreasonable manner. In general, the Court believes Defendants have reasonably litigated this action. While there were discovery disputes, they were not overly laborious or frequent, and the case generally proceeded in good order. And, in the runup to trial, Defendants were sparing in their objections, appeared willing to concede issues that should be conceded, and reached compromises when appropriate—while Penn State largely took the opposite tack. Penn State litigated every issue conceivable, objecting—as Defendants point out—to approximately two-thirds of the deposition designations and counter-designations[96] and driving the charge conference to several hours, including a lengthy debate of a single paragraph of those instructions.

Beyond that, as noted above, Penn State points to a number of minor issues that it contends demonstrate that Defendants litigated this case in an unreasonable manner. However, these issues are either fairly minor or not truly issues at all.

First, Penn State complains about the fact that Defendants "altered key evidence in a transparent effort to conceal [their] bad-faith infringement" by

---

[95]  *See* Docs. 194, 195, 212.
[96]  Doc. 353 at 9 n.4.

removing the ™ symbol from the S Lion Logo that they used on their products.[97] It is undisputed that Defendants did take such action but, as they explain, inclusion of the ™ symbol was accidental, and it was removed well in advance of trial after Penn State pointed it inclusion out to Defendants.[98] Although Defendants' explanation is not entirely satisfactory, those actions may not even constitute spoliation, as Penn State urges. That is primarily because the evidence itself was not destroyed; prior to the deletion of the ™ symbol, Defendants produced samples of their products that bore the ™ symbol and turned them over to Penn State during discovery.[99]

Moreover, Penn State's suggestion that Defendants deleted the ™ symbol to conceal their bad faith infringement does not make sense—deleting the symbol could not possibly conceal infringement when Defendants had already provided Penn State with samples that bore the ™ symbol. Therefore, Defendants' actions may have been careless—maybe even reckless—but were not nefarious, and do not contribute significantly to whether this is an exceptional case.

---

[97] Doc. 345 at 7-9.

[98] Doc. 353 at 10-12.

[99] *Id.* at 10-11. The Court need not definitively decide whether such action constitutes spoliation. But the Third Circuit has held that producing only "facsimiles and photocopies" of a document rather than the original may, in certain circumstances, constitute spoliation where failure to produce the originals "would prevent discovering critical information." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012). There is no evidence that such is the case here, and it would appear that Penn State was able to fully present its case to the jury using the sample products that contained the ™ symbol. Importantly, Penn State never moved for sanctions related to alleged spoliation of evidence.

As to the allegation that Defendants violated their own rules—as set forth by Hartvigson—for selecting images to use on their products,[100] this is not terribly relevant to whether this case is exceptional. To begin, the fact that Hartvigson may not always have followed his own rules for selecting images prior to litigation has nothing to do with how this litigation was prosecuted. Moreover, while Penn State points to three images that did not fit Hartvigson's criteria,[101] Vintage Brand has more than 25,000 images in its collection.[102] Three images out of 25,000 equates to .00012 percent of total images that do not align with Hartvigson's criteria, which is essentially a rounding error. And while Penn State makes much of Defendants' use of a lion image that was reproduced on a modern sticker,[103] Hartvigson explained during trial that, while the sticker itself was new, the image was historical and dated, he believed, from between 1950 and 1954—and the history behind the image itself is why he used acquired it for Vintage Brand.[104]

With respect to the deletion of the Pozniak Lion file that Defendants possessed, Defendants assert that they "permanently deleted the digitally enhanced memorabilia image for the Pozniak Lion design to prevent that image from being inadvertently uploaded back onto the Vintage Brand website in the future."[105]

---

[100] Doc. 345 at 10-13.
[101] *Id.*
[102] Doc. 350 at 47.
[103] Doc. 345 at 12-13.
[104] Doc. 350 at 42-45.
[105] Doc. 353 at 18.

During the hearing on these motions, Defendants explained that it was necessary to delete that file and not others because they believed the Pozniak Lion Logo was still actively used by Penn State, while other images were not. Again, no harm appears to have come from Defendants' actions, and the deletion does not appear to have impacted this case in any way. And again, Defendants' actions are unusual, but do not render the case exceptional.

Further related to the Pozniak Lion Logo, Penn State asserts that Defendants stated that they had sold only 2 items bearing that image, when a subsequent investigation revealed that Vintage Brand had in fact sold 50 products bearing that image.[106] Defendants offer an innocent explanation for this discrepancy: counsel apparently attributed the wrong Asset ID Number—numbers that Vintage Brand uses to identify its various images—to the Pozniak Lion design, and therefore inadvertently reported the wrong sales numbers to Penn State.[107] This mistake, although yet again careless, does not seem to be malicious. Rather, this is the type of mistake that can, and often does, happen during litigation. Moreover, that error caused no lasting damage, as the misinformation was corrected by Defendants six days later.[108]

---

[106] Doc. 345 at 15.
[107] Doc. 353 at 19-20.
[108] *Id.*

Next, Penn State complains that counsel for Defendants once instructed Hartvigson not to answer questions during a deposition,[109] which necessitated a telephonic status conference call wherein this Court ordered that Hartvigson sit for another deposition and answer the challenged questions.[110] One discovery dispute does not make a case exceptional, particularly when Penn State is the only party in this litigation that has engaged in conduct that this Court has described as having been taken in "bad faith."[111] This simple discovery dispute does nothing to render this matter exceptional.

As to Penn State's contention that Defendants' decision to drop their pursuit of certain defenses and counterclaims renders this case exceptional,[112] that decision appears entirely reasonable. It is frequently the case that parties will pursue certain issues throughout litigation as a fallback position or as leverage in settlement negotiations. But, when trial inevitably arrives, parties must make decisions on whether to simplify and scale back its case before the jury.[113] Dropping certain defenses or counterclaims is both ordinary and appropriate and does not contribute to whether this case was extraordinary.

---

[109] Doc. 345 at 16.

[110] *See* Docs. 51 (letter detailing discovery dispute) and 60 (minute sheet detailing phone call).

[111] *See* Doc. 63 at 13 (describing Penn State's attempt to excise from its complaint allegations related to the Penn State Seal marks after the Court denied a motion to dismiss Vintage Brand's counterclaim seeking to cancel those marks as "constitut[ing] bad faith").

[112] Doc. 345 at 17-18.

[113] In fact, Penn State pursued claims against Erik Hartvigson and Michelle Young through the filing of motions *in limine*, only to drop claims against them in September 2024.

Finally, Penn State argues that this case is exceptional because Defendants continue to infringe on Penn State's marks to this day.[114] Defendants respond that, while Vintage Brand had listed items for sale as a result of reactivating design files to create sample products for trial and accidentally failed to remove those files after creating the samples, it has now corrected the issue.[115] Penn State notes in its reply brief that Defendants continue to infringe even after filing the response brief, as the Prep Sportswear website still sells items bearing the PENN STATE trademark.[116]

Defendants' explanation—that continued infringement occurred because of yet more carelessness or inadvertence—is plausible. But continued infringement is troublesome, as it indicates, at a minimum, that Defendants do not take this matter seriously enough to put forth sufficient effort to cease their infringing conduct. At the motions hearing, defense counsel was unable to offer a satisfactory reason why infringing items are still being advertised on Defendants' websites.

Nevertheless, while this conduct is troublesome, courts have held that continued infringement alone is insufficient to warrant attorneys' fees under the Lanham Act.[117] For example, the United States Court of Appeals for the Sixth Circuit observed in *Max Rack, Inc. v. Core Health & Fitness, LLC* that "a bright-line rule permitting fees if a defendant's intentional infringement continued after the

---

[114] Doc. 345 at 19-20.
[115] Doc. 353 at 25.
[116] Doc. 356 at 5-8.
[117] The Third Circuit does not appear to have weighed in on this issue.

plaintiff sued" would run contrary to "the Supreme Court's more flexible totality-of-the-circumstances approach to this inquiry."[118] For that reason, while continued infringement may be relevant to the question of whether a case is exceptional, that alone cannot justify attorneys' fees.[119]

If Defendants in fact continue to infringe upon on Penn State's trademarks, that would be quite concerning, although not in and of itself demonstrative of an exceptional case. But the seriousness of such action is mitigated by the fact that there is no evidence that infringing merchandise was sold to, or is capable of being purchased by, consumers. Penn State shows what it contends is the ability to purchase infringing goods on Defendants' websites,[120] but it is notable that Penn State never actually purchased any of those goods; had they, those infringing products would likely have featured prominently in the motions hearing and briefing. It is therefore not entirely clear whether infringing products were actually posted for sale by Defendants, or if these are simply glitches in their websites that have not been corrected. Accordingly, although Defendants possible continued infringement weighs in favor of finding that this is an exceptional case, the Court does not afford this action undue weight when considering the totality of the circumstances.

---

[118] 40 F.4th 454, 479 (6th Cir. 2022) (citing *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).

[119] *Id.* Penn State cites to an unpublished Third Circuit case in arguing that continued infringement warrants attorneys' fees, but that case is easily distinguishable, as it involved the entry of default judgment after the defendant failed to appear in the case. Doc. 345 at 20 (citing *World Ent. Inc. v. Brown*, 487 F. App'x 758, 763 (3d Cir. 2012)).

[120] Doc. 356 at 8.

When viewed in totality, Penn State strings together a series of fairly innocuous events and occurrences in an effort to paint this case as extraordinary in nature. It is not, as Vintage Brand litigated this matter reasonably, while making occasional mistakes that often occurs during years-long litigation. The deletion of images or portions of images was careless but, ultimately, harmless, and the only other major issue—continued infringement—appears to be unintentional and isolated. These actions, when considered over the long arc of years-long litigation, simply do not render this case extraordinary in nature. Accordingly, Penn State's motion for attorneys' fees will be denied.

### C.    Motion to Vacate Costs Taxed

Finally, Defendants move to vacate the costs taxed by the Clerk of Court.[121] First, Defendants argue that Penn State does not qualify as the prevailing party for purposes of taxation of costs because this was a mixed judgment where Penn State lost four of its claims and only obtained a judgment of $28,000.[122] Second, Defendants assert that the Court should exercise its discretion and decline to award costs, as Penn State acted in bad faith during this case and litigated it in an

---

[121] Doc. 360.

[122] Doc. 361 at 5-7. Defendants further assert that taxation of costs is premature until the Court rules on the motion for a permanent injunction. *Id.* at 7-9. The Court has ruled on that motion, rendering this argument moot.

unreasonable manner.[123] Finally, Defendants contend that some costs within Penn State's cost bill are not properly taxable.[124]

Penn State responds that there is no doubt it is the prevailing party under Third Circuit precedent.[125] It further argues that the costs awarded should not be reduced, since the fees awarded are narrowly tailored to the costs required to obtain the jury verdict, and the only instance of bad faith on Penn State's part was narrow and occurred on an issue upon which it ultimately prevailed at trial.[126]

While litigants generally bear their own expenses in a lawsuit, "Congress [has] permitted a prevailing party to obtain reimbursement for a 'narrow' category of expenses 'that a federal court may tax as a cost under the discretionary authority found in [Federal Rule of Civil Procedure] 54(d).'"[127] "Among other things, the costs for service of process, transcripts, and copies may be awarded."[128] Rule 54(d) "creates the strong presumption that costs are to be awarded to the prevailing party."[129]

---

[123] *Id.* at 9-10.

[124] *Id.* at 10-11.

[125] Doc. 362 at 5-10.

[126] *Id.* at 10-11.

[127] *Knowles v. Temple Univ.*, 109 F.4th 141, 142-43 (3d Cir. 2024) (quoting *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 573 (2012); *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441-42 (1987) (brackets and internal citations omitted)).

[128] *Id.* at 143.

[129] *In re Paoli R.R. Yard PCB Litig.*, 221 F.3d 449, 462 (3d Cir. 2000) (internal quotation marks omitted).

Although an award of fees under Rule 54(d) is subject to equitable principles, "the losing party bears the burden of making the showing that an award is inequitable under the circumstances."[130] Two equitable factors should be considered:

> (1) the prevailing party's unclean hands, bad faith, dilatory tactics, or failures to comply with process during the course of the instant litigation or the costs award proceedings; and (2) each of the losing parties' potential indigency or inability to pay the full measure of a costs award levied against them.[131]

As to whether Penn State qualifies as a prevailing party within the meaning of Rule 54, "[t]he Supreme Court has given a 'generous formulation' to the term 'prevailing party,' stating that 'plaintiffs may be considered prevailing parties for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'"[132] As the United States Supreme Court has explained, "'[t]he touchstone of the prevailing party inquiry must be the *material alteration of the legal relationship of the parties*.'"[133]

Under that definition, Penn State clearly qualifies as the prevailing party here. Not only did Penn State obtain a jury verdict in its favor as to the most consequential claims in this matter—those of trademark infringement—but it has now obtained a permanent injunction against Defendants. There can be no doubt that the imposition

---

[130] *Id.* at 462-63.

[131] *Id.* at 468.

[132] *Truesdell v. Phila. Hous. Auth.*, 290 F.3d 159, 163 (3d Cir. 2002) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983)).

[133] *Id.* (quoting *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 792 (1989)).

of a permanent injunction materially alters the legal relationship between the parties here and achieves a benefit for Penn State, as Defendants may no longer use Penn State's trademarks.[134]

Nor does the Court find any reason to exercise its discretion to deny an award of fees. First, the losing party's potential indigence disfavors an exercise of this Court's equitable powers, as Defendants do not contend that they are indigent.[135] Second, although Penn State did engage in some conduct that the Court viewed as having been taken in bad faith,[136] that action occurred relatively early in the case and related to a small portion of the litigation. Moreover, the costs requested by Penn State are unrelated to that bad faith act. The Court therefore determines that taxation of costs is appropriate, and Defendants' motion will be denied.[137]

## III.    CONCLUSION

In accordance with the above discussion, Penn State's motion to amend the Clerk's judgment is granted, its motion for attorneys' fees is denied, and Defendants' motion to vacate the costs taxed is denied.

---

[134] *See Lefemine v. Wideman*, 568 U.S. 1, 4 (2012) ("we have repeatedly held that an injunction or declaratory judgment, like a damages award, will usually satisfy [the prevailing party] test").

[135] The Third Circuit has stated that the indigency factor is "[t]he most important of these factors." *In re Paoli*, 221 F.3d at 463.

[136] *See* Doc. 63.

[137] Defendants assert that, to the extent costs were awarded for the daily delivery of a transcript, that should be excised from any award. Doc. 361 at 11 (citing Doc. 355-4 at 12). After reviewing the costs awarded for transcripts, it does not appear that these costs were awarded to Penn State.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | |
| Plaintiff, | No. 4:21-CV-01091 |
| | Chief Judge Brann |
| v. | |
| VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a PREP SPORTSWEAR; and CHAD HARTVIGSON, | |
| Defendants. | |

## PERMANENT INJUNCTION

Before the Court is a motion by Plaintiff The Pennsylvania State University ("Penn State") seeking to amend judgment and for entry of a permanent injunction against Defendants Vintage Brand, LLC, Sportswear Inc., and Chad Hartvigson ("Defendants"). Having considered the parties' respective submissions, and in view of the Jury Verdict (Doc. 335) and the Court's Judgment (Doc. 337) entered in this action, pursuant to and in accordance with 15 U.S.C. § 1116 and this Court's inherent equitable authority, it is hereby **ORDERED, ADJUDGED AND DECREED** that:

1)    Defendants Vintage Brand, LLC, Sportswear Inc., and Chad Hartvigson, and their officers, agents, servants, employees, and attorneys, and other

1

persons who are in active concert or participation with Defendants (collectively, the "Enjoined Parties") shall permanently refrain from advertising, marketing, distributing, importing, manufacturing, promoting, offering for sale, or selling merchandise, including but not limited to t-shirts, sweatshirts, hats, drinkware, can coolers, coasters, wall art, socks, pennants, and cutting boards, bearing the Penn State Word and Logo Trademarks, or any design that resembles those Trademarks, notwithstanding any differences in color, orientation, or other minor visual elements. The Penn State Word and Logo Trademarks are shown below:

# PENN STATE



 

2)      The Enjoined Parties shall also permanently refrain from:

a.      Using the Penn State Word and Logo Trademarks, or any design that resembles those Trademarks, notwithstanding any differences in color, orientation, or other minor visual elements, on or in connection with an online store or commercial website, as a domain name, metatag, or keyword, or in advertising or promotional materials; and

b.      Making any statements on promotional materials or advertising for its goods or services that are false or misleading as to source or origin or affiliation with, sponsorship by, or connection to Penn State.

3)      Defendants Vintage Brand, LLC and Chad Hartvigson, and their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with Defendants shall permanently refrain from advertising, marketing, distributing, importing, manufacturing, promoting, offering for sale, or selling merchandise, including but not limited to t-shirts, sweatshirts, hats, drinkware, can coolers, coasters, wall art, socks, pennants, and cutting boards,

3

bearing THE PENNSYLVANIA STATE UNIVERSITY, or any design that resembles those Trademarks, notwithstanding any differences in color, orientation, or other minor visual elements.

4)    Defendants Vintage Brand, LLC and Chad Hartvigson, shall permanently refrain from using THE PENNSYLVANIA STATE UNIVERSITY, or any design that resembles those Trademarks, notwithstanding any differences in color, orientation, or other minor visual elements, on or in connection with an online store or commercial website, as a domain name, metatag, or keyword, or in advertising or promotional materials.

5)    Within thirty (30) days from the issuance of the Permanent Injunction, the Enjoined Parties shall destroy or deliver to Penn State any and all merchandise, advertising or promotional materials, and any materials used in the preparation thereof (excepting authentic memorabilia retained solely as part of a physical collection), which in any way use or make reference to the Penn State Word and Logo Trademarks, or any design that resembles those Trademarks, notwithstanding any differences in color, orientation, or other minor visual elements.

6)    Within thirty (30) days from the issuance of the Permanent Injunction, Vintage Brand, LLC and Chad Hartvigson shall destroy or deliver to Penn State any and all merchandise, advertising or promotional materials, and any materials used in the preparation thereof (excepting authentic memorabilia retained solely as part of a physical collection), which in any way use or make reference to THE PENNSYLVANIA STATE UNIVERSITY, or any design that resembles those

Trademarks, notwithstanding any differences in color, orientation, or other minor visual elements.

7)    Within thirty (30) days from the issuance of the Permanent Injunction, the Enjoined Parties shall file with the Court and serve upon Penn State's counsel a written report under oath setting forth details of the manner in which Defendants have complied with the Court's order pursuant to paragraphs one through six above.

8)    This Permanent Injunction shall inure to the benefit of Penn State and any successors, assigns, and acquiring companies.  This Permanent Injunction shall be binding upon Defendants and any successors, assigns, and acquiring companies.

9)    The Enjoined Parties shall refrain from effecting any assignments or transfers, outside of the ordinary course of business, or forming a new entity or association, or utilizing any other device or contrivance for the purpose of or with the effect of circumventing or otherwise avoiding any prohibitions set forth in this Permanent Injunction, or any payment obligations set forth in the Court's Judgment (Doc. 337) and any other Court Orders.

10)    This Permanent Injunction shall be deemed to have been served upon Defendants at the time of its execution by this Court.

DATED:    _____June 25, 2025_____

SO ORDERED:

_____
Honorable Matthew W. Brann
Chief United States District Judge

5