# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE PENNSYLVANIA STATE UNIVERSITY, | No. 4:21-CV-01091 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a PREP SPORTSWEAR; and CHAD HARTVIGSON, | |
| Defendants. | |

## MEMORANDUM OPINION

### OCTOBER 31, 2025

This trademark dispute originated over Vintage Brand, LLC ("Vintage Brand"), Sportswear, Inc. ("Sportswear"), and Chad Hartvigson's (collectively "Defendants") use of certain of The Pennsylvania State University's ("Penn State") trademarks. After a motion to dismiss, dueling motions for summary judgment, and numerous motions *in limine*, this matter proceeded to trial, where a jury concluded that Defendants had willfully violated Penn State's trademarks. Thereafter, this Court granted Penn State's motion for a permanent injunction, denied its motion for attorneys' fees, and entered final judgment in this matter, setting, the Court believed, the stage for an appeal by the parties.

Rather than appeal, however, Defendants move for the entry of judgment as a matter of law or, alternatively, for a new trial. Although the motion was filed in a timely manner, the evidence presented at trial was sufficient to support the jury's verdict, and there was no discernable error that would necessitate a new trial. Accordingly, the Court will deny Defendants' motion.

## I.    BACKGROUND

In 2022, Penn State filed a second amended complaint alleging that Defendants had: (1) willfully infringed on Penn State's trademarks in violation of 15 U.S.C. § 1114 (Count One);[1] (2) sold and marketed counterfeit products in violation of Sections 1114, 1116(d), and 1117 (Count Two);[2] (3) unfairly competed and falsely designated Penn State as the source of Vintage Brand's products in violation of Section 1125(a) (Count Three);[3] (4) falsely advertised and endorsed its products' affiliation with Penn State in violation of Section 1125(a) (Count Four);[4] diluted Penn State's trademarks in violation of Section 1125(c) and 54 Pa. C.S. § 1124 (Counts Five and Six, respectively);[5] and (7) infringed on Penn State's common-law trademarks (Count Seven).[6]

---

[1] Doc. 67 ¶¶ 99-105. Specifically, Penn State alleges that Vintage Brand infringed on its PENN STATE, TPSU, Nittany Lion Logo, Pozniak Lion Logo, and Penn State Seal marks. *Id.*

[2] *Id.* ¶¶ 106-12.

[3] *Id.* ¶¶ 113-16.

[4] *Id.* ¶¶ 117-25.

[5] *Id.* ¶¶ 126-34 (Count Five), 135-40.

[6] *Id.* ¶¶ 141-45.

The relevant history and the facts related to the underlying dispute has been outlined previously[7] and will not be repeated here. Following several rulings by the Court, a six-day jury trial commenced after which the jury determined that Defendants had willfully violated Penn State's trademark[8] and awarded Penn State $28,000 in compensatory damages.[9] The Clerk of Court entered judgment accordingly, followed by an Order taxing certain costs against Defendants.[10]

The Court provided Penn State until December 4, 2024, to seek any further relief.[11] In response, in December 2024 Penn State filed a motion to amend the Judgment to include a permanent injunction, and a motion for attorneys' fees.[12] On June 25, 2025, this Court granted Penn State's motion for a permanent injunction, finding that (1) there would be irreparable injury if one were not implemented, (2) monetary remedies would be insufficient to compensate Penn State, (3) the balance of hardships tipped in Penn State's favor, and (4) a permanent injunction would not disserve the public interest.[13] The Court determined, however, that attorneys' fees were not warranted, as the case had not been litigated in an exceptional manner nor was there an unusual discrepancy in the underlying merits.[14]

---

[7] *See* Doc. 194.
[8] Excluding Sportswear as to THE PENNSYLVANIA STATE UNIVERSITY trademark. Doc. 335 at 2.
[9] *See* Doc. 335.
[10] Docs. 337, 359.
[11] Doc. 338.
[12] Docs. 342, 344.
[13] Doc. 367 at 8-11.
[14] *Id.* at 18-29.

Fourteen days later, on July 9, 2025, Defendants filed their motion for judgment as a matter of law or, alternatively, for a new trial.[15] Defendants first argue that the Court erred in holding that Sportswear could be subject to direct liability for trademark infringement, and the cases upon which it relied in so ruling are distinguishable.[16] Second, they contend that a new trial is warranted because the verdict form failed to identify every allegedly infringing image used by Defendants and ask whether each was infringing, and instead simply queried whether Defendants had violated each of the Penn State trademarks at issue in the case; this, Defendants assert, unnecessarily confused the jury, as demonstrated by the fact that it found Sportswear not liable for infringement on one trademark.[17]

Third, Defendants assert that the jury was improperly permitted to consider three types of confusion, when only point-of-sale confusion was at issue in the case, and no evidence related to any other form of confusion was presented.[18] Fourth, Defendants argue that Penn State was required to prove that Defendants used the trademarks as trademarks, but failed to do so.[19] Fifth, they contend that the evidence established their aesthetic functionality defense.[20]

---

[15] Doc. 370.
[16] Doc. 371 at 9-15.
[17] *Id.* at 15-18.
[18] *Id.* at 18-22.
[19] *Id.* at 22-24.
[20] *Id.* at 25-26.

Sixth, Defendants maintain that Penn State did not use the Pozniak Lion Mark in commerce, and it therefore lacks trademark rights in that mark.[21] Finally, Defendants argue that the jury charge misstated the law regarding the University Seal Mark, and those marks should be cancelled.[22]

Penn State responds that Defendants' motion is untimely since it was filed more than 28 days after the entry of Judgment following the jury verdict.[23] Further, Penn State asserts that some of Defendants' claims are waived by the failure to previously challenge those issues.[24] In any event, Penn State argues, Defendants' motion is without merit.[25] Defendants have filed a reply brief, rendering this matter ripe for disposition.[26] For the following reasons, Defendants' motion will be denied.

## II.   DISCUSSION

### A.   Timeliness of the Motion

The parties first dispute whether Defendants' motion was timely filed.[27] Federal Rule of Civil Procedure 50(b) provides that "[n]o later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law." Rule 59 similarly provides that a motion "must be filed no later than 28 days

---

[21] *Id.* at 27-28.
[22] *Id.* at 28-29.
[23] Doc. 381 at 6-9.
[24] *Id.* at 15, 20, 25-26.
[25] *Id.* at 9-27.
[26] Doc. 386.
[27] Doc. 381 at 6-9; Doc. 386 at 6-10.

after the entry of the judgment."[28] The parties dispute, however, whether the judgment from which those 28 days began to run was the judgment entered on November 19, 2024 following the jury verdict,[29] or the judgment entered on June 25, 2025 following the imposition of a permanent injunction.[30]

The United States Court of Appeals for the Third Circuit has spoken plainly on this issue, holding in *O. Hommel Company v. Ferro Corporation* "that 'judgment' means final judgment" in Rule 50(b),[31] which comports with Rule 54(a)'s definition of judgment as used in the Rules of Civil Procedure, which defines a judgment as "any order from which an appeal lies."[32] Here, it the judgment entered on November 19, 2024 was not a final judgment as Penn State's request for injunctive relief remained outstanding,[33] and judgment did not become final until June 25, 2025, when this Court ruled on Penn State's request for injunctive relief.[34] Defendants' motion, filed 14 days later on July 9, 2025, was therefore timely.

Penn State seeks to avoid this conclusion by asserting that *Hommel* was overruled[35] and a later Third Circuit decision, *State National Insurance Company v.*

---

[28] Fed. R. Civ. P. 59(e).

[29] Doc. 381 at 6.

[30] Doc. 386 at 7.

[31] 659 F.2d 340, 353 (3d Cir. 1981).

[32] Fed. R. Civ. P. 54(a).

[33] *See, e.g.*, *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1542 (10th Cir. 1996) (pending claim for injunctive relief meant judgment entered on the jury verdict was not final).

[34] Docs. 367-69.

[35] *Hommel* was overruled in part by the Supreme Court of the United States in *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 199 (1988), which found that a pending motion for attorneys' fees did not render a judgment non-final for purposes of appeal; *Budinich*, however, did not

*County of Camden*,[36] held that the Rule 59's—and by extension Rule 50(b)'s—"motion deadline is calculated from the entry of the final judgment on the issue being challenged, regardless of whether that judgment is subject to immediate appeal."[37] But Penn State reads too much into *State National*.

In *State National*, the plaintiff had filed a claim against numerous defendants, including an individual named Donna Whiteside.[38] In 2010, the district court granted a motion to dismiss and dismissed Whiteside from the case; shortly thereafter the plaintiff filed a timely Rule 59 motion, which was likewise denied.[39] Nearly four years later, the district court denied the plaintiff's motion for summary judgment against the only remaining defendant, causing the plaintiff to file a Federal Rule of Civil Procedure 60(b)(6) motion seeking to reinstate the claim against Whiteside.[40] Before the district court ruled on that motion, however, the plaintiff filed a stipulation of dismissal as to the remaining defendant, which effectively ended the litigation.[41] Six weeks later, in December 2014, the district court denied the Rule 60(b)(6) motion, and the plaintiff filed an appeal fifteen days later.[42]

---

disturb the Third Circuit's determination in *Hommel* that judgment as used in Rule 50(b) means final judgment.

[36] 824 F.3d 399 (3d Cir. 2016)
[37] Doc. 381 at 7.
[38] 824 F.3d at 402-03.
[39] *Id.* at 403.
[40] *Id.* at 403-04.
[41] *Id.* at 404, 406.
[42] *Id.* at 404.

The Third Circuit held that the plaintiff's appeal was untimely, as it was effectuated more than thirty days after the stipulation of dismissal was docketed.[43] Nor did the district court's decision on the Rule 60(b) motion change that conclusion, since that court had already lost jurisdiction over the matter after the stipulation of dismissal was docketed.[44]

The Third Circuit then analyzed whether the Rule 60(b) motion could be construed as a Rule 59 motion that could render the appeal timely and held that it could not.[45] The Third Circuit observed that "[a] Rule 59 motion is timely when it is filed within twenty-eight days of the order or judgment for which reconsideration is sought" and the plaintiff had previously filed a timely Rule 59 motion after Whiteside had been initially dismissed from the case.[46] But the Rule 60(b) motion—filed more than 28 days after Whiteside's dismissal and *before* the entry of final judgment—was not properly filed and could not therefore toll the time to appeal even if construed as a Rule 59 motion.[47]

Importantly, however, the Third Circuit said nothing regarding whether a Rule 50 or 59 motion would have been timely had it been filed within 28 days after the dismissal was entered. Rather, the language used by the Third Circuit in *State*

---

[43] *Id.* at 406-08.
[44] *Id.* at 408-10.
[45] *Id.* at 410-11.
[46] *Id.* at 410.
[47] *Id.*

*National* and quoted by Defendants here—referencing both an order and a judgment—implies that a timely motion could have been filed after the stipulation of dismissal was entered.

In any event, nothing in *State National* contradicts the Third Circuit's decision in *Hommel* and the two opinions may easily be read in tandem as holding that a Rule 50 or 59 motion is timely filed if it is filed either within 28 days of the order that is contested, or the final judgment entered in the case. *Hommel* remains binding on this Court and means what it says—judgment as used in Rules 50 and 59 refers to a final judgment.[48] Defendants filed their motion well within 28 days of the entry of final judgment in this case and, as such, the motion is timely.

### B. Whether Certain Claims are Waived

Penn State next argues that certain claims brought in this motion are waived by virtue of Defendants' failure to have raised these issues at an earlier date.[49]

Rule 50(a)—controlling motions for judgment as a matter of law—requires that any such motion "specify the judgment sought and the law and facts that entitle the movant to the judgment."[50] As to Rule 50(b) motions, that Section provides that if a "court does not grant a motion for judgment as a matter of law made under Rule

---

[48] 659 F.2d at 353. *See also Weatherly v. Ala. State Univ.*, 728 F.3d 1263, 1271 (11th Cir. 2013) ("Federal Rules of Civil Procedure 50(b) and 59(b) require the motion to be filed within 28 days after the entry of final judgment").

[49] Doc. 381 at 15, 20, 25-26.

[50] Fed. R. Civ. P. 50(a)(2).

50(a) . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." These provisions work in tandem to provide that "a defendant's failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to put the plaintiffs on notice waives the defendant's right to raise the issue in their Rule 50(b) motion."[51]

As to the use-as-trademarks claim, Defendants in their Rule 50(a) motion argued that Penn State had failed to demonstrate that Defendants had used the marks to indicate that Penn State sponsored or endorsed the products[52] and, in their current motion, Defendants assert that Penn State failed to "establish that Defendants use the accused images to indicate the source of their own goods."[53] This is sufficient to have preserved this issue.[54]

With regard to the instructions related to the counterclaims to cancel the University Seal, Defendants did object to that instruction during the charge conference, asserting that "our position is that a trademark is not only unregisterable when the entirety of the mark is understood to be a Government insignia, but instead when consumers would recognize features of it as being Government insignia

---

[51]   *Williams v. Runyon*, 130 F.3d 568, 571-72 (3d Cir. 1997).

[52]   Doc. 348 at 194-98.

[53]   Doc. 371 at 23.

[54]   Even if Defendants have not used identical language in the two motions, the arguments are sufficiently similar that Penn State should have "understood . . . the tenor of the Rule 50 movant's position and theory." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 519 n.18 (3d Cir. 1998).

because comprise means include."[55] Again, this objection preserved the claim for this motion.[56]

With respect to Defendants' argument related to the various types of confusion, this claim was preserved as well. Although Defendants did not request a jury instruction related to this issue, they repeatedly raised it in their motions for judgment as a matter of law, and therefore may pursue it in their Rule 50(b) motion.[57]

Finally, Defendants raise issues with the jury instruction given with respect to the counterclaim to cancel the University Seal.[58] Defendants did not raise this issue in their Rule 50(a) motion,[59] and therefore have waived consideration of this claim with respect to any Rule 50(b) motion.[60] But, because Defendants objected to the instructions given, they have preserved their request for a new trial based upon the instructions regarding cancellation of the University Seal.[61]

---

[55] Doc. 350 at 377-78.

[56] *See* Fed. R. Civ. P. 51(c)(1) (providing that a party who "objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection").

[57] *See* Doc. 348 at 197-200.

[58] Doc. 381 at 25-26.

[59] *See* Doc. 350 at 230-31; Doc. 324.

[60] Defendants did object to this jury instruction. Doc. 350 at 377-78. However, a "request for jury instructions may suffice to fulfill the requirement that a motion for a directed verdict be made before granting a JNOV only if it is clear that the district court treated the request as a motion for a directed verdict and ruled on it as such." *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 814-15 (3d Cir. 1984). That did not occur here.

[61] *Alexander v. Riga*, 208 F.3d 419, 426 (3d Cir. 2000) ("Under Fed. R. Civ. P. 51, a party, in order to preserve an objection either to a failure to instruct the jury on an issue or to the manner in which the jury was instructed, clearly must object thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection" (brackets and internal quotation marks omitted).

### C.     Merits of the Motion

Defendants' motion is premised on both Rule 50(b), seeking an entry of judgment in their favor, and Rule 59, seeking a new trial in the alternative. The two requests carry different evidentiary standards.

Under Rule 50(b), a judgment may be entered notwithstanding the jury's verdict "only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief."[62] "Because the jury returned a verdict in favor of the plaintiff, [this Court] must examine the record in a light most favorable to the plaintiff, giving [it] the benefit of all reasonable inferences, even though contrary inferences might reasonably be drawn."[63] When conducting that analysis, courts "must refrain from weighing the evidence, determining the credibility of witnesses, or substituting [their] own version of the facts for that of the jury."[64] "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party."[65]

In considering a motion pursuant to Rule 59(a), court may grant such a motion "for any reason for which a new trial has heretofore been granted in an action at law

---

[62] *In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015) (internal quotation marks omitted).

[63] *Id.* (internal quotation marks omitted).

[64] *Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC*, 784 F.3d 177, 184 n.9 (3d Cir. 2015).

[65] *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 218 n.8 (3d Cir. 2021).

in federal court, [but] it should do so only when the great weight of the evidence cuts against the verdict and a miscarriage of justice would result if the verdict were to stand."[66] Typically, this only occurs if "'the verdict is contrary to the great weight of the evidence . . .' or when the court believes the verdict results from jury confusion."[67] A "district court's power to grant a new trial is limited to ensure that it does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury."[68]As with a Rule 50(b) motion, in reviewing a Rule 59(a) motion courts "must view the evidence in the light most favorable to the non-moving party."[69]

### 1.    Direct Liability for Sportswear

Defendants first assert that this Court erred in holding on reconsideration that Sportswear could be held directly liable for trademark infringement, rather than only secondarily liable.[70] Specifically, Defendants argue that Sportswear only produced goods for Vintage Brand, but did not include its own marks anywhere on those products, nor was it involved in any way in the sale of those products—meaning it was merely an invisible middleman shielded from direct liability.[71]

---

[66] *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (brackets, ellipsis, and internal quotation marks omitted).

[67] *Brown v. Nutrition Mgmt. Servs. Co.*, 370 F. App'x 267, 269-70 (3d Cir. 2010) (quoting *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir. 2001)).

[68] *Leonard*, 834 F.3d at 386 (brackets and internal quotation marks omitted).

[69] *Frank C. Pollara Grp., LLC*, 784 F.3d at 184 n.9.

[70] Doc. 371 at 9-15.

[71] *Id.*

Penn State responds that, first, there was sufficient evidence in the record for the jury to have concluded that Sportswear was directly liable due to its distribution of the infringing goods, since it (1) manufactured, printed, and shipped all Vintage Brand goods, (2) collected, curated, and prepared all Penn State images that were used on Vintage Brand products, and (3) handled all customer service related to Vintage Brand's sales.[72] Second, Penn State contends that direct liability does not hinge on whether consumers view the defendant as the true seller of the goods since, in most trademark cases, consumers are confused as to who the true seller is.[73]

Defendants' arguments are unavailing, as they merely rehash issues previously brought before this Court and rejected after careful consideration of the facts of this case and the applicable law. Although the Court initially agreed with Defendants that Sportswear could not be held directly liable, on reconsideration it determined that the law supported independent liability against Sportswear.[74] It analyzed caselaw from across the country and concluded that those cases stood "for the proposition that one uses a mark in commerce by manufacturing goods displaying the mark in connection with their sale, which causes consumer confusion. In this case, Sportswear manufactures goods displaying the mark in connection with their distribution, which causes consumer confusion."[75]

---

[72] Doc. 381 at 9-10.

[73] *Id.* at 10-11.

[74] *See* Docs. 329, 330.

[75] Doc. 329 at 11; *see id.* at 6-11.

Defendants present nothing that undermines this fundamental conclusion. Although they take pains to distinguish two cases upon which the Court relied in granting reconsideration,[76] this Court itself observed that those cases were in some ways distinguishable from this matter.[77] But those cases—combined with several other cases Defendants do not address[78]—and the force of logic compelled the Court to hold that the evidence was sufficient for that issue to go to the jury. Nothing presented changes that fundamental conclusion.[79] Accordingly, Defendants' motion will be denied as to this claim.

### 2.    Verdict Form

Defendants next argue that the verdict form was confusing and inconsistent with Penn State's position during this litigation.[80] They maintain that the failure to identify specific images in the instructions and verdict form left the jury without any

---

[76] Doc. 371 at 9-14.

[77] *See* Doc. 329 at 10-11 (examining *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 440 (6th Cir. 2021) and *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1017 (E.D. Wis. 2018) and noting that "[t]here are of course distinctions").

[78] *See, e.g., Red Rock Sourcing LLC v. JGX LLC*, No. 21 CIV. 1054 (JPC), 2024 WL 1243325, at *24 (S.D.N.Y. Mar. 22, 2024) (noting that "any member of the distribution chain may be held liable for trademark infringement").

[79] Although Defendants argue that this conclusion "would massively expand direct liability to shipping companies for merely handling and distributing packages containing infringing goods, even when those distributors had no idea what they were shipping," Doc. 386 at 12, the Court's ruling does not stretch direct liability that far and such an outcome is not a concern in this case. Rather, where Sportswear employees were intimately involved in several aspects of Vintage Brand's business—including collecting the images used and handling customer service issues—and manufactured Vintage Brand products, affixed tags to those products, and shipped the goods, Sportswear may be held directly liable for trademark infringement.

[80] Doc. 371 at 15-18.

method of understanding which images were and were not alleged to be infringing.[81] That this was confusing to the jury is demonstrated, Defendants contend, by the fact that the jury marked that all defendants had infringed on all trademarks except Sportswear as to THE PENNSYLVANIA STATE UNIVERSITY trademark, when there was no reason to differentiate as to that single defendant and that single trademark.[82]

Penn State asserts that the verdict form used is typical in trademark cases, there is no precedent for Defendants' proposed image-by-image verdict form, and such a verdict form would have been problematic given that Defendants themselves often presented several versions of various images and there are potentially endless variations of infringing images.[83] Moreover, Penn State contends that the allegedly inconsistent jury verdict may be easily reconciled.[84]

First, the Court finds no error in the jury verdict form. Defendants argue that "this case has always been about the *images*"[85] and they are correct—to an extent. Of course, the case must be viewed by the jury through the prism of the images displayed on Vintage Brand's website and included on the goods they sold, as viewing the real-life evidence (i.e., the merchandise upon which Defendants were

---

[81]  *Id.* at 15-16.
[82]  *Id.* at 16-17.
[83]  Doc. 381 at 12-13.
[84]  *Id.* at 14.
[85]  Doc. 371 at 17.

alleged to have placed the infringing images) is the only way that the jury would be able to determine whether Defendants infringed upon Penn State's trademarks. But the ultimate question that the jury needed to answer was not whether any specific image was infringing, but whether Defendants improperly used Penn State's trademarks. If the answer was yes, then Defendants were liable and that would be the end of the jury's inquiry, regardless of whether Defendants used one or one hundred images that infringed on a particular trademark.

Defendants have presented no case law that would even suggest their proposed verdict form—breaking down the verdict by each particular image—is necessary or proper. In the absence of such case law, the Court finds no error in the verdict form submitted to the jury that asked merely whether each Defendant had infringed upon each trademark.

Second, there is insufficient evidence that the jury verdict was the result of confusion or was fatally inconsistent. The Third Circuit has held that courts must "approach [any] incompatibility and inconsistency argument recognizing that inconsistent jury verdicts are an unfortunate fact of life in law, and should not, in and of themselves, be used to overturn otherwise valid verdicts."[86] "Rather, when faced with a seemingly inconsistent verdict, a court, to the extent possible, should

---

[86]    *Graboff v. Colleran Firm*, 744 F.3d 128, 138 (3d Cir. 2014) (internal quotation marks omitted).

read the verdict to resolve the inconsistencies."[87] Courts are "constitutionally obligated" to resolve any inconsistency if it is possible to so do.[88]

Here, although the jury verdict is unusual, it is possible to read all of the jury's findings harmoniously. The jury in its verdict form found every Defendant liable for infringing upon every Penn State trademark at issue in this case, with the exception of Sportswear as to "THE PENNSYLVANIA STATE UNIVERSITY" trademark, which the jury found was not infringed by Sportswear and, as a necessary corollary, there was no willful infringement by Sportswear.[89]

Defendants contend that "no evidence offered by either party would have differentiated use of that one mark by Sportswear,"[90] but that is not accurate. The images used by Defendants and submitted to the jury rarely feature THE PENNSYLVANIA STATE UNIVERSITY, never featured that trademark in a prominent position, and never, in the Court's review, appear on their own absent another trademark.[91] Given this fact, the jury could reasonably have concluded that, while Sportswear knew it was violating *a* Penn State trademark, it did not know it was violating *the* specific trademark at issue here. Stated differently, it is not unreasonable to infer that the jury determined that Sportswear did not intend to

---

[87] *Id.*

[88] *Repola v. Morbark Indus., Inc.*, 934 F.2d 483, 494 (3d Cir. 1991).

[89] Doc. 335 at 2, 6.

[90] Doc. 371 at 17.

[91] *See* Docs. 375-2 through 375-5, 375-12, 375-60 through 375-65; Docs. 377-7, 377-8, 377-18 through 377-32, 377-44; Docs. 379-16, 379-17, and 379-22 through 379-24.

violate trademark law as to THE PENNSYLVANIA STATE UNIVERSITY. Given Vintage Brand's role as the seller of those products, it would have intended such a violation, but given Sportswear's more limited role as a manufacturer and distributor of those goods—and the less prominent placement of that trademark—it did not intend to violate that specific trademark.

While this is not the only plausible reading of the verdict, and perhaps not even the most plausible reading, it is an interpretation that this Court has a constitutional duty to accept. Because it is not a given that the verdict was inconsistent or the result of confusion, a new trial will not be granted on this ground.

### 3.    Types of Confusion

Next, Defendants argues that the jury was improperly permitted to consider evidence related to three types of confusion when this case was only ever about one type of confusion.[92] Although the case only involved point-of-sale confusion, Defendants maintain, argument was improperly presented that related to initial-interest and post-sale confusion even though no evidence was presented to support such confusion.[93]

As to initial interest confusion, Defendants maintain that: (1) the search results presented at trial were purposefully crafted to find Vintage Brand's website; (2) confusion in search results is immaterial to the initial interest analysis; and (3) any

---

[92] Doc. 371 at 18-22.
[93] *Id.*

confusion was irrelevant to the operation of the marketplace.[94] With respect to post-sale confusion, Defendants maintain that there was no evidence that Defendants' products were substantially inferior to officially licensed products.[95]

Penn State in turn argues that any error was harmless given the strong evidence supporting point-of-sale confusion and the fact that all types of confusion are considered using the same elements.[96] Moreover, Penn State contends that the evidence of the search results, along with testimony presented at trial, was sufficient when viewed in the light most favorable to Penn State to establish initial interest confusion and point-of-sale confusion.[97] Finally, Penn State argues that, even if evidence of inferior quality were required, such evidence was presented at trial.[98]

The Court rejects Defendants' argument that different types of confusion "must be pled and proved under specific standards" and that initial-interest confusion in particular requires intentional deception.[99] Rather, within the Third Circuit, Penn State is correct that the various types of confusion are not separate claims but, rather, merely separate ways of demonstrating confusion and are all analyzed "within the context of the relevant *Lapp*[[100]] factors."[101] In that vein, the

---

[94] *Id.* at 19-21.
[95] *Id.* at 21-22.
[96] Doc. 381 at 16-17.
[97] *Id.* at 17-18.
[98] *Id.* at 18-19.
[99] Doc. 386 at 19 (citing *I-800* Contacts, Inc. v. JAND, Inc.*, 119 F.4th 234, 247 (2d Cir. 2024)).
[100] *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983).
[101] *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 297 (3d Cir. 2001). *See also id.* ("As with all cases involving the likelihood of confusion under the Lanham Act,

Third Circuit has previously examined evidence related initial interest confusion and, in conducting that analysis, has treated an intent to deceive as relevant to the confusion inquiry, but not dispositive or required.[102] Therefore, while other types of evidence may be more or less relevant to different forms of confusion, all types of confusion  are evaluated under the same rubric and factors.

Moreover, adjudged under the relevant standards applicable to this motion, this Court finds that there was sufficient evidence for the jury to consider both types of challenged confusion. As to initial interest confusion, both parties note that one witness performed a Google search that brought up Vintage Brand products alongside officially licensed products, and that the witness did not see any indication that Vintage Brand was not an authorized retailer of Penn State merchandise.[103] Certainly, this evidence is neither overwhelming nor particularly strong. But this evidence is sufficient, when viewed most favorably to Penn State, to support a jury determination that these results were confusing.

---

courts should employ all the relevant *Lapp* factors and weigh each factor to determine whether in the totality of the circumstances marketplace confusion is likely"); *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 358 (3d Cir. 2007) ("Whether a plaintiff alleges initial interest or point-of-sale confusion or both, a district court should employ the factors we announced in [*Lapp*] to decide whether there is a likelihood of confusion").

[102] *See id.* at 298 (observing that there was no "evidence that Check Point Software intentionally adopted the Check Point mark to create confusion" but noting the presence of other *de minimus* evidence of initial interest confusion and analyzing such evidence despite the failure to demonstrate intentionality).

[103] *See* Doc. 347 at 154-156, 181-82.

Defendants nevertheless rely on a decision from the United States Court of Appeals for the Ninth Circuit to assert that the web search itself is not "probative of the type of confusion that trademark law cares about."[104] It is true that the Ninth Circuit has held that "experienced internet consumers are accustomed to . . . exploration by trial and error" and "fully expect to find some sites that aren't what they imagine based on a glance at the domain name or search engine summary . . . [meaning] consumers don't form any firm expectations about the sponsorship of a website until they've seen the landing page—if then."[105] That decision is reasonable, but inapplicable in this case.

Here, there is evidence that even a wary consumer without any expectations of the website that they visited would have been confused by the search results presented—and that such confusion would not have been dispelled by Vintage Brand's website. For example, Penn State's expert testified that there were high levels of confusion associated with Vintage Brand's website (or at least excised portions of the website) and "a substantial risk that people will think that Penn State has either made, sponsored, is affiliated with, or is approving of the -- of the merchandise that Vintage Brands [sic] is selling."[106] Similarly, Defendants' expert testified to high levels of gross confusion, although the net confusion numbers were

---

[104] Doc. 371 at 20 (citing *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1179 (9th Cir. 2010)).

[105] *Tabari*, 610 F.3d at 1179.

[106] Doc. 348 at 76.

significantly lower.[107] Finally, deposition testimony was played for the jury wherein a witness for Penn State asserted that she believed, based on Vintage Brand's website, that it was authorized to use Penn State trademarks on its products.[108]

Under these circumstances, the Ninth Circuit's general statement in *Tabari* does not undermine the available evidence of initial interest confusion. And that evidence, while hardly ironclad, is sufficient to support the jury's verdict.

Moreover, there was some evidence of inferiority as related to post-sale confusion. One witness testified that some of Vintage Brand's products were "not a high quality Penn State product" and officially licensed merchandise is "much higher quality and much better made."[109] There was also testimony from two witnesses that Vintage Brand shirts have a "plasticky" feel.[110] Again, this evidence of substantial inferiority is not strong and this Court may well have found it insufficient if presented with this question on *de novo* review. But that is not the question here. Rather, under the applicable standards, the Court concludes that the evidence presented was sufficient to support a verdict even as to post-sale confusion.[111]

---

[107] Doc. 350 at 185-93.

[108] Doc. 374-3 at 24-25.

[109] Doc. 347 at 135, 137.

[110] *Id.* at 133; *see* Doc. 348 at 169 (describing artwork affixed to front of Vintage Brand shirt as feeling "almost like a sheet of plastic on the front of the shirt").

[111] Furthermore, to the extent that Defendants challenge the failure to give any specific instruction as to confusion, this Court cannot conclude that the instructions given as related to confusion when "*taken as a whole*, 'fail[ ] to 'fairly and adequately' present the issues in the case without

### 4.    Trademark Use

Next, Defendants argue that, under binding precedent, Penn State was required to demonstrate that Defendants used the trademarks as trademarks, and failed to do so.[112] Specific, they contend that Penn State failed to demonstrate that Defendants used the images and trademarks at issue to indicate the source of their goods.[113] Penn State maintains that such proof is not required under the law.[114]

The Court has already considered, and rejected, Defendants' assertion, and nothing present in their motion gives reason to alter that determination. In ruling on the proposed jury instructions, this Court informed the parties that it would not issue an instruction "that trademarks must actually be used by Vintage Brand as trademarks."[115] The Court determined that "such an instruction is inconsistent with the Lanham Act because it would seem to add an extra element to such a claim that is not required by the statute."[116] It observed that, "to make out a classic fair use defense, a Defendant is required to prove, amongst other things, that it used the mark, other than as a trademark," and it would be inconsistent "to require the Defendant to

---

confusing or misleading the jury.'" *Ponzini v. Monroe Cnty.*, 789 F. App'x 313, 316 (3d Cir. 2019) (quoting *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 79 (3d Cir. 2009)).

[112]    Doc. 371 at 22-24.

[113]    *Id.*

[114]    Doc. 381 at 20-22.

[115]    Doc. 350 at 337.

[116]    *Id.*

establish something in an affirmative defense that is the Plaintiff's burden to establish a claim to begin with."[117]

The cases cited by Defendants, *Jack Daniel's Properties, Inc. v. VIP Products LLC*,[118] and *Abitron Austria GmbH v. Hetronic Int'l, Inc.*,[119] do not compel a different result. In *Jack Daniel's*, the Supreme Court of the United States held that using "a trademark as a trademark . . . falls within the heartland of trademark law" and therefore such use cannot receive special First Amendment protections.[120] Notably, however, the Supreme Court explicitly declined to "decide whether the threshold [First Amendment] inquiry . . . is ever warranted," which strongly implies that trademark infringement cases may fall outside of the heartland of trademark law where a mark is not being used as a mark. Viewed in this way, *Jack Daniel's* set a ceiling, not a floor; conduct that falls within that heartland enjoys fewer protections, but conduct outside of that heartland may still be actionable, and therefore use "as a trademark" is not required to be proven to make out a case of trademark infringement.

*Abitron* also says nothing about the type of use that is required for conduct to be actionable under the Lanham Act. Rather, that case was concerned with "the foreign reach of 15 U.S.C. § 1114(1)(a) and § 1125(a)(1), two provisions of the

---

[117] *Id.* at 337-38.
[118] 599 U.S. 140 (2023).
[119] 600 U.S. 412 (2023).
[120] 599 U.S. at 145.

Lanham Act that prohibit trademark infringement."[121] Nothing within that opinion mandates that plaintiffs in a Lanham Act case must prove specific trademark use by the alleged infringer.

Moreover, even if Defendants are correct that Penn State was required to produce evidence of trademark use, it did. As this Court has previously held, trademarks need not simply identify the source of a good, but may also indicate, *inter alia*, sponsorship of a good.[122] Penn State's expert witness testified to just that: that individuals often believed that Penn State sponsored Vintage Brand's products.[123] And, accidental or not, it is undisputed that Vintage Brand for at least some time used an S Lion Logo that contained a trademark symbol for its products.[124] This evidence is sufficient to support the jury's verdict.

### 5.    Aesthetic Functionality

Next Defendants argue that the evidence presented at trial conclusively established its defense of aesthetic functionality.[125] They assert that something is aesthetically functional if it is useful for any purpose other than identifying the source of a product, and two Penn State witnesses testified that they purchased Penn State merchandise for reasons beyond the source of the merchandise.[126]

---

[121] 600 U.S. at 415.
[122] Doc. 194 at 58.
[123] Doc. 348 at 70-73.
[124] Doc. 377-18 at 2.
[125] Doc. 371 at 25-26.
[126] *Id.*

Defendants' claim fails, as the evidence presented—and not presented—at trial adequately supports the jury's finding that the marks at issue as used by Defendants were not aesthetically functional. To being with, Defendants' assertion that something is aesthetically functional "if it is useful for anything beyond branding"[127] is inconsistent with this Court's prior decision in this matter.

The Court instructed the jury that a design feature is aesthetically functional if it "in itself and apart from its identification of source, improves the usefulness or appeal of the object it adorns."[128] The jury was told that "the defense is generally limited to product features that serve an aesthetic purpose independent of any source-identifying function."[129] In crafting the jury instructions in this matter, this Court explained that it had rejected Defendants' proposed instructions based on *PIM Brands* because that case involved trade dress, whereas this one involves symbols and "the aesthetic functionality defense is strongest when applied to trade dress or cases involving product designs, but weakest when applied to symbols."[130] That is why this Court emphasized that Defendants' "burden is appropriately difficult in a case like this that involves symbol trademarks."[131]

---

[127] Doc. 371 at 25 (quoting *PIM Brands Inc. v. Haribo of Am. Inc.*, 81 F.4th 317, 321 (3d Cir. 2023)).

[128] Doc. 334 at 37.

[129] *Id. See also Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1073 (9th Cir. 2006).

[130] Doc. 350 at 366; *see id.* at 366-69.

[131] *Id.* at 369.

Judged under that legal standard, the jury was properly permitted to consider the question of aesthetic functionality, and its determination that the images at issue were not aesthetically functional should stand. Certainly, as Defendants point out, there was some evidence from which a jury could have determined that individuals buy Penn State merchandise for reasons other than that the trademarks identify the manufacturer or sponsor of those goods.[132] But there was also evidence presented that companies can create a connection between their goods and Penn State without using Penn State trademarks—for example by using a blueprint of Penn State's Beaver Stadium or by using Penn State's blue and white color scheme.[133]

Collectively then, the evidence did not firmly establish that the images used by Defendants served an aesthetic purpose wholly independent of any source-identifying function. Nor did it conclusively establish that failing to permit Defendants to use the Penn State trademarks would "impose a significant non-reputation-related competitive disadvantage" on Defendants.[134] As a result, the jury verdict regarding aesthetic functionality must stand.

### 6.    Pozniak Lion Logo

Defendants further contend that the evidence failed to establish that Penn State had any rights in the Pozniak Lion Logo, as that trademark was never used in

---

[132] Doc. 371 at 25-26.
[133] Doc. 347 at 16-59.
[134] Doc. 334 at 36.

commerce.[135] Specifically, they assert that, although goods bearing that design were sold, they were only sold to internal members of Penn State and were never sold to the general public.[136] Penn State argues that such sales are sufficient to grant it ownership rights in the Pozniak Lion Logo.[137]

The Court concludes that evidence of sales proffered by Penn State during trial was sufficient to demonstrate that the Pozniak Lion Logo was used in commerce. The Lanham Act provides that the "term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark."[138] The Act further provides that "a mark shall be deemed to be in use in commerce" if "it is placed in any manner on the goods or their containers or the displays associated therewith" and "the goods are sold or transported in commerce."[139]

This definition does not prohibit, as Defendants argue, a trademark holder from demonstrating use in commerce through sales limited to certain groups.[140] Rather, in determining if there was commercial use of a trademark, courts must assess whether any sales created "in the mind of the relevant purchasing public, an

---

[135] Doc. 371 at 27-28.
[136] *Id.*
[137] Doc. 381 at 24-25.
[138] 15 U.S.C. § 1127.
[139] *Id.*
[140] Doc. 371 at 27.

association of the designation with the plaintiff's goods."[141] Because the appropriate inquiry focuses on "the relevant purchasing public," the Trademark Trial and Appeal Board ("TTAB") has held that even clothing provided exclusively to employees may be sufficient to satisfy the use in commerce requirement.[142]

In that case, the TTAB reviewed a trademark application by McDonald's Corporation for a mark placed on merchandise that was purchased by McDonald's franchisees and provided to their employees to "be worn by restaurant personnel during working hours" and casually during "leisure time activities."[143] The TTAB defined the relevant purchasing public not as "the customers of the licensed restaurants who purchase the various food items served in the various McDonald's food establishments, but [as McDonald's] licensees who own and operate the individual restaurants."[144] When viewed in that light, the TTAB concluded that the marks,

> displayed on the outer surface of the various items of apparel in a small, neat, discreet and distinctive manner, . . . consisting either of the word "McDONALD'S", the wellknown and publicized Double Arch Design, or the combination of the word "McDONALD'S" and Double Arch Design, do create a commercial impression in the minds of the particular purchasers of applicant's clothing items (the owners and operators of the licensed restaurants) indicating the source of origin of the various items of apparel in applicant.[145]

---

[141] *Reed v. ML Bonnell, Inc.*, No. APP SERIAL 78634920, 2008 WL 3211808, at *3 (T.T.A.B. July 17, 2008) (quoting *Flatley v. Trump*, 11 U.S.P.Q.2d 1284, 1287 (T.T.A.B. 1989)).

[142] *In Re Mcdonald's Corp.*, 199 U.S.P.Q. 702 (T.T.A.B. July 25, 1978).

[143] *Id.*

[144] *Id.*

[145] *Id.*

Here, the evidence presented at trial established that merchandise bearing the Pozniak Lion Logo was sold in the Penn State campus bookstore to Lion Ambassadors[146] and members of the Nittany Lion Wrestling Club.[147] There is no question that such merchandise was "sold to students"[148] and that the purchase of such merchandise was not required of those students.[149]

In that context, the relevant purchasing public is the Penn State student body—specifically the student ambassadors and members of the wrestling club. The Pozniak Lion Logo when used by Penn State in that manner clearly creates an impression in the minds of those purchasers that the merchandise is sponsored by Penn State. Merchandise bearing the Pozniak Lion Logo was therefore sold and used in commerce, and Penn State adequately established ownership of that trademark.

The case to which Defendants cite—*Morgan Creek Productions, Inc. v. Foria International, Inc.*[150]—does not contradict that conclusion.[151] There, the TTAB rejected opposition to a trademark application after finding no likelihood of confusion.[152] The TTAB noted that "Opposer does not sell any clothing under the

---

[146] Lion Ambassadors are Penn State students who "promote traditions and well-being of Penn State" by undertaking activities such as giving tours of the campus to prospective students. Doc. 347 at 7.

[147] *Id.* at 32-33, 137-43; *see* Doc. 346 at 105.

[148] Doc. 347 at 142-43.

[149] *Id.* at 6.

[150] 91 U.S.P.Q.2d 1134 (T.T.A.B. 2009).

[151] Doc. 371 at 27.

[152] 91 U.S.P.Q.2d at *10-11.

mark MORGAN CREEK or MORGAN CREEK and design. The clothing that bears these marks is given away as promotional items" to employees and friends, among other people.[153] However, there was no evidence that the goods were given away at "a regular or recurring" interval sufficient to establish continuous usage of the mark "so that the consuming public would be aware that opposer offers the goods under the mark and therefore associate opposer's mark with the goods."[154]

In contrast, here merchandise bearing the Pozniak Lion Logo has been sold from the late 1970's through today, creating a stream of continuous sales.[155] And, in contrast to *Morgan Creek*, the relevant consumers of the Penn State goods—its wrestlers and ambassadors—certainly knew that they were buying items branded with the Pozniak Lion Logo because that merchandise was produced specifically for Penn State and at Penn State's direction; that is, in the mind of those consumers the merchandise was sponsored by Penn State.[156]

In sum, the law and the facts support the jury's verdict with respect to the Pozniak Lion Logo. Defendants' motion will therefore be denied.

---

[153]  *Id.*

[154]  *Id.*

[155]  Doc. 347 at 32-33, 137-43; Doc. 346 at 105; Doc. 377-4; Doc. 377-5.

[156]  *See* Doc. 347 at 6 (witness testifying that his sweatshirt bearing the Pozniak Lion Logo was purchased "from the Lion Ambassador organization itself, who collected the money to pay the local State College vendor who printed the sweatshirts for us").

### 7.    University Seal

Finally, Defendants argue that a new trial is warranted because this Court's instructions regarding the counterclaim to cancel the University Seal was erroneous.[157] They assert that, while the jury was instructed that the trademark should "be cancelled if it includes the coat of arms of a state in such a manner that consumers would perceive that trademark as a government insignia," the correct test is whether the seal "*includes* anything which creates the commercial impression of the Pennsylvania coat of arms."[158] Penn State responds that the jury was properly instructed and, therefore, Defendants' motion is without merit.[159]

The Court finds no error in the instructions given. This Court has previously acknowledged that the Lanham Act prohibits the registration of a mark that comprises the insignia of any state, and that "'[c]omprises' is interpreted to mean 'includes' and, therefore, the Lanham Act 'prohibits registration of a mark that includes a flag of a foreign nation or any simulation thereof.'"[160] The Court went on to emphasize:

> However, the ultimate question is not simply whether a mark contains a government's insignia, but whether relevant consumers would "perceive matter in the mark as a" government insignia. Registration should therefore not be refused if the insignia used within the mark "is

---

[157] Doc. 371 at 28-29.

[158] *Id.* at 28.

[159] Doc. 381 at 26-27.

[160] Doc. 194 at 92 (quoting *In Re Fam. Emergency Room LLC*, 121 U.S.P.Q.2d 1886, 1889 n.2 (T.T.A.B. 2017)).

sufficiently altered, stylized, or merged with other elements in the mark, so as to create a distinct commercial impression."[161]

Under the law then, it is insufficient to cancel a registration simply because it contains a state insignia where that insignia is altered in some way or merged with other elements. When that occurs, the factfinder must examine the mark to determine "whether relevant consumers would 'perceive matter in the mark as a' government insignia."[162] That is precisely as the jury was instructed here, and Defendants' motion will be denied.

## III.    CONCLUSION

In accordance with the above discussion, Defendants' motion for judgment as a matter of law or, alternatively, for a new trial will be denied.

This matter is complex and has presented numerous issues of first impression or questions of law not yet addressed by the Third Circuit. This Court has done its level best to reason through these issues and adopt coherent, understandable, and practical tests to answer those questions.

Although the Court is skeptical that trademark law was intended to be applied in circumstances such as these—involving universities that play little to no role in the sale of merchandise—it has endeavored to accurately apply the law here, and the jury has spoken, finding Defendants liable for trademark infringement. George

---

[161]  *Id.* (quoting *In Re Fam. Emergency Room LLC*, 121 U.S.P.Q.2d at 1890).
[162]  *Id.* (quoting *In Re Fam. Emergency Room LLC*, 121 U.S.P.Q.2d at 1890).

Washington in his farewell address to the Nation remarked that, although "I am unconscious of intentional error, I am nevertheless too sensible of my defects not to think it probable that I may have committed many errors."[163] Should this Court have erred in any of its rulings, it trusts that its eminently capable colleagues on the Third Circuit will view those errors with indulgence and issue much needed authoritative guidance on these important questions. It is now time for an appeal to be taken so that such guidance may issue.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[163] George Washington, *Farewell Address to the People of the United States* (Sept. 19, 1796).