**Nos. 25-2398, 25-2494**

In the

# United States Court of Appeals
## For the Third Circuit

———————

THE PENNSYLVANIA STATE UNIVERSITY,

*Plaintiff-Appellant/Cross-Appellee,*

v.

VINTAGE BRAND LLC, ET AL.,

*Defendants-Appellees/Cross-Appellants.*

———————

On Appeal from the United States District Court
for the Middle District of Pennsylvania, No. 4:21-cv-01091
Honorable Matthew W. Brann, U.S. District Judge

———————

**OPENING BRIEF OF APPELLANT/CROSS-APPELLEE
THE PENNSYLVANIA STATE UNIVERSITY**

———————

Lucy Jewett Wheatley
Claire Hagan Eller
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
T: 804.775.4320
F: 804.698.2017
*lwheatley@mcguirewoods.com*
*celler@mcguirewoods.com*

Brian D. Schmalzbach
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
T: 804.775.4746
F: 804.698.2304
*bschmalzbach@mcguirewoods.com*

*Counsel for Plaintiff-Appellant
The Pennsylvania State University*

## United States Court of Appeals for the Third Circuit

## <u>Corporate Disclosure Statement and</u><br><u>Statement of Financial Interest</u>

No. <u>25-2398, 25-2494</u>

The Pennsylvania State University

v.

Vintage Brand LLC, et al.

<u>Instructions</u>

 Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

 Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

 In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

 The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

 The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

 If additional space is needed, please attach a new page.

(Page 1 of 2)

i

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

The Pennsylvania State University
_____
(Name of Party)

      1) For non-governmental corporate parties please list all parent corporations: N/A

      2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

N/A

      3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

None

      4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

/s/ Lucy Jewett Wheatley
_____
(Signature of Counsel or Party)

Dated: 1/20/2026

**rev: 09/2014**           (Page 2 of 2)

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................1

STATEMENT OF JURISDICTION .......................................4

STATEMENT OF THE ISSUES .............................................5

STATEMENT OF RELATED CASES AND PROCEEDINGS..........6

STATEMENT OF THE CASE..................................................6

    A.    Relevant Facts ................................................6

    B.    Procedural History ......................................15

    1.        The Operative Pleadings....................................15

    2.        The Parties' Summary Judgment Motions.......16

    3.        Jury Trial on Willful Trademark Infringement ...............18

SUMMARY OF ARGUMENT ..............................................18

    A.    The District Court Misstated the Law on Counterfeiting .........18

    B.    The District Court Applied the Wrong Test for Dilution...........19

    C.    The District Court Improperly Disregarded Penn State's Evidence and Drew Inferences in Defendants' Favor ...............20

STANDARD OF REVIEW ...................................................21

ARGUMENT.........................................................................22

I.    Vintage Brand's Merchandise Bearing Penn State's Registered Trademarks Is Counterfeit as a Matter of Law ......................22

    A.    Counterfeiting is Trademark Infringement Using Substantially Indistinguishable Marks .........................23

    B.    The District Court Erred in Holding That to be "Counterfeit" a Mark Must Create a Likelihood of Confusion as to the Producer of a Product.................................29

    1.        Under the Plain Language of the Lanham Act, Counterfeit and Infringing Marks are Subject to the Same Expansive Test for Likelihood of Confusion ..........................................31

2.        The District Court's Definition of "Counterfeit" is Inconsistent with the Lanham Act, the Authority in this Circuit, and the Applicable Out of Circuit Precedent .........................................37

C.    This Court Should Enter Judgement that Defendants are Liable for Counterfeiting..................................................................45

II.    The District Court Erred in Granting Summary Judgment on Penn State's Dilution Claims by Misapplying Governing Law. .........46

A.    The Trademark Dilution Revision Act Establishes a Holistic, Multi-Factor Test for Dilution by Blurring ..................47

B.    The District Court's Application of a "Substantial Similarity" Requirement is Contradicted by the Statute's Plain Language. ................................................................................51

C.    The District Court Fundamentally Misunderstood the 'Impairment of Distinctiveness' Standard for Dilution by Blurring. ............................................................................................53

III.    In the Alternative, the District Court's Summary Judgment Ruling Should be Vacated for Misapplying Rule 56. ............................58

A.    The District Court Drew Inferences in Defendants' Favor and Disregarded Penn State's Evidence on Counterfeiting.......59

B.    On Dilution, the District Court Improperly Weighed Evidence to Resolve the Factual Question of Similarity............63

C.    The District Court Usurped the Jury's Role by Resolving Other Key Factual Disputes on Dilution as a Matter of Law. ...................................................................................................67

CONCLUSION ...................................................................................................69

# TABLE OF CITATIONS

**Page(s)**

## Cases

*A & H Sportswear, Inc., v. Victoria's Secret Stores, Inc.*,
   237 F.3d 198 (3d Cir. 2000) ........................................................32, 33

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...........................................................................58

*Babbit Elecs., Inc. v. Dynascan Corp.*,
   38 F.3d 1161 (11th Cir. 1994) ..........................................................36

*Barnhart v. Sigmon Coal Co.*,
   534 U.S. 438 (2002)...........................................................................52

*Cen v. Att'y Gen.*,
   825 F.3d 177 (3d Cir. 2016) .............................................................41

*Chanel, Inc. v. Gordashevsky*,
   558 F. Supp. 2d 532 (D.N.J. 2008) ..................................................35

*Country Floors, Inc. v. P'ship Composed of Gepner & Ford*,
   930 F.2d 1056 (3d Cir. 1991) .............................................58, 59, 66

*Deere & Co. v. MTD Prods., Inc.*,
   41 F.3d 39 (2d Cir. 1994) .................................................................53

*Dranoff-Perlstein Assocs. v. Sklar*,
   967 F.2d 852 (3d Cir. 1992) .............................................................34

*First Nat'l Bank of Pa. v. Lincoln Nat'l Life Ins. Co.*,
   824 F.2d 277 (3d Cir. 1987) .............................................................45

*Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*,
   955 F.2d 1143 (7th Cir. 1992) ..........................................................36

*Hayes v. Harvey*,
   903 F.3d 32 (3d Cir. 2018) ...............................................................40

*ICCS USA Corp. v. United States*,
  952 F.3d 1325 (Fed. Cir. 2020) ...................................................35, 43

*In re Cont'l Airlines, Inc.*,
  279 F.3d 226 (3d Cir. 2002) ............................................................45

*Interpace Corp. v. Lapp, Inc.*,
  721 F.2d 460 (3d Cir. 1983) ............................................................24

*Just Enters., Inc. v. O'Malley & Langan, P.C.*,
  560 F. Supp. 2d 345 (M.D. Pa. 2008) .............................................47

*Kos Pharms., Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004) ..............................................24, 31, 62

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*,
  633 F.3d 1158 (9th Cir. 2011) .........................................................52

*Levi Strauss & Co. v. Shilon*,
  121 F.3d 1309 (9th Cir. 1997) .........................................................31

*Lontex Corp. v. Nike, Inc.*,
  107 F.4th 139 (3d Cir. 2024) ............................. 23, 24, 25, 34, 46, 61

*Louis Vuitton Malletier & Oakley, Inc. v. Veit*,
  211 F. Supp. 2d 567 (E.D. Pa. 2002), *amended* (June 28, 2002).....................35

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,
  507 F.3d 252 (4th Cir. 2007) ...........................................................57

*Mattel, Inc. v. MCA Recs., Inc.*,
  296 F.3d 894 (9th Cir. 2002) .....................................................54, 56

*Moseley v. V Secret Catalogue, Inc.*,
  537 U.S. 418 (2003).................................................................47, 50

*Motel 6 Operating LP v. HI Hotel Grp. LLC*,
  670 F. App'x 759 (3d Cir. 2016) ................................................34, 36

*Nabisco, Inc. v. PF Brands, Inc.*,
  191 F.3d 208 (2d Cir. 1999) .............................................................50

*Pennsylvania State Univ. v. Parshall,*
   No. 4:19-CV-01299, 2022 WL 2712051 (M.D. Pa. Feb. 17, 2022) ...............48

*Pennzoil-Quaker State Co. v. Smith,*
   No. 2:05CV1505, 2008 WL 4107159 (W.D. Pa. Sept. 2, 2008) ....................35

*Pharmacia Corp. v. Alcon Lab'ys, Inc.,*
   201 F. Supp. 2d 335 (D.N.J. 2002) ..................................................................51

*PIM Brands Inc. v. Haribo of Am. Inc.,*
   81 F.4th 317 (3d Cir. 2023) ...........................................................................21

*Reeves v. Sanderson Plumbing Prods., Inc.,*
   530 U.S. 133 (2000) .......................................................................................67

*Romag Fasteners, Inc. v. Fossil, Inc.,*
   590 U.S. 212 (2020) .......................................................................................42

*Rosetta Stone Ltd. v. Google, Inc.,*
   676 F.3d 144 (4th Cir. 2012) ....................................................................58, 69

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,*
   588 F.3d 97 (2d Cir. 2009) ...........................................................50, 52, 54, 57

*State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.,*
   425 F.3d 708 (9th Cir. 2005) .........................................................................35

*Times Mirror Mags., Inc. v. Las Vegas Sports News, L.L.C.,*
   212 F.3d 157 (3d Cir. 2000) .....................................................................49, 53

*Tolan v. Cotton,*
   572 U.S. 650 (2014) (per curiam) .......................................................64, 67, 69

*United States v. Cone,*
   714 F.3d 197 (4th Cir. 2013) .........................................................................43

*United States v. Diallo,*
   575 F.3d 252 (3d Cir. 2009) ..........................................................................39

*United States v. Farmer,*
   370 F.3d 435 (4th Cir. 2004) ....................................................................36, 43

*United States v. Milstein,*
    401 F.3d 53 (2d Cir. 2005) ................................................................43

*United States v. Petrosian,*
    126 F.3d 1232 (9th Cir. 1997)...........................................................43

*Visa Int'l Serv. Ass'n v. JSL Corp.,*
    610 F.3d 1088 (9th Cir. 2010) ..........................................................55

*Weil Ceramics & Glass, Inc. v. Dash,*
    878 F.2d 659 (3d Cir. 1989) .........................................33, 37, 39, 43

*Willis v. UPMC Children's Hosp. of Pittsburgh,*
    808 F.3d 638 (3d Cir. 2015) ..............................................................21

**Statutes**

15 U.S.C. § 1114.......................................... 19, 23, 24, 31, 32, 33, 34, 35

15 U.S.C. § 1115(b) ..............................................................................60

15 U.S.C. § 1116......................................................................31, 32, 40, 41

15 U.S.C. § 1125......................... 31, 32, 33, 34, 42, 48, 49, 51, 54, 57, 68

15 U.S.C. § 1127.................................................... 23, 24, 35, 37, 38, 60

28 U.S.C. § 1291 ....................................................................................4

28 U.S.C. § 1331 ....................................................................................4

28 U.S.C. § 1367 ....................................................................................4

28 U.S.C. § 2106....................................................................................45

36 U.S.C. § 220506(c)(4) ....................................................................41

54 Pa. Cons. Stat. § 1124 ...................................................................47

Trademark Dilution Revision Act of 2006, Pub. L. No. 109-312,
    120 Stat. 1730.....................................................................................47

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................21, 58

**Other Authorities**

2 Gilson on Trademarks § 5A.01 (2026) ...................................49, 50, 57

5 J. McCarthy on Trademarks & Unfair Competition § 32:188
    (5th ed. 2025) ...........................................................................60

152 Cong. Rec. H 6963, H 6965 (Sept. 25, 2006) .................................47

Joint Statement on Trademark Counterfeiting Legislation, 130
    Cong. Rec. 31673, 31675 (1984).........................................................43

Restatement (Third) of Unfair Competition § 25 (1995)..................................50

## INTRODUCTION

This is a classic case of willful trademark counterfeiting and dilution. Defendants Vintage Brand LLC, Sportswear, Inc., and Chad Hartvigson (collectively, "Defendants") built a business model on appropriating the famous trademarks of universities like The Pennsylvania State University ("Penn State"), copying them onto merchandise, and selling that merchandise to the public without permission. As shown by the below examples, Vintage Brand's products were visually indistinguishable from genuine Penn State merchandise[1]:



---

[1] A key is required to tell Vintage Brand's items from authorized Penn State merchandise. The middle items in each row are genuine Penn State products; the remaining items are Defendants' imitations. *See* JA5137; JA4204; JA5136; JA4359; JA5055; JA5301.

Defendants did this for years, profiting from the goodwill and reputation that Penn State spent a century building. And while a jury ultimately found Defendants' conduct to be willful trademark infringement, this appeal concerns two critical claims—counterfeiting and dilution—that the district court kept from the jury, denying Penn State the opportunity to obtain over $60 million in statutory damages and mandatory attorneys' fees.

The district court's grant of summary judgment rested on an idiosyncratic and incorrect view of trademark law. The district court decided, in essence, that even exact copies of licensed merchandise cannot be counterfeit. To reach this conclusion the court adopted a flawed and improperly narrow definition of the claim. Specifically, the district court held that counterfeiting only occurs when there is a likelihood of confusion about *manufacturing origin* and not when there is likely confusion about *sponsorship or approval*. This holding disregards the plain language of the Lanham Act and this Court's precedent.

The district court's errors on "dilution by blurring" were similarly pronounced. Dilution by blurring asks whether the ability of a famous trademark to distinguish only one source is likely to be weakened by a defendant's use of a similar mark. Yet the district court fundamentally

misunderstood this legal concept, wrongly concluding that a famous mark's distinctiveness cannot be impaired so long as consumers still associate the mark with the senior user. This logic, if accepted, would functionally eliminate the cause of action Congress created. The district court further erred by applying a "substantial similarity" test that Congress expressly abrogated in the Trademark Dilution Revision Act of 2006 ("TDRA").

The district court compounded its errors of trademark law by misapplying Federal Rule of Civil Procedure 56. Instead of viewing the record in the light most favorable to Penn State, the court weighed evidence, resolved disputed facts, and drew inferences in Defendants' favor, usurping the jury's role. The court credited Defendants' self-serving claims that their disclaimers and house marks negated confusion and dilution while ignoring Penn State's countervailing evidence that these measures were ineffective by design. Even under the legal standard applied by the district court, there was more than sufficient evidence of counterfeiting and dilution to permit Penn State's claims to go to trial.

Defendants are brazen purveyors of counterfeit university merchandise who built a business on the unauthorized use of others' intellectual property. Courts in the United States routinely treat near-

identical conduct as criminal counterfeiting, and Defendants' unauthorized Penn State products inevitably lessen the cachet of the genuine articles. Penn State merchandise is a constant target for counterfeiters and attempts to free-ride off of the PENN STATE name are endemic. Yet here the district court's legal and procedural errors gave Defendants a pass on the most serious aspects of their misconduct. Fundamentally, the district court's analysis sets a dangerous precedent as it treats Penn State's trademarks (and all licensed trademarks) as less deserving of protection under the law.

This Court should reverse the grant of summary judgment in Defendants' favor on Penn State's counterfeiting and dilution claims, enter judgement in Penn State's favor with respect to liability for counterfeiting, and remand for a trial on the merits on dilution and counterfeiting damages.

## STATEMENT OF JURISDICTION

The United States District Court for the Middle District of Pennsylvania had jurisdiction over the Lanham Act claims in this case under the federal question statute, 28 U.S.C. § 1331, and supplemental jurisdiction over Penn State's state-law claims under 28 U.S.C. § 1367. This Court has jurisdiction under 28 U.S.C. § 1291 to review the District Court's final judgment. Final judgment was entered on November 19, 2024. JA7850. Penn

4

State filed a timely post-trial motion on December 3, 2024 (Dkt. 342), which was decided on June 25, 2025. JA243. Penn State filed a timely notice of appeal on July 23, 2025. JA249.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in granting summary judgment to Defendants and denying Penn State's motion for summary judgment on Penn State's counterfeiting claim, where the district court failed to apply the correct test for counterfeiting, warranting reversal and entry of judgment in Penn State's favor under *de novo* review.

> Raised: Raised in Penn State's Brief in Support of its Motion for Partial Summary Judgment (Dkt. 114 at 33-34); its Opposition to Defendants' Motion for Summary Judgment (Dkt. 143 at 47-48); and its Reply in Support of its Motion for Partial Summary Judgment (Dkt. 158 at 26-28).

> Ruled Upon:  Memorandum and Order. JA75-JA78.

2. Whether the district court erred in granting summary judgment to Defendants on Penn State's federal and state trademark dilution claims by misapplying the governing legal standards under the Lanham Act for dilution by blurring, warranting reversal under *de novo* review.

> Raised: Raised in Penn State's Opposition to Defendants' Motion for Summary Judgment (Dkt. 143 at 48-51).

> Ruled Upon:  Memorandum and Order. JA78-JA85.

3.     In the alternative, whether the district court erred in granting summary judgment to Defendants on Penn State's federal and state counterfeiting and trademark dilution claims by resolving disputed issues of fact at summary judgment, warranting reversal under *de novo* review.

Raised: Raised in Penn State's Opposition to Defendants' Motion for Summary Judgment (Dkt. 143 at 47-51).

Ruled Upon:  Memorandum and Order. JA75-JA85.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this Court. The related case or proceeding of which Appellant is aware is:

*Vintage Brand LLC v. Pennsylvania State University*, Cancellation No. 92080712 (T.T.A.B.).

## STATEMENT OF THE CASE

### A.     Relevant Facts

The Pennsylvania State University is Pennsylvania's flagship public research university. JA6273, ¶ 1; JA3886, ¶ 6. Penn State educates approximately one-hundred thousand students each academic year across Pennsylvania and online. JA6275, ¶ 2; JA3886, ¶ 6; JA7327, ¶ 24. Penn State provides a top-quality education, and through recognition of its educational and athletic services, has developed a strong and loyal base of students,

alumni, and fans who support the University. JA3902-JA3903; JA6275, ¶ 2; JA7333, ¶ 28; JA1246–JA1247(31:21-33:12). For decades, Penn State has also sold branded merchandise at its bookstore and through local and national online and brick and mortar retailers. JA3888-JA3890, ¶¶ 8, 11-14, 17; JA3921-JA3987; JA4112-JA4162; JA4190–JA4239; JA4265–JA4302; JA4304–JA4366; JA4435–JA4492; JA3909–JA3911 (80:17-82:5).

Penn State has developed rights in a number of trademarks that it uses to distinguish its various goods and services. Among these marks are the following, which are at issue in this case:

| MARK | ABBREVIATION | U.S. REGISTRATION NOS. |
|---|---|---|
| **PENN STATE** | ("PENN STATE Mark") | • 1308610 (incontestable)<br>• 5766698 |
| **THE PENNSYLVANIA STATE UNIVERSITY** | ("TPSU Mark") | • 1315693 (incontestable)<br>• 5399989<br>• 5742516 |
|  | ("Lion Shrine Logo") | • 1350286 (incontestable)<br>• 1397810 (incontestable) |

7

| MARK | ABBREVIATION | U.S. REGISTRATION NOS. |
|---|---|---|
|  | ("Pozniak Lion Logo") | • 5305910 |
|  | ("University Seal") | • 1276712 (incontestable)<br>• 5877080 |
|  | ("S Lion Logo") | None (protected by common law rights) |

(collectively, the "University Marks"). JA3886–JA3887, ¶ 7; JA4186–JA4187, ¶¶ 16–17; JA4095-JA4110; JA4164–JA4180; JA4241–JA4253; JA4257–JA4262; JA4494–JA4510; JA4369–JA4433. Penn State has been using each of the University Marks continuously in commerce for years, going back before 2018—when the infringement at issue began. *Id*.

Penn State uses the University Marks for many different services and products, ranging from educational, athletics, and alumni services to merchandise such as apparel, drinkware, magnets, wall art, and other household accessories. Pertinent to this case, the registrations identified above cover these types of merchandise. *Id.*; JA3888–JA3890, ¶¶ 8, 11–14, 17. Penn State licenses its trademarks to approved manufacturers who create

8

authorized merchandise featuring the University Marks. JA3888–JA3890, ¶¶ 12–14, 17. Penn State sells some of its licensed merchandise directly and some through third-party retailers. *Id.*; JA3920–JA4093 (examples of PENN STATE Mark uses); JA4112–JA4162 (examples of TPSU Mark uses); JA4190–JA4239 (examples of Lion Shrine Logo uses); JA4265–JA4302 (examples of Pozniak Lion uses); JA4304–JA4366, JA4369–JA4433 (examples of S Lion uses); JA4435–JA4492 (examples of University Seal uses); JA6288–JA6321, ¶¶ 13, 19, 29, 37, 41, 47; JA3890, ¶ 17 (examples of undisputed authorized uses of University Marks); JA3909–JA3914 (80:17–82:5, 85:5–87:6) (Penn State deposition about how the Athletics store and the Penn State Bookstore sell authorized merchandise); JA4512–JA4519 (list of Penn State licensees); JA5955–JA5982 (showing licensees).

Since developing its licensing program in the 1980s, Penn State has found that licensing has been an effective way to develop merchandise bearing the University Marks and control its quality. JA3888–JA3890, ¶¶ 12–14, 16–17; JA4186–JA4188, ¶¶ 14–20; JA4876; JA3411–JA3419; JA3421–JA3428; JA6334–JA6336, ¶¶ 61–68. Penn State receives a portion of its licensees' profits, which Penn State reinvests in student scholarships and other programs, further supporting the University's mission of providing a

top-notch education and collegiate experience. JA6335, ¶ 65; JA4187–JA4188, ¶¶ 19–20; JA4876; JA3891, ¶¶ 20–21; JA10614-JA10623.

Defendants/Appellees here are Vintage Brand and its affiliated company (Sportswear, Inc.), along with Chad Hartvigson, who founded and operated both companies. JA6337–JA6347, ¶¶ 69, 70, 81, 82, 86–89; JA931, ¶ 8; JA956–JA990. Vintage Brand was an e-commerce website that sold clothing and other merchandise related to various colleges and universities, as well as some professional sports teams. JA936-JA937, ¶18; JA6337–JA6342, ¶¶ 69–73; JA5052–JA5128; JA6440, ¶ 2. Vintage Brand's website, <vintagebrand.com>, was organized into different "stores" for specific colleges and sports teams. *Id.*; JA6265; JA5684–JA5685 (40:13-41:11). Customers navigated the site to the "store" for their chosen team, and had the option to buy t-shirts, hats, glassware, magnets, and other merchandise that bear various logos from their school or team. *See, e.g.*, JA6337–JA6342, ¶¶ 70-73; JA5052–JA5128; JA5130–JA5362; JA5365–JA5645; JA355, ¶¶ 73-74; JA432, ¶¶ 73-74; JA4970–JA4971 (81:14–82:5). Vintage Brand admits that it used virtually indistinguishable copies of logos and word marks (such as PENN STATE) that schools themselves have used and registered as trademarks. JA6342–JA6344, JA6367–JA6372, ¶¶ 74-80, 113; JA4973–JA4982

(98:17–25, 99:2–3, 114:6–115:25, 134:3–7); JA4992 (165:16-21); JA5649–JA5656 (43:13-44:17, 139:10-143:13); JA5692; JA5864; JA5933–JA5950; JA4096–JA4105; JA4164–JA4180; JA4258; JA4494–JA4510; JA4241–JA4253; JA5052–JA5128; JA4309; JA5831. In fact, Vintage Brand sourced its images of the University Marks directly from old genuine branded merchandise that it had acquired. JA6342–JA6344, ¶¶ 74-80; JA4973–JA4976 (98:17–99:2, 114:6–115:25); JA5649–JA5656 (43:13-44:17, 139:10-143:13); JA5692; JA5864. Vintage Brand manually scanned this vintage Penn State merchandise, producing digital images that were then placed unaltered (with the exception of formatting changes necessary for printing) onto its website where customers could purchase merchandise bearing these copied logos. *Id.*

Vintage Brand did not actually manufacture any products itself or distribute items to customers. JA6341–JA6342, ¶ 73; JA4970–JA4971 (81:14–82:5). Those functions were provided by Sportswear. *Id.*; JA6346, ¶ 87; JA353, ¶ 66; JA428–JA429, ¶ 66; JA5661 (17:5–15). Vintage Brand instead purchased and scanned pictures of collegiate and sports-related memorabilia, offered for sale and sold the products through its website, and collected profits from sales of the products that Sportswear manufactured and distributed to customers. JA6337–JA6344, ¶¶ 70-71, 73-80; JA4970–JA4974 (81:14–82:5,

98:17–99:2); JA5649–JA5656 (43:13–44:17, 139:10–143:13); JA5691–JA5776; JA5933–JA5950.

Vintage Brand launched a store on the Vintage Brand Website featuring unauthorized Penn State merchandise in 2018. JA4991 (161:4–11); JA6347–JA6349, ¶ 90. The webpage for this store was titled "Penn State Nittany Lions Vintage Designs for Apparel & Gear" and offered various merchandise, as shown in the following screenshot from Defendants' store:



JA6356, ¶ 100; JA5131.

Vintage Brand's website was virtually indistinguishable from the e-commerce sites that sell licensed Penn State collegiate merchandise. *Compare, e.g.*, JA5988, JA6097, JA6105, *with* JA5130–JA5362. Vintage Brand sold the exact same sort of merchandise that Penn State sells and authorizes. JA3888–JA3890, ¶¶ 8, 11–14, 17; JA5131; JA5933–JA5950. Vintage Brand used identical copies of Penn State's registered trademarks on its merchandise and throughout its website. *Id. Compare* JA4096–JA4105; JA4164–JA4180; JA4257–JA4262; JA4494–JA4510; JA4241–JA4253; *with* JA5052–JA5128; JA5131–JA5149; JA5829. Vintage Brand solicited customers through online advertisements and promoted its products at Penn State events alongside authorized merchandise. JA6345, JA6384–JA6385, JA6391–JA6392, ¶¶ 83, 128, 135; JA6226–JA6238 (19:18–24, 24:2–27:22, 34:17-37:4, 106:15–109:17); JA6219; JA4993–JA4994 (226:18–227:22). Vintage Brand, just like retailers who sell genuine Penn State products, included its brand name alongside images of Penn State merchandise. *See, e.g.*, JA5131. The difference here is that Vintage Brand's products were not genuine Penn State merchandise, and Defendants never asked for (or received) permission to use Penn State's marks. JA6403, ¶¶ 141–142; JA4980 (121:3–15); JA3891–JA3892, ¶¶ 22–24. As

13

a result, Penn State had no ability to control Vintage Brand's use of the Penn State trademarks, and Penn State received no portion of Defendants' revenues. *Id.*

At least one of Defendants' customers was confused by the Vintage Brand website, incorrectly believing that Penn State had licensed or authorized the merchandise. JA5687–JA5688 (54:25–55:13); JA6246. In addition, expert David Franklyn tested the likelihood of confusion for two different t-shirt designs sold by Defendants and found significant net confusion levels, with 27-39% of respondents confused as to source, sponsorship, affiliation, or licensure. JA594–JA595; JA632–JA633. Mr. Franklyn also analyzed Defendants' expert's own survey and found that it demonstrated 18-30% confusion specifically as to source. JA721–JA722, ¶ 28 & Figures 6a-6b. While the Vintage Brand website features various "disclaimers" stating that the University Marks are used as "work[s] of art" and do not indicate sponsorship by any college, Defendants' own expert acknowledged that Defendants' small print disclaimers had no impact on consumer confusion. JA729, ¶ 45; JA868–JA882.

### B.     Procedural History

Penn State issued a cease-and-desist letter to Vintage Brand in December 2020 regarding its unauthorized use of Penn State's trademarks. JA6406, ¶¶ 151, 152; JA4905–JA4924. In response, Defendants removed merchandise bearing the Pozniak Lion Logo from the Vintage Brand Website but otherwise refused to stop using Penn State's trademarks. *Id.*; JA3891, ¶ 23; JA5667–JA5668 (13:17–14:15).

#### 1.     The Operative Pleadings

Penn State then brought this action against Defendants on June 21, 2021. Dkt. 1. In the operative Second Amended Complaint, filed October 21, 2022, Penn State asserted claims against Vintage Brand, Sportswear, and Mr. Hartvigson for trademark infringement of the University Marks and unfair competition, counterfeiting of the federally registered University Marks, and dilution of the PENN STATE Mark under federal and Pennsylvania law.[2] JA365–JA372.

---

[2] Penn State had also previously asserted a claim for false endorsement. The district court granted summary judgment to Defendants on that claim, and Penn State's appeal here does not encompass that claim.

## 2.    The Parties' Summary Judgment Motions

Following the close of discovery, all of the parties filed motions seeking summary judgment on various claims and defenses. Relevant here, the parties cross-moved for summary judgment on Penn State's claims for trademark infringement and counterfeiting, and Defendants sought summary judgment on Penn State's claim for trademark dilution.

The district court denied Penn State's motion, and granted summary judgment to Defendants on both counterfeiting and dilution.

On the counterfeiting claim, the district court held that counterfeiting requires that the defendant employ a "counterfeit" mark, and that Defendants' uses of the University Marks were not "counterfeit." JA76-JA78. The court defined "counterfeit" to include a requirement that Defendants' use of the University Marks cause a likelihood of confusion as to the manufacturing origin of Defendants' products. JA76. The court then reasoned that no rational consumer would think a university manufactures its own merchandise and, given Vintage Brand's prominent house mark on its website, packaging, and products, there was no plausible confusion about manufacturing origin. *Id.* The court rejected Penn State's argument that Defendants could be liable for counterfeiting if their use of the University

Marks created a likelihood of confusion as to the sponsorship, affiliation, or approval of Defendants' goods by Penn State. JA77.

The district court also granted summary judgment to Vintage Brand on Penn State's federal and Pennsylvania dilution claims covering the PENN STATE word mark. JA78-JA85. The court held that, regardless of whether PENN STATE is "famous," Vintage Brand's uses were not "substantially similar" to Penn State's PENN STATE mark and there was no evidence that the uses lessened the mark's capacity to identify Penn State. *Id.* The court emphasized that Vintage Brand's designs incorporated additional words and imagery, used its own house mark on many products, and featured website disclaimers, so the accused uses were not "essentially the same" as PENN STATE—which the court held was sufficient to independently defeat dilution. JA80-JA83. On the "lessening capacity" element, the court found no proof of dilution because consumers were buying the goods to express Penn State affiliation, which would reinforce the association with Penn State, meaning that dilution could not be shown. JA83-JA85. The district court allowed Penn State's remaining claims for willful trademark infringement to go to trial.

### 3.    Jury Trial on Willful Trademark Infringement

A six-day jury trial on willful trademark infringement was held in November 2024. The jury found the Defendants liable for willful trademark infringement of the University Marks.[3] JA7842-7849. The jury further rejected the affirmative defenses that Defendants asserted at trial, including nominative fair use and aesthetic functionality. JA7846-7847.

## SUMMARY OF ARGUMENT

The district court erred in dismissing Penn State's counterfeiting and dilutions claims as matter of law.

### A.    The District Court Misstated the Law on Counterfeiting

Pursuant to Section 1114(1) of the Lanham Act and this Court's precedent, counterfeiting is trademark infringement using a mark that is identical or substantially indistinguishable from a genuine mark. Under this analysis, Defendants' products are plainly counterfeit. However, the district court did not apply Section 1114(1) or follow this Court's precedent. Instead, the district court relied on the wrong sections of the Lanham Act and

---

[3] The jury found all three Defendants liable for infringing all of the University Marks with one exception—the jury found that Defendant Sportswear was not liable for trademark infringement of the mark THE PENNSYLVANIA STATE UNIVERSITY. JA7843.

misconstrued the statutory definition of "counterfeit" to apply a novel and incorrect likelihood of confusion as to manufacturing "origin" test. As the district court's dismissal of Penn State's counterfeiting claims hinges entirely on these legal errors, it should be reversed.

Moreover, at this stage, the Court can and should enter judgment in Penn State's favor as to counterfeiting of the University Marks. Liability for trademark infringement under 15 U.S.C. § 1114(1) was decided by the jury at trial, meaning the only remaining inquiry is whether the marks at issue are "identical or substantially indistinguishable" from genuine Penn State registered trademarks. A simple visual comparison confirms this degree of similarity, meaning that judgment should be entered in favor of Penn State.

### B.   The District Court Applied the Wrong Test for Dilution

The hallmark of "dilution by blurring" is that it impairs the distinctiveness of a famous mark by causing consumers to associate that mark with *both* the mark owner and the defendant. Under the 2006 Trademark Dilution Revision Act (TDRA), dilution by blurring is assessed using a holistic, multifactor analysis where similarity of the marks is just one consideration. However, the district court ignored this framework, and instead wrongly applied a pre-TDRA "substantial similarity" test, holding

that dilution fails unless the marks are "essentially the same." The district court also fundamentally misunderstood the concept of dilution by blurring, holding that if consumers associated Defendants' PENN STATE-branded products with the University, dilution could not occur. In fact the opposite is true; by creating an association with Penn State, Defendants were creating a likelihood of dilution. These legal errors require reversing the district court's dismissal of Penn State's dilution claim.

### C. The District Court Improperly Disregarded Penn State's Evidence and Drew Inferences in Defendants' Favor

In the alternative, even if this Court declines to reverse based on the district court's legal errors, the district court's ruling should be vacated because it violated Federal Rule of Civil Procedure 56. Instead of viewing the record in the light most favorable to Penn State, the court repeatedly weighed evidence and drew inferences in Defendants' favor. With respect to counterfeiting, the court disregarded evidence that Defendants' merchandise created a likelihood of confusion as to manufacturing origin and relied principally on the unsupported assumption that no consumer would believe a university produced merchandise. On dilution, in assessing similarity, the court credited Defendants' evidence regarding house marks

and disclaimers while ignoring or dismissing Penn State's substantial countervailing evidence. The district court also assumed that the images accompanying the PENN STATE Mark on Defendants' products weighed against dilution, disregarding the fact that these images were themselves sourced from Penn State's own historical merchandise—facts that a jury could find strengthen, rather than weaken, the similarity. For the independent basis that the district court misapplied Rule 56, the grant of summary judgment on counterfeiting and dilution should be reversed.

## STANDARD OF REVIEW

The district court's grant of summary judgment is subject to *de novo* review. *PIM Brands Inc. v. Haribo of Am. Inc.*, 81 F.4th 317, 320 (3d Cir. 2023). On appeal, this Court engages in the same analysis the district court should have initially applied. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015). Summary judgment for Defendants was inappropriate unless they showed no genuine dispute regarding any material fact and that they were entitled to judgment as a matter of law on Penn State's counterfeiting and dilution claims. *PIM Brands Inc.*, 81 F.4th at 320; Fed. R. Civ. P. 56(a).

# ARGUMENT

## I.    Vintage Brand's Merchandise Bearing Penn State's Registered Trademarks Is Counterfeit as a Matter of Law

As Defendants have admitted, their business model is to create digital copies of the logos on vintage Penn State merchandise and apply those logos to their own blank products. By intentionally and literally creating copies of genuine trademark-bearing products, Defendants are engaging in textbook counterfeiting under the Lanham Act and this Court's precedent. Yet despite there being no dispute as to these key facts, the district court in this case granted summary judgment to Defendants and dismissed Penn State's counterfeiting claims as a matter of law.

To reach this result, the district court disregarded the statutory provision on counterfeiting and held that Defendants' Penn State logos could not be "counterfeit" unless the logos created a likelihood of confusion as to the manufacturing origin of Defendants' products. The district court came to this conclusion by misstating which section of the Lanham Act governs counterfeiting claims, and by rejecting a plain language reading of the definition of a counterfeit mark.

This Court can correct these errors by entering judgment for Penn State on its counterfeiting claims. Given that a jury subsequently found Defendants liable for willful trademark infringement, the necessary likelihood of confusion has been established. And this Court can confirm via a simple visual comparison that Defendants' products feature identical or substantially indistinguishable versions of the registered University Marks as a matter of law.

### A. Counterfeiting is Trademark Infringement Using Substantially Indistinguishable Marks

Under the Lanham Act, counterfeiting is trademark infringement involving the use of a "counterfeit" mark. 15 U.S.C. § 1114(1)(a); *Lontex Corp. v. Nike, Inc.*, 107 F.4th 139, 158 (3d Cir. 2024) (describing counterfeiting as a "type[] of trademark infringement" that "requires greater similarity between marks.") (citing 15 U.S.C. § 1127). Therefore, under the framework set out in *Lontex*, the district court should have determined if there was trademark infringement under Section 1114(1) of the Lanham Act. *Id.* Then the court should have analyzed whether the infringing marks at issue were "counterfeit marks" under the Lanham Act, that is whether they were

"identical or substantially indistinguishable" from Penn State's registered marks. *Lontex*, 107 F.4th at 158-59; 15 U.S.C. § 1127.

To prove trademark infringement, the first element of a counterfeiting claim, the owner of a valid and legally protectable mark "must show that a defendant's use of a similar mark on its goods causes a likelihood of confusion." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708–09 (3d Cir. 2004) (quotations omitted). Likelihood of confusion for trademark infringement encompasses "confusion, mistake, or deception of any kind," including confusion as to affiliation or sponsorship. *Id.* at 711. That is, likely confusion as to whether the mark owner made a defendant's product is not necessary; confusion as to whether the mark owner is affiliated with a defendant or approved the defendant's product is equally actionable. *Id.* The likelihood of confusion is assessed by applying the *Lapp* factors. *Id.* at 709; *see generally Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983). In this case, the jury has already determined that Defendants are liable for trademark infringement of the registered University Marks under 15 U.S.C. § 1114(1).

The next element of counterfeiting requires a district court to determine if the parties' respective marks are "'identical' or 'substantially

indistinguishable.'" *Lontex*, 107 F.4th at 158–59. To make this determination, the district court should compare the "overall impression" ordinary consumers have upon encountering the parties' respective marks on products. *Id.* "If consumers see the entirety of the marks, it is the entirety of the marks that must be compared." *Id.* at 159 (quotations omitted).

As shown below, it is beyond dispute that Defendants were selling merchandise featuring blatant copies of the University Marks:

| Penn State Registration and Goods Covered | Example of Defendants' Product Bearing Mark | Example of Genuine Penn State Product Bearing Mark |
|---|---|---|
| **PENN STATE** (JA4096; JA4104) U.S. Registration No. 1,308,610 (PENN STATE), covering, inter alia, drinking mugs, cups, tumblers, pennants, shirts, t-shirts, shorts, sweat shirts, socks, hats, and non-textile wall hangings. (JA4098-JA4101). U.S. Registration No. 5,766,698 (PENN STATE), covering, |  (JA5151)  |  (JA4219)  |

| Penn State Registration and Goods Covered | Example of Defendants' Product Bearing Mark | Example of Genuine Penn State Product Bearing Mark |
|---|---|---|
| inter alia, decorative magnets, drinking glasses, cutting boards, fabric flags, hooded sweatshirts, sweatpants, caps being headwear, coasters, and jigsaw puzzles. (JA4107-JA4110). | (JA5055) | (JA4352) |
| THE PENNSYLVANIA STATE UNIVERSITY<br><br>(JA4165; JA4171; JA4177)<br><br>U.S. Registration Nos. 1,315,693, 5,399,989 covering, inter alia, decals, drinking mugs, tankards, cups, and tumblers. (JA4172–JA4174).<br><br>U.S. Registration No. (THE PENNSYLVANIA STATE UNIVERSITY), covering, inter alia, hats, shirts, sweat shirts. (JA4179–JA4180). | (JA5210) | (JA4455) |

| Penn State Registration and Goods Covered | Example of Defendants' Product Bearing Mark | Example of Genuine Penn State Product Bearing Mark |
|---|---|---|
| U.S. Registration No. 5,742,516 (THE PENNSYLVANIA STATE UNIVERSITY), covering decorative magnets and fabric flags. (JA4167–JA4168). | | |
|  (JA4258) <br><br> U.S. Registration No. 5,305,910 (Pozniak Lion) covering, inter alia, metal novelty license plates, hats, t-shirts, and sweatshirts. (JA4260–JA4261). |  (JA5080) |   (JA4278) |
|  |  |  |

| Penn State Registration and Goods Covered | Example of Defendants' Product Bearing Mark | Example of Genuine Penn State Product Bearing Mark |
|---|---|---|
| (JA4495; JA4503)<br><br>U.S. Registration No. 1,276,712 (University Seal), covering, inter alia, decorative magnetic stickers, decorative wall plaques, drinking mugs, tankards, glasses, cups, tumblers, pennants, shirts, t-shirts, sweat shirts, and hats. (JA4497–JA4499).<br><br>U.S. Registration No. 5,877,080 (University Seal), covering, inter alia, coasters, ceramic mugs, fabric flags, banners of textile, and hooded sweatshirts. (JA4506–JA4507). | <br>(JA5829) | <br>(JA4461) |
| <br>(JA4242; JA4249) | <br>(JA5060) | <br>(JA4204) |

| Penn State Registration and Goods Covered | Example of Defendants' Product Bearing Mark | Example of Genuine Penn State Product Bearing Mark |
|---|---|---|
| U.S. Registration No. 1,350,286 (Lion Shrine Logo), covering, inter alia, decorative magnetic stickers, banners, drinking mugs, tankards, glasses, cups, tumblers, pennants, shirts, t-shirts, sweatshirts, and hats. (JA4250–JA4252). | | |

Under the correct test for counterfeiting and based on the evidence shown above, summary judgment should have been entered for Penn State. Yet despite the unmistakable proof that Defendants were selling obvious counterfeits, the district court made multiple legal errors and dismissed the counterfeiting claims as a matter of law.

> ### B. The District Court Erred in Holding That to be "Counterfeit" a Mark Must Create a Likelihood of Confusion as to the Producer of a Product

In its memorandum opinion, the district court did not follow the analysis described in *Lontex*. Instead of assessing trademark infringement and determining if the marks in question were substantially

indistinguishable, the district court fashioned its own unprecedented test for counterfeiting. The district court reasoned that to be a "counterfeit," a mark must cause a likelihood of confusion as to the "origin" of a product, that is whether the mark owner is the producer of a defendant's product, as opposed to confusion as to whether the mark owner sponsors or approves the defendant's product. JA76–JA77. The district court then asserted, without relying on any record evidence, that no one would expect that Penn State actually produced merchandise. JA76.

The district court's narrowed test for counterfeiting was based on two legal errors. First, the district court incorrectly asserted that the plain language of the Lanham Act supported this distinction, as the statutory provision on trademark infringement referenced "sponsorship or approval," while the section on counterfeiting contained no such language. JA77. Second, the district court construed the word "spurious" in the statutory definition of "counterfeit" to require this narrowed likelihood of confusion test, a construction that is inconsistent with the Lanham Act as a whole and binding authority. JA76. Based on this novel and incorrect analysis, the

district court dismissed Penn State's counterfeiting claims.

### 1. Under the Plain Language of the Lanham Act, Counterfeit and Infringing Marks are Subject to the Same Expansive Test for Likelihood of Confusion

By holding that counterfeiting requires proving a likelihood of confusion as to the "origin" or producer of a product, the district court creates a narrower likelihood of confusion test for counterfeiting than for trademark infringement. *See Kos Pharms., Inc.*, 369 F.3d at 711. The district court justifies this distinction by citing Section 43(a) (15 U.S.C. § 1125(a)(1)(A)) as the provision in the Lanham Act governing trademark infringement and Section 34 (15 U.S.C. § 1116) as the provision on counterfeiting. JA77 & n.340-41. The district court notes that the former section mentions confusion as to sponsorship or approval, while the latter contains no such language, meaning that likely confusion as to sponsorship or approval alone is insufficient to find counterfeiting under the statute.

The district court is mistaken. It is Section 32 of the Lanham Act (15 U.S.C. § 1114(1)(a)) that governs *both* trademark infringement and counterfeiting. 15 U.S.C. § 1114(1)(a); *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1312 (9th Cir. 1997) ("Section 32 of the Lanham Act created a civil cause of action for trademark infringement and counterfeiting"); *A & H Sportswear,*

*Inc., v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) (citing to

15 U.S.C. § 1114 as the provision governing federal trademark infringement).

The statutory provision cited by the district court on counterfeiting, Section

34 (15 U.S.C. § 1116), concerns the issuance of injunctions and *ex parte* seizure

orders. *See* 15 U.S.C. § 1116(d) (referring to a "civil action arising under

section 1114(1)(a) of this title . . . with respect to a violation that consists of

using a counterfeit mark in connection with the sale, offering for sale, or

distribution of goods or services[.]"). Section 43(a) (15 U.S.C. § 1125(a)(1)(A))

is the Lanham Act provision on unfair competition, including the

infringement of unregistered marks. *See A & H Sportswear*, 237 F.3d at 210 &

n.5.

By its plain language, Section 32 (15 U.S.C. § 1114), applies an identical

likelihood of confusion test to both infringing (involving reproductions,

copies, or colorable imitations) and counterfeit marks:

> 1) Any person who shall, without the consent of the registrant—
> (a) **use in commerce any** reproduction, **counterfeit**, copy, or
> colorable imitation of a registered mark in connection with the
> sale, offering for sale, distribution, or advertising of any goods
> or services **on or in connection with which such use is likely to
> cause confusion, or to cause mistake, or to deceive**; . . . shall be
> liable in a civil action by the registrant for the remedies
> hereinafter provided.

15 U.S.C. § 1114(1) (emphasis added). This likelihood of confusion language, which applies to the use of a counterfeit mark, is not limited to a particular type of confusion.

The lack of limiting language in this provision is purposeful. In 1962, Congress amended the likelihood of confusion language in 15 U.S.C. § 1114(1)(a) that governs trademark infringement and counterfeiting. Section 1114(1)(a) originally required that "infringement must be 'likely to cause confusion, or to cause mistake, or to deceive *purchasers as to the source of origin of such goods or services.*'" *Weil Ceramics & Glass, Inc. v. Dash*, 878 F.2d 659, 681 (3d Cir. 1989) (Becker, J., concurring). Congress deleted the italicized "source of origin" language, a change which was intended to "to broaden the scope of the Act so that source of origin was no longer a necessary element of an infringement action." *Id.*

As a result of this lack of any limiting language, this Court has consistently held that the likelihood of confusion test set out in Section 32 (15 U.S.C. § 1114) is identical in scope to the broad likelihood of confusion test for unregistered trademarks in Section 43(a) (15 U.S.C. § 1125(a)), which expressly includes confusion as to sponsorship, approval, affiliation and connection. *A & H Sportswear*, 237 F.3d at 210 & n.5 ("We measure federal

trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), by identical standards."); *see id.* at 211 ("A likelihood of confusion exists when 'consumers viewing the mark would probably assume that the product or service it represents is *associated with the source* of a different product or service identified by a similar mark.'") (quoting *Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992)) (emphasis added).

The district court's holding that counterfeiting does not encompass confusion as to sponsorship or approval is therefore inconsistent with the statutory language and cannot be reconciled with this Court's authority on counterfeiting. *See Lontex*, 107 F.4th at 158 (classifying counterfeiting as a "form[] of trademark infringement" distinguished from other types of trademark infringement by the greater similarity of the marks required); *see also Motel 6 Operating LP v. HI Hotel Grp. LLC*, 670 F. App'x 759 (3d Cir. 2016) (vacating district court ruling that counterfeiting remedies did not apply to the use of the Motel 6 mark without permission by a former franchisee and holding that district court interpreted the Lanham Act too narrowly).[4]

---

[4] District courts in the Third Circuit have also consistently analyzed counterfeiting claims under the likelihood of confusion test for trademark

Outside of this Circuit, appellate courts have not restricted counterfeiting liability to cases where there was likely confusion as to manufacturing origin. *See ICCS USA Corp. v. United States*, 952 F.3d 1325, 1332 (Fed. Cir. 2020) (affirming that unauthorized use of the "UL" certification mark was "counterfeit" because it falsely communicated to consumers that defendant's product was approved by UL); *State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 722 (9th Cir. 2005) ("Because G & T's unlicensed use of IPC's certification mark was likely to cause confusion and to undermine the effectiveness of IPC's certification mark licensing regime, we hold that G & T's use constituted counterfeiting.")[5] (cited with approval in *Motel 6 Operating LP v. HI Hotel*

---

infringement. *See, e.g.*, *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 536–37 (D.N.J. 2008) (applying test for infringement under 15 U.S.C. § 1114 to counterfeiting claim); *Pennzoil-Quaker State Co. v. Smith*, No. 2:05CV1505, 2008 WL 4107159, at *21 (W.D. Pa. Sept. 2, 2008) ("The plain language of the statute indicates that the term 'counterfeit' refers to the mark itself, not the nature of the goods and services associated with the mark as Plaintiff suggests."); *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 581 (E.D. Pa. 2002), *amended* (June 28, 2002) (holding that the only material difference between trademark infringement and counterfeiting related to evidence required to obtain damages).

[5] Certification marks are considered "marks" under the Lanham Act and thus can be considered "counterfeit" under the statute. 15 U.S.C. § 1127. However, by definition, a certification mark does not indicate the

*Grp. LLC*, 670 F. App'x 759 (3d Cir. 2016)); *United States v. Farmer*, 370 F.3d 435, 440 (4th Cir. 2004) (rejecting argument that blank shirts to which defendant affixed third party trademarks were not counterfeit because defendant obtained the blanks from the same factories used by the third-party trademark owners and thus did not create a likelihood of confusion as to the manufacturing source); *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1178–81 (11th Cir. 1994) (holding that likelihood of confusion test for counterfeiting claim encompassed confusion as to source, sponsorship or affiliation and that unauthorized use of a trademark on cellular phone from same manufacturer as genuine phone constituted counterfeiting); *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1147 (7th Cir. 1992) (affirming that unauthorized HARD ROCK CAFE t-shirts were counterfeit despite presence of labels demonstrating the same manufacturing source as authorized versions; remanding for determination as to contributory liability and attorneys' fees).

---

manufacturing origin of a product, as certification marks are licensed to multiple manufacturers to certify a particular standard of quality, accuracy, or labor. *Id.* Therefore, if a certification mark can be counterfeit, liability for counterfeiting cannot be limited to marks that cause confusion as to manufacturing origin.

Due to its citation of the wrong sections of the Lanham Act, the district court incorrectly held that the expansive test for likelihood of confusion applicable to trademark infringement does not also apply to counterfeiting.

### 2. The District Court's Definition of "Counterfeit" is Inconsistent with the Lanham Act, the Authority in this Circuit, and the Applicable Out of Circuit Precedent

Having mistakenly decided that the statutory likelihood of confusion test for trademark infringement did not apply to counterfeiting claims, the district court looked to the definition of the term "counterfeit" for guidance on what likelihood of confusion test *should* apply. Under 15 U.S.C. § 1127, a "counterfeit" is defined as a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark." Applying this definition, this Court previously held that "counterfeit" has a "readily comprehensible ordinary meaning[]" that refers to an item that "resembles" but is not, the "original" or "genuine" item." *Weil Ceramics*, 878 F.2d at 671; *see id.* (stating that this Court was "convinced that the Congress understood this commonly held meaning of these terms and intended to apply them literally in §§ 42 and 32.").

However, the district court disregarded this guidance and asserted that the Lanham Act's definition of "counterfeit" limits "counterfeit" marks

to those that cause confusion as to the manufacturing origin or producer of a good. JA76–JA77. As a basis for this purported requirement, the district court focused on the undefined word "spurious" in the Lanham Act definition of "counterfeit." *See* 15 U.S.C. § 1127 (defining "counterfeit" as a "spurious" mark); JA76. The district court then quoted an unpublished decision from an out-of-Circuit district court as stating that "courts . . . have defined [spurious] as 'deceptively suggesting an erroneous origin; fake.'" JA76.

From that definition of "spurious," the district court then construed "suggesting an erroneous origin" to mean that a "spurious" (and therefore a "counterfeit" mark) *must* be likely to confuse consumers as to the *producer* of a good. JA76. The district court does not explain why "erroneous origin" can only refer to confusion as to who produces a good. To the contrary, the opinion repeatedly contradicts itself on this point, alternating between asserting that to be "counterfeit" a mark must suggest an "erroneous origin," and asserting that a product that merely confuses consumers as to "origin or sponsorship" is *not* counterfeit. *Compare* JA77 ("An improper use of a mark that only suggests an erroneous affiliation or sponsorship cannot be said to suggest an erroneous origin; those are distinct concepts.") *with* JA78

38

("Therefore, this Court agrees with other courts that have concluded counterfeiting does not occur when a product is "merely presented in a manner likely to confuse some consumers as to the origin or sponsorship of the infringer's product."). None of the out-of-Circuit cases cited by the district court clarify the issue or squarely support reading a "confusion as to the producer" requirement into the word "spurious" in the Lanham Act definition of "counterfeit."

Regardless of where it was derived from, the district court's definition of "counterfeit" and "spurious" cannot be reconciled with the applicable authority. The district court's construction of "counterfeit" in this case, which relies on multiple non-obvious inferential leaps, does not give the term a readily comprehensible ordinary meaning. *See Weil Ceramics*, 878 F.2d at 671. Moreover, in analyzing counterfeiting, this Court previously acknowledged that "spurious" marks can (falsely) convey that a product was approved by the lawful trademark owner—meaning that marks are not limited simply to conveying that the mark owner itself was the manufacturer. *United States v. Diallo*, 575 F.3d 252, 261 (3d Cir. 2009) ("The intended purpose of a trademark, be it genuine or spurious, is to convey that the good *meets the design and manufacturing specifications of the lawful owner* of

the trademark, not only at the time the mark is first affixed or attached to the good, but throughout the lifetime of that good.") (emphasis added).

The district court's definition of "counterfeit" also contradicts the language and meaning of the section of the statute on which the district court relied, in part, to create it. *See Hayes v. Harvey*, 903 F.3d 32, 42 (3d Cir. 2018) (statutes must be interpreted to avoid rendering provisions superfluous, void, or insignificant). Under Section 34 (15 U.S.C. § 1116(d)), the definition of "counterfeit mark" expressly excludes "any mark or designation used on or in connection with goods or services of which the manufacture or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the rights to use such mark or designation." 15 U.S.C. § 1116(d)(1)(B)(ii). That is, the statute clearly contemplates that marks may be counterfeit where a rights holder has enlisted another entity to manufacture goods bearing the rights holder's mark on its behalf. If the district court's definition of a counterfeit mark, which excludes marks that create confusion as to sponsorship or approval, was accurate, then the express exclusion under 15 U.S.C. § 1116(d) for

scenarios where approval from the trademark rights holder has been obtained by the manufacturer would have no meaning.

Second, the district court's definition of "counterfeit" is inconsistent with how the term is used in other parts of the statute. *Cen v. Att'y Gen.*, 825 F.3d 177, 193 (3d Cir. 2016) ("We normally give identical words and phrases within the same statute the same meaning") (cleaned up). Under 15 U.S.C. § 1116(d), a "counterfeit mark" is expressly defined to include "spurious" designations which are used to "falsely represent[] association with, or authorization by" the Olympic Committee. *See* 15 U.S.C. § 1116(d)(1)(B)(ii) (defining "counterfeit marks" to include Olympic designations that are subject to the Lanham Act) *and* 36 U.S.C. § 220506(c)(4) (listing designations that falsely represent an association with or authorization by the Olympic Committee as subject to the Lanham Act). The district court's definition of "counterfeit" *excludes* designations which falsely represent authorization, as opposed to manufacturing origin. Because the statutory definition of "counterfeit marks" *expressly includes* designations which "falsely represent[] . . . authorization", the district court's definition of "counterfeit" cannot be correct.

41

Furthermore, the district court's definition unreasonably assumes that Congress intended to bury a significant limitation within an undefined term. *See, e.g.*, *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 216 (2020) (declining to assume phrase "principles of equity" within the Lanham Act created a "willfulness" requirement). Elsewhere in the Lanham Act, Congress readily delineated between the various types of confusion as to origin, sponsorship, and approval. *See* 15 U.S.C. § 1125.[6] If Congress had intended for the definition of "counterfeit marks" to exclude marks which did not cause "origin" confusion, it would have said so clearly, rather than hiding that limitation within the undefined term "spurious." Where Congress has included express language on an issue, the Court should decline to assume that Congress intended to incorporate limiting language on this same issue "obliquely." *Romag Fasteners*, 590 U.S. at 216.

While, as discussed above, the term "counterfeit" has a plain language meaning, to the extent "spurious" in the Lanham Act definition of

---

[6] As discussed *supra*, Section 32 was previously amended to delete language that required the likelihood of confusion for purposes of infringement and counterfeiting to concern "the source of origin." It is highly implausible that the Congress deleted one express "source of origin" confusion requirement that applied to counterfeiting claims but hid another one in an implied definition of "spurious."

"counterfeit" can be considered ambiguous, the legislative history states that it means "not genuine or authentic" which echoes this Court's previous holding in *Weil Ceramics*. *See* Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. 31673, 31675 (1984) ("As [an earlier] Senate bill indicated, 'spurious' means 'not genuine or authentic.'"); *Weil Ceramics*, 878 F.2d at 671. Other Courts of Appeals have come to similar conclusions. *See, e.g.*, *ICCS USA Corp. v. United States*, 952 F.3d 1325, 1332 (Fed. Cir. 2020) ("A 'spurious' mark is one that is false."); *United States v. Cone*, 714 F.3d 197, 208 (4th Cir. 2013) ("Critically, the mark that was affixed to the goods at issue was not genuine, being fraudulently affixed by the defendant himself, thereby rendering the mark a 'spurious mark.'") (*citing United States v. Farmer*, 370 F.3d 435 (4th Cir. 2004)); *United States v. Milstein*, 401 F.3d 53, 62 (2d Cir. 2005) (affirming jury instruction that "[a] counterfeit mark is a spurious mark or a mark that is not genuine," and "in order for the mark to be genuine, it must be placed there by the legitimate owner of the mark or with the owner's authorization."); *United States v. Petrosian*, 126 F.3d 1232, 1234 (9th Cir. 1997) ("A 'spurious' mark is one that is false or inauthentic.").

<p style="text-align:center">***</p>

When analyzed under the correct likelihood of confusion test and a plain language reading of the term "counterfeit," the district court's rationale for dismissing Penn State's counterfeiting claim dissolves. Like many brand owners, Penn State regularly licenses its marks to third-party manufacturers, and its products are sold by third-party retailers. Therefore, the facts the opinion cites in support of dismissal—primarily that the "Vintage Brand" mark appears on the Vintage Brand website or on packaging beside the infringing products—are irrelevant as to any likelihood of confusion on whether Penn State approved or sponsored Defendants' Penn State products.

Moreover, there is simply no basis, in either the Lanham Act or this Court's precedent, to deprive Penn State, or any trademark owner, of access to counterfeiting remedies due to the decision to outsource manufacturing. The district court's decision, if allowed to stand, will disrupt well-settled law, undermine the rights of all licensors, and embolden willful infringers. The dismissal of Penn State's counterfeiting claims should be reversed.

### C.  This Court Should Enter Judgement that Defendants are Liable for Counterfeiting

Pursuant to 28 U.S.C. § 2106, this Court may reverse the grant of summary judgment in favor of Defendants and direct the district court on remand to enter summary judgement on counterfeiting in Penn State's favor. *First Nat'l Bank of Pa. v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 282 (3d Cir. 1987). This course is appropriate here because the jury verdict that Defendants are liable for willful trademark infringement with respect to each of Penn State's registered marks is already the law of the case. JA7842-7847; *In re Cont'l Airlines, Inc.*, 279 F.3d 226, 232 (3d Cir. 2002) (The law of the case doctrine "limits relitigation of an issue once it has been decided" in an earlier stage of the same litigation.).

This means that whether the marks on the Vintage Brand products are "identical to or substantially indistinguishable from" the University Marks is the only issue left to adjudicate with respect to liability for counterfeiting. The operative facts required to make this determination (the appearance of the parties' respective goods and the registered trademarks) are undisputed. This Court can decide whether the marks at issue are identical or substantially indistinguishable as a matter of law by comparing the "overall

impression" ordinary consumers would have upon encountering the marks. *Lontex*, 107 F.4th at 158 (affirming dismissal of counterfeiting claim as a matter of law on the basis that the marks, while infringing, were not substantially indistinguishable). As discussed in Part I.A., *supra*, no reasonable jury could find that the Vintage Brand products do not feature substantially indistinguishable copies of the University Marks.

Therefore, Penn State respectfully requests that the Court direct that judgment be entered for Penn State on its counterfeiting claims, with the amount of any award of statutory damages, attorneys' fees, and costs to be assessed in further proceedings before the district court.

## II.    The District Court Erred in Granting Summary Judgment on Penn State's Dilution Claims by Misapplying Governing Law.

The district court's grant of summary judgment on Penn State's federal and state dilution claims was premised on multiple, independent legal errors. In granting summary judgment to Defendants, the court held that the defendants' use of the PENN STATE mark was not "substantially similar" to Penn State's mark and that there was "no evidence" that Vintage Brand's use "lessens the capacity" of the mark to identify Penn State. JA79-JA85. Both conclusions are wrong as a matter of law. First, the court incorrectly applied

46

a pre-TDRA "substantial similarity" test that Congress expressly abrogated.

Second, it fundamentally misunderstood the "impairment of distinctiveness" standard for dilution by blurring, adopting a rationale that would immunize nearly all dilutive uses and functionally eliminate the cause of action. These errors require reversal.

### A.    The Trademark Dilution Revision Act Establishes a Holistic, Multi-Factor Test for Dilution by Blurring

Penn State's dilution claim is governed by the Trademark Dilution Revision Act of 2006 ("TDRA"), which amended the Lanham Act to clarify federal dilution law. Pub. L. No. 109-312, 120 Stat. 1730.[7] Congress enacted the TDRA in response to inconsistent court decisions, including the Supreme Court's decision in *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003), which had required proof of "actual dilution." 152 Cong. Rec. H 6963, H 6965 (Sept. 25, 2006). The TDRA rejected that high bar, establishing that a plaintiff

---

[7] The standard for federal and Pennsylvania dilution claims is the same except that dilution under Pennsylvania law does not require proof of fame outside of the Commonwealth and may require a showing of actual dilution versus a likelihood of dilution. *See* 54 Pa. Cons. Stat. § 1124; *Just Enters., Inc. v. O'Malley & Langan, P.C.*, 560 F. Supp. 2d 345, 351 (M.D. Pa. 2008).

need only show a "likelihood of dilution" to obtain relief. 15 U.S.C. § 1125(c)(1).

The TDRA defines "dilution by blurring" as an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). To determine if blurring is likely, the statute directs courts to consider "all relevant factors," including a non-exhaustive list of six: (i) the degree of similarity between the marks; (ii) the degree of inherent or acquired distinctiveness of the famous mark; (iii) the extent to which the owner is engaging in substantially exclusive use of the famous mark; (iv) the degree of recognition of the famous mark; (v) whether the user of the mark intended to create an association with the famous mark; and (vi) any actual association between the marks. *Id.*

Dilution by blurring protects the unique signaling power of a famous mark[8], that is the mark's capacity to identify and distinguish the mark

---

[8] The U.S. District Court for the Middle District of Pennsylvania has held that the PENN STATE Mark was "indisputably famous and incontestable." *Pennsylvania State Univ. v. Parshall*, No. 4:19-CV-01299, 2022 WL 2712051, at *16 (M.D. Pa. Feb. 17, 2022), *R&R adopted*, No. 4:19-CV-01299, 2022 WL 2714998 (M.D. Pa. Mar. 31, 2022).

owner, against uses that create a second, parallel association, even when no one is confused. The Lanham Act authorizes relief for dilution by blurring "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(2)(B), (c)(1). Courts have long described the harm as the gradual whittling away of the famous mark's selling power as the same mark comes to point to more than one source. *See Times Mirror Mags., Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 163 (3d Cir. 2000) (explaining that dilution is "a gradual attenuation of the value of a famous trademark" where "the defendant's use diminishes or dilutes the strong identification value" of a famous mark, thereby "inva[ding] the senior user's property rights in its mark"); 2 Gilson on Trademarks § 5A.01[5][a] (2026) ("Blurring takes place when another's use of a mark creates the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product.") (quotations omitted). Dilution by blurring can be summarized as: one mark, two sources.

By enacting a federal dilution law, Congress has granted special protections to famous marks because they uniquely tell consumers "this comes from us." *See Times Mirror*, 212 F.3d at 163 (discussing "extra protection" afforded to famous marks to protect their "strong identification

value"); *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 217 (2d Cir. 1999), *abrogated on other grounds by Moseley*, 537 U.S. 418 ("The antidilution statutes rest on a judgment that the 'stimulant effect' of a distinctive and well-known mark is a 'powerful selling tool' that deserves legal protection.") (quoting Restatement (Third) of Unfair Competition § 25 (1995)).

Blurring erodes that uniqueness because consumers learn that the same badge can just as well signal someone else. The harm is the loss of exclusivity in what the famous mark signifies, not the loss of name recognition. 2 Gilson on Trademarks § 5A.01 (dilution occurs where consumers believe the famous mark is available for other companies to use and make a mental association between the famous mark and a new additional source). In short, dilution by blurring is the legal mechanism that preserves a famous mark's single-source message from being impaired, assessed holistically and independently from trademark infringement under the TDRA's factors. *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 105–10 (2d Cir. 2009).

Therefore, in determining whether the defendants should be granted summary judgment on Penn State's claims for dilution of the PENN STATE Mark, the district court should have applied the multi-factor test set forth by

the Lanham Act and determined whether a reasonable jury could find that blurring was likely to occur.

## B. The District Court's Application of a "Substantial Similarity" Requirement is Contradicted by the Statute's Plain Language.

The district court did not apply the statutory dilution test discussed above. Instead, the district court relied on an outdated legal standard that Congress expressly abrogated and concluded that Penn State could not satisfy a threshold "similarity" requirement for dilution by blurring. Citing pre-2006 case law for this rigid prerequisite, the district court held that dilution claims fail unless the marks are "essentially the same." JA80–JA81 (citing *Pharmacia Corp. v. Alcon Lab'ys, Inc.*, 201 F. Supp. 2d 335, 379 (D.N.J. 2002)). This was a legal error.

While the original Federal Trademark Dilution Act of 1995 led some courts to require that marks be "identical or nearly identical," the TDRA deliberately eliminated that gateway test. The TDRA replaced it with the holistic, non-exhaustive, multi-factor analysis described above. 15 U.S.C. § 1125(c)(2)(B). The first statutory factor is now merely "the degree of similarity" of the marks (as opposed to the marketplace context), and Congress conspicuously omitted any threshold requirement that the marks

be near-identical. As discussed *supra*, given that elsewhere in the Lanham Act (with regards to counterfeiting) Congress mandated that marks be "identical or substantially indistinguishable", the omission of such language in the "degree of similarity" factor under the TDRA precludes reading that requirement into the language. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[I]t is a general principle of statutory construction that when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (cleaned up).

The Second and Ninth Circuits have recognized that the TDRA's plain text and multifactor structure abrogate the pre-TDRA "substantially similar" requirement. *See Starbucks*, 588 F.3d at 108 (holding the TDRA provides "a compelling reason to discard the 'substantially similar' requirement"); *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1172–73 (9th Cir. 2011) (holding the statute's language, history, and multifactor design is incompatible with any identity/near-identity prerequisite and ruling that application of "nearly identical" standard was a reversible error). The district court's decision to require essentially identical marks in an identical

marketplace context, based on pre-TDRA case law, contravenes the more recent statute Congress enacted and constitutes reversible legal error.

## C.    The District Court Fundamentally Misunderstood the 'Impairment of Distinctiveness' Standard for Dilution by Blurring.

The district court's second ground for summary judgment rests on a legally erroneous premise. The court asked whether consumers still associate "PENN STATE" with the University when they see it on Defendants' merchandise. JA84. Finding they do, the district court concluded there could be no "lessening" of the mark's capacity to distinguish Penn State. *Id.* This analysis inverts the statutory test and reflects a fundamental misunderstanding of dilution by blurring.

The correct inquiry for dilution by blurring is not whether the original association is erased, but whether the mark's unique, source-signaling power is likely to be impaired by the creation of a second, unauthorized association. *See, e.g., Times Mirror*, 212 F.3d at 168 ("['Blurring'] occurs when … the public … begins associating both the plaintiff and the defendant with the famous mark.") (emphases added); *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir. 1994) ("Thus, dilution by 'blurring' may occur where the defendant uses or modifies *the plaintiff's trademark* to identify *the defendant's*

*goods and services*, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product."); *see also Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894, 904 (9th Cir. 2002) (holding that a "classic blurring injury" was "in no way diminished" by the fact that the junior user was referencing the senior user). This is apparent from the statutory language, which describes dilution by blurring as an "association arising from the similarity between a mark . . . and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). This is why the statutory factors that indicate likely dilution include an intent to "create an association with the famous mark" and "any actual association" with the famous mark. 15 U.S.C. § 1125(c)(2)(B)(v)–(vi); *see Starbucks*, 588 F.3d at 109 ("[W]here, as here, the allegedly diluting mark was created with an intent to associate with the famous mark, this factor favors a finding of a likelihood of dilution."). The district court's conclusion that Defendants' use of PENN STATE "strengthens" the mark's association with the University and is therefore not dilution reverses the import of the statutory factors and ignores the plain language of the statute.

To cause blurring, an allegedly dilutive mark *must* be associated with the senior user, otherwise it could not possibly have any impact on the senior

mark in the minds of consumers. *See, e.g.*, *Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1090–92 (9th Cir. 2010) (in affirming summary judgment finding of blurring where defendant's "eVisa" mark resulted in likelihood of "Visa" being associated with *both* the plaintiff's credit cards and financial services and defendant's online education and information business). Put simply, dilution by blurring is the creation of a second, unauthorized association for a famous mark. This second association impairs the ability of the famous mark to distinctively identify the mark owner. That consumers associate Defendants' products with Penn State *and* with Defendants due to their house marks does not refute dilution, it confirms it.

By treating continued association with the mark owner as a defense to blurring, the district court misconstrued the statute and created a rule that would immunize nearly all dilutive uses, which invariably trade on the famous mark's existing renown. The harm of blurring is not that the public forgets the senior user, but that the mark's exclusive association is weakened by an additional link to a junior user. Each new use drains the mark of its "commercial magnetism" and exclusive power to identify the source and, over time, can reduce a famous mark to a mere decorative feature. *Mattel*,

296 F.3d at 903.[9] The district court's theory would functionally eliminate the cause of action Congress created; since dilution is limited to marks that are famous household names, nearly all dilutive uses piggyback on the famous mark's existing association.

The district court compounded this error by improperly importing a likelihood-of-confusion analysis into the dilution framework, contrary to the statute's plain text. The court focused on whether consumers were confused about an "official[] link[] to Penn State," JA84, and suggested that Penn State could not show dilution because it also argued for confusion, JA84 n.366. But blurring is fundamentally different from trademark infringement. Infringement asks whether consumers are likely to be confused about source, affiliation, approval, or sponsorship; dilution by blurring asks whether the famous mark's singular source-identifying capacity is likely to be impaired by a second association. Congress confirmed this separation by

---

[9] The reduction of the PENN STATE mark to a mere decorative feature that no longer conveys any sponsorship by Penn State is in fact precisely the inevitable impact of Defendants' disclaimers. Defendants' disclaimers inform consumers that the PENN STATE mark on Defendants' products is a "work of art" in the "public domain" that does not indicate that the products are "affiliated with, licensed, sponsored, or endorsed by" Penn State. *E.g.*, JA5134. Contrary to the district's court analysis, Defendants' disclaimers do not prevent dilution; they actively promote it.

making dilution actionable without proof of confusion. 15 U.S.C. § 1125(c)(1); *see Starbucks*, 588 F.3d at 109 (explaining that "the absence of actual or even of a likelihood of confusion does not undermine evidence of trademark dilution").[10] What matters is the impairment of distinctiveness, and it is irrelevant for dilution purposes whether buyers believe the two products share a common source. *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 266 (4th Cir. 2007) (stating that the relevant question for dilution is whether the mark's ability to identify a single source has been weakened).

Finally, the district court applied the wrong temporal standard, repeatedly analyzing whether Penn State had shown that dilution "has occurred" rather than whether it was "likely to cause dilution." JA83–JA84; 15 U.S.C. § 1125(c)(1) (emphasis added). The TDRA requires only a "likelihood" of future harm, not proof of actual, past dilution. *Rosetta Stone*

---

[10] As one leading treatise on trademark law explained: "where there is a clear case of infringement on competing soft drinks or computers, *a fortiori* the distinctiveness of the famous mark would be diluted. Accordingly, one would expect to see violations of both sections of the Act pleaded in a complaint asserting rights in even an arguably famous trademark. Cases where there would be dilution only, and no infringement, are few and far between. These might involve famous trademarks for industrial products sold to sophisticated consumers." 2 Gilson on Trademarks § 5A.01.

*Ltd. v. Google, Inc.*, 676 F.3d 144, 171 (4th Cir. 2012) (holding it was error for the district court to focus on "any actual injury" instead of "a *likelihood* of dilution").

For these independent legal errors, the judgment on dilution should be vacated.

## III. In the Alternative, the District Court's Summary Judgment Ruling Should be Vacated for Misapplying Rule 56.

The district court's grant of summary judgment against Penn State on dilution and counterfeiting also rests on factual determinations that are clearly incorrect, and which should, at a minimum have been reserved for a jury. Even if this Court declines to reverse based on the district court's legal errors, the grant of summary judgment should be reversed on this independent basis. Summary judgment is appropriate only where there is no genuine dispute of material fact. A court must view the record in the non-movant's favor, draw all reasonable inferences for the non-movant, and refrain from weighing evidence. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (at summary judgment, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor"); *Country Floors, Inc. v. P'ship Composed of Gepner & Ford*, 930

F.2d 1056, 1062 (3d Cir. 1991) ("a district court should not weigh the evidence and determine the truth of the matter itself, but should determine whether there is a genuine issue for trial"). Here, the district court violated these core Rule 56 procedures.

### A. The District Court Drew Inferences in Defendants' Favor and Disregarded Penn State's Evidence on Counterfeiting

In deciding Defendants' summary judgment motion on Penn State's counterfeiting claim, the district court did not draw all necessary inferences in Penn State's favor and take Penn State's allegations, as the non-movant, as true. *See Country Floors*, 930 F.2d at 1061–62. Assuming arguendo that Penn State had to prove a likelihood of confusion as to the "source of origin" of Vintage Brand's products, there was sufficient evidence in the record to create a triable dispute on this point. Specifically, there was direct evidence on confusion as to manufacturing origin through Penn State's expert. And as the district court acknowledged, Penn State put forward adequate evidence in support of the *Lapp* factors to allow likelihood of confusion to go to a jury. JA74–JA75. As the *Lapp* factors also apply to show likelihood of confusion as to manufacturing origin, this alone should have been sufficient

to defeat summary judgment. Combined, this evidence at a minimum entitled Penn State to a jury trial on counterfeiting.

First, as described in Professor Franklyn's rebuttal report (JA721–JA722, ¶ 28 & figs. 6a–6b), Defendants' expert's survey demonstrated significant levels (ranging from 18-30%) of consumer confusion as to whether Penn State *made* the Vintage Brand products, independent of confusion as to sponsorship or affiliation. Properly crediting Mr. Franklyn's testimony in Penn State's favor, this evidence was sufficient to create a triable issue as to whether there was a likelihood of confusion on the origin of Defendants' products. 5 J. McCarthy on Trademarks & Unfair Competition § 32:188 (5th ed. 2025) (explaining that percentages over 10% are indicative of a likelihood of confusion).

In addition, Penn State's incontestable trademark registrations serve as conclusive proof of the validity of the University Marks, including their ability to indicate the source of origin of those products. 15 U.S.C. § 1115(b). A valid registered mark "identif[ies] and distinguish[es] [the mark holder's] goods, including a unique product, from those manufactured or sold by others and [] indicate[s] the source of the goods, even if that source is unknown." *Id*. § 1127. Other than the district court's unsupported statement

that "it is nearly impossible to believe that any rational consumer would expect that an institution of higher education produces its own merchandise," (JA76), there was no evidence of record that rebutted the presumption that the University Marks are valid indicators of source of origin. Given that Defendants acknowledged copying the University Marks, the incontestable registrations for those marks also created a triable issue on likelihood of confusion as to source of origin. Therefore, had the district court properly credited the survey and incontestable registration evidence, instead of relying on the unsupported assumption that consumers could not believe that Penn State produced products (JA76), summary judgment would not have been granted to Defendants.

Second, there was substantial evidence in Penn State's favor on each of the *Lapp* factors, and thus sufficient evidence to allow the likelihood of confusion question with respect to counterfeiting to go to a jury. The *Lapp* factors are applicable to the likelihood of confusion test generally, including confusion as to manufacturing origin. *Lontex*, 107 F.4th at 155 (applying *Lapp* factors where both parties made the products at issue). As acknowledged by the district court when it discussed the likelihood of confusion factors for the trademark infringement claim, Penn State produced sufficient evidence that

the marks were similar, that the University Marks were strong, that there was actual confusion, and that the parties' respective goods were the same or related, to create a triable issue on likelihood of confusion. JA70–JA74; *see also, e.g.*, JA3887-JA3890, ¶¶ 7, 8, 11-14, 17; JA4183–JA4188, ¶¶ 7-20; JA4095–JA4110; JA4164–JA4180; JA4241–JA4253; JA4257–JA4262; JA4494–JA4510; JA4369–JA4433; JA6287, JA6293, JA6300–JA6301, JA6318, JA6342–JA6344, JA6367–JA6372, ¶¶ 10, 16, 26, 44, 74–80, 113; JA5687–JA5688 (54:25–55:13). In addition, Defendants' testimony that they were aware that Penn State had registered trademarks and copied the marks from Penn State merchandise showed the requisite intent under the *Lapp* factors, and there was substantial record evidence that the parties sold through similar channels (namely third party distributor websites), that the goods were at a price point where consumers did not exercise a high degree of care, and that the parties targeted the same audience through similar channels. JA4992 (165:16–21); JA3888, ¶ 11; JA3923–JA3967; JA5052–JA5109; JA6351, JA6384, JA6404–JA6405, ¶¶ 92, 124–127, 146. Given that the likelihood of confusion factors apply equally to prove confusion as to origin as they do to prove confusion as to sponsorship or approval, *see Kos Pharms., Inc.*, 369 F.3d at 711–25, this evidence also created a triable issue as to counterfeiting.

## B.    On Dilution, the District Court Improperly Weighed Evidence to Resolve the Factual Question of Similarity.

With respect to Penn State's dilution claim, even applying the "substantially similar" test urged by the district court, there was more than sufficient evidence that the parties' respective marks were near identical to create, at a minimum, a factual question as to whether the degree of similarity was sufficient to impair the distinctiveness of the famous PENN STATE trademark.[11] The court weighed the evidence on this point itself, rather than treating the "degree of similarity" as one of several disputed evidentiary considerations for a jury. JA81–JA83. In doing so, it credited Defendants' evidence regarding house marks and disclaimers while ignoring substantial countervailing evidence from Penn State showing that (1) Defendants sourced and copied their designs from vintage Penn State merchandise (JA6342; JA6351); (2) the presence of house marks is common on Penn State's authorized goods (*see, e.g.*, JA3925, JA3929, JA3941); and (3)

---

[11] As discussed *supra*, the PENN STATE mark used by Defendants is substantially similar to Penn State's PENN STATE trademark as a matter of law. However, as Penn State did not move for summary judgment on dilution, here it analyzes this question from the perspective of whether there was sufficient evidence of substantial similarity to allow the dilution claim to go to the jury.

Defendants' own expert and its employee confirmed that its website disclaimers were ineffective and intentionally hidden (JA5807–5809 (13:23-16:2); JA5811-5112 (20:9-21:12); JA729). *See also* JA7301–JA7314, ¶¶ 13–17. By selectively crediting Defendants' evidence, the court engaged in precisely the sort of fact-weighing that Rule 56 forbids. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam).

Whether, under the district court's erroneous test, the degree of similarity is sufficient to find dilution presented a question for the jury. The resolution turns on whether potential purchasers who encounter Vintage Brand's use of the PENN STATE Mark will associate that Mark with the University in a manner that blurs the Mark's exclusive association with Penn State's own authorized merchandise. Instead of leaving this determination to the jury, the district court considered just a few non-representative examples of Vintage Brand's uses of PENN STATE before deciding that these additional elements "distinguish Vintage Brand's use" and "compel[] the conclusion that no dilution has occurred here." JA83.

The district court's analysis on similarity failed to properly consider the record evidence. The court considered only a handful of Defendants' products and scrutinized them for any differences from the PENN STATE

Mark. JA81–JA82. In this exercise, any words or images appearing on Defendants' merchandise alongside "PENN STATE" were counted as a "difference" that made the Defendants' use "less similar" and thus less likely to dilute. In assuming that any "difference" weighed against dilution, the district court ignored evidence showing that these additional words and images were themselves related to the University. In fact, every image Defendants used was sourced directly from Penn State's own memorabilia. JA6342, JA6351, ¶¶ 74-76, 90; JA4973–JA4976 (98:17–25, 99:2–3, 115:10–25). Thus, the very "additional elements" the court scrutinized (JA81) not only *related to* Penn State but *originated from* Penn State's own authorized merchandise. Moreover, the summary judgment record shows that some of Defendants' PENN STATE-branded products are nearly indistinguishable from genuine Penn State products available today:

| Authorized Penn State Merchandise | Vintage Brand's Unauthorized Merchandise |
|---|---|
|  |  |

JA4306; JA5831. Viewing this evidence in Penn State's favor, as is required, the district court erred in concluding as a matter of law that the images on Defendants' products are so different from the PENN STATE Mark that dilution cannot occur. *See Country Floors*, 930 F.2d at 1061–62 (at summary judgment, court must draw all justifiable inferences in non-movant's favor).

The district court committed similar errors by concluding that the presence of Vintage Brand's house mark and disclaimers categorically dispelled similarity for purposes of dilution. JA81–JA83. Even disregarding that it was a legal error to compare marketplace context when assessing similarity of the *marks*, the summary judgment record contained ample evidence creating a genuine dispute on this issue. *See* JA7301–JA7314, ¶¶ 13–14, 16–17. For example, the record shows numerous examples of authorized Penn State merchandise sold on retailer websites that display the retailer's own house marks. *See, e.g.*, JA5985–JA6087; JA6089; JA6093. The record also contains significant evidence that Vintage Brand's disclaimers are ineffective, including: (i) testimony from a consumer who did not recall seeing any disclaimer (JA5687–JA5688 (54:25–55:13)); (ii) survey results showing the disclaimers were ineffective (JA869–JA882; JA729, ¶ 45); and (iii) testimony that the Vintage Brand website is purposely designed to hide

the disclaimers (JA5807–5809 (13:23-16:2); JA5811–5112 (20:9-21:12)). The district court failed to properly credit any of this evidence.

The district court's conclusion that Defendants' use of the PENN STATE Mark is so dissimilar that it defeats a dilution claim as a matter of law resulted from its failure to properly apply the standards governing summary judgment. The court improperly construed the evidence in Defendants' favor and ignored countervailing record evidence. This warrants reversal. *See, e.g., Tolan*, 572 U.S. at 659 (Courts may not "credit[] the evidence of the party seeking summary judgment" and "fail[] to properly to acknowledge key evidence offered by the [other] party[.]").

### C.    The District Court Usurped the Jury's Role by Resolving Other Key Factual Disputes on Dilution as a Matter of Law.

Even if the district court had applied the correct legal framework, summary judgment was improper because Penn State presented sufficient evidence to create a triable issue of fact on the likelihood of dilution by blurring. A court may not resolve genuine disputes of material fact on summary judgment, but that is precisely what the district court did here with respect to the statutory dilution by blurring factors. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).

For example, Penn State offered substantial evidence on whether Defendants "intended to create an association with the famous mark." 15 U.S.C. § 1125(c)(2)(B)(v). The record shows that Vintage Brand deliberately curated and marketed Penn State-specific products and imagery to attract Penn State fans, including designs featuring PENN STATE that the University itself uses. JA3888, ¶ 11; JA933–JA934, ¶ 14; JA5810 (18:9–17); JA6381–JA6384, ¶¶ 121, 122, 124, 127; JA4306; JA5831. There is no dispute here that Defendants source their images directly from Penn State memorabilia. JA6349–JA6351, ¶¶ 91–92; JA933–JA934, ¶ 14; JA5691–JA5776; JA6342, ¶¶ 74–76; JA4973–JA4976 (98:17–25, 99:2–3, 115:10–25). Therefore, the very process Defendants use to create their products shows Defendants' intent to associate their goods with Penn State. This evidence of intent is a key factor a jury should have been allowed to weigh.

Similarly, the record contained significant evidence on the PENN STATE Mark's "degree of inherent or acquired distinctiveness," its "degree of recognition," and "the extent to which the owner . . . is engaging in substantially exclusive use of the mark." 15 U.S.C. § 1125(c)(2)(B)(ii)-(iv). Penn State's incontestable federal trademark registrations for the PENN STATE Mark (JA6287, ¶ 10; JA4095-JA4102) and its extensive, long-standing

licensed merchandising program (JA6331–JA6334, ¶¶ 59–62; JA4186–JA4187, ¶¶ 14–17; JA3411–JA3414; JA3886–JA3889, ¶¶ 7–13; JA3899 (14:15–20); JA4876; JA4881–JA4882 (20:10–21:12) support these factors.

The district court was not permitted to weigh this evidence, resolve these factual disputes, and conclude that no reasonable jury could find a likelihood of dilution by blurring. By usurping the jury's role, the district court committed reversible error. *See, e.g., Tolan*, 572 U.S. at 657 (reversing summary judgment where lower court "improperly 'weigh[ed] the evidence' and resolved disputed issues in favor of the moving party"); *Rosetta Stone*, 676 F.3d at 150, 164–65 (same).

## CONCLUSION

For these reasons, this Court should reverse the district court's grant of summary judgment for Defendants on counterfeiting and dilution, enter judgment in Penn State's favor on counterfeiting, and remand the case for further proceedings on dilution and damages.

Dated: January 20, 2026                      Respectfully submitted,

<div style="margin-left:50%">

*/s/ Lucy Jewett Wheatley*
Lucy Jewett Wheatley
VA Bar No. 77459
Claire Hagan Eller
VA Bar No. 90077

</div>

McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
T: 804.775.4320
F: 804.698.2017
*lwheatley@mcguirewoods.com*
*celler@mcguirewoods.com*

Brian D. Schmalzbach
VA Bar No. 88544
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
T: 804.775.4746
F: 804.698.2304
*bschmalzbach@mcguirewoods.com*

*Counsel for Plaintiff-Appellant The Pennsylvania State University*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because:

- This brief contains 12,986 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because:

- This brief has been prepared in a proportionally spaced 14-point Book Antiqua font using Microsoft Word.

The text of the electronic brief is identical to the text in the paper copies.

At least one of the attorneys whose names appear on this brief is a member of the bar of this Court.

The electronic version of this brief has been scanned for viruses using CrowdStrike Falcon Sensor, Version 7.28.20006.0, and no virus was detected.

*/s/ Lucy Jewett Wheatley*
Lucy Jewett Wheatley

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2026 the foregoing was filed with

the Clerk of the United States Court of Appeals for the Third Circuit using

the appellate CM/ECF system, which will also serve counsel of record.

<div align="right">

*/s/ Lucy Jewett Wheatley*
Lucy Jewett Wheatley

</div>