Nos. 25-2398, 25-2494

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

THE PENNSYLVANIA STATE UNIVERSITY,

Plaintiff-Appellant/Cross-Appellee,

v.

VINTAGE BRAND, LLC, ET AL,

Defendants-Appellees/Cross-Appellants.

---

On appeal from the United States District Court
for the Middle District of Pennsylvania, No. 4:21-cv-01091
Honorable Matthew W. Brann, U.S. District Judge

---

BRIEF OF AMICI CURIAE 25 TRADEMARK LAW PROFESSORS

---

Phillip R. Malone
Nina K. Srejovic

Gabriella Blatt
Rebecca J. Steinberg
 (CA Certified Law Students)
JUELSGAARD INTELLECTUAL
 PROPERTY & INNOVATION CLINIC
MILLS LEGAL CLINIC AT STANFORD LAW
SCHOOL
559 Nathan Abbott Way
Stanford, CA 94350
(650) 725-6369
pmalone@law.stanford.edu
srejovic@law.stanford.edu

*Counsel for* Amici Curiae

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ................................................................ 1

SUMMARY OF ARGUMENT ................................................................... 1

ARGUMENT ............................................................................................. 4

I.      Different Types of Trademark Use Require Distinct Analytical Frameworks Under the Lanham Act. .............................................. 5

      A.      Trademark law targets confusion about the source of goods, but it also tolerates some confusion to protect expression and competition. ..................................................................... 5

      B.      Institutional merchandising cases abandon the Lanham Act's goals by treating mere association with a mark as confusion. ............. 9

II.     An Overbroad Institutional Merchandising Right Undermines Trademark Law's Interest in Promoting Competition for the Benefit of Consumers. ........................................................................ 12

      A.      This Court's traditional source confusion test is inapt in cases involving expressive uses of cultural institutions' marks. ................. 14

      B.      In cases involving expressive uses of cultural institutions' marks, an application of the *Lapp* factors leads to higher consumer costs and reduced consumer choice. ....................................................... 18

      C.      In assessing institutional merchandising cases, courts should look beyond the *Lapp* factors and draw from alternative frameworks that better protect expressive interests. ......................... 20

CONCLUSION ....................................................................................... 25

APPENDIX – LIST OF AMICI ........................................................... A1

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Greetings Corp. v. Dan-Dee Imps., Inc.*,
807 F.2d 1136 (3d Cir. 1986) .................................................................... 23

*Boston Pro. Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg.*,
510 F.2d 1004 (5th Cir. 1975) ............................................................ 10, 11

*Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*,
550 F.3d 465 (5th Cir. 2008) .................................................................... 11

*Century 21 Real Estate Corp. v. Lendingtree, Inc.*,
425 F.3d 211 (3rd Cir. 2005) ......................................................... 4, 18, 21

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003) .................................................................................... 10

*Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*,
986 F.3d 250 (3d Cir. 2021) .................................................................. 8, 25

*Int'l Ord. of Job's Daughters v. Lindeburg & Co.*,
633 F.2d 912 (9th Cir. 1980) .................................................................... 11

*Interpace Corp. v. Lapp Inc.*,
721 F.2d 460 (3d Cir. 1983) ................................................................ 14, 15

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*,
599 U.S. 140 (2023) ................................................................ 5, 12, 20, 24

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
543 U.S. 111 (2004) .................................................................................... 8

*King-Seeley Thermos Co. v. Aladdin Indus., Inc.*,
321 F.2d 577 (2d Cir. 1963) ...................................................................... 23

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,
507 F.3d 252 (4th Cir. 2007) ..................................................................... 17

*McNeil Nutritionals LLC v. Heartland Sweeteners LLC*,
   511 F.3d 350 (3d Cir. 2007) ............................................................... 15

*New Kids on the Block v. News America Publishing, Inc.*,
   971 F.2d 302 (9th Cir. 1992) ............................................................. 20

*Pennsylvania State Univ. v. Vintage Brand, LLC*,
   No. 4:21-CV-01091, 2025 WL 3048996 (M.D. Pa. Oct. 31, 2025) ................ 1, 3

*PIM Brands Inc. v. Haribo of Am. Inc.*,
   81 F.4th 317 (3d Cir. 2023) ................................................................. 8

*Qualitex Co. v. Jacobson Prods. Co., Inc.*,
   514 U.S. 159 (1995) .................................................................. 6, 8, 18

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989) ............................................................ 8, 24

*Univ. of Georgia Athletic Ass'n v. Laite*,
   756 F.2d 1535 (11th Cir. 1985) ......................................................... 11

*Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.*,
   50 F.3d 189 (3d Cir.1995) ................................................................. 16

*Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*,
   916 F.2d 76 (2d Cir. 1990) ................................................................ 21

**Statutes**

15 U.S.C. § 1127 ................................................................................. 5

Lanham Act ................................................................................ *passim*

**Other Authorities**

Christine Haight Farley & Lisa P. Ramsey, *Raising the Threshold for
Trademark Infringement to Protect Free Expression*, 72 Am. U. L.
Rev. 1225 (2023) ............................................................................. 23

Glynn S. Lunney Jr., *Trademark Monopolies*, 48 Emory L.J. 368
   (1999) ........................................................................................ 10

James Gibson, *Risk Aversion and Rights Accretion in Intellectual
Property Law*, 116 Yale L.J. 822 (2007) ............................................... 11

John A. Rothschild, *That Old College Try: Judge-Made Monopolies in the Market for Affinity Goods*, 13 Tex. A&M L. Rev. 343 (2025) .......... 17, 21

Laura A. Heymann, *The Public's Domain in Trademark Law: A First Amendment Theory of the Consumer*, 43 Ga. L. Rev. 651 (2009)...................... 10

Lisa P. Ramsey, *Trademarks and Free Speech: Conflicts and Resolutions* (2026). ........................................................................................ 7

Mark A. Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 Yale L.J. 1687 (1999) ........................................................ 14

Rebecca Tushnet, *Gone in Sixty Milliseconds: Trademark Law and Cognitive Science*, 86 Tex. L. Rev. 507 (2008) .................................................... 19

Rochelle Cooper Dreyfuss, *Expressive Genericity: Trademarks as Language in the Pepsi Generation*, 65 Notre Dame L. Rev. 397 (1990) ............................................................................................. 13, 24

S. Rep. No. 1333 (1946).............................................................................. 19

Stacey L. Dogan & Mark A. Lemley, *Grounding Trademark Law Through Trademark Use*, 92 Iowa L. Rev. 1669 (2007)........................................7

Stacey L. Dogan & Mark A. Lemley, *The Merchandising Right: Fragile Theory or Fait Accompli*, 54 Emory L.J. 461 (2005) .................. 6, 10, 21

William McGeveran & Mark P. McKenna, *Confusion Isn't Everything*, 89 Notre Dame L. Rev. 253 (2013).......................................7

## INTEREST OF AMICI CURIAE

Amici are 25 law professors who teach and write extensively about trademark law and other intellectual property law subjects.[1] Amici have no personal interest in this case. Amici's sole interest is in the orderly development of trademark law in a way that serves the public interest, including by taking account of legitimate trademark interests, free expression, and the need for informed and competitive markets.

A full list of amici can be found in the Appendix.[2]

## SUMMARY OF ARGUMENT

When the district court denied Vintage Brand's post-trial motion for judgment as a matter of law, it recognized that the case involved "numerous issues of first impression" and expressed skepticism that "trademark law was intended to be applied in circumstances such as these—involving universities that play little to no role in the sale of merchandise . . . ." *Pennsylvania State Univ. v. Vintage Brand, LLC*, No. 4:21-CV-01091, 2025 WL 3048996, at *14 (M.D. Pa. Oct. 31, 2025). That

---

[1] Neither the parties nor their counsel have authored this brief in whole or in part, and neither they nor any other person or entity other than amici curiae and their counsel contributed money that was intended to fund the preparation or submission of this brief. Pursuant to Fed. R. App. P. 29(a)(2), all parties have consented to the filing of this brief.

[2] Affiliation is provided for identification purposes only. All signatories are participating in their individual capacity, not on behalf of their institutions.

1

skepticism is well founded. Trademark law should not block the sale of merchandise featuring logos of universities or other cultural institutions in the same way it limits the use of source-identifying trademarks on goods.[3]

Trademarks are, as a matter of both law and policy, intended to function as source identifiers. When consumers see a source-identifying trademark, they know they are receiving goods made or endorsed by a particular producer. By protecting against confusing imitation of source-identifying marks, the law protects those consumer expectations about who makes or stands behind products. But when trademark law is applied to regulate non-source-identifying and expressive uses, it can harm rather than help consumers. These uses rarely cause confusion and prohibiting them results in higher prices and reduced consumer choice.

The Lanham Act does not grant trademark owners a complete monopoly over every use of their marks, and it does not function as a general right to control cultural expression, even if some consumer confusion may result. The district court, although

---

[3] Amici do not express a position on cases where the trademark owner is not a cultural institution like a sports team or university. When the trademark owner is a cultural institution, it is almost certainly the case that a significant number of consumers are using the trademark for expressive, non-source-identifying purposes. Accordingly, this Court can and should limit itself to the issue this case presents: whether consumers should have access to merchandise that allows them to express their support for a sports team or university, even if that merchandise is not authorized by the team or school.

2

"endeavor[ing] to accurately apply the law," lost sight of these foundational principles. *Id.* at *14.

When most consumers buy a t-shirt that features the Pittsburgh Pirates logo on the front, they are almost certainly not using the logo to find high-quality clothing. If they were concerned about that, they would look for a logo in a place where manufacturers typically put their trademarks, such as a hangtag or inside the neck of the garment. Instead, a consumer's goal in purchasing and wearing a t-shirt with the Pirates logo on the front is to send a message to the public. That message may be, "I support the same team as you," or it may be, "My dad grew up a Pirates fan," but it is nonetheless an expressive message of support of or affiliation with the team. Trademark law's traditional justifications do not apply in the same way to these expressive uses, and using the standard infringement analysis without accounting for that distinction will reach conclusions contrary to the purposes of the Lanham Act.

This Court's likelihood of confusion framework, as applied to institutional merchandising, systematically favors plaintiffs in ways that have nothing to do with source confusion. A merchandiser, like Vintage Brand, that wishes to sell expressive merchandise signaling support for a college team must, by necessity, use that college's mark—there is no adequate substitute. The usual framework—the similarity of the marks being used, the similarity of the parties' marketing and selling channels, the mark's strength, and the overlap in the parties' consumers—will

always favor the trademark owner, regardless of whether any consumer was actually confused about who made or stands behind the goods.

Instead, this Court should articulate for the lower courts in this circuit a more exacting, alternative approach that reflects and protects the expressive nature of uses of marks for institutional merchandising. One path is to draw on principles already embedded in trademark doctrines that tolerate some confusion in cases of expressive uses—nominative fair use and aesthetic functionality. These models suggest that courts should allow expressive uses of institutional marks when three requirements are satisfied: first, that use of the mark was necessary to enable consumers to convey a message about the university, team, or cultural institution; second, that the use was reasonable in scope; and third, that the defendant took no affirmative steps to mislead consumers about authorization or sponsorship. *Cf. Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211 (3d Cir. 2005). Such a framework productively cabins the inquiry to intentional deceptive efforts and protects uses that serve an expressive function about consumers' support or admiration for, or membership in, educational or cultural communities.

## ARGUMENT

When a person buys a sweatshirt with a college or university trademark on the front, that consumer is using the trademark primarily to serve an expressive function, enabling the wearer to say something to others about her relationship with the school.

Many such consumers are not using the college's trademark on the front of the garment as a shorthand to find sweatshirts of a certain quality. Consumers who wish to do that will use the tag inside the sweatshirt to determine whether it was manufactured by Hanes or Champion, and consumers who want authorized merchandise will look for a hangtag that conveys that information. This distinction is what requires a different approach to trademark infringement cases involving expressive uses, and the district court's failure to recognize this was in error.

## I.    Different Types of Trademark Use Require Distinct Analytical Frameworks Under the Lanham Act.

### A.    Trademark law targets confusion about the source of goods, but it also tolerates some confusion to protect expression and competition.

The Lanham Act defines trademarks as words, designs, or symbols used to distinguish goods "from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127.[4] Identification of a product's source or sponsorship is a central tenet of trademark law, and uses that are likely to confuse consumers about the source or sponsorship of goods are the primary target of the Lanham Act's prohibitions. *See, e.g., Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 147 (2023) ("Confusion as to source is the bête noire of trademark

---

[4] While the Lanham Act also applies to service marks used to identify and distinguish services, 15 U.S.C. § 1127, this brief refers primarily to "goods" and "trademarks" given the specific nature of the merchandise at issue in this case.

law—the thing that stands directly opposed to the law's twin goals of facilitating consumers' choice and protecting producers' good will.").

By enabling consumers to recognize who produces or stands behind a product, trademarks facilitate consumers' ability to select the goods they desire (or avoid the goods they disfavor) and give producers incentives to invest in consistent quality. *See Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 164 (1995) ("[Trademark law] quickly and easily assures a potential customer that *this* item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past."); Stacey L. Dogan & Mark A. Lemley, *The Merchandising Right: Fragile Theory or Fait Accompli,* 54 Emory L.J. 461, 467 (2005) [hereinafter Dogan & Lemley, *Merchandising*]. Likewise, by prohibiting uses that are likely to confuse consumers as to the source or sponsorship of a good, the Lanham Act protects consumers from the harm of purchasing goods based on the mistaken belief that the trademark owner produced or stands behind their quality, and it protects trademark owners from the risk of reputational harm when consumers attribute inferior products to them. *See Qualitex Co.*, 514 U.S. at 164 ("At the same time, the law helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product.").

6

But because the Lanham Act's ultimate purpose is to protect competition rather than suppress it, courts have long recognized that trademark rights are not absolute. On the contrary, even if some consumer confusion is likely to exist, the goal of eliminating that confusion must sometimes give way to important values such as competition, informational accuracy, and freedom of expression. William McGeveran & Mark P. McKenna, *Confusion Isn't Everything*, 89 Notre Dame L. Rev. 253, 290–92 (2013); *see generally* Lisa P. Ramsey*, Trademarks and Free Speech: Conflicts and Resolutions* 107–08 (2026).

Accordingly, trademark law features several defenses and exceptions that "reflect the view that sometimes we should tolerate some risk of confusion, either in the service of some other goal or because the potential harm from allowing a class of claims outweighs the harms from possible confusion." Stacey L. Dogan & Mark A. Lemley, *Grounding Trademark Law Through Trademark Use*, 92 Iowa L. Rev. 1669, 1698 (2007). In such cases, the trademark is functioning not as a source-identifier, but as a feature of the product, which implicates aesthetic functionality. *See generally* Ramsey, *supra*, at 184–236, 291–347.

For example, in weighing First Amendment concerns against trademark rights, many courts apply the Second Circuit's *Rogers* test, which shields the non-source-identifying use of a mark in an artistic work unless the plaintiff can demonstrate that the use has no artistic relevance to the underlying work or is

explicitly misleading as to the source or content of the work. *Rogers v. Grimaldi*, 875 F.2d 994, 1000 (2d Cir. 1989). Likewise, the functionality doctrine prevents the monopolization of useful product features by a trademark owner even if copying creates some confusion about source or sponsorship. *See PIM Brands Inc. v. Haribo of Am. Inc.*, 81 F.4th 317, 321 (3d Cir. 2023) (explaining that features are functional if exclusive rights would place competitors at a significant non-reputation-related disadvantage or limit their ability to compete effectively).

The descriptive fair use doctrine likewise contemplates that some confusion may occur when descriptive words that happen to be trademarks are used to describe another party's product; such descriptive uses are nonetheless allowed in order to promote competition. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 121–22 (2004) (holding that a defendant asserting fair use need not negate likelihood of confusion and that some consumer confusion is compatible with fair use). Finally, aesthetic functionality applies when an aesthetic product feature serves a "significant non-trademark function" such that granting trademark rights in the feature would confer a significant non-reputation-related advantage over competitors. *Qualitex Co.*, 514 U.S. at 170; *see also Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 986 F.3d 250, 257 (3d Cir. 2021), (noting that *Qualitex's* inquiry about whether "exclusive use of [the feature] would put competitors at a

significant non-reputation-related disadvantage" is "especially apt for proving aesthetic functionality," although not limited to that context).

**B.    Institutional merchandising cases abandon the Lanham Act's goals by treating mere association with a mark as confusion.**

The use of trademarks owned by cultural institutions, such as universities and sports teams, often involves important expressive interests like conveying support for or affiliation with that university or team. Consumers therefore seek out merchandise with the mark that will enable them to express themselves. They assess the trademark on the front of that merchandise not by whether it signifies the source of the product but whether it captures the message they wish to convey. Even if some consumers believe that the trademark holder authorized the manufacture of that merchandise, such authorization is not the motivating factor that leads most consumers to choose that apparel. Most consumers would not be induced to purchase a plain white sweatshirt simply because the college they attended authorized its manufacture, and most sports teams would not expect their fans to buy an authorized t-shirt that used the team's logo to poke fun at the team.

Rather, many consumers use the cultural institution's mark on the front of the apparel to signal their personal relationship with and support for the institution and uses the mark on the hangtag or label to determine who manufactured or authorized the product, to the extent that matters to them. In other words, "the

mark in these cases is rarely serving the traditional function of a trademark"; instead, "the mark *is* the product." Dogan & Lemley, *Merchandising*, *supra*, at 471–72; *see also* Laura A. Heymann, *The Public's Domain in Trademark Law: A First Amendment Theory of the Consumer*, 43 Ga. L. Rev. 651, 708–09 (2009).

An influential prior case addressing such uses, however, failed to recognize the important expressive interests at issue and instead found infringement based on attenuated or inapt forms of confusion. In *Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Manufacturing*, the court found that the defendant's sale of patches featuring the plaintiff's sports team logos constituted infringement even in the absence of confusion about the source of the goods, because consumers might believe that the plaintiffs were "the source and origin of *the trademark symbols*." 510 F.2d 1004, 1012 (5th Cir. 1975) (emphasis added). That is, the court erroneously asked whether consumers recognized the logos as the plaintiff's *trademarks*, not whether consumers would be confused about the source of the defendant's *goods*. *See* Glynn S. Lunney Jr., *Trademark Monopolies*, 48 Emory L.J. 368, 395–99 (1999) (discussing *Boston Hockey* and related "ornamental use cases").

This was an error, as the Supreme Court subsequently explained in *Dastar Corp. v. Twentieth Century Fox Film Corp.,* when it noted that the Lanham Act's focus on confusion about the "origin of goods" "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or

communication embodied in those goods." 539 U.S. 23, 37 (2003); *see also Int'l Ord. of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 919 (9th Cir. 1980) (noting that courts in institutional merchandise cases "must closely examine the articles themselves, the defendant's merchandising practices, and any evidence that consumers have actually inferred a connection between the defendant's product and the trademark owner") (concluding that third-party merchandiser was not using plaintiff's name and emblem as trademarks).

Despite its serious errors, *Boston Hockey* has led other courts to embrace an overbroad merchandising right untethered from the Lanham Act's source-identification function. *See, e.g., Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 485 (5th Cir. 2008); *Univ. of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1546–47 (11th Cir. 1985). This unwarranted extension has perpetuated misunderstandings of trademark law throughout the country and has likely led to licensing by risk-averse manufacturers that was not required by trademark law. James Gibson, *Risk Aversion and Rights Accretion in Intellectual Property Law*, 116 Yale L.J. 822, 920–23 (2007).

When merchandise producers avoid using trademarks in expressive ways out of fear of litigation, consumers may internalize the incorrect conclusion that trademark owners get to control all uses of their marks. This, in turn, may lead consumers to assume that the trademark of a cultural institution on merchandise has

been or should be licensed by the trademark owner, which then feeds into the confusion analysis itself. Consumer confusion about what the law requires should not justify a finding of infringement. *See, e.g., Jack Daniel's Props.,* 599 U.S. at 165 (Sotomayor, J., concurring) (warning against reliance on surveys that "may reflect a mistaken belief . . . that all parodies require permission from the owner of the parodied mark"). The law, moreover, should not perpetuate a mistake—and reinforce a cycle of confusion—merely because the public has been conditioned to accept that mistake as the law.

This case offers an opportunity to restore the proper boundary between trademark law's core function of source identification and permissible expressive uses of marks that lie outside the Lanham Act's prohibitions. The Lanham Act targets uses of a mark that cause consumer confusion about who made or authorized the goods in question—not uses that simply reference the mark owner or cause confusion over whether that reference was authorized. Extending liability to that type of confusion transforms trademark law from a source-identification regime into a sweeping right to control markets and speech.

## II.    An Overbroad Institutional Merchandising Right Undermines Trademark Law's Interest in Promoting Competition for the Benefit of Consumers.

If universities or sports teams are allowed to control all uses of their trademarks, even expressive, non-source-identifying ones, there will be less

competition among sellers of apparel or other goods that consumers can purchase to show their support for the institution. Without that competition, consumers will pay higher prices and have fewer options from which to choose.

Indeed, this case illustrates the reduction in product options that can result from universities' attempts to limit the sale of third-party products that feature their marks for expressive purposes. Appellant Vintage Brand was selling a unique style of product—"vintage"-style t-shirts and related items—that may not otherwise have been available for purchase. By cutting off consumers' access to these products, the decision below effectively limited both consumers' expressive choices and competition in the expressive, low-cost, university-related apparel market.

Interpreting trademark law to ignore consumers' expressive interests—which are always present in these cases *even if* there may be some confusion over sponsorship or affiliation—mistakes trademark law's purpose, which is to protect the accuracy of information about who makes or stands behind the quality of a given product. When cultural institutions like Penn State enforce their trademarks against uses like those Vintage Brand made in this case, they are, in effect, causing their supporters to pay more to show their affiliation with the institution than they would pay in a competitive market. *See* Rochelle Cooper Dreyfuss, *Expressive Genericity: Trademarks as Language in the Pepsi Generation*, 65 Notre Dame L. Rev. 397, 405 (1990) ("If investment is dispositive of the trademark owner's right to control, then

the public's ability to evoke the expressive dimension of marks is in danger of significant restriction."); Mark A. Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 Yale L.J. 1687, 1696 (1999) ("When we protect the design of products as trademarks, we prevent competition in the sale of those products, and the price goes up accordingly.").

This does not mean, of course, that sellers can falsely assert that their goods are "official" or "officially licensed" by the school; such a statement would be literally false. But it does mean that such officially licensed merchandise should compete in the market with merchandise that uses the mark as a product feature rather than a signal of source or approval.

### A. This Court's traditional source confusion test is inapt in cases involving expressive uses of cultural institutions' marks.

Claims regarding expressive uses of cultural institution marks are not about confusion over the source of the good. Instead, they are effectively about whether consumers will (falsely) think that a university or sports team *authorized the use* of the mark by the defendant. Applying the traditional likelihood of confusion test to these types of expressive uses creates problems of both practicality and policy.

To assess any type of confusion claim under the Lanham Act, this Court looks to *Interpace Corporation v. Lapp Inc.*, 721 F.2d 460 (3d Cir. 1983), and applies a ten-part analysis for determining whether a likelihood of confusion exists (the "*Lapp*

factors."). But the very nature of a sponsorship or affiliation claim arising from institutional merchandising imposes a practical problem: it renders much of the *Lapp* factors inapt.

Take, for instance, the first factor, similarity of the marks, which this Court has deemed the "single most important factor in determining likelihood of confusion." *See McNeil Nutritionals LLC v. Heartland Sweeteners LLC*, 511 F.3d 350, 367 (3d Cir. 2007) (internal quotations and parentheticals omitted). It is axiomatic that a merchandiser that is seeking to provide consumers with products that allow those consumers to show support for a cultural institution must use some version of the institution's trademark. A sports fan in search of a Yankees hat will not choose one that lacks the interlocking "NY," because that symbol is the principal way of visually signaling support for the team. As a result, the first *Lapp* factor will always favor the plaintiff.

The other *Lapp* factors fare no better. Consider the seventh and eighth factors: "whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media" and "the extent to which the targets of the parties' sales efforts are the same." *Lapp*, 721 F.2d at 463. Sellers of university-related merchandise will often market to the same audiences as the university itself: students, alums, and fans of the school. The overlap between these markets, however, says nothing about whether those consumers experience

15

confusion about who makes or stands behind the products featuring the university marks. Nonetheless, these factors will also automatically favor the plaintiff in merchandise cases.

The second factor, regarding the strength of the owner's mark, is similarly inapt here. Traditionally, a mark that is considered strong has a high level of conceptual strength, widespread commercial recognition, or both—and is presumed to receive greater protection. *See, e.g., Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 203 (3d Cir.1995) (observing that stronger marks carry greater recognition, and that therefore a similar mark is more likely to cause confusion). In the traditional source confusion context, this makes sense: the stronger the mark, the more likely consumers have been conditioned to recognize the mark as a reliable indicator of the origin of the goods with which it is associated. The appearance of a similar mark on a competing product would therefore increase the probability of source confusion. In other words, courts have treated "strength of the mark" as a measure of a mark's capacity to source-signal.

In an institutional merchandising case, however, this internal reasoning collapses: the stronger the mark as a cultural signal, the more likely that consumers will be seeking it for that meaning and not because they believe the trademark holder manufactured or stands behind the physical product being sold. Because a court is assessing only whether a consumer wrongly believes that the plaintiff authorized the

16

use of a mark for expressive purposes (and not confusion over who manufactured the good), a jury considering the "strength of the mark" is assessing not the mark's source-identifying capacity but instead the cultural weight that the mark carries and conveys.

To serve its expressive purpose, in other words, the mark being used must be widely recognizable. *Cf. Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 262 (4th Cir. 2007) (noting that the strength of a mark does not support a likelihood of confusion in parody cases) ("In this case, precisely because LOUIS VUITTON is so strong a mark and so well recognized as a luxury handbag brand from LVM, consumers readily recognize that when they see a 'Chewy Vuiton' pet toy, they see a parody."). Allowing the strength of the mark to weigh in favor of confusion would make the second *Lapp* factor fatal against any merchandiser, regardless of whether the consumer seeks the mark for an expressive purpose unrelated to source identification.

This effectively converts trademark ownership into something closer to full propertization in cultural expression itself, which swallows First Amendment principles and which the Lanham Act was not intended to allow. *See* John A. Rothschild, *That Old College Try: Judge-Made Monopolies in the Market for Affinity Goods*, 13 Tex. A&M L. Rev. 343, 349 (2025). This same concern arises in the context of artistic and literary works and nominative uses of trademarks, which

17

is why courts have departed from the standard likelihood of confusion analysis in disputes involving non-source-identifying expressive or informational uses of another's mark. *See, e.g., Century 21*, 425 F.3d at 220 (noting that "a distinct analysis is needed for nominative fair use cases[.]").

Ultimately, a traditional application of the *Lapp* factors in institutional merchandising cases boils down to one question: whether the defendant merchandiser is using the plaintiff's trademark. With the question so defined, it is difficult to see how such a defendant could ever avoid a finding of infringement, even if the defendant were creating shirts with an explicitly and exclusively expressive message like, "Go Yale. Beat Harvard."

### B.    In cases involving expressive uses of cultural institutions' marks, an application of the *Lapp* factors leads to higher consumer costs and reduced consumer choice.

Giving universities and other cultural institutions absolute control over merchandise bearing their marks undermines trademark law's interest in protecting consumers' access to affordable goods and preserving marketplace competition.

One of trademark law's principal economic justifications is that trademark protection promotes competition by reducing consumer search costs. By "preventing others from copying a source-identifying mark," trademark law "reduces the customer's costs of shopping and making purchasing decisions." *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 163 (internal quotations and citation omitted);

*see also* Rebecca Tushnet, *Gone in Sixty Milliseconds: Trademark Law and Cognitive Science*, 86 Tex. L. Rev. 507, 517 (2008) ("[A] successful trademark regime decreases consumer search costs because the trademark serves as shorthand for the qualities the consumer seeks and thus increases efficiency."). Under this rationale, trademarks reduce search costs but impose little competitive harm in markets, because competitors can simply use their own source identifier in selling competing products. Indeed, in passing the Lanham Act, Congress emphasized that trademarks *promote* competition by ensuring the accuracy of information about who makes and sells products. *See* S. Rep. No. 1333, 79th Cong., 2d Sess., at 3 (1946) ("Trademarks defeat monopoly by stimulating competition.").

But when an expressive mark essentially *is* the product rather than a source identifier (like a plain blue t-shirt affixed with the Penn State mascot), the law's affordance of exclusive rights thwarts competition rather than promoting it. The rights holder, without any fear of market effect, can demand a premium for the sale of every product on which its mark appears. Licensed vendors can charge astronomical prices without fear of lower-priced competitors. And with no legal alternatives, consumers may struggle to find any low-cost cultural merchandise or team-affiliative gear, forcing many to forgo purchase of the expressive product. Third-party merchandise sellers give consumers a choice of a different or lower-cost expressive product that they would not otherwise have had, including products that

criticize the trademark holder. *Cf. Jack Daniel's Props.,* 599 U.S. at 165 (Sotomayor, J., concurring) (warning against over-reliance on surveys in cases involving expressive uses of marks). Trademark law should—and is designed to—incentivize this kind of competition, not inhibit it.

### C.  In assessing institutional merchandising cases, courts should look beyond the *Lapp* factors and draw from alternative frameworks that better protect expressive interests.

The expressive interests inherent in institutional merchandise counsel in favor of an alternative approach to assessing infringement claims in this context. Though not dispositive, two existing trademark doctrines provide helpful models.

First, in the context of nominative fair use, this Court has recognized that "a distinct analysis is needed" because application of the traditional likelihood of confusion test "would disadvantage the defendant by making confusion an all but foregone conclusion" despite the significant expressive interests of the defendant. *Century 21*, 425 F.3d at 220. This Court therefore adopted a two-step approach for nominative fair use cases that first requires the plaintiff to prove "that confusion is likely due to the defendant's use of [the] plaintiff's mark" but "eliminating those factors" that "do not 'fit' in the nominative use context." *Id*. at 222. If the plaintiff meets its burden, "the burden then shifts to [the] defendant to show that its nominative use of [the] plaintiff's mark is nonetheless fair," *id.*, based on a three-prong test similar to that deployed by the Ninth Circuit in *New Kids on the Block v.*

*News America Publishing, Inc.*, 971 F.2d 302 (9th Cir. 1992). Under the *Century 21* test, the defendant must show (1) that the use of the plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service, (2) that the defendant uses only so much of the plaintiff's mark as is necessary to describe plaintiff's product, and (3) that the defendant's conduct or language reflect the true and accurate relationship between the plaintiff's and the defendant's products or services. *See Century 21*, 425 F.3d at 228.

A second model comes from the aesthetic functionality doctrine, where trademark protection is denied "where an ornamental feature is claimed as a trademark and trademark protection would significantly hinder competition by limiting the range of adequate alternative designs." *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76, 81 (2d Cir. 1990). An expressive, institutional mark affixed to a good (like the interlocking Yankees logo affixed to a navy hat) is almost always aesthetically functional because, in that context, it is a necessary feature of the good and not a source identifier. If, for example, "a competitor wants to offer a t-shirt or other item aimed at fans of the Chicago Bulls, there is no alternative but to use a trademark of the team. A t-shirt emblazoned with 'the professional basketball team from Chicago' will not be competitive." Rothschild, *supra,* at 381; *see also* Dogan & Lemley, *Merchandising, supra,* at 502 ("Because the trademark effectively is the product, consumers will settle for nothing less than

21

it. Therefore, the trademark undeniably 'affects the cost or quality of the article.'" (footnotes omitted)).

Whether or not nominative fair use or aesthetic functionality maps perfectly onto the use of institutional trademarks on expressive merchandise, the underlying goals of both doctrines make them useful models for assessing such uses. A three-part inquiry similar to the nominative fair use test, for example, would effectively balance the interests of consumers, institutional trademark holders, and merchandise sellers in these cases.

Under such an inquiry, courts should first ask whether the cultural institution is readily identifiable without use of the trademark, given the expressive purpose. A merchandiser should not be required to put "the Ivy League school located in Cambridge, Massachusetts" on a ballcap when "Harvard" is the most efficient way for consumers to identify the school about which they are expressing a message.

Second, courts should ask whether the defendant has engaged in a reasonable use of the institutional trademark given the expressive purpose of that use. For example, an unauthorized merchandiser who sells business cards emblazoned with a university's logo to members of the public is likely engaging in use that goes beyond an expressive purpose, as is a t-shirt manufacturer who puts a sports team's logo on a hangtag or label as opposed to on the front of the shirt.

And third, courts should ask whether the defendant has expressly misled consumers into believing that the mark owner sponsored or authorized the goods featuring the trademark. A merchandiser who falsely conveys to consumers that its goods are "official" or "authorized" would be expressly misleading consumers; by contrast, a merchandiser who provides a disclaimer of affiliation with the institution would not be engaging in misleading activity, expressive or otherwise.[5] Indeed, the use of clear labeling and disclaimers helps to educate consumers who seek out authorized expressive merchandise for whatever reason. *See* Christine Haight Farley & Lisa P. Ramsey, *Raising the Threshold for Trademark Infringement to Protect Free Expression*, 72 Am. U. L. Rev. 1225, 1226 (2023) (proposing a legal standard that would allow informational or expressive uses of marks unless they contain explicitly false statements or are likely to confuse as to source).

---

[5] Courts have successfully used clear labeling in the genericide context to transition consumer expectations for a portion of consumers who still use a mark as a source identifier while protecting the speech of those that use the mark generically. *See King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d 577, 579–81 (2d Cir. 1963) (holding that "thermos" had become generic when only 12 percent of consumers used the term as a source identifier but requiring defendants to use clear labeling to protect against confusion among the minority of consumers). Likewise, courts have sometimes required clear labeling to dispel any risk of confusion even when the defendant is using functional features unprotected by trademark law. *See Am. Greetings Corp. v. Dan-Dee Imps., Inc.,* 807 F.2d 1136, 1141 (3d Cir. 1986) ("[I]f the functional feature or combination is also found to have acquired secondary meaning, the imitator may be required to take reasonable steps to minimize the risk of source confusion.").

Applying the traditional likelihood-of-confusion standard to institutional merchandise claims fails to accommodate consumers' interests in product competition and speech about their schools, teams, and communities. The benefit of an alternative framework—whether aesthetic functionality, nominative fair use, or an alternative model—is that it allows for consideration of these vital consumer interests. Such a framework would be more attuned to the intersection of trademark law and First Amendment values, a critical interest that courts have consistently emphasized. *See, e.g., Rogers,* 875 F.2d at 998 ("Because overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values, we must construe the Act narrowly to avoid such a conflict."); *see also Jack Daniel's Props.,* 599 U.S. at 163 (Sotomayor, J., concurring) (cautioning courts to "treat the results of surveys with particular caution" when "parodies and potentially other uses implicate First Amendment concerns.").

If a price-conscious consumer and the seller they wish to buy from are prohibited from using culturally embedded symbols in expressive ways, such consumers may effectively be barred from conveying their athletic allegiances or using a shared cultural vocabulary. *See* Dreyfuss, *supra*, at 412 ("[T]he essence of the first amendment claim [by those who wish to use trademarks for expressive purposes] is that there are instances in which the loss of vocabulary is, effectively, the loss of the ability to communicate."). Granting a trademark owner exclusive

24

control over these expressive, ornamental uses does not merely lessen legitimate competition—it eliminates it. This is exactly the type of expressive monopoly that trademark law aims to prevent and that this Court should be wary of enabling.

## CONCLUSION

For the foregoing reasons, amici urge the Court to reverse the district court's denial of Vintage Brand's post-trial motion for judgment as a matter of law and remand the case for consideration under an alternative framework for assessing possible confusion. Whether that framework is the one amici propose above, or an alternative framework, the assessment must adequately consider and accommodate the unique expressive and First Amendment interests, and the different likelihood of confusion considerations, raised by institutional merchandising cases. In other words, as this Court has previously counseled, the approach to such cases should "keep trademark law in its lane." *Ezaki*, 986 F.3d at 256.

March 19, 2026

Respectfully submitted,

/s/ Phillip R. Malone

Phillip R. Malone
JUELSGAARD INTELLECTUAL
  PROPERTY AND
  INNOVATION CLINIC
MILLS LEGAL CLINIC AT
  STANFORD LAW SCHOOL
559 Nathan Abbott Way
Stanford, CA 94305
(650) 725-6369
pmalone@stanford.edu

## APPENDIX—LIST OF *AMICI*

*Amici curiae* are the 25 Trademark Law professors listed below. Affiliation is provided for identification purposes only; all signatories are participating in their individual capacity and not on behalf of their institutions.

**Professor Mark Bartholomew**
University of Buffalo School of Law

**Professor Michael Carroll**
American University Washington College of Law

**Professor Zachary L. Catanzaro**
Widener University Delaware Law School

**Professor Andrew Chin**
University of North Carolina School of Law

**Professor Stacey Dogan**
Boston University School of Law

**Professor Dave Fagundes**
Emory University School of Law

**Emeritus Professor William T. Gallagher**
Golden Gate University School of Law

**Professor Jim Gibson**
University of Richmond School of Law

**Professor Laura A. Heymann**
William & Mary Law School

**Professor Timothy T. Hsieh**
Oklahoma City University School of Law

**Professor Stacey M. Lantagne**
Suffolk University Law School

**Professor Yvette Joy Liebesman**
Saint Louis University School of Law

**Professor Jessica Litman**
University of Michigan Law School

**Professor Glynn S. Lunney, Jr.**
Texas A&M University School of Law

**Professor Sari Mazzurco**
SMU Dedman School of Law

**Professor Joseph Scott Miller**
University of Georgia School of Law

**Professor Viva R. Moffat**
University of Denver College of Law

**Professor Jef Pearlman**
Boston University School of Law

**Professor Aaron Perzanowski**
University of Michigan Law School

**Professor Betsy Rosenblatt**
Case Western Reserve University Law School

**Professor Guy Rub**
Temple University Beasley School of Law

**Professor Pamela Samuelson**
University of California Berkeley School of Law

**Professor Jason Schultz**
NYU School of Law

**Professor Jessica Silbey**
Boston University School of Law

**Professor Matthew Sipe**
University of Baltimore School of Law

## CERTIFICATE OF COMPLIANCE

Pursuant to Third Circuit Rule 46.1(e), lead counsel Phillip R. Malone certifies that he is a member of the bar of this court.

This brief complies with the type-volume limitation of Rule 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 5,959 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in 14-point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because (1) the text of this electronic brief is identical to the text of the paper copies and (2) the virus detection program CrowdStrike Falcon Sensor version

7.27.19907.0 was run on the file containing the electronic version of this brief and no viruses were detected.

Dated: March 19, 2026                         /s/ Phillip R. Malone

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing BRIEF OF AMICI CURIAE 25 TRADEMARK LAW PROFESSORS with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on March 19, 2026. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

Dated: March 19, 2026                              /s/ Phillip R. Malone